# Exhibit 1



Site: GE- 0000
Break: 10.8
Other: 9420

WESTON Ref. No.

## 00-0388

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS
WESTERN DIVISION

UNITED STATES OF AMERICA,
STATE OF CONNECTICUT,
COMMONWEALTH OF
MASSACHUSETTS,

       Plaintiffs,

    v.

GENERAL ELECTRIC
COMPANY,

       Defendant.

CIVIL ACTION NO'S. ____
99-30225, 99-30226,
99-30227-MAP
(consolidated cases)

## CONSENT DECREE

9420

SEMS Doc ID 9420

## TABLE OF CONTENTS

I. BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
II. JURISDICTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
III. PARTIES BOUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
IV. DEFINITIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
V. GENERAL PROVISIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43
VI. PERFORMANCE OF RESPONSE ACTIONS BY SETTLING DEFENDANT . . . . . . . . . . . . . . . 57
VII. REMOVAL ACTIONS OUTSIDE THE RIVER . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 81
VIII. RIVER RESPONSE ACTIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 85
IX. PERFORMANCE STANDARDS AND RELATED REQUIREMENTS . . . . . . . . . . . . . . . . . . . . 114
X. REVIEW OF RESPONSE ACTIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 144
XI. SAMPLING PROTOCOLS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 146
XII. QUALITY ASSURANCE, SAMPLING, and DATA ANALYSIS . . . . . . . . . . . . . . . . . . . . . . . 149
XIII. ACCESS AND LAND/WATER USE RESTRICTIONS . . . . . . . . . . . . . . . . . . . . . . . . . . 151
XIV. REPORTING REQUIREMENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 203
XV. EPA APPROVAL OF PLANS AND OTHER SUBMISSIONS . . . . . . . . . . . . . . . . . . . . . . . 207
XVI. PROJECT COORDINATORS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 210
XVII. ASSURANCE OF ABILITY TO COMPLETE WORK . . . . . . . . . . . . . . . . . . . . . . . . . . 211
XVIII. CERTIFICATION OF COMPLETION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 214
XIX. EMERGENCY RESPONSE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 222
XX. REIMBURSEMENT OF COSTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 226
XXI. NATURAL RESOURCE DAMAGES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 257
XXII. INDEMNIFICATION AND INSURANCE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 279
XXIII. FORCE MAJEURE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 283
XXIV. DISPUTE RESOLUTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 286
XXV. STIPULATED PENALTIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 302
XXVI. COVENANTS NOT TO SUE BY PLAINTIFFS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 315
XXVII. COVENANTS BY SETTLING DEFENDANT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 366
XXVIII. COVENANTS BY THE CITY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 374
XXIX. EFFECT OF SETTLEMENT; CONTRIBUTION PROTECTION . . . . . . . . . . . . . . . . . . . . 376
XXX. ACCESS TO INFORMATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 383
XXXI. RETENTION OF RECORDS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 385
XXXII. NOTICES AND SUBMISSIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 388
XXXIII. EFFECTIVE DATE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 391
XXXIV. RETENTION OF JURISDICTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 391
XXXV. APPENDICES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 392
XXXVI. COMMUNITY RELATIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 394
XXXVII. MODIFICATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 395
XXXVIII. LODGING AND OPPORTUNITY FOR PUBLIC COMMENT . . . . . . . . . . . . . . . . . . . . 396
XXXIX. SIGNATORIES/SERVICE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 398
XL. FINAL JUDGMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 399

## I. BACKGROUND

A.      The United States of America ("United States"), on behalf of the

Administrator of the United States Environmental Protection Agency ("EPA"), the United

States Department of Interior ("DOI"), and the National Oceanic and Atmospheric

Administration ("NOAA"), filed a complaint in this matter pursuant to Sections 106 and

107 of the Comprehensive Environmental Response, Compensation, and Liability Act

("CERCLA"), 42 U.S.C. §§ 9606 and 9607, Sections 3008 and 7003 of the Resource

Conservation and Recovery Act ("RCRA"), 42 U.S.C. §§ 6928 and 6973, and other

federal statutes.

B.      The United States in its complaint seeks, inter alia: (1) reimbursement of

costs incurred and to be incurred by EPA and the Department of Justice for response

actions with regard to the GE-Pittsfield/Housatonic River Site ("Site"), together with

accrued interest; (2) performance of studies and response work by the defendant at the

Site; and (3) damages for injury to, destruction of, or loss of natural resources, and for

costs of assessing natural resource damages together with accrued interest.

C.      In accordance with the National Contingency Plan ("NCP"), 40 C.F.R. Part

300 and Section 121(f)(1)(F) of CERCLA, 42 U.S.C. § 9621(f)(1)(F), EPA notified the

Commonwealth of Massachusetts (the "State," the "Commonwealth" or

"Massachusetts") of negotiations with the General Electric Company ("Settling

Defendant"), regarding the implementation of the response actions for the Site, and

3

EPA has provided the State with an opportunity to participate in such negotiations and be a party to this Consent Decree.

      D.      The State has filed a complaint against the defendant in this Court alleging that the defendant is liable to the State under Section 107 of CERCLA, 42 U.S.C. § 9607 and M.G.L. c. 21E for, inter alia: (1) reimbursement of costs incurred and to be incurred by the State for response actions with regard to the Site, together with accrued interest; (2) performance of studies and response work by the defendant at the Site; and (3) damages for injury to, destruction of, or loss of natural resources, and for costs of assessing natural resource damages, together with accrued interest. The State's action has been consolidated with the action of the United States.

      E.      The State of Connecticut ("Connecticut") has filed a complaint against the defendant in this Court alleging that the defendant is liable to Connecticut under Section 107 of CERCLA, 42 U.S.C. § 9607, and Conn. Gen. Stat. §§ 22a-6(a)(3), 22a-6a, 22a-16, 22a-427, 22a-432 and 22a-451, seeking, inter alia: (1) reimbursement of costs incurred and to be incurred by Connecticut for response actions with regard to the Site, together with accrued interest; (2) performance of studies and response work by the defendant at the Site; and (3) damages for injury to, destruction of, or loss of natural resources, and for costs of assessing natural resource damages, together with accrued interest. Connecticut's action has been consolidated with the action of the United States.

      F.      In accordance with Section 122(j)(1) of CERCLA, 42 U.S.C. § 9622(j)(1), EPA notified the DOI and NOAA of negotiations with General Electric regarding the

4

release of hazardous substances that may have resulted in injury to natural resources under Federal trusteeship and encouraged the trustee(s) to participate in the negotiation of this Consent Decree.

G.    The City of Pittsfield, Massachusetts ("City") and the Pittsfield Economic Development Authority ("PEDA") are joined in this proceeding pursuant to Fed. R. Civ. P. 19.

H.    Settling Defendant does not admit any liability to the Plaintiffs arising out of the transactions or occurrences alleged in the complaints, nor does it acknowledge that the release or threatened release of hazardous substance(s) at or from the Site constitutes or may present an imminent or substantial endangerment to the public health or welfare or the environment.

I.    On February 11, 1991, EPA issued to Settling Defendant a permit in compliance with RCRA, to require corrective action activities related to Settling Defendant's Pittsfield, Massachusetts facility pursuant to Sections 3004(u), 3004(v), 3005(c) and 3005(h) of RCRA, 42 U.S.C. §§ 6924(u), 6924(v), 6925(c) and 6925(h). Settling Defendant as well as Massachusetts, Connecticut and another private party appealed the terms of that Permit, and, on December 21, 1993, EPA issued a modified Permit for the facility.  The modified Permit became effective on January 3, 1994.

J.    On May 22, 1990 and July 2, 1990, the Massachusetts Department of Environmental Protection ("MADEP") issued to Settling Defendant, and Settling Defendant consented to, two Administrative Consent Orders (the "ACOs").  The ACOs require Settling Defendant to perform response actions pursuant to M.G.L. c.21E at its

5

industrial facility in Pittsfield and related areas including, but not limited to, the Housatonic River and Silver Lake and their floodplains, Allendale School, filled former oxbows along the Housatonic River, and Unkamet Brook and its floodplain.

K.      Settling Defendant has been performing investigations and response activities pursuant to the Permit and the ACOs.

L.      Pursuant to Section 105 of CERCLA, 42 U.S.C. § 9605, EPA proposed the Site for placement on the National Priorities List, set forth at 40 C.F.R. Part 300, Appendix B, by publication in the Federal Register on September 25, 1997. Settling Defendant submitted comments to EPA in opposition to that proposal.

M.      On May 26, 1998, EPA issued a combined Action and Engineering Evaluation/Cost Analysis Approval Memorandum regarding the Upper 2 - Mile Reach of the Housatonic River ("Upper Reach Action Memorandum"). The Upper Reach Action Memorandum authorizes a removal action for the Upper ½ Mile Reach and further investigation and evaluation of removal action alternatives for the 1 ½ Mile Reach. Settling Defendant submitted comments to EPA in opposition to the Upper Reach Action Memorandum. EPA issued written responses to the comments on the Upper Reach Action Memorandum.

N.      In the Fall of 1997, the Parties re-instituted settlement negotiations to resolve the United States', Massachusetts', and Connecticut's claims for response actions, response costs and natural resource damages in connection with the GE-Pittsfield/Housatonic River Site. As a result of those negotiations, the Parties have reached the settlement embodied in this Consent Decree.

6

O.     In addition to this Consent Decree, Settling Defendant, the City and PEDA
have entered into a Definitive Economic Development Agreement providing, inter alia,
for redevelopment of a portion of the GE Plant Area, in part through the transfer of
portions of the GE Plant Area to PEDA, and economic aid to the City.  Pursuant to this
Consent Decree, PEDA is participating in the compensation to the Trustees for Natural
Resource Damages.

P.     On July 12, 1999, EPA issued an Action Memorandum for the Allendale
School Removal Action.  In that Action Memorandum, EPA selected a removal action
for the Allendale School.  In addition, on August 5, 1999, EPA issued an Action
Memorandum for Removal Actions Outside the River.   In that Action Memorandum,
EPA selected removal actions for the Removal Actions Outside the River.

Q.     Based on the information presently available to EPA and the State, EPA
and the State believe that the Work will be properly and promptly conducted by Settling
Defendant if conducted in accordance with the requirements of this Consent Decree
and its appendices.

R.     Solely for the purposes of Section 113(j) of CERCLA, the response
actions selected and the Work to be performed by Settling Defendant shall constitute
response actions taken or ordered by the President.

S.     The Parties recognize, and the Court by entering this Consent Decree
finds, that this Consent Decree has been negotiated by the Parties in good faith and
implementation of this Consent Decree will expedite the cleanup of the Site, restore
part of the Site to productive economic use, expedite restoration of natural resources,

7

and avoid prolonged and complicated litigation between the Parties, and that this Consent Decree is fair, reasonable, and in the public interest.

NOW, THEREFORE, it is hereby Ordered, Adjudged, and Decreed:

## II. JURISDICTION

1.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1345, 42 U.S.C. §§ 9606, 9607, and 9613(b), 42 U.S.C. §§ 6928 and 6973, 33 U.S.C. § 1319, and 15 U.S.C. § 2606. This Court has pendent jurisdiction over the state law claims. This Court also has personal jurisdiction over Settling Defendant. Solely for the purposes of this Consent Decree and the underlying complaints, Settling Defendant, the City, and PEDA waive all objections and defenses that they may have to jurisdiction of the Court or to venue in this District. Settling Defendant, the City and PEDA shall not challenge the terms of this Consent Decree or this Court's jurisdiction to enter and enforce this Consent Decree.

## III. PARTIES BOUND

2.      This Consent Decree applies to and is binding upon the United States, on behalf of EPA, DOI, NOAA, the Army Corps of Engineers ("ACOE"), the Department of Defense ("DOD"), the Agency for Toxic Substances Disease Registry ("ATSDR"), and any other agency which may have authority to administer the statutes cited in Paragraph 161 (United States' Covenant), upon Massachusetts, upon Connecticut and upon the City, PEDA, Settling Defendant and their successors and assigns. Except as provided in Paragraph 12, any change in ownership or corporate status of Settling Defendant, the City or PEDA, including, but not limited to, any transfer of assets or real

8

or personal property, shall in no way alter Settling Defendant's, the City's or PEDA's responsibilities under this Consent Decree.

3.     Settling Defendant shall provide a copy of this Consent Decree to each contractor hired to perform the Work (as defined below) required by this Consent Decree and to each entity representing Settling Defendant with respect to the Site or the Work and shall condition all contracts entered into hereunder upon performance of the Work in conformity with the terms of this Consent Decree.  Settling Defendant or its contractors shall provide written notice of the Consent Decree to all subcontractors hired to perform any portion of the Work required by this Consent Decree.  Settling Defendant shall nonetheless be responsible for ensuring that its contractors and subcontractors perform the Work contemplated herein in accordance with this Consent Decree.  With regard to the activities undertaken pursuant to this Consent Decree, each contractor and subcontractor shall be deemed to be in a contractual relationship with the Settling Defendant within the meaning of Section 107(b)(3) of CERCLA, 42 U.S.C. § 9607(b)(3).  To the extent that PEDA has assumed obligations under this Consent Decree, it shall comply with the provisions of this Paragraph.

## IV.  DEFINITIONS

4.     Unless otherwise expressly provided herein, terms used in this Consent Decree which are defined in CERCLA, RCRA or in regulations promulgated under CERCLA or RCRA shall have the meaning assigned to them in CERCLA, RCRA or in such regulations.  Whenever terms listed below are used in this Consent Decree or in

the appendices attached hereto and incorporated hereunder, the following definitions shall apply:

"1 ½ Mile Reach" or "Housatonic River - Next 1 ½ Mile Reach" shall mean the section of the East Branch of the Housatonic River and its riverbanks, from Lyman Street to the confluence with the West Branch of the Housatonic River.   This term does not include the Actual/Potential Lawns and other non-riverbank portions of the floodplain properties adjacent to this Reach.

"1 ½ Mile Reach Removal Action" shall mean the Removal Action for the 1 ½ Mile Reach to be selected by EPA pursuant to Paragraph 21 of this Consent Decree.

"1 ½ Mile Reach Removal Action Costs" shall mean U.S. 1 ½ Mile Reach Removal Action Costs, and the following costs incurred by Settling Defendant: (1) costs of obtaining EREs for the 1 ½ Mile Reach Removal Action; (2) costs to conduct Post-Removal Site Control activities related to the 1 ½ Mile Reach Removal Action; (3) reimbursement of any costs Incurred by the State to obtain EREs for the 1 ½ Mile Reach Removal Action; and (4) any other costs incurred by Settling Defendant pursuant to any requirement of this Consent Decree for the implementation of the 1 ½ Mile Reach Removal Action.

"1 ½ Mile Reach Removal Action Memo" shall mean the Action Memorandum to be issued by EPA pursuant to Paragraph 21 of this Consent Decree selecting the 1 ½ Mile Reach Removal Action.

"Action Memorandum for Removal Actions Outside the River" shall mean the decision document for the Removal Actions Outside the River, attached to this Consent Decree as Appendix D.

"Actual/Potential Lawns" shall mean all areas of the Housatonic River Floodplain - Current Residential Properties except the riverbanks and those areas at which the wet nature or steep slope of the ground surface results in potential exposures that are inconsistent with residential use. For residential properties between the GE Plant Area and Woods Pond Dam, these areas are generally delineated on Figures 2-7 through 2-24 of the SOW. For residential properties downstream of Woods Pond Dam, the delineation of these areas will be in accordance with this definition and will be proposed in the Pre-design Investigation Work Plan for the Actual/Potential Lawns within the Housatonic River Floodplain - Current Residential Properties.

"Agencies" shall mean the U.S. Environmental Protection Agency, Region I, and the Massachusetts Department of Environmental Protection and any successor departments or agencies.

"Allendale School Property" or "Allendale School" shall mean the school property located at 180 Connecticut Avenue in Pittsfield, Massachusetts. The school property is bounded to the south and southwest by the GE Plant Area, to the north by Connecticut Avenue, to the northwest by residential properties along Delaware Avenue, and to the east by residential properties on Virginia Avenue.

"Appendix IX+3" or "Appendix IX" shall mean, unless otherwise specified in a given work plan or other document submitted pursuant to this Consent Decree and

11

approved by EPA, all compounds listed in Appendix IX of 40 C.F.R. Part 264, plus the following three additional constituents: benzidene, chloroethylvinyl ether, and 1,2-diphenylhydrazine.

"ARAR" or "Applicable or Relevant and Appropriate Requirement" shall mean any legally applicable or relevant and appropriate standard, requirement, criteria or limitation within the meaning of Section 121 of CERCLA, 42 U.S.C. § 9621.

"Building 71 Consolidation Area" shall mean an approximately 5-acre area within the approximately 57-acre area bounded by New York Avenue on the west, the General Dynamics parking lot on the east, Tyler Street Extension on the north, and Merrill Road on the south, as depicted generally on the map attached to this Consent Decree as Appendix A-3, which will be used for on-plant consolidation of certain materials from the Site pursuant to this Consent Decree and the work plans included in Annex 1 to the SOW.

"CERCLA" shall mean the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended, 42 U.S.C. §§ 9601 et seq.

"Chapter 21E" shall mean the Massachusetts Oil and Hazardous Material Release Prevention and Response Act, codified at Massachusetts General Laws Chapter 21E, as amended.

"Citizens' Coordinating Council" shall mean the council established with respect to the Site, as referenced in Section XXXVI of this Consent Decree.

"City" shall mean the City of Pittsfield, Massachusetts.

"Commonwealth" or "State" or "Massachusetts" shall mean the Commonwealth of Massachusetts.

"Conceptual Removal Design/Action Work Plan" or "Conceptual Removal Design/Removal Action Work Plan" shall mean, for each Removal Action Outside the River, the conceptual document developed, if any, pursuant to Paragraph 18.c of this Consent Decree and approved by EPA, and any amendments thereto.

"Conditional Solution" shall mean a response action that achieves the Performance Standards for Conditional Solutions described in Paragraphs 34 and 36 of this Consent Decree and in Sections 2.2, 2.3, 2.5, and 2.6 of the SOW attached to this Consent Decree.

"Connecticut" shall mean the State of Connecticut.

"Connecticut Future Costs" shall mean all direct and indirect costs Incurred or to be Incurred by Connecticut at or in connection with the Site on or after September 1, 1998.

"Connecticut Past Response Costs" shall mean all costs, including, but not limited to, direct and indirect costs, that the State of Connecticut paid at or in connection with the Site through August 31, 1998, plus Interest on all such costs which has accrued pursuant to 42 U.S.C. § 9607(a) through the lodging of this Consent Decree.

"Consent Decree" shall mean this document and all appendices attached hereto (listed in Section XXXV). In the event of conflict between this document and any appendix, this document shall control.

13

"Conservation Easement and Restrictions" or "CER" shall mean an instrument that grants rights and imposes restrictions running with the land in perpetuity, for the purpose of protecting a specified area in its current undeveloped condition and/or, as applicable, for the purpose of ensuring non-interference with the integrity of the Restoration Work to be performed at a specified area pursuant to this Consent Decree, including, without limitation (i) access for the purpose of monitoring and inspecting the area subject to the CER to determine compliance with its terms, (ii) restrictions and obligations concerning the use of the property subject to the CER, and (iii) the right to enforce the rights of access, restrictions, and obligations set forth in subclauses (i) and (ii) of this definition.

"CTDEP" shall mean the Connecticut Department of Environmental Protection, and any successor departments or agencies of the State of Connecticut.

"Day" shall mean a calendar day unless expressly stated to be a working day. "Working day" shall mean a day other than a Saturday, Sunday, or Federal holiday. In computing any period of time under this Consent Decree, where the last day would fall on a Saturday, Sunday, or Federal holiday, the period shall run until the close of business of the next working day.

"Definitive Economic Development Agreement" shall mean the agreement entered into by PEDA, the City, and Settling Defendant that provides for, *inter alia*, the transfer to PEDA and redevelopment of portions of the GE Plant Area and economic aid to the City.

14

"Designated Fill Properties" shall mean the off-site properties identified in Appendix T, which are categorized into two categories: Category 1, which shall consist of Designated Fill Properties as to which EPA completed its Incurrence of all costs relating to such properties on or before March 31, 1999; and Category 2, which shall consist of Designated Fill Properties as to which EPA Incurred costs after March 31, 1999.

"DOD" shall mean the United States Department of Defense, including its departments, offices, agencies, activities and commands.

"DOI Future Costs" shall mean direct and indirect costs that DOI Incurs pursuant to the provisions of this Consent Decree solely for the purposes of dispute resolution relating to and/or enforcement of only the following Paragraphs of this Consent Decree: Paragraphs 114, 115, 118 (excluding 118.b), 119, 120, 121, 122 and 123. DOI Future Costs shall not include DOI Oversight Costs.

"DOI Oversight Costs" shall mean all costs, including, but not limited to, direct and indirect costs, that DOI Incurs after March 31, 1999, in reviewing plans, reports and other items concerning Restoration Work pursuant to this Consent Decree, verifying the Work, or otherwise overseeing this Consent Decree, including, but not limited to, payroll costs, contractor costs, travel costs, and laboratory costs. DOI Oversight Costs shall not include DOI Future Costs.

"DOI Past Assessment Costs" shall mean all costs, including, but not limited to, direct and indirect assessment costs, that DOI paid at or in connection with the Site

15

through March 31, 1999, plus Interest on all such costs which has accrued pursuant to 42 U.S.C. § 9607(a) through the lodging of this Consent Decree.

"Engineered Barrier" shall have the meaning ascribed to that term in the Massachusetts Contingency Plan and as described further in Attachment G to the SOW.

"Environmental Restriction and Easement" or "ERE" shall mean an instrument that grants rights and imposes restrictions and obligations running with the land in perpetuity, for the purpose of implementing, ensuring non-interference with, and/or ensuring the integrity and protectiveness of the response actions performed, and to be performed, pursuant to this Consent Decree, including, without limitation (i) access for the purpose of monitoring, implementing, or otherwise conducting any response actions related to this Consent Decree, (ii) restrictions and obligations concerning the use of land/water, and (iii) the right to enforce the rights of access, restrictions, and obligations set forth in subclauses (i) and (ii) of this definition.

"EOEA" shall mean the Executive Office of Environmental Affairs of the Commonwealth of Massachusetts and any successor departments or agencies of the State.

"EPA" shall mean the United States Environmental Protection Agency and any successor departments or agencies of the United States.

"Federal Trustees" shall mean DOI and NOAA.

"Flood Storage Compensation" shall mean, for activities which will cause or contribute incrementally to a loss of flood storage capacity, provision of a volume of

16

flood storage capacity that is equal to the volume of flood storage capacity that would be displaced by the activities, to the maximum extent practicable.  Unless otherwise provided in this Consent Decree, the SOW, Upper ½ Mile Reach Removal Action Work Plan, or the Rest of River SOW, Flood Storage Compensation shall be provided at the same elevation and within the same general waterbody stretch as the activities causing or contributing to the loss of flood storage capacity, but need not be in the specific locations of those activities.

"Former Oxbow Areas" shall mean: (i) the properties located where oxbows of the Housatonic River formerly conveyed river flows, where such properties have been isolated from the channel of the river, and subsequently filled, and found to contain Waste Materials; and (ii) properties adjacent thereto found to be contaminated with Waste Materials.  The Former Oxbow Areas are generally depicted on the maps attached as Appendix A-6, Figures 1 and 2.

"General Electric" or "GE" shall mean the General Electric Company, headquartered in Fairfield, Connecticut.

"GE Plant Area" shall mean the current or former General Electric facility in Pittsfield and certain adjacent areas, as described generally on the map attached to this Consent Decree as Appendix A-2.

"Hill 78 Consolidation Area" shall mean the approximately 6-acre portion of the approximately 57-acre area between New York Avenue on the west and the General Dynamics parking lot on the east, and bounded by Tyler Street Extension to the north and Merrill Road to the south, as depicted generally on the map attached to this

17

Consent Decree as Appendix A-4, which contains the area that Settling Defendant historically used for conducted landfilling operations involving Waste Materials, and which will be used for on-plant consolidation pursuant to this Consent Decree.

"Housatonic River Floodplain-Current Residential Properties" shall mean those properties currently in residential use which are in or adjacent to the Housatonic River floodplain downstream of the Lyman Street Bridge. For properties between the Lyman Street Bridge and Woods Pond Dam, these properties are included on Figures 2-7 through 2-24 of the SOW, which generally delineate (by shading) the Actual/Potential Lawns of such properties. Downstream of Woods Pond Dam, these properties will be identified in the Pre-Design Investigation Work Plan for Housatonic River Floodplain - Current Residential Properties.

"Housatonic River Floodplain-Non-Residential Properties" shall mean those properties currently not in residential use which are in or adjacent to the Housatonic River floodplain between Lyman Street and the confluence of the East and West Branches of the Housatonic River, as generally delineated on Figures 2-7 through 2-9 of the SOW.

"Incur" shall mean to incur and to pay costs.

"Interest" shall mean interest at the rate specified for interest on investments of the Hazardous Substance Superfund established under Subchapter A of Chapter 98 of Title 26 of the U.S. Code, compounded on October 1 of each year, in accordance with 42 U.S.C. § 9607(a).

18

"LAT" or "Lead Administrative Trustee" shall mean the representative designated by the Trustees pursuant to Paragraph 113 of this Consent Decree to serve as the contact representative of the Trustees in matters under this Consent Decree.

"MADEP" shall mean the Massachusetts Department of Environmental Protection (including its prior name as the Massachusetts Department of Environmental Quality Engineering) and any successor departments or agencies of the State.

"Massachusetts Contingency Plan" or "MCP" shall mean the regulations specified at 310 CMR 40.0000.

"Massachusetts Future Response Costs" or "State Future Response Costs" shall mean all direct and indirect costs that Massachusetts Incurs pursuant to the provisions of this Consent Decree after its effective date, including but not limited to costs Incurred to enforce the Consent Decree (including dispute resolution except as noted below), costs Incurred in fulfilling the State's mandatory statutory obligation pursuant to Section 104(c)(3) of CERCLA in the event of a Work Takeover pursuant to Paragraph 178 of this Consent Decree, costs Incurred pursuant to Paragraphs 91 and/or 92 (Emergency Response), costs of additional sampling in the areas subject to Removal Actions Outside the River Incurred pursuant to Paragraph 48.b, costs Incurred to develop plans or reports or perform modeling or assessments, costs of obtaining EREs in accordance with Paragraph 60.h, and costs associated with enforcement and administration of EREs and CERs.  Massachusetts Future Response Costs shall not include Massachusetts Oversight Costs, Massachusetts Trustee Oversight Costs, or Massachusetts Trustee Future Response Costs.  Massachusetts Future Response

19

Costs shall also not include:  (i) any costs Incurred in connection with a petition for review, appeal, or other proceeding in which the State challenges a determination by EPA to select or waive any ARAR for the Rest of the River Remedial Action or O&M, regardless of whether such determination is made prior to or after the selection of such Remedial Action; or (ii) any costs associated with a legal action challenging EPA's alleged failure to enforce any such ARAR.

"Massachusetts Interim Response Costs" or "State Interim Response Costs" shall mean all costs, including direct and indirect costs, (a) paid by the State in connection with the Site between June 21, 1999 and the effective date of this Consent Decree, inclusive, or (b) of work performed prior to the effective date of this Consent Decree but paid by the State after that date.  Massachusetts Interim Response Costs shall not include Massachusetts Oversight Costs, Massachusetts Trustee Oversight Costs, or Massachusetts Trustee Future Response Costs.

"Massachusetts Oversight Costs" or "State Oversight Costs" shall mean all costs, including, but not limited to, direct and indirect costs, that the State Incurs or has Incurred after June 21, 1999 in reviewing plans, reports and other items pursuant to this Consent Decree (including review of proposed EREs or related documents required to be submitted pursuant to Section XIII), verifying the Work, or otherwise overseeing this Consent Decree, including, but not limited to, payroll costs, contractor costs, travel costs, and laboratory costs.  Massachusetts Oversight Costs shall also include costs Incurred by the State in challenging a determination by EPA, in its selection or revised selection of the Rest of the River Remedial Action, to waive any ARARs for such

20

Remedial Action or O&M, if such costs are Incurred prior to an appeal to the EPA Environmental Appeals Board. However, Massachusetts Oversight Costs shall not include any costs Incurred in connection with a petition for review, appeal, or other proceeding in which the State challenges such EPA determination in the EPA Environmental Appeals Board or the United States Court of Appeals, nor shall Massachusetts Oversight Costs include any costs associated with a legal challenge, following EPA's selection of the Rest of the River Remedial Action (after all appeals and remands), to a determination by EPA to waive any ARAR for the Rest of the River Remedial Action or O&M or to EPA's alleged failure to enforce any such ARAR. Massachusetts Oversight Costs shall also not include Massachusetts Future Response Costs, Massachusetts Interim Response Costs, Massachusetts Trustee Oversight Costs, or Massachusetts Trustee Future Response Costs.

"Massachusetts Past Response Costs" or "State Past Response Costs" shall mean all costs, including, but not limited to, direct and indirect costs, that the Commonwealth of Massachusetts paid at or in connection with the Site through June 20, 1999.

"Massachusetts Trustee Future Response Costs" shall mean direct and indirect costs that Massachusetts, in its capacity as Trustee for Natural Resources at the Site, Incurs pursuant to the provisions of this Consent Decree solely for the purposes of dispute resolution relating to and/or enforcement of only the following Paragraphs of this Consent Decree: Paragraphs 114, 115, 118 (excluding 118.b), 119, 120, 121, 122, and 123  Massachusetts Trustee Future Response Costs shall not include

21

Massachusetts Future Response Costs, Massachusetts Oversight Costs,

Massachusetts Trustee Oversight Costs, or Massachusetts Interim Response Costs.

"Massachusetts Trustee Oversight Costs" shall mean all costs, including but not limited to, direct and indirect costs, that Massachusetts, in its capacity as Trustee for Natural Resources at the Site, incurs in reviewing plans, reports, and other items pursuant to this Consent Decree and verifying the Work required to be performed under this Consent Decree, including but not limited to, payroll costs, contractor costs, travel costs, and labor costs. Massachusetts Trustee Oversight Costs shall not include Massachusetts Future Response Costs, Massachusetts Interim Response Costs, Massachusetts Oversight Costs, or Massachusetts Trustee Future Response Costs.

"Municipal Sewage Sludge" shall mean any solid, semi-solid, or liquid residue removed during the treatment of municipal wastewater or domestic sewage, and may include residue removed, all or in part, during the treatment of wastewater from manufacturing or processing operations, provided that such residue has essentially the same characteristics as residue removed during the treatment of domestic sewage.

"Municipal Solid Waste" shall mean household waste and solid waste collected from non-residential sources that is essentially the same as household waste. While the composition of such wastes may vary considerably, municipal solid waste generally is composed of large volumes of non-hazardous substances (e.g., yard waste, food waste, glass and aluminum) and can contain small amounts of other wastes as typically may be accepted in RCRA Subtitle D landfills.

22

"National Contingency Plan" or "NCP" shall mean the National Oil and Hazardous Substances Pollution Contingency Plan promulgated pursuant to Section 105 of CERCLA, 42 U.S.C. § 9605, codified at 40 C.F.R. Part 300, and any amendments thereto.

"Natural Resources" shall have the meaning provided in Section 101(16) of CERCLA, 42 U.S.C. § 9601(16).

"Natural Resource Damages" shall mean: (1) damages recoverable under Section 107 of CERCLA, Section 311 of the Clean Water Act, and/or Sections 1002 and 1006 of the Oil Pollution Act for injury to, destruction of, or loss of any and all Natural Resources relating to the Site, including the reasonable costs of assessing such injury, destruction or loss; (2) damages recoverable under M.G.L. c. 21E § 5(a), c.12 §§ 5, 7, 11D, c.40 § 39G, c. 91 § 59A, and/or c. 131, §§ 42 and 90, and/or under common law for such injury, destruction or loss of natural resources relating to the Site, including the costs of assessing and evaluating such injury, destruction or loss, incurred or suffered as a result of a release or threat of release; and/or (3) damages recoverable under Conn. Gen. Stat. §§ 22a-6, 22a-6a, 22a-14 et seq., 22a-432 and/or 22a-451, and/or under common law relating to such injury, destruction or loss, including the reasonable costs and expenses in restoring the natural resources of Connecticut or for damage to the natural resources of Connecticut and to the public trust therein.

"NOAA Future Costs" shall mean all direct and indirect costs that NOAA incurs pursuant to the provisions of this Consent Decree solely for the purposes of dispute resolution relating to and/or enforcement of only the following Paragraphs of this

23

Consent Decree: Paragraphs 114, 115, 118 (excluding 118.b), and 119-123. NOAA Future Costs shall not include NOAA Oversight Costs.

"NOAA Oversight Costs" shall mean all costs, including, but not limited to, direct and indirect costs, that NOAA Incurs after March 31, 1999, in reviewing plans, reports and other items concerning Restoration Work pursuant to this Consent Decree, verifying the Work, or otherwise overseeing this Consent Decree, including, but not limited to, payroll costs, contractor costs, travel costs, and laboratory costs. NOAA Oversight Costs shall not include NOAA Future Costs.

"NOAA Past Assessment Costs" shall mean all costs, including, but not limited to, direct and indirect assessment costs, that NOAA paid at or in connection with the Site through March 31, 1999, plus Interest on all such costs which has accrued pursuant to 42 U.S.C. § 9607(a) through the lodging of this Consent Decree.

"Non-Settling Defendant Property" shall mean any real property at the Site, or to which access and/or land/water use restrictions are required under this Consent Decree, which is not Settling Defendant Property.

"Notice ERE" shall mean an instrument, which affects a certain parcel(s) of land, that (i) provides record notice, in accordance with 310 C.M.R. 40.1074(3) ("Recording/Registering Notices"), of prohibited and permitted uses and activities, and obligations and conditions for conducting the permitted uses and activities, for the purpose of ensuring non-interference with, and/or ensuring the integrity and protectiveness of the response actions performed, and to be performed, pursuant to this Consent Decree; and (ii) contains the information identified in 310 C.M.R.

24

40.1074(2) ("Contents of a Notice of Activity and Use Limitation"), as such information may be modified to be consistent with CERCLA response actions conducted pursuant to this Consent Decree.

"Operation and Maintenance" or "O&M" shall mean all activities required to maintain the effectiveness of the Remedial Action for the Rest of the River as required under an Operation and Maintenance Plan developed for the Rest of the River Remedial Action.

"Paragraph" shall mean a portion of this Consent Decree identified by an arabic numeral or an upper case letter.

"Parties" shall mean the United States, the Commonwealth of Massachusetts, the State of Connecticut, the City, PEDA and the Settling Defendant.

"PCBs" shall mean polychlorinated biphenyls.

"PEDA" or "Pittsfield Economic Development Authority" shall mean the authority established pursuant to Mass. St. 1998, c. 194, Section 268 as amended by St. 1998, C. 486, Section 2.

"Performance Standards" shall mean the cleanup standards, design standards, and other measures and requirements set forth in Section IX of this Consent Decree and those identified as Performance Standards in the SOW, the Removal Action Work Plan for the Upper ½ Mile Reach of Housatonic River (as approved by EPA), the final modification of the Reissued RCRA Permit to select the Rest of the River Remedial Action, or the Rest of the River SOW. For Removal Actions Outside the River, the Performance Standards for Appendix IX + 3 constituents other than PCBs include both

25

the procedures set forth in the SOW for evaluating and setting cleanup standards for such constituents and the cleanup standards which result from following those procedures.

"Plaintiffs" shall mean the United States, the Commonwealth of Massachusetts, and the State of Connecticut.

"Post-Removal Site Control" shall mean the activities performed to monitor and maintain the effectiveness of each Removal Action under this Consent Decree, as specified in the SOW, the Upper ½ Mile Reach Removal Action Work Plan, or Work Plans developed for each Removal Action.

"Pre-design Investigation Report" shall mean, for each Removal Action Outside the River, except as provided in Paragraph 18.b, the document developed pursuant to Paragraph 18.b of this Consent Decree and approved by EPA, and any amendments thereto.

"Pre-design Investigation Work Plan" shall mean, for each Removal Action Outside the River,  except as provided in Paragraph 18.a, the document developed pursuant to Paragraph 18.a of this Consent Decree and approved by EPA, and any amendments thereto.

"RCRA" shall mean the Solid Waste Disposal Act, as amended, 42 U.S.C. §§ 6901 et seq. (also known as the Resource Conservation and Recovery Act).

"RCRA Permit" shall mean the modified Permit, as described in Paragraph I of Section I, that became effective January 3, 1994.

26

"Reissued RCRA Permit" shall mean the permit re-issued by EPA to the Settling Defendant in accordance with the provisions of Paragraph 10 of this Consent Decree, a draft of which is set forth in Appendix G.

"Removal Actions Outside the River" shall mean the following Removal Actions required to be performed by Settling Defendant under this Consent Decree and the SOW:

(1)     Removal Actions at the GE Plant Area:

The GE Plant Area Removal Actions each shall consist of the activities required to be performed by Settling Defendant under this Consent Decree and the SOW at or related to the area specified below, as generally depicted on Figures 2-1 through 2-3 of the SOW, excluding activities pertaining to groundwater or to Non-Aqueous Phase Liquid ("NAPL"), as described in Section 2.7, Attachment H, and (where applicable) Annex 2 to the SOW:

(a)     The 30s Complex Removal Action, which shall consist of the activities required to be performed by Settling Defendant at or related to the 30s Complex;

(b)     The 40s Complex Removal Action, which shall consist of the activities required to be performed by Settling Defendant at or related to the 40s Complex;

(c)     The 20s Complex Removal Action, which shall consist of the activities required to be performed by Settling Defendant at or related to the 20s Complex;

27

(d)     The East Street Area 2-South Removal Action, which shall consist of the activities required to be performed by Settling Defendant at or related to East Street Area 2-South;

(e)     The East Street Area 2-North Removal Action, which shall consist of the activities required to be performed by Settling Defendant at or related to East Street Area 2-North;

(f)     The East Street Area 1-North Removal Action, which shall consist of the activities required to be performed by Settling Defendant at or related to East Street Area 1-North;

(g)     The Hill 78 Consolidation Area Removal Action, which shall consist of the activities required to be performed by Settling Defendant at or related to the Hill 78 Consolidation Area;

(h)     The Building 71 Consolidation Area Removal Action, which shall consist of the activities required to be performed by Settling Defendant at or related to the Building 71 Consolidation Area;

(i)     The Hill 78 Area - Remainder Removal Action, which shall consist of the activities required to be performed by Settling Defendant at or related to the Hill 78 Area - Remainder; and

(j)     The Unkamet Brook Area Removal Action, which shall consist of the activities required to be performed by Settling Defendant at or related to the Unkamet Brook Area.

(2)     Removal Actions at the Former Oxbow Areas:

28

The Removal Actions at the Former Oxbow Areas each shall consist of the activities required to be performed by Settling Defendant under this Consent Decree and the SOW at or related to the area specified below, as generally depicted on Figures 2-4 and 2-5 of the SOW, excluding activities pertaining to groundwater or NAPL as described in Section 2.7, Attachment H, and Annex 2 (for the Lyman Street Area and Newell Street Area II) to the SOW:

(a)     The Former Oxbow Areas A and C Removal Action, which shall consist of the activities required to be performed by Settling Defendant at or related to Former Oxbow Areas A and C;

(b)     The Lyman Street Area Removal Action, which shall consist of the activities required to be performed by Settling Defendant at or related to the Lyman Street Area;

(c)     The Newell Street Area II Removal Action, which shall consist of the activities required to be performed by Settling Defendant at or related to Newell Street Area II;

(d)     The Newell Street Area I Removal Action, which shall consist of the activities required to be performed by Settling Defendant at or related to Newell Street Area I; and

(e)     The Former Oxbow Areas J and K Removal Action, which shall consist of the activities required to be performed by Settling Defendant at or related to Former Oxbow Areas J and K.

(3)     The Allendale School Removal Action, which shall consist of the activities

required to be performed by Settling Defendant under this Consent

Decree and the SOW at or related to the Allendale School Property, as

described in the SOW and generally depicted on Figure 2-6 of the SOW,

excluding activities pertaining to groundwater or NAPL, as described in

Section 2.7 and Attachment H to the SOW.

(4)     The Silver Lake Area Removal Action, which shall consist of the activities

required to be performed by Settling Defendant under this Consent

Decree and the SOW at or related to the Silver Lake Area, as described in

the SOW and generally depicted on Figure 2-25 of the SOW, excluding

activities pertaining to groundwater or subsurface NAPL, as described in

Section 2.7 and Attachment H to the SOW.

(5)     Removal Actions within the Housatonic River Floodplain:

The Removal Actions within the Housatonic River Floodplain each shall

consist of the activities required to be performed by Settling Defendant

under this Consent Decree and the SOW at or related to the area

specified below, as generally depicted on Figures 2-7 through 2-24 of the

SOW:

(a)     The Removal Action for Actual/Potential Lawns within the

Housatonic River Floodplain - Current Residential Properties

Adjacent to 1½ Mile Reach, which shall consist of the activities

required to be performed by Settling Defendant at or related to the

30

Actual/Potential Lawns within the Housatonic River Floodplain - Current Residential Properties located adjacent to the 1½ Mile Reach;

(b)   The Removal Action for the Housatonic River Floodplain - Non-Residential Properties, which shall consist of the activities required to be performed by Settling Defendant at or related to the Housatonic River Floodplain - Non-Residential Properties (located adjacent to the 1½ Mile Reach), excluding the riverbanks; and

(c)   The Removal Action for Actual/Potential Lawns within the Housatonic River Floodplain - Current Residential Properties Downstream of Confluence, which shall consist of the activities required to be performed by Settling Defendant at or related to the Actual/Potential Lawns within the Housatonic River Floodplain - Current Residential Properties located downstream of the confluence of the East and West Branches of the Housatonic River.

(6)   Groundwater Removal Actions:

The Groundwater Removal Actions each shall consist of the activities required to be performed by Settling Defendant under this Consent Decree and the SOW (including Attachment H and, if applicable, Annex 2) pertaining to groundwater and/or NAPL at or related to the Groundwater Management Area specified below, as described in Attachment H to the SOW:

31

(a) The Plant Site 1 Groundwater Management Area Removal Action, which shall consist of the activities required to be performed by Settling Defendant at or related to the Plant Site 1 Groundwater Management Area;

(b) The Former Oxbows J and K Groundwater Management Area Removal Action, which shall consist of the activities required to be performed by Settling Defendant at or related to the Former Oxbows J and K Groundwater Management Area;

(c) The Plant Site 2 Groundwater Management Area Removal Action, which shall consist of the activities required to be performed by Settling Defendant at or related to the Plant Site 2 Groundwater Management Area;

(d) The Plant Site 3 Groundwater Management Area Removal Action, which shall consist of the activities required to be performed by Settling Defendant at or related to the Plant Site 3 Groundwater Management Area; and

(e) The Former Oxbows A and C Groundwater Management Area Removal Action, which shall consist of the activities required to be performed by Settling Defendant at or related to the Former Oxbows A and C Groundwater Management Area.

"Removal Design/Action Work Plan" shall mean, for each Removal Action Outside the River, except as provided in Paragraph 18, the document developed

32

pursuant to Paragraph 18.d of this Consent Decree and approved by EPA, and any amendments thereto.

"Rest of the River" or "Rest of River" shall mean the Housatonic River and its sediments and floodplain areas downstream of the confluence of the East and West Branches of the Housatonic River, including backwaters, except for Actual/Potential Lawns, to the extent that such areas are areas to which Waste Materials that originated at the GE Plant Area have migrated and which are being investigated and/or remediated pursuant to this Consent Decree. Between the confluence of the East and West Branches of the River and Woods Pond Dam, the Rest of the River generally includes the Housatonic River and its sediments, as well as its floodplain (except for Actual/Potential Lawns) extending laterally to the approximate 1 ppm PCB isopleth, as generally depicted on Figures 2 through 4 of Appendix A-1. Downstream of Woods Pond Dam, the Rest of the River shall include those areas of the River and its sediments and floodplain (except for Actual/Potential Lawns) at which Waste Materials originating at the GE Plant Area have come to be located and which are being investigated and/or remediated pursuant to this Consent Decree.

"Rest of River Remedial Action" shall mean those activities, except for Operation and Maintenance, to be undertaken by Settling Defendant to implement the selected remedy for the Rest of the River, in accordance with a modification of the Reissued RCRA Permit as provided in Paragraph 22 of this Consent Decree, the Rest of River SOW and the final Remedial Design and Remedial Action Work Plans and other plans approved by EPA pursuant to the Rest of River SOW.

"Rest of River SOW" shall mean the Statement of Work to be prepared by Settling Defendant for performance of the Remedial Action for the Rest of the River, as set forth in Paragraph 22.x of this Consent Decree.

"Restoration Work" shall mean the work to be performed as part of response actions to restore, replace, enhance, and/or acquire the equivalent of Natural Resources, as specified in Section XXI of this Consent Decree.

"River Response Actions" shall mean the Upper ½ Mile Reach Removal Action, the 1 ½ Mile Reach Removal Action, and the Rest of the River Remedial Action.

"Section" shall mean a portion of this Consent Decree identified by a capital Roman numeral.

"Settling Defendant" shall mean the General Electric Company.

"Settling Defendant Property" shall mean any real property at the Site, or to which access and/or land/water use restrictions are required under this Consent Decree, which Settling Defendant either (i) owns or (ii) sufficiently controls to grant a legally binding and valid interest of a nature and kind required pursuant to this Consent Decree; provided, however, that Settling Defendant Property shall not include any property in which Settling Defendant holds only a mortgage or other non-fee property interest that is not also related to Settling Defendant's manufacturing facility in Pittsfield, Massachusetts. For purposes of this definition, "owned" shall include all such real property owned as of the date that Settling Defendant signs this Consent Decree or acquired thereafter.

34

"Silver Lake Area" or "Silver Lake" shall mean the 26-acre Massachusetts Great Pond located on the Site, including the area bounded by properties with frontage on East Street to the south, Fourth Street and Fenn Street to the west, and Silver Lake Boulevard to the north and east, including the banks of Silver Lake, as depicted generally on the map attached to this Consent Decree as Appendix A-7.

"Site" or "GE-Pittsfield/Housatonic River Site" shall  mean the GE Plant Area, the Former Oxbow Areas, the Allendale School Property, the Housatonic River Floodplain - Current Residential Properties, the Housatonic River Floodplain - Non-Residential Properties, the Silver Lake Area,  the Upper ½ Mile Reach, the 1 ½ Mile Reach, the Rest of the River, and other properties or areas to the extent that they are areas to which Waste Materials that originated at the GE Plant Area have migrated and which are being investigated or remediated pursuant to this Consent Decree.  The Site shall not include properties on which Waste Materials have come to be located solely as a result of the placement of fill and which are not being investigated or remediated pursuant to this Consent Decree (including but not limited to the Designated Fill Properties and/or the properties addressed by the new State Administrative Consent Order described in Paragraph 11 (except as provided in the SOW with respect to East Street Area 1-South)).  The Site is depicted generally on the maps attached hereto as Appendix A-1, Figures 1-5.

"State," "Massachusetts" or "Commonwealth" shall mean the Commonwealth of Massachusetts.

35

"Statement of Basis" shall mean the statement of basis for the modification of the Reissued RCRA Permit for performance of Remedial Design and Remedial Action for the Rest of the River, pursuant to Paragraph 22 of this Consent Decree and in accordance with 40 C.F.R. § 124.7.

"Statement of Work" or "SOW" shall mean the statement of work for implementation of the Removal Actions Outside the River, as set forth in Appendix E to this Consent Decree (including Attachments and Annexes) and any modifications made in accordance with this Consent Decree.

"Supervising Contractor(s)" shall mean the principal contractor(s) retained by Settling Defendant to supervise and direct the implementation of the Work under this Consent Decree.

"Trustee Secretaries" shall mean the Secretary of the United States Department of the Interior, the Secretary of the United States Department of Commerce, the Secretary of the Executive Office of Environmental Affairs for the Commonwealth of Massachusetts, and the Commissioner of the Connecticut Department of Environmental Protection, or their respective designees for purposes of dispute resolution under this Consent Decree.

"Trustees" or "Trustee Council" shall mean the designated representatives of each of the Trustee Secretaries (or the designated representatives of the Trustee Secretaries' respective designees) who shall act collectively to carry out the Trustees' responsibilities under this Consent Decree pursuant to a Memorandum of Agreement referenced in Paragraph 117 of this Consent Decree.

36

"United States" shall mean the United States of America, including all of its departments, agencies or instrumentalities.

"Unkamet Brook Area" shall mean the area consisting generally of the eastern portion of the GE Plant Area including property from Dalton Avenue to the north and extending along Unkamet Brook and its floodplain to its confluence with the Housatonic River, as depicted generally on the map attached to this Consent Decree as Appendix A-5.

"Upper ½ Mile Reach" shall mean the portion of the Upper 2-Mile Reach of the East Branch of the Housatonic River, including the riverbanks, from Newell Street to Lyman Street.

"Upper ½ Mile Reach Removal Action" shall mean the Removal Action for the Upper ½ Mile Reach as described in Paragraph 20 of this Consent Decree.

"Upper 2-Mile Reach" or "Upper Reach" shall mean the section of the East Branch of the Housatonic River, riverbanks, and associated floodplains, from Newell Street to the confluence with the West Branch of the Housatonic River.

"U.S. 1 ½ Mile Reach Removal Action Costs" shall mean all costs incurred by the United States in the design and implementation of the 1 ½ Mile Reach Removal Action following selection of such Removal Action, including, but not limited to, the costs of Restoration Work associated with the 1 ½ Mile Reach Removal Action, as described in Paragraph 21 of this Consent Decree, costs of obtaining access to property for the purpose of conducting the 1½ Mile Reach Removal Action pursuant to Paragraph 21.b of this Consent Decree, and costs of any additional studies, investigation, analytical

37

work, or community relations activities conducted by the United States as part of the design and implementation of the 1½ Mile Reach Removal Action.

"U.S. Future Additional Sampling Costs" shall mean the costs Incurred for certain additional sampling to be performed by or on behalf of EPA at areas subject to the Removal Actions Outside the River as described in the SOW.

"U.S. Future Response Costs" or "Future Response Costs" shall mean all direct and indirect costs that EPA and DOJ Incur pursuant to the provisions of this Consent Decree, including but not limited to costs Incurred to enforce the Consent Decree (including dispute resolution), the costs incurred pursuant to Sections X (Review of Response Actions), XIII (Access and Land/Water Use Restrictions) (including the cost of attorney time and monies paid to secure access and/or to secure or implement land/water use restrictions, including the amount of just compensation), XIX (Emergency Response), and Paragraph 178 (Work Takeover), non-field work costs incurred for preparing, reviewing, and approving the documents that propose and select the Rest of River Remedial Action (including responding to public comments thereto), and costs Incurred to develop plans or reports pursuant to the provisions of this Consent Decree that do not fall within the categories of costs excluded from U.S. Future Response Costs by the last sentence of this definition, together with any accrued Interest.   U.S. Future Response Costs shall also include all U.S. Interim Response Costs and costs Incurred in connection with the Category 2 Designated Fill Properties after March 31, 1999.   U.S. Future Response Costs shall not include U.S. Oversight Costs, U.S. Future Rest of River Capped Response Costs, U.S. Future

38

Additional Sampling Costs, U.S. Rest of River Oversight Costs, U.S. Post Removal/Groundwater Monitoring Costs, or the U.S. 1½ Mile Reach Removal Action Costs.

"U.S. Future Rest of River Capped Response Costs" shall mean all costs EPA Incurs after March 31, 1999, including but not limited to direct and indirect costs, in connection with studying or otherwise investigating the Rest of River and/or all field work to support the preparation, development, and selection of the Rest of River Remedial Action, all prior to the modification of the Reissued RCRA Permit to select the Rest of River Remedial Action pursuant to Paragraph 22.p of this Consent Decree. U.S. Future Rest of River Capped Response Costs shall include, but not be limited to, costs that EPA Incurs for sampling and analysis in the Rest of River, performance of human health risk assessment(s), performance of ecological risk assessment(s), modeling, data management, preparation of reports, peer input, peer review, general contractor costs (including, for example, administrative record development, project administration, project management, health and safety), interagency and intergovernmental agreement costs (including costs of ATSDR and Army Corps of Engineers), and costs of maintaining a Field Office, insofar as such costs are Incurred for the activities described in the first sentence of this definition. U.S. Future Rest of River Capped Response Costs shall not include U.S. Oversight Costs, U.S. Rest of River Oversight Costs, U.S. Post-Removal/Groundwater Monitoring Costs, U.S. Future Response Costs, U.S. Future Additional Sampling Costs, U.S. Interim Response Costs, or U.S. 1½ Mile Reach Removal Action Costs.

39

"U.S. Interim Response Costs" or "Interim Response Costs" shall mean all costs, including direct and indirect costs, (a) incurred or paid by EPA and DOJ in connection with the Site between March 31, 1999, and the effective date of this Consent Decree, or (b) of work performed prior to the effective date of this Consent Decree but paid by EPA or DOJ after that date. U.S. Interim Response Costs shall not include U.S. Oversight Costs, U.S. Future Rest of River Capped Response Costs, U.S. Future Additional Sampling Costs, or U.S. 1 ½ Mile Reach Removal Action Costs.

"U.S. Oversight Costs" shall mean all costs, including, but not limited to, direct and indirect costs, that EPA incurs after March 31, 1999, and prior to either the date of the last Certification of Completion issued for the non-groundwater/NAPL-related Removal Actions Outside the River or the date of the Certification of Completion for the Upper ½ Mile Reach Removal Action, whichever is later (or, for costs of activities described in subclause (d) herein, prior to the date of the modification of the Reissued RCRA Permit to select the Rest of River Remedial Action pursuant to Paragraph 22.p), in conducting the following activities:  (a) reviewing plans, studies, reports and other items related to any Removal Actions Outside the River (including those that do not relate to groundwater/NAPL and those that relate to groundwater/NAPL) and the Upper ½ Mile Reach Removal Action; (b) verifying the Work for such Removal Actions; (c) otherwise overseeing Settling Defendant's compliance with this Consent Decree relating to such Removal Actions; and (d) reviewing proposals, reports, studies and other deliverables submitted by Settling Defendant under the Reissued RCRA Permit, conducting shadow or supplemental studies for the studies to be conducted by Settling

40

Defendant under that Permit, and otherwise overseeing Settling Defendant's activities under that Permit, all prior to the modification of that Permit to select the Rest of the River Remedial Action pursuant to Paragraph 22.p of this Consent Decree. U.S. Oversight Costs shall include, but not be limited to, payroll costs, contractor costs, travel costs, laboratory costs, community relations costs, technical support costs, interagency and intergovernmental agreement costs (including ATSDR and U.S. Army Corps of Engineers costs), costs of maintaining a Field Office, data management costs, and modeling costs, insofar as such costs are Incurred for the activities described in the first sentence of this definition. U.S. Oversight Costs shall not include U.S. Rest of River Oversight Costs, U.S. Post-Removal/Groundwater Monitoring Costs, U.S. Future Response Costs, U.S. Future Rest of River Capped Response Costs, U.S. Future Additional Sampling Costs, U.S. Interim Response Costs, or U.S. 1½ Mile Reach Removal Action Costs.

"U.S. Past Response Costs" or "Past Response Costs" shall mean all costs, including, but not limited to, direct and indirect costs, that EPA and DOJ paid at or in connection with the Site through March 31, 1999, plus all costs paid at or in connection with the Designated Fill Properties through March 31, 1999, plus Interest on all such costs which have accrued pursuant to 42 U.S.C. § 9607(a) through the lodging of this Consent Decree.

"U.S. Post-Removal/Groundwater Monitoring Costs" shall mean all costs Incurred by EPA after either the date of the last Certification of Completion issued for the non-groundwater/NAPL-related Removal Actions Outside the River or the date of

41

the Certification of Completion for the Upper ½ Mile Reach Removal Action, whichever is later, in overseeing: (a) Post-Removal Site Control activities for the non-groundwater/NAPL-related Removal Actions Outside the River and the Upper ½ Mile Reach Removal Action; and (b) any remaining activities that are part of the Removal Actions Outside the River that relate to groundwater/NAPL. U.S. Post-Removal/Groundwater Monitoring Costs shall include, but not be limited to, payroll costs, contractor costs, travel costs, laboratory costs, community relations costs, technical support costs, interagency and intergovernmental agreement costs (including ATSDR, and U.S. Army Corps of Engineers costs), costs of maintaining a Field Office, data management costs, and modeling costs, insofar as such costs are Incurred for the activities described in the first sentence of this definition. U.S. Post-Removal/Groundwater Monitoring Costs shall not include U.S. Oversight Costs, U.S. Rest of River Oversight Costs, U.S. Future Response Costs, U.S. Future Rest of River Capped Response Costs, U.S. Future Additional Sampling Costs, U.S. Interim Response Costs, or U.S. 1½ Mile Reach Removal Action Costs.

"U.S. Rest of River Oversight Costs" shall mean all costs related to the Rest of River Remedial Action Incurred by EPA after the modification of the Reissued RCRA Permit to select the Rest of River Remedial Action pursuant to Paragraph 22.p of this Consent Decree, including but not limited to, direct and indirect costs that EPA Incurs in connection with the following activities: reviewing plans, studies, reports, and other items related to the design, implementation, and Operation and Maintenance of the Rest of River Remedial Action pursuant to this Consent Decree, verifying the Work,

sampling and analysis or performing studies for such purposes, or otherwise overseeing the Rest of River Remedial Action under this Consent Decree. U.S. Rest of River Oversight Costs shall include, but not be limited to, payroll costs, contractor costs, travel costs, laboratory costs, community relations costs, technical support costs, interagency and intergovernmental agreement costs (including costs of ATSDR and Army Corps of Engineers), costs of maintaining a Field Office, data management costs, and modeling costs, insofar as such costs are Incurred for the activities described in the first sentence of this definition. U.S. Rest of River Oversight Costs shall not include U.S. Oversight Costs, U.S. Future Response Costs, U.S. Future Rest of River Capped Response Costs, U.S. Post-Removal/Groundwater Monitoring Costs, U.S. Future Additional Sampling Costs, U.S. Interim Response Costs, or U.S. 1 ½ Mile Reach Removal Action Costs.

"Waste Material" shall mean (1) any "hazardous substance" under Section 101(14) of CERCLA, 42 U.S.C. § 9601(14); (2) any pollutant or contaminant under Section 101(33) of CERCLA, 42 U.S.C. § 9601(33); (3) any "solid waste" under Section 1004(27) of RCRA, 42 U.S.C. § 6903(27); and (4) any "oil and/or hazardous material" under M.G.L. c. 21E, section 2.

"Work" shall mean all activities Settling Defendant is required to perform under this Consent Decree, except those required by Section XXXI (Retention of Records).

## V.  GENERAL PROVISIONS

5.    Objectives of the Parties.  The objectives of the Parties in entering into this Consent Decree are to protect public health, welfare and the environment at the

Site by the design and implementation of response actions at the Site by the Settling Defendant and EPA, to reimburse response costs of the Plaintiffs as provided herein, to provide for recovery of damages and the performance of restoration projects for injury to natural resources, and to resolve the claims of Plaintiffs against Settling Defendant as provided in this Consent Decree. In addition to this Consent Decree, Settling Defendant, the City, and PEDA have entered into a Definitive Economic Development Agreement which provides, inter alia, for redevelopment of a portion of the GE Plant Area and economic aid to the City. The United States and the State reserve the right to consult with and/or assist the City and PEDA and to move to intervene or participate as amicus curiae in connection with any dispute or proceeding relating to enforcement or implementation of the Definitive Economic Development Agreement.

6.      Commitments by Settling Defendant. Except as otherwise expressly provided in this Consent Decree, Settling Defendant shall finance and perform the Work in accordance with this Consent Decree, the SOW, the Rest of the River SOW, and Work Plans attached to this Consent Decree, and all work plans and other plans, standards, specifications, and schedules set forth herein or developed by Settling Defendant and approved by EPA pursuant to this Consent Decree. Settling Defendant shall also reimburse Plaintiffs for response costs as provided in this Consent Decree, and shall reimburse the United States for costs related to the 1 ½ Mile Reach Removal Action as provided in this Consent Decree. Settling Defendant shall also pay Natural Resource Damages to the Trustees, perform Restoration Work and other natural

44

resource protection and restoration actions as specified herein, and reimburse the Trustees for costs Incurred and to be Incurred, all as provided in this Consent Decree.

7.     Commitments by EPA.  EPA intends to implement a Removal Action in the  1 ½ Mile Reach.  Performance of such Removal Action shall be in accordance with the 1 ½ Mile Reach Removal Action Memorandum.  Funding of such Removal Action shall be in accordance with Paragraphs 103-111 of this Consent Decree.

8.     Compliance With Applicable Law And Protectiveness

a.     All activities undertaken by Settling Defendant pursuant to this Consent Decree shall be performed in accordance with the requirements of all applicable federal and state laws and regulations.  Except for the Rest of the River Remedial Action, for all activities undertaken pursuant to CERCLA in this Consent Decree, Settling Defendant must also comply with any ARARs of all federal and state environmental laws, as described in Attachment B to the SOW and in ARARs tables in the Removal Action Work Plan for the Upper ½ Mile Reach (Appendix F hereto), EPA's Action Memorandum for the Allendale School Removal Action (Appendix C hereto), and a Supplemental Addendum to the Work Plan for On-Plant Consolidation Areas (included in Annex 1 to the SOW), unless otherwise determined by EPA pursuant to CERCLA and the NCP.   For the Rest of the River Remedial Action, for all activities undertaken pursuant to CERCLA in this Consent Decree, Settling Defendant must also comply with any ARARs of federal and state environmental laws set forth in the documents selecting the Rest of the River Remedial Action and/or in the Rest of the River SOW, unless waived by EPA pursuant to CERCLA and the NCP.  For purposes

45

of this Consent Decree, ARARs shall not be considered Performance Standards unless, for the Rest of the River, EPA specifically identifies an ARAR as a Performance Standard. The activities conducted pursuant to this Consent Decree, if approved by EPA, shall be deemed to be consistent with the NCP.

        b.     EPA, MADEP and CTDEP have determined that:

        (i)     The Removal Actions, when implemented and completed in accordance with this Consent Decree, the SOW, and the Work Plan for the Upper ½ Mile Reach Removal Action (including achieving and maintaining Performance Standards), are protective of human health and the environment with respect to the areas addressed by those Removal Actions; and

        (ii)     Except as expressly provided in this Consent Decree, no further response actions for the areas addressed by such Removal Actions are necessary to protect human health and the environment.

        c.     The Consent Decree establishes a process intended to ensure that the Remedial Action to be selected for the Rest of the River will be protective of human health and the environment.

        d.     In the event that EPA, or MADEP or CTDEP (as applicable), determines that a Removal Action or Remedial Action is no longer protective of human health or the environment, the Consent Decree provides a procedure by which EPA or MADEP or CTDEP (as applicable) can seek additional relief.

9.   Permits

a.   As provided in Section 121(e) of CERCLA and Section 300.400(e) of the NCP, no permit shall be required for any portion of the Work conducted entirely on-site (i.e., within the areal extent of contamination or in very close proximity to the contamination and necessary for implementation of the Work).  Any measures performed pursuant to Paragraphs 118 and 123 (Restoration Work and Other Natural Resource Protection and Restoration Actions) shall be considered on-site for purposes of this provision.  Where any portion of the Work that is not on-site requires a federal, state or local governmental permit or approval, Settling Defendant shall submit timely and complete applications and take all other actions necessary to obtain all such permits or approvals.

b.   Settling Defendant may seek relief under the provisions of Section XXIII (Force Majeure) of this Consent Decree for any delay in the performance of the Work resulting from a failure to obtain, or a delay in obtaining, any permit required for the Work.

c.   This Consent Decree is not, and shall not be construed to be, a permit issued pursuant to any federal or state statute or regulation, or local law.

10.   Reissuance of RCRA Permit.

a.   Settling Defendant and the United States agree that, in connection with the settlement embodied in this Consent Decree, GE's RCRA Permit will be revoked and reissued pursuant to 40 C.F.R. §§ 124.5 and 270.41, upon the effective date of this Consent Decree.  Settling Defendant and EPA have jointly proposed for

47

public comment, pursuant to 40 C.F.R. § 124.10, a draft Reissued RCRA Permit in the

form attached hereto as Appendix G. Following the close of the public comment period

on the draft Reissued RCRA Permit, and prior to any United States motion for entry of

this Consent Decree, EPA shall issue a final permit decision on the Reissued RCRA

Permit in accordance with 40 C.F.R. § 124.15, to be effective in accordance with

Paragraph 10.d.

   b.  In the event that EPA's final permit decision on the Reissued

RCRA Permit does not materially modify the draft Reissued RCRA Permit attached as

Appendix G, Settling Defendant shall not seek review of, or otherwise contest, that final

permit decision, and shall comply with requirements of the Reissued RCRA Permit and

this Consent Decree.

   c.  To the extent that Settling Defendant believes the final Reissued

RCRA Permit to be a material modification of the draft Reissued RCRA Permit attached

as Appendix G, Settling Defendant, may, within 15 days of its receipt of the final

Reissued RCRA Permit, file a motion with the Court for dispute resolution pursuant to

Paragraph 136.c and d (record review) of this Consent Decree, regarding the final

Reissued RCRA Permit. Settling Defendant's dispute shall be limited to whether the

final Reissued RCRA Permit materially modifies Appendix G. The United States, the

State and Connecticut may file an opposition to Settling Defendant's motion within thirty

days after receipt of such motion. The Parties hereby stipulate that after lodging and

prior to entry of this Consent Decree, such dispute shall proceed under this Paragraph

as a contractual matter. If, at the conclusion of dispute resolution, the final Reissued

RCRA Permit is held not to materially modify the draft Reissued RCRA Permit set forth at Appendix G, Settling Defendant shall not oppose entry of the Consent Decree, shall not seek review of the Reissued RCRA Permit, and shall comply with the requirements of the Reissued RCRA Permit and this Consent Decree.  If, at the conclusion of dispute resolution, the final Reissued RCRA Permit is held to materially modify the draft Reissued Permit set forth at Appendix G, the United States, the State, Connecticut and the Settling Defendant may agree to go forward with the Consent Decree, and the United States may thereafter move for entry and Settling Defendant shall not contest and shall comply with the requirements of the Reissued RCRA Permit and this Consent Decree.  If, at the conclusion of dispute resolution, the final Reissued RCRA Permit is held to materially modify the draft Reissued Permit set forth at Appendix G, and the United States, the State, Connecticut and the Settling Defendant do not agree to go forward with the Consent Decree, either the United States or Settling Defendant shall withdraw from the Consent Decree.

        d.      In accordance with 40 C.F.R. § 124.15(b)(1), the effective date of the Reissued RCRA Permit shall be the date of entry of this Consent Decree; provided, however, that if, after dispute resolution, the final Reissued RCRA Permit is found to materially modify Appendix G and the United States, the State, Connecticut and the Settling Defendant do not agree to go forward with this Consent Decree, then EPA may finalize the permit after either the United States or Settling Defendant withdraws from the Consent Decree.  In that event, Settling Defendant may appeal the final Reissued RCRA Permit in accordance with 40 C.F.R. § 124.19 and Section 7006(b) of RCRA, in

which case Settling Defendant's compliance with such Permit shall be governed by applicable laws and regulations relating to RCRA permits issued by EPA. If Settling Defendant does not appeal such Reissued RCRA Permit, Settling Defendant shall comply with all conditions of the Reissued RCRA Permit. If this Consent Decree is entered, upon the effective date of the Consent Decree, Settling Defendant shall comply with the provisions of the Reissued RCRA Permit and the requirements of Paragraph 22 (Rest of River) of this Consent Decree. If, after the effective date of this Consent Decree, a person other than Settling Defendant appeals the final Reissued RCRA Permit pursuant to 40 C.F.R. § 124.19, Settling Defendant shall comply with the requirements of the Reissued RCRA Permit, as well as the requirements of Paragraph 22 (Rest of River) of this Consent Decree, during the period of such appeal. In the event that a person other than Settling Defendant appeals the Reissued RCRA Permit, but Settling Defendant does not, Settling Defendant shall support the issuance of the Reissued RCRA Permit in such appeal.

11. Revision of State Administrative Consent Orders. Settling Defendant and the State agree that in connection with the settlement embodied in this Consent Decree, the Administrative Consent Orders executed by Settling Defendant and MADEP on May 22, 1990, and July 2, 1990, will be terminated and superseded by a new Administrative Consent Order. Within fifteen (15) days of entry of this Consent Decree, Settling Defendant and MADEP will execute the Administrative Consent Order attached hereto as Appendix H. The properties addressed by the new Administrative Consent Order shall not be considered part of the Site, as Site is defined in Paragraph

50

4 of this Consent Decree (except as provided in the SOW with respect to East Street Area 1-South).

    12.    Conveyance of Property and Notice to Successors-in-Title

        a.    Conveyance of Property from Settling Defendant to Grantee Other than PEDA.

        (i)    In addition to the requirements of Paragraph 54.j of this Consent Decree, at least 30 days prior to the conveyance from Settling Defendant to a grantee other than PEDA, of any interest in property owned by Settling Defendant located within the Site including, but not limited to, fee interests, leasehold interests, and mortgage interests, Settling Defendant shall give the grantee written notice of (A) this Consent Decree, (B) any instrument by which an interest in real property has been previously conveyed that confers a right of access to the property to be conveyed, including Environmental Restrictions and Easements ("EREs") and/or Conservation Easements and Restrictions ("CERs") pursuant to Section XIII (Access and Land/Water Use Restrictions), and (C) any instrument by which an interest in real property has been conveyed that confers a right to enforce restrictions on the use of such property (EREs and/or CERs) pursuant to Section XIII (Access and Land/Water Use Restrictions); provided, however, that this requirement shall not apply to any mortgage or other non-fee property interest held by Settling Defendant that is not also related to Settling Defendant's manufacturing facility in Pittsfield, Massachusetts. At least 30 days prior to such conveyance, Settling Defendant shall also give written notice to EPA and the State of the proposed conveyance, including the name and address of the grantee, and

the date on which notice of the Consent Decree, CERs and/or EREs was given to the grantee.

(ii)    In the event of any such conveyance, Settling Defendant's obligations under this Consent Decree, including, but not limited to, its obligation to provide or secure access and land/water use restrictions, as well as to abide by such land/water use restrictions pursuant to Section XIII (Access and Land/Water Use Restrictions) of this Consent Decree, shall continue to be met by Settling Defendant. In no event shall the conveyance release or otherwise affect the liability of Settling Defendant to comply with all provisions of this Consent Decree, absent the prior written consent of the Agencies. If the United States and the State approve, the grantee may perform some or all of the Work under this Consent Decree.

b.    Conveyance of Property from Settling Defendant to PEDA

(i)    Consent/Notice:

(A)    The Parties acknowledge that Settling Defendant has agreed to transfer a fee interest in portions of the GE Plant Area to PEDA pursuant to the Definitive Economic Development Agreement. The Parties hereby consent to transfer of such properties, identified in Appendix I hereto, provided that the requirements of this Paragraph are met.

(B)    For all property transfers specified in Paragraph 12.b(i)(A) above, and to the extent that Settling Defendant agrees to transfer to PEDA any fee property interest in additional portions of the GE Plant Area other than those specified in Paragraph 12.b(i)(A) above, the following shall apply:

52

(1) At least 30 days prior to such conveyance, Settling Defendant and PEDA shall give written notice to EPA and the State of the proposed conveyance.

(2) Unless otherwise agreed to by Settling Defendant, PEDA, EPA and MADEP, Settling Defendant shall not convey such property to PEDA unless and until Settling Defendant has caused an ERE to be placed on such property pursuant to Section XIII of this Consent Decree, and unless and until Settling Defendant has received, pursuant to Section XVIII of this Consent Decree, a Certification of Completion for the Removal Action at the GE Plant Area applicable to such property (excluding the Groundwater Removal Actions).

(3) Settling Defendant shall not convey to PEDA the Hill 78 Consolidation Area, the Building 71 Consolidation Area, the potential consolidation area that may be constructed at the corner of New York Avenue and Merrill Road (unless such area is not used for any on-plant consolidation) or the interior landfill at the Unkamet Brook Area.

(ii) In the event of any fee conveyance from Settling Defendant to PEDA as specified in this Paragraph, Settling Defendant's obligations under this Consent Decree shall continue to be met by Settling Defendant, with the following exceptions (which exceptions shall apply unless and until the property reverts or is conveyed back to Settling Defendant):

53

(A)   The obligations to provide or secure access and land/water use restrictions, as well as to abide by such land/water use restrictions, pursuant to Section XIII of this Consent Decree, shall be met by PEDA, not Settling Defendant; and

(B)   The Post-Removal Site Control obligations with respect to such property (other than with respect to Removal Actions relating to groundwater and/or NAPL) shall be met by PEDA, not Settling Defendant, unless EPA, after a reasonable opportunity for review and comment by the State, determines to its satisfaction that PEDA has ceased to exist or otherwise will not or cannot perform such obligations.  If EPA so determines, EPA will notify Settling Defendant, and Settling Defendant will meet such Post-Removal Site Control obligations, unless and until EPA, after a reasonable opportunity for review and comment by the State, determines to its satisfaction that PEDA will resume performance of such responsibilities in a satisfactory manner.

(iii)   Nothing in this Consent Decree shall preclude Settling Defendant and PEDA from agreeing that PEDA will assume obligations of Settling Defendant in addition to those specified in Paragraph 12.b(ii), above, with respect to property conveyed to PEDA.  However, except as specifically provided in this Paragraph, in no event shall such agreement or the conveyance release or otherwise affect the liability of Settling Defendant for compliance under this Consent Decree, absent the prior written consent of the Agencies.

54

c.     Conveyance of Property from PEDA to Another Party.

(i)     To the extent that PEDA agrees to transfer to any other party any interest in property transferred previously to PEDA by Settling Defendant within the Site including, but not limited to, fee interests, leasehold interests, and mortgage interests, PEDA shall give the grantee written notice of (A) this Consent Decree, (B) any instrument by which an interest in real property has been previously conveyed that confers a right of access to the property to be conveyed, including EREs and/or CERs, pursuant to Section XIII (Access and Land/Water Use Restrictions), and (C) any instrument by which an interest in real property has been conveyed that confers a right to enforce restrictions on the use of such property (EREs and/or CERs) pursuant to Section XIII. At least 30 days prior to such conveyance, PEDA shall also give written notice to EPA, the State and Settling Defendant of the proposed conveyance, including the name and address of the grantee, and the date on which notice of the Consent Decree, CERs and/or EREs was given to the grantee.

(ii)     In the event of such conveyance from PEDA as specified in this Paragraph, Settling Defendant's obligations under this Consent Decree shall continue to be met by Settling Defendant, with the following exceptions (which exceptions shall apply unless and until the property reverts to or is conveyed back to Settling Defendant):

(A)     The obligations to ensure that access and land/water use restrictions are provided and secured, as well as to ensure that such land/water

55

restrictions are abided by, pursuant to Section XIII of this Consent Decree, shall be met by PEDA, not Settling Defendant; and

                    (B)   Regarding Post-Removal Site Control obligations with respect to such property (other than with respect to Removal Actions relating to groundwater and/or NAPL), PEDA, not Settling Defendant, shall ensure that such obligations are met, unless EPA, after a reasonable opportunity for review and comment by the State, determines to its satisfaction that PEDA has ceased to exist or otherwise will not or cannot perform such obligations. If EPA so determines, EPA will notify Settling Defendant, and Settling Defendant will meet such Post-Removal Site Control obligations, unless and until EPA, after a reasonable opportunity for review and comment by the State, determines to its satisfaction that PEDA will resume performance of such responsibilities in a satisfactory manner.

                    (iii)   Except as specifically provided in this Paragraph, in no event shall the conveyance release or otherwise affect the liability of Settling Defendant to comply with all provisions of this Consent Decree, absent the prior written consent of the Agencies. If the United States and the State approve, the grantee may perform some or all of the Work under this Consent Decree.

        13.    Management of Response Action Activities

        a.    The Parties agree to implement a fully collaborative, collegial and cooperative approach to management of the response actions at the Site.

        b.    The Parties agree to form three Management Groups to oversee the response actions at the Site. These Management Groups are to meet regularly,

review progress, and anticipate and minimize problems with the response actions. The Management Groups will include the following:

(i)     A Project Management Group consisting of EPA's Remedial Project Manager, MADEP's Special Projects Section Chief of the Western Regional Office, and GE's Project Coordinator designated pursuant to Section XVI to work on day-to-day project management issues.

(ii)    A Senior Management Group consisting of EPA's Director of the Office of Site Remediation and Restoration, MADEP's Director or Deputy Director of its Western Regional Office, and GE's Manager of Pittsfield Remediation Programs or its Manager and Counsel for Remediation Programs, Corporate Environmental Programs, or their respective designees to consult and confer on issues that could not be resolved at the Project Management Group level.

(iii)   An Executive Board consisting of the EPA Regional Administrator, MADEP Commissioner, and GE Vice President for Corporate Environmental Programs to meet periodically to review overall progress of the cleanup.

c.     Each of the Management Groups will include, as the United States, and the State deem appropriate, a representative of the Trustees. Each of the Management Groups will include, as the United States, the State and Settling Defendant deem appropriate, a representative of the City of Pittsfield and/or PEDA.

## VI. PERFORMANCE OF RESPONSE ACTIONS BY SETTLING DEFENDANT

14.    Settling Defendant shall perform the following response actions pursuant to this Consent Decree, the SOW, the Rest of the River SOW, the Removal Action

57

Work Plan for Upper ½ Mile Reach, and Work Plans developed and/or implemented pursuant to this Consent Decree:

        a.    Settling Defendant shall perform the Removal Actions Outside the River in accordance with this Consent Decree and the SOW attached hereto.

        b.    Settling Defendant shall perform the Upper ½ Mile Reach Removal Action in accordance with this Consent Decree and the Removal Action Work Plan for Upper ½ Mile Reach (Appendix F hereto) as approved by EPA.

        c.    Settling Defendant shall, with respect to the 1 ½ Mile Reach Removal Action, pay its share of the 1½ Mile Reach Removal Action Costs in accordance with Section XX of this Consent Decree (Reimbursement of Costs) and perform other activities as specified in this Consent Decree.

        d.    Subject to and in accordance with Paragraph 22 (Rest of River) of this Consent Decree, Settling Defendant shall complete the RCRA Facility Investigation Report, shall propose Interim Media Protection Goals, and shall perform the Corrective Measures Study for the Rest of the River in accordance with the Reissued RCRA Permit, and shall perform the Rest of River Remedial Action and O&M in accordance with the modification of that Reissued RCRA Permit to select the Rest of the River Remedial Action and in accordance with the Rest of River SOW.

    15.    In addition to Settling Defendant's other obligations in this Consent Decree, including the specific obligations regarding the performance of response actions and Restoration Work and other natural resource protection and restoration actions pursuant to Sections VII (Removal Actions Outside the River), VIII (River

Response Actions), and XXI (Natural Resource Damages) and its obligation to achieve and maintain Performance Standards as set forth in Section IX of this Consent Decree and in the SOW, Settling Defendant shall comply with the following requirements with respect to each Removal or Remedial Action required under this Consent Decree:

a.    Materials that are excavated or otherwise removed from their current location at the Site and demolition debris from building demolition may be permanently consolidated at the GE Plant Area using a combination of the Hill 78 Consolidation Area, the Building 71 Consolidation Area, and another potential Consolidation Area at the corner of New York Avenue and Merrill Road, as designated in the SOW as permanent consolidation areas (collectively referred to herein as "on-plant consolidation areas"), in accordance with the following:

(i)    All materials to be consolidated at the Hill 78 Consolidation Area shall contain less than 50 ppm PCBs, as determined by appropriate composite sampling techniques or other techniques approved by EPA, and shall not constitute hazardous waste under RCRA.

(ii)    Settling Defendant shall not place in the on-plant consolidation areas any asbestos-containing materials required by applicable law to be removed from buildings or structures prior to demolition, free liquids, "free product," intact drums and capacitors, or other equipment that contains liquid PCBs within its internal components. If such materials are encountered, Settling Defendant will instead dispose of these materials appropriately off-site.   For purposes of this Paragraph, "free product" is defined as materials containing PCBs or other Waste Material that by visual inspection

59

flow at room temperature or from which liquid passes when a 100 mg or 100 ml sample is placed on a mesh number 60 plus or minus 5 percent paint filter and allowed to drain at room temperature for 5 minutes.

        (iii)    The specific design and implementation requirements of the on-plant consolidation areas, including, but not limited to, engineering limitations and consolidation area configuration (e.g., horizontal extent and maximum elevation), shall comply with Section 2.1.4 and Annex 1 of the SOW attached to this Consent Decree.

        b.    In addition to using the on-plant consolidation areas for consolidation of building demolition debris, Settling Defendant may use the existing foundations of certain buildings, as described in the SOW, for placement of debris from building demolition activities conducted pursuant to the Definitive Economic Development Agreement and at Buildings 12, 12X, and 12Y. Such building foundations shall not be considered "on-plant consolidation areas" for purposes of this Consent Decree. However, if Settling Defendant uses such building foundations for the placement of building demolition debris, it shall comply with the requirements of Section 2.1.5 of the SOW for placement of such material in building foundations and for the covering of those foundations after use. Building demolition conducted pursuant to the Definitive Economic Development Agreement and at Buildings 12, 12X, and 12Y is not part of the GE Plant Area Removal Actions; however, the placement of demolition debris in the foundations shall be part of the GE Plant Area Removal Actions for the areas where such foundations are located (but will be excluded from the spatial averaging for such areas, as provided in Section 2.1.5 of the SOW).

c.      To the extent Settling Defendant performs the Work in accordance with this Consent Decree, the SOW, the Upper ½ Mile Reach Removal Action Work Plan, and other required work plans, RCRA land disposal restrictions shall not apply to on-plant consolidation (including placement of materials in the on-plant consolidation areas and placement of building demolition debris in building foundations), because the areas covered by those documents have been designated by EPA as an Area of Contamination pursuant to EPA's "Area of Contamination Policy."  For the Building 71 and New York Avenue/Merrill Road Consolidation Areas, Settling Defendant shall: suitably prepare, cap, monitor and maintain the area in accordance with Section 2.1.4, Attachments G, H and J, and Annex 1 of the SOW; provided, however, that except as otherwise provided therein, the additional liner and leachate collection requirements of 40 C.F.R. § 761.75 and 40 C.F.R. § 253.301(c) and comparable requirements of Massachusetts regulations shall not apply to the consolidation areas.  For the Hill 78 Consolidation Area, as well as the other on-plant consolidation areas, Settling Defendant shall comply with the requirements of Paragraph 25.b (Performance Standards) of this Consent Decree.

16.      <u>Performance of Removal Actions Prior to Effective Date of Consent Decree.</u>

a.      <u>Obligations to be Performed.</u>  In order to expedite response actions at the Site, Settling Defendant has agreed to commence and perform the following work as a contractual obligation effective upon lodging of this Consent Decree: (1) all design and implementation of the Allendale School Removal Action, in

61

accordance with Sections VI, VII and IX of this Consent Decree and the SOW and Annex 3 to the SOW (Work Plan for Allendale School Removal Action); (2) all design and implementation of the Upper ½ Mile Reach Removal Action, in accordance with Paragraph 20 and Sections VI, VIII and IX of this Consent Decree and the Upper ½ Mile Reach Removal Action Work Plan; (3) the design, implementation, and operation of the Hill 78 and Building 71 Consolidation Areas for the consolidation of materials excavated as part of the Allendale School and Upper ½ Mile Reach Removal Actions, in accordance with the applicable provisions of Sections VI, VII and IX of this Consent Decree, the SOW, and Annex 1 to the SOW (Work Plans for On-Plant Consolidation Areas); and (4) submittal of Pre-design Investigation Work Plans for the 30s Complex Removal Action, the 40s Complex Removal Action, the 20s Complex Removal Action, and the Newell Street Area I Removal Action, as well as the Field Sampling Plan/Quality Assurance Project Plan portions of the Project Operations Plan, in accordance with the schedule set forth in Attachment A to the SOW, and submittal of the Baseline Monitoring Program Proposal for the Plant Site 1 Groundwater Management Area in accordance with the schedule set forth in Attachment H to the SOW; and (5) continuation of source control investigation, design, and implementation activities for East Street Area 2-South, the Lyman Street Area, and Newell Street Area II in accordance with the work plans and schedules approved by EPA as included in Annex 2 to the SOW; provided, however, that if the Court denies entry of this Consent Decree before completion of all work provided for in this Paragraph, or if the United States, the State or Connecticut withdraws from this Consent Decree pursuant to

62

Section XXXVIII (Lodging and Opportunity for Public Comment) of this Consent Decree,

or if either the United States or Settling Defendant withdraws from this Consent Decree

pursuant to Paragraph 10.c, then Settling Defendant may suspend performance as of

the date of denial of entry by the Court or of written notice by the United States, the

State or Connecticut (or Settling Defendant pursuant to Paragraph 10.c) that it has

withdrawn from the Decree and Settling Defendant shall have no further obligations

under this Paragraph 16.   In the event that Settling Defendant suspends performance,

the Parties reserve all of their rights except as specifically provided in this Paragraph

16.

In addition, the Parties agree that Settling Defendant may, upon lodging of this

Consent Decree, commence use of certain existing building foundations for

consolidation of building demolition debris, as described in Paragraph 15.b of this

Consent Decree, in accordance with and subject to the requirements of Paragraph 15.b

and Section 2.1.5 of the SOW.

b.    Covenants by United States.  In consideration of the actions that

will be performed and the payments that will be made by the Settling Defendant as a

contractual matter prior to the effective date of the Consent Decree, and except as

specifically provided in this Paragraph, the United States, on behalf of EPA, NOAA,

DOI, DOD, ACOE, ATSDR and any other agency of the United States which may have

authority to administer the statutes cited in this subparagraph, as a contractual

obligation effective upon lodging of this Consent Decree, covenants not to sue or to

take administrative action against Settling Defendant pursuant to Section 106 or 107(a)

63

of CERCLA, Section 7003 of RCRA, Section 7 of the Toxic Substances Control Act ("TSCA"), and/or Section 504 of the Clean Water Act for releases or threatened releases of Waste Material to or at the Allendale School Property and/or the Upper ½ Mile Reach, where such Waste Material originated at the GE Plant Area, and/or for the on-plant consolidation activities that are the subject of this Paragraph.  The United States, on behalf of the above-mentioned agencies, further covenants not to sue or to take administrative action against Settling Defendant pursuant to Sections 1002, 1005, 1006, 1009 and 1015 of the Oil Pollution Act, Section 113(f) of CERCLA, Sections 3004(u) and (v) and 3008 of RCRA, Section 17 of TSCA, Sections 309, 311 and 404 of the Clean Water Act, and/or Section 10 of the Rivers and Harbors Act for releases or threatened releases of Waste Material (regardless of the manner in which such Waste Material may be listed, defined or characterized under these statutes) to or at the Allendale School Property and/or the Upper ½ Mile Reach, where such Waste Material originated at the GE Plant Area, and/or for the on-plant consolidation activities that are the subject of this Paragraph; provided, however, that the United States' covenant with respect to such statutory provisions does not apply to any action or claim other than an action or claim to compel Settling Defendant to implement, comply with, or fund response actions, corrective actions or measures, or other similar judicial or administrative response-type injunctive relief, or for recovery, reimbursement, contribution or equitable share of response costs or, with respect to the Upper ½ Mile Reach, Natural Resource Damages, and specifically does not apply to any action or claim for civil penalties under these statutory provisions.  Except with respect to future

liability, these covenants not to sue shall take effect upon lodging of this Consent

Decree. With respect to future liability, the covenant not to sue shall be effective as to

each Removal Action upon EPA's Certification of Completion for that individual

Removal Action. These covenants not to sue are conditioned upon the satisfactory

performance by Settling Defendant of its obligations under this Paragraph. These

covenants not to sue extend only to the Settling Defendant and do not extend to any

other person. Upon the effective date of this Consent Decree, the provisions of Section

XXVI of this Consent Decree shall apply in lieu of the covenants in this Paragraph 16.b.

However, if the Court denies entry of this Consent Decree or the United States, the

State or Connecticut withdraws from this Consent Decree pursuant to Section XXXVIII

of this Consent Decree (Lodging and Opportunity for Public Comment), or the United

States or Settling Defendant withdraws from this Consent Decree pursuant to

Paragraph 10.c, and Settling Defendant suspends work pursuant to Paragraph 16.a,

then the scope of the covenant not to sue in this Paragraph 16.b shall be limited to the

work that has been completed as of the date that Settling Defendant suspends the

work.

      c.    Covenants by Massachusetts.

(i) In consideration of the actions that will be performed and the payments

that will be made by the Settling Defendant as a contractual matter prior to the effective

date of the Consent Decree, and except as specifically provided in this Paragraph, the

State, as a contractual obligation effective upon lodging of this Consent Decree,

covenants not to sue or to take administrative action against Settling Defendant

65

pursuant to the statutes and common law theories listed in Paragraph 16.c(ii), whether on its own behalf or as *parens patriae*, for releases or threatened releases of Waste Material (regardless of the manner in which such Waste Material may be listed, defined or characterized under these statutes or common law theories), where such Waste Material originated at the GE Plant Area, to or at the Allendale School Property and/or the Upper ½ Mile Reach  and/or for the on-plant consolidation activities that are the subject of this Paragraph; provided, however, that the State's covenant is limited to claims or actions:  (A) to compel Settling Defendant to implement, comply with, or fund response actions, corrective actions or measures, or other similar judicial or administrative response-type injunctive relief; (B) for recovery, reimbursement, contribution, or equitable share of response costs or, with respect to the Upper ½ Mile Reach, Natural Resource Damages; and (C) for recovery, reimbursement, contribution, or equitable share of property damage.  The covenants in this Paragraph 16.c specifically do not apply to any action or claim for civil penalties under these statutory provisions.

(ii) The statutes and common law theories subject to the covenants in Paragraph 16.c(i), and to the limitations set forth therein, are the following: Sections 107, 113, 121(e)(2), 121(f), and 310 of CERCLA; Sections 1002, 1005, 1006, 1008 and 1009 of the Oil Pollution Act, Section 7002 of RCRA; Section 20 of TSCA; Section 505 of the Clean Water Act; Sections 3A, 4, 4A, 5, 9, and 10 of M.G.L. c. 21E and Section 11 of M.G.L. c. 21E for violation or enforcement of such Sections 3A, 4, 4A, 5, 9, and 10; Section 4 of M.G.L. c. 21H; Sections 5, 7, and 11D of M.G.L. c. 12; Sections 42, 44,

66

46, and 53 of M.G.L. c. 21; Sections 9 and 10 of M.G.L. c. 21C; Sections 142A; 142B,

160, 160B, and 162 of M.G.L. c. 111; Section 169 of M.G.L. c. 111 for violation of

Section 167; Sections 40, 40A, 42, and 90 of M.G.L. c. 131; Section 7A of M.G.L. c.

214; Section 39G of M.G.L. c. 40; Sections 59 and 59A of M.G.L. c. 91; Sections 4, 9,

and 11 of M.G.L. c. 93A for a violation of Section 2; and Section 6 of M.G.L. c. 131A

(including the implementing regulations of the statutes listed in this subparagraph

16(c)(ii)) and nuisance, trespass, negligence, strict liability, or restitution.

(iii) Except with respect to future liability, these covenants not to sue shall

take effect upon lodging of this Consent Decree. With respect to future liability, the

covenant not to sue shall be effective as to each Removal Action upon EPA's

Certification of Completion for that individual Removal Action. These covenants not to

sue are conditioned upon the satisfactory performance by Settling Defendant of its

obligations under this Paragraph. These covenants not to sue extend only to the

Settling Defendant and do not extend to any other person. Upon the effective date of

this Consent Decree, the provisions of Section XXVI of this Consent Decree shall apply

in lieu of the covenants in this Paragraph 16.c. However, if the Court denies entry of

this Consent Decree or the United States, the State or Connecticut withdraws from this

Consent Decree pursuant to Section XXXVIII of this Consent Decree (Lodging and

Opportunity for Public Comment), or the United States or Settling Defendant withdraws

from this Consent Decree pursuant to Paragraph 10.c, and Settling Defendant

suspends work pursuant to Paragraph 16.a, then the scope of the covenant not to sue

in this Paragraph 16.c shall be limited to the work that has been completed as of the date that Settling Defendant suspends the work.

    d.    Covenants by Connecticut.

    (i)    In consideration of the actions that will be performed and the payments that will be made by the Settling Defendant as a contractual matter prior to the effective date of the Consent Decree, and except as specifically provided in this Paragraph, Connecticut, as a contractual obligation effective upon lodging of this Consent Decree, covenants not to sue or take administrative action against Settling Defendant pursuant to Sections 107, 121(e)(2), or 113 of CERCLA, Sections 310 and 106 of CERCLA, Sections 7002 and 7003 of RCRA, Sections 20 and 7 of TSCA, Sections 1002, 1005, 1006, 1008 and 1009 of the Oil Pollution Act, or Sections 505 and 504 of the Clean Water Act for releases or threatened releases of substances subject to these statutes, where such substances originated at the GE Plant Area, to or at the Allendale School Property, the Upper ½ Mile Reach, and/or the Hill 78 and Building 71 Consolidation Areas, and for the Removal Actions and on-plant consolidation activities that are the subject of this Paragraph, and not to sue or take administrative action against Settling Defendant pursuant to the Connecticut statutory provisions set forth herein with respect to releases, spills or discharges of or pollution from, or threatened releases, spills or discharges of or pollution from, the chemical liquids, hazardous wastes, oil or petroleum, waste oil or solid, liquid or gaseous products subject to such statutes, where such substances originated at the GE Plant Area, to or at the Allendale School Property, the Upper ½ Mile Reach, and/or the Hill 78 and Building 71

Consolidation Areas, and for the Removal Actions and on-plant consolidation activities that are the subject of this Paragraph. The Connecticut statutory provisions subject to Connecticut's covenant are Sections 5, 6, 6a, 7, 427, 432, 435, 451 and 452 of Title 22a of the Connecticut General Statutes, and, to the extent Connecticut participates in the New England Interstate Water Pollution Control Commission, these covenants include Section 309, Article XII of the Connecticut General Statutes. For purposes of this subparagraph (d)(i), the phrase "substances subject to these statutes" includes wastes, hazardous constituents, refuse, materials, chemical substances or mixtures, PCBs, pollutants, oil, hazardous substances, and pollution sources.

(ii)     In consideration of the actions that will be performed and the payments that will be made by the Settling Defendant as a contractual matter prior to the effective date of this Consent Decree, and except as specifically provided in sub-paragraph (e) and subject to the limitations set forth herein, Connecticut, as a contractual obligation effective upon lodging of this Consent Decree, covenants not to sue Settling Defendant pursuant to Sections 7002 and 3004(u) or (v) of RCRA, Sections 7002 and 3008 of RCRA, Sections 20 and 17 of TSCA, Sections 505 and 309 of the Clean Water Act, or Sections 505 and 311 of the Clean Water Act; and further covenants not to sue Settling Defendant for nuisance, negligence, negligence per se, strict liability for ultrahazardous activity, restitution, reckless misconduct, trespass, or under the public trust doctrine theory, with respect to pollution, chemical liquids, hazardous wastes, oil or petroleum, waste oil or solid, liquid or gaseous products, where such pollution, chemical liquids, hazardous wastes, oil or petroleum, waste oil or

69

solid, liquid or gaseous products originated at the GE Plant Area, to or at the Allendale School Property, the Upper ½ Mile Reach, and/or the Hill 78 and Building 71 Consolidation Areas, and for the Removal Actions and on-plant consolidation activities that are the subject of this Paragraph; and further covenants not to sue or take administrative action against Settling Defendant, pursuant to the statutory provisions set forth herein, with respect to the pollution, chemical liquids, hazardous wastes, oil or petroleum, waste oil or solid, liquid or gaseous products  subject to the statutes set forth herein, where such pollution, chemical liquids, hazardous wastes, oil or petroleum, waste oil or solid, liquid or gaseous products originated at the GE Plant Area, to or at the Allendale School Property, the Upper ½ Mile Reach, and/or the Hill 78 and Building 71 Consolidation Areas, and for the Removal Actions and on-plant consolidation activities that are the subject of this Paragraph.  The Connecticut statutory provisions subject to Connecticut's covenant are Sections 6b, 6e, 14 et seq. (Environmental Protection Act), 123, 131, 133c-g, 225, 226, 226a, 226b, 416, 430, 438, 449(c) and 463-469 of Title 22a of the Connecticut General Statutes.  Connecticut's covenant set forth in this subparagraph (d)(ii), with respect to the aforementioned common law and statutory provisions, does not apply to any action other than: (A) an action to compel Settling Defendant to implement response actions, corrective actions or measures, or for other similar judicial or administrative injunctive relief; or (B) an action for recovery of response costs, damages, civil penalties or Natural Resource Damages.

(iii)    For purposes of subparagraphs (i) and (ii) of this Paragraph 16.d, the phrase "pollution, chemical liquids, hazardous wastes, oil or petroleum, waste oil or

70

solid, liquid or gaseous products" shall be as defined in Chapters 445 or 446k of the Connecticut General Statutes.

(iv)    Except with respect to future liability, these covenants not to sue shall take effect upon lodging of this Consent Decree. With respect to future liability, the covenant not to sue shall be effective as to each Removal Action upon EPA's Certification of Completion for that individual Removal Action. These covenants not to sue are conditioned upon the satisfactory performance by Settling Defendant of its obligations under this Paragraph. These covenants not to sue extend only to the Settling Defendant and do not extend to any other person. Upon the effective date of this Consent Decree, the provisions of Section XXVI of this Consent Decree shall apply in lieu of the covenants in this subparagraph 16.d. However, if the Court denies entry of this Consent Decree or the United States, the State or Connecticut withdraws from this Consent Decree pursuant to Section XXXVIII of this Consent Decree, or the United States or Settling Defendant withdraws from this Consent Decree pursuant to Paragraph 10.c, and Settling Defendant suspends work pursuant to Paragraph 16.a, then the scope of the covenant not to sue in this Paragraph 16.d shall be limited to the work that has been completed as of the date that Settling Defendant suspends the work.

e.       Pre- and Post-Certification Reservation. The covenants set forth in subparagraphs b, c and d above are subject to the provisions of Paragraphs 162, 163, 167, 168, 171 and 172 (United States, State and Connecticut Pre- and Post-Certification Reservations) and Paragraph 42 of this Consent Decree.

71

f.    General Reservation of Rights. The covenants not to sue set forth above do not pertain to any matters other than those expressly specified in subparagraphs 16.b, 16.c, and 16.d above.  The United States, Connecticut and the State reserve, and this Paragraph is without prejudice to, all rights against Settling Defendant with respect to all other matters, including but not limited to, the following:

(i)    claims based on a failure by Settling Defendant to meet a requirement of this Paragraph;

(ii)   liability arising from the past, present, or future disposal, release, or threat of release of Waste Materials outside of the Site;

(iii)  liability for future disposal of Waste Material at the Site, other than as provided in the Work to be performed under this Paragraph, or otherwise ordered by EPA;

(iv)   criminal liability;

(v)    liability for violations of federal or state law which occur during or after implementation of any Work under this Paragraph;

(vi)   if the Court denies entry of this Consent Decree or the United States, the State or Connecticut withdraws from this Consent Decree pursuant to Section XXXVIII of this Consent Decree or the United States or Settling Defendant withdraws from this Consent Decree pursuant to Paragraph 10.c, liability for additional response actions that EPA determines are necessary to address releases or threatened releases of NAPL or Waste Materials in groundwater from areas outside the Upper ½ Mile Reach or the Allendale School Property to or at the Upper ½ Mile Reach or the

72

Allendale School Property, except as addressed by the source control activities performed by Settling Defendant pursuant to clause (5) of Paragraph 16.a; and

(vii)    liability for Natural Resource Damages except relating to the Upper ½ Mile Reach.

g.    Work Takeover.   In the event EPA determines that Settling Defendant has ceased implementation of the Allendale School Removal Action (and associated on-plant consolidation activities) and/or the Upper ½ Mile Reach Removal Action (and associated on-plant consolidation activities), as required by Paragraph 16.a, is seriously or repeatedly deficient or late in its performance of such response actions under Paragraph 16.a, or is implementing such response actions under Paragraph 16.a in a manner which may cause an endangerment to human health or the environment, EPA may assume the performance of the Removal Action in question (including associated on-plant consolidation activities).  Settling Defendant may invoke the procedures set forth in Section XXIV (Dispute Resolution), Paragraph 136, to dispute EPA's determination that takeover of such response actions is warranted under this Paragraph.  Costs Incurred by the United States in performing such response actions pursuant to this Paragraph shall be considered U.S. Future Response Costs that Settling Defendant shall pay in accordance with  Section XX (Reimbursement of Costs).

h.    Covenants by Settling Defendant.

(i)   As a contractual matter, as of the lodging of this Consent Decree, Settling Defendant covenants not to sue and agrees not to assert any claims or causes

73

of action against the United States, on behalf of EPA, DOI, NOAA, DOD, ACOE,

ATSDR, and any other agency of the United States which may have authority to

administer the statutes cited in subparagraph 16.b, or against Connecticut and the

State (including any department, agency or instrumentality of Connecticut or the State),

with respect to the Removal Actions and on-plant consolidation activities that are the

subject of this Paragraph or for releases or threatened releases of Waste Material

(regardless of the manner in which such Waste Material may be listed, defined or

characterized under these statutes) to or at the Allendale School Property and the

Upper ½ Mile Reach, where such Waste Material originated at the GE Plant Area,

including, but not limited to:

(A)     any direct or indirect claim for reimbursement from the

Hazardous Substance Superfund (established pursuant to the Internal Revenue Code,

26 U.S.C. § 9507) through CERCLA Sections 106(b)(2), 107, 111, 112, 113 or any

other provision of law;

(B)     any direct or indirect claim for recovery, reimbursement,

contribution or equitable share of response costs, Natural Resource Damages, or

property damage pursuant to M.G.L. c. 21E;

(C)     any claims under Sections 107 or 113 of CERCLA, Section

7002 of RCRA, Section 504 of the Clean Water Act, and/or Sections 1002, 1005, 1008,

1009 or 1015 of the Oil Pollution Act;

(D)     any claims arising out of the Removal Actions and on-plant

consolidation activities that are the subject of this Paragraph, including claims based on

74

the United States', the State's and Connecticut's selection of oversight or approval of

plans for such Removal Actions and on-plant consolidation activities;

            (E)    any claim under the Fifth Amendment to the United States

Constitution or under the Massachusetts Constitution for "takings"; and

            (F)    any claim under the Tucker Act, 28 U.S.C. § 1491, or at

common law, arising out of or relating to such Removal Actions and on-plant

consolidation activities or access to, or land use restrictions on, the areas subject to

such Removal Actions and on-plant consolidation activities.

            (ii)  The covenant not to sue set forth in this Paragraph 16.h extends only

to the extent that Settling Defendant performs the Removal Actions and on-plant

consolidation activities that are the subject of this Paragraph 16 and only to the extent

that the covenants by the United States, Massachusetts, and Connecticut set forth in

Paragraphs 16.b, 16.c, and 16.d apply.  Upon the effective date of this Consent Decree,

the provisions of Section XXVII of this Consent Decree shall apply in lieu of the

covenants in this Paragraph 16.h.  However, if the Court denies entry of this Consent

Decree or the United States, the State or Connecticut withdraws from this Consent

Decree pursuant to Section XXXVIII of this Consent Decree or the United States or

Settling Defendant withdraws from this Consent Decree pursuant to Paragraph 10.c,

and Settling Defendant suspends work pursuant to Paragraph 16.a, then the scope of

the covenant not to sue in this Paragraph 16.h shall be limited to the work that has

been completed as of the date that Settling Defendant suspends the work, and Settling

Defendant reserves the right to assert any and all claims or causes of action against the

United States, the State, and/or Connecticut with respect to any matters whatsoever other than that completed work.

(iii)   Nothing in this Paragraph shall be construed to preclude Settling Defendant from pursuing dispute resolution under Section XXIV of this Consent Decree, defending against a claim by the United States or the State in accordance with Paragraph 16.m of this Consent Decree, challenging a settlement under Paragraph 125 of this Consent Decree, applying to the Court for relief under Paragraph 211 of this Decree, submitting comments to any government agency, submitting and pursuing claims regarding requests for information relating to the Removal Actions and on-plant consolidation activities that are the subject of this Paragraph under 5 U.S.C. § 552 (Freedom of Information Act) or M.G.L. c. 66 (Public Records Act) or Connecticut General Statutes, Title 1, Chapter 14, Sections 1-200 et seq. (Connecticut Freedom of Information Act), or challenging rules, regulations or permits issued by any government agency; provided, however, that any challenge to issuance of the Reissued RCRA Permit shall be in accordance with Paragraph 10 of this Consent Decree.

i.      Retention of Response Authority.  Subject to the other  provisions of this Consent Decree, the United States, Connecticut and the State retain all authority and reserve all rights to take any and all response actions authorized by law.

j.      Contribution Protection.  The Parties agree that the Settling Defendant is entitled, as of the date of lodging of this Consent Decree, to protection from contribution actions or claims to the extent provided by CERCLA Section 113(f)(2), 42 U.S.C. § 9613(f)(2), for matters addressed in this Paragraph. "Matters addressed in

76

this Paragraph" shall mean all Work to be performed by Settling Defendant pursuant to this Paragraph and all Restoration Work activities to be completed pursuant to this Paragraph. The Parties do not intend for this provision to affect in any way the rights of persons with actual or potential claims against Settling Defendant with respect to any portion of the Site for causes of action other than those described in this subparagraph 16.j.

k.  Other Requirements.  The Parties agree, as a contractual matter, that the other provisions of this Consent Decree, including but not limited to Paragraph 177 (Issuance of Administrative Orders), shall apply to the activities to be performed by Settling Defendant pursuant to this Paragraph 16 until the effective date of this Consent Decree, but only with respect to and insofar as relevant to such activities; provided, however, that the following provisions shall not apply to such activities: Sections X (Review of Response Actions), XIII (Access and Land/Water Use Restrictions) (except as applicable to the Upper ½ Mile Reach); XVII (Assurance of Ability To Complete Work); XXI (Natural Resource Damages) (except Paragraph 118.a); XXV (Stipulated Penalties); XXVI (Covenants Not to Sue by Plaintiffs) (except Paragraph 177); XXVII (Covenants by Settling Defendant); Paragraph 192 of Section XXIX (Effect of Settlement; Contribution Protection); XXXIII (Effective Date); and XL (Final Judgment).

l.  Transition to Effective Consent Decree.  Upon the effective date of this Consent Decree, the other provisions of this Consent Decree shall govern the performance of the Work by Settling Defendant in lieu of the provisions contained in this Paragraph, and all ongoing obligations existing from the date of lodging of this Consent

Decree will continue without interruption and shall be enforceable obligations under this Consent Decree. Upon the effective date of this Consent Decree, all executory obligations, duties, burdens and sanctions arising under this Paragraph will be subject to enforcement pursuant to the other provisions of this Consent Decree, including but not limited to stipulated penalties (but only for violations occurring after the date of entry of this Consent Decree); however, no obligation or duty already performed or imposed under this Paragraph shall be required or imposed a second time under the Consent Decree, and the provisions of the Consent Decree and this Paragraph shall be construed accordingly.

          m.      In the event EPA, after reasonable opportunity for review and comment by the State, determines that Settling Defendant has ceased implementation of all or any portion of the Work required by this Paragraph 16, is late or seriously deficient in its performance of the Work required under this Paragraph 16 (including compliance with deadlines), or is implementing the Work under this Paragraph 16 in a manner which may cause an endangerment to human health or the environment, the United States may, notwithstanding any other dispute resolution provision in this Consent Decree, file a motion in this action seeking the grant of immediate injunctive relief and/or specific performance relating to Settling Defendant's obligations under this Paragraph 16. The State may join the United States' motion or file a response. Settling Defendant may file a response to the United States' and/or the State's motion. Settling Defendant may raise, in opposition to the United States' and/or State's motion, any issue relevant to the motion that otherwise could have been raised in dispute resolution

under this Consent Decree, provided that Settling Defendant will then not pursue such issue in any other dispute resolution proceeding. The United States, the State and Settling Defendant stipulate that they will jointly request an expedited hearing of any such motion. In the event the United States files its motion based on a determination that Settling Defendant has ceased implementation of all or any portion of the Work required by this Paragraph 16, or is late or seriously deficient in its performance of the Work required under this Paragraph 16, then upon the United States proving that Settling Defendant has ceased implementation or is late or seriously deficient in its performance of the Work under this Paragraph, Settling Defendant shall stipulate to entry of an order for immediate injunctive relief or for specific performance to enforce Settling Defendant's obligations under this Paragraph 16; provided, however, that any findings by the Court shall not be binding in any proceeding other than the one referenced in this subparagraph seeking an injunction or order of specific performance or any subsequent proceeding to enforce such injunction or order.

17.    Selection of Supervising Contractor(s).

a.    All aspects of the Work to be performed by Settling Defendant pursuant to Sections VI (Performance of the Work by Settling Defendant), VII (Removal Actions Outside the River), VIII (River Response Actions), IX (Performance Standards), X (Remedy Review), XI (Sampling Protocols), XII (Quality Assurance, Sampling and Data Analysis),  XIX (Emergency Response) of this Consent Decree, and the Restoration Work and other natural resource protection and restoration actions pursuant to Section XXI (Natural Resource Damages) of this Consent Decree shall be

under the direction and supervision of the Supervising Contractor(s), the selection of which shall be subject to disapproval by EPA after a reasonable opportunity for review and comment by the State. Within 10 days after the lodging of this Consent Decree, Settling Defendant shall notify EPA and the State in writing of the name, title, and qualifications of the contractor(s) proposed to be the Supervising Contractor(s). EPA will issue a notice of disapproval or an authorization to proceed. If at any time thereafter, Settling Defendant proposes to change a Supervising Contractor, Settling Defendant shall give such notice to EPA and the State and must obtain an authorization to proceed from EPA, after a reasonable opportunity for review and comment by the State, before the new Supervising Contractor performs, directs, or supervises any Work under this Consent Decree.

b.     If EPA disapproves a proposed Supervising Contractor, EPA will notify Settling Defendant in writing. Settling Defendant shall submit to EPA and the State a list of contractors, including the qualifications of each contractor, that would be acceptable to it within 30 days of receipt of EPA's disapproval of the contractor previously proposed. EPA will provide written notice of the names of any contractor(s) that it disapproves and an authorization to proceed with respect to any of the other contractors. Settling Defendant may select any contractor from that list that is not disapproved and shall notify EPA and the State of the name of the contractor selected within 21 days of EPA's authorization to proceed.

c.     If EPA fails to provide written notice of its authorization to proceed or disapproval as provided in this Paragraph and this failure prevents Settling

Defendant from meeting one or more deadlines in this Consent Decree, or in a plan approved by EPA pursuant to this Consent Decree, Settling Defendant may seek relief under the provisions of Section XXIII (Force Majeure) hereof.

## VII.   REMOVAL ACTIONS OUTSIDE THE RIVER

18.    Except as specified herein, Settling Defendant shall implement the following requirements in accordance with the SOW, for each Removal Action Outside the River required under this Consent Decree.

a.    Following EPA's issuance of an authorization to proceed pursuant to Paragraph 17 and in accordance with the schedule in Attachment A to the SOW, Settling Defendant shall submit to EPA and the State a work plan for the pre-design investigation ("Pre-design Investigation Work Plan") for each Removal Action Outside the River except for the Allendale School Removal Action, the Hill 78 Consolidation Area Removal Action, and the Building 71 Consolidation Area Removal Action (which Work Plans have already been submitted), and the Groundwater Removal Actions (which shall require the submittals set forth in Paragraph 18.f).  Upon request, Settling Defendant shall also provide a copy of any Pre-Design Investigation Work Plan to Connecticut and the City.  The Pre-design Investigation Work Plan shall propose the additional sampling and other investigations necessary to design and implement the Removal Action, including any associated Restoration Work, to achieve the Performance Standards, taking into account existing data, and shall include a schedule for the performance of such investigations, as provided in the SOW.  Upon the later of

81

its approval by EPA or entry of this Consent Decree, the Pre-design Investigation Work Plan shall be incorporated into and become enforceable under this Consent Decree.

b.        Within 7 days after EPA's approval of the Pre-design Investigation Work Plan for each Removal Action subject to Paragraph 18.a (or, for the Pre-Design Investigation Work Plans referenced in Paragraph 16.a(4), following entry of this Consent Decree and in accordance with a schedule approved by EPA), Settling Defendant shall initiate performance of the obligations in that Pre-design Investigation Work Plan. In accordance with the schedule set forth in the Pre-design Investigation Work Plan, as approved by EPA, Settling Defendant shall submit to EPA and the State, with a copy to Connecticut and the City, if requested, a report on its pre-design investigation activities ("Pre-design Investigation Report"), as specified more fully in the SOW. The Pre-design Investigation Report shall provide results of all investigations undertaken pursuant to the Pre-design Investigation Work Plan, in a format as specified in the Pre-design Investigation Work Plan, as approved. It shall also include a schedule for submission of a Conceptual Removal Design/Action Work Plan or, for the Housatonic River Floodplain Removal Actions, for submission of a Removal Design/Action Work Plan for those Removal Actions. Upon its approval by EPA, the Pre-design Investigation Report shall be incorporated into and become enforceable under this Consent Decree.

c.        For all Removal Actions subject to Paragraph 18.a except the Housatonic River Floodplain Removal Actions, following EPA's approval of the Pre-design Investigation Report for each such Removal Action and in accordance with the

82

schedule set forth in that report as approved, Settling Defendant shall submit to EPA, and the State, with a copy to Connecticut and the City, if requested, a conceptual work plan for the design and implementation of the Removal Action ("Conceptual Removal Design/Action Work Plan"). The Conceptual Removal Design/Action Work Plan shall provide Settling Defendant's conceptual proposal for design and implementation of the Removal Action in accordance with the SOW and for achievement of the Performance Standards and other requirements set forth in this Consent Decree and the SOW. It shall also include a schedule for submission of a Removal Design/Action Work Plan for the Removal Action. Upon its approval by EPA, the Conceptual Removal Design/Action Work Plan shall be incorporated into and become enforceable under this Consent Decree.

   d.  Following EPA's approval of the Conceptual Removal Design/Action Work Plan for each Removal Action subject to Paragraph 18.a, and in accordance with the schedule set forth in that plan as approved, or for the Housatonic River Floodplain Removal Actions, following EPA's approval of the Pre-Design Investigation Report and in accordance with the schedule set forth in that report as approved, Settling Defendant shall submit to EPA and the State, with a copy to Connecticut and the City, if requested, a work plan for the design and implementation of the Removal Action ("Removal Design/Action Work Plan"). The Removal Design/Action Work Plan shall provide for design and implementation of the Removal Action in accordance with the SOW and for achievement of the Performance Standards and other requirements set forth in this Consent Decree and the SOW. The Removal

83

Design/Action Work Plan shall include plans and schedules for implementation of all design and implementation tasks identified in the SOW.

      e.    For each Removal Action Outside the River, upon approval of the Removal Design/Action Work Plan by EPA, Settling Defendant shall implement the activities required under the Removal Design/Action Work Plan.  Settling Defendant shall submit to EPA and the State, with a copy to Connecticut and the City, if requested, all plans, submittals, or other deliverables required under the approved Removal Design/Action Work Plan in accordance with the approved schedule for review and approval pursuant to Section XV (EPA Approval of Plans and Other Submissions). Unless otherwise directed by EPA in writing, Settling Defendant shall not commence physical Removal Action activities at the Site prior to approval of the Removal Design/Action Work Plan.

      f.    For the Groundwater Removal Actions, Settling Defendant shall, for each Groundwater Management Area, submit the following documents and perform the following activities, as described in Attachment H to the SOW, in accordance with the schedule set forth in Attachment H to the SOW:

      (i)    Baseline Monitoring Program Proposal;

      (ii)    Baseline monitoring program activities and Baseline Assessment Interim Reports;

      (iii)    Baseline Assessment Final Report and Long-Term Monitoring Program Proposal;

(iv)    Long-term monitoring program activities and event-specific

Monitoring Event Evaluation Reports; and

(v)    Long-Term Trend Evaluation Reports.

g.    For each Removal Action Outside the River, Settling Defendant

shall continue to implement such Removal Action, including any Post-Removal Site

Control required, until the Performance Standards for such Removal Action are

achieved and for so long thereafter as is otherwise required under this Consent Decree.

Settling Defendant shall have the right to invoke dispute resolution pursuant to Section

XXIV of this Consent Decree with respect to any determination by EPA under this

subparagraph.

## VIII.   RIVER RESPONSE ACTIONS

19.    Except as specified herein, Settling Defendant shall implement the

following requirements with respect to each River Response Action required under this

Consent Decree.

20.    Upper ½ Mile Reach.  Settling Defendant shall implement the Work for the

Upper ½ Mile Reach in accordance with the schedules and requirements of the Removal

Action Work Plan for the Upper ½ Mile Reach, as approved by EPA in its letter dated

August 5, 1999 (included in Appendix F hereto), and achieve and maintain the

Performance Standards for the Upper ½ Mile Reach. The Removal Action Work Plan for

the Upper ½ Mile Reach is attached hereto as Appendix F and is enforceable under this

Consent Decree.

21.     1 ½ Mile Reach.  EPA intends to implement a removal action in the 1 ½

Mile Reach upon its completion of an Engineering Evaluation/Cost Analysis ("EE/CA")

and selection of such removal action.  EPA and Settling Defendant shall fund the 1 ½

Mile Reach Removal Action in accordance with Paragraphs 103-111.  Selection of the 1

½ Mile Reach Removal Action shall incorporate the following procedures:

    a.      In connection with its activities related to the 1 ½ Mile Reach, EPA

shall:

        (i)     have technical consultation with Settling Defendant

throughout the process, including discussions of the alternatives under consideration by

EPA prior to the EPA National Remedy Review Board ("Remedy Review Board")

Meeting;

        (ii)    have technical consultation with the Citizens' Coordinating

Council, which may have independent technical advisors;

        (iii)   seek review by the Remedy Review Board of the draft EE/CA

and draft Fact Sheet prior to issuance of the EE/CA and final Fact Sheet;

        (iv)    provide Settling Defendant with the opportunity to provide a

position paper to the Remedy Review Board for the Remedy Review Board's

consideration.  Settling Defendant shall summarize its position in no more than 10

pages.  Settling Defendant may submit additional material, if necessary to support its

position, but not to exceed an additional 15 pages;

        (v)     provide a period of public comment in excess of 30 days on

the draft EE/CA and Fact Sheet; and

86

(vi)    provide Settling Defendant with an opportunity to provide comments to the Citizens Coordinating Council's independent technical experts as well as to submit its own comments for the administrative record.

b.    EPA shall obtain all access necessary to implement the 1 ½ Mile Reach Removal Action, with the costs thereof to be shared as provided in Paragraphs 103 - 111 of this Consent Decree.  At the time it seeks to obtain such access, EPA will attempt to obtain, with no additional compensation to property owners, the EREs (if any) necessary to implement the 1 ½ Mile Reach Removal Action.   If EPA is unable to obtain such EREs with no additional compensation to property owners, EPA will so notify Settling Defendant, and the provisions of Paragraphs 56, 57 and 60 of this Consent Decree shall apply.  After the completion of the 1 ½ Mile  Reach Removal Action, Settling Defendant shall undertake any Post-Removal Site Control activities required in connection with that Removal Action.  Any costs incurred by Settling Defendant in (i) obtaining EREs for properties or portions of properties subject to the 1 ½ Mile Reach Removal Action, (ii) reimbursing the State for any costs Incurred by the State in seeking to obtain such EREs, (iii) implementing Post-Removal Site Control activities associated with the 1 ½ Mile Reach Removal Action, and/or (iv) conducting other activities pursuant to any requirement of this Consent Decree for implementation of the 1 ½ Mile Reach Removal Action shall be subject to cost sharing with EPA in accordance with Paragraphs 103-111 of this Consent Decree.

87

22.    Rest of the River:   Additional studies of the Rest of the River and the

selection of a Remedial Action for the Rest of the River shall be conducted in

accordance with the Reissued RCRA Permit and the following provisions.

a.    Upon EPA's notification to Settling Defendant to move forward with

completion of the RCRA Facility Investigation ("RFI") Report, as provided in the

Reissued RCRA Permit, Settling Defendant shall complete and submit to EPA an RFI

Report on the Rest of the River in accordance with, and on the schedule provided in, the

Reissued RCRA Permit.  Settling Defendant shall submit copies of that RFI Report to

the Trustees, the State and Connecticut.

b.    EPA will conduct the human health and ecological risk assessments

of the Rest of the River.  EPA has provided a scope of work for the risk assessments

and supporting activities to Settling Defendant and other interested persons for review

and discussion.

c.    EPA's human health risk assessment will be subject to peer review

by a panel of independent risk assessment experts, in accordance with the EPA Science

Policy Council January 1998 Peer Review Handbook, EPA 100-B-98-001, and the

Protocols set forth in Appendix J.

(i)    The human health risk assessment peer review panel will be

selected by a Selection Contractor in accordance with the following procedures.  A

neutral contractor ("the Selection Contractor") will be selected by agreement between

EPA and Settling Defendant within 30 days of initiation of discussions relating to such

peer review.  If EPA and Settling Defendant do not reach agreement within 30 days of

88

initiation of discussions, EPA shall seek the decision of the Chair of EPA's Science Advisory Board or other agreed-upon scientific body or expert. EPA's decision to seek the decision of the Chair of EPA's Science Advisory Board or other agreed-upon scientific body or expert, and the selection of the Selection Contractor by the Chair or other agreed-upon scientific body or expert, shall not be subject to dispute resolution. The Selection Contractor shall accept nominations for participants in the peer review panel from any interested person for a period of 30 days. The Selection Contractor shall thereafter evaluate the nominations of all interested persons (including Settling Defendant) and other candidates it identifies for the peer review panel as it sees fit against the criteria identified in the charge for review, and select peer review panel members with the required technical expertise, free from direct and substantial conflict of interest. The affiliation of nominations will remain "blind" to the Selection Contractor.

(ii)     The human health risk assessment peer review panel will review EPA's human health risk assessment to evaluate:  (1) consistency with EPA policy and guidance; (2) the exposure scenarios and parameters used; (3) the toxicity assessment; (4) the risk calculations; and (5) the report conclusions.  Settling Defendant and other interested persons will be provided an opportunity to submit written comments and make an oral presentation to the peer review panel in accordance with the Protocols set forth in Appendix J.

d.     EPA's ecological risk assessment will be subject to peer review by a panel of independent risk assessment experts, in accordance with the EPA Science Policy Council January 1998 Peer Review Handbook, EPA 100-B-98-001, and the

89

Protocols set forth in Appendix J. The ecological risk assessment peer review panel will be selected by a Selection Contractor following the same selection procedures described in Paragraph 22.c.(i). The ecological risk assessment peer review panel will review EPA's ecological risk assessment to evaluate: (1) consistency with EPA policy and guidance; (2) the protocols applied in the studies used in the risk assessment; (3) interpretation of information generated from the studies included in the risk assessment, and (4) the report conclusions. Settling Defendant and other interested persons will be provided an opportunity to submit written comments and make an oral presentation to the peer review panel in accordance with the Protocols set forth in Appendix J.

e.     Nothing herein shall prohibit Settling Defendant from conducting its own human health and/or ecological risk assessments and submitting reports thereon as a component of its comments to EPA on EPA's human health and ecological risk assessments.

f.     Following EPA's approval of the RFI Report and EPA's determination that the peer review processes for both the human health and the ecological risk assessments have been completed, Settling Defendant shall develop and submit to EPA an Interim Media Protection Goals ("IMPG") Proposal, proposing IMPGs, in accordance with, and on the schedule provided in, the Reissued RCRA Permit. Settling Defendant shall submit copies of that IMPG Proposal to the Trustees, the State and Connecticut.

g.     EPA will conduct modeling of the fate, transport, and bioaccumulation of PCBs in the Rest of the River. The models used will include a

90

hydrodynamics component, a sediment transport component, a PCB fate and transport component, and a bioaccumulation component. EPA and Settling Defendant will share with each other critical components of all working tools and data collected and/or used in modeling activities. A working group of technical staff and contractors from EPA and Settling Defendant has been assembled to have an ongoing dialogue on the technical aspects of model construction to simulate the Housatonic River, collection of information for input to the models, model calibration, model validation, and the types of questions and uncertainties that will be addressed by the model. EPA has provided draft sampling plans and will provide draft modeling frameworks to the working group members, the State, Connecticut and the Trustees for review and discussion.

h.      EPA's modeling activities will be subject to peer review by a panel of independent modeling experts, in accordance with the EPA Science Policy Council January 1998 Peer Review Handbook, EPA 100-B-98-001, and the Protocols set forth in Appendix J. The modeling peer review panel will be selected by a Selection Contractor following the same procedures described in Paragraph 22.c.(i). The modeling peer review panel will review EPA's modeling activities at appropriate intervals during the modeling process, which will include review of at least the following EPA documents: (1) draft modeling frameworks and description of data needs; (2) model calibration report; and (3) model validation report. In this multi-staged review, the modeling peer review panel will address a number of questions, including but not limited to the following:

(i)      Do the modeling frameworks include the significant processes affecting PCB fate, transport, and bioaccumulation in the Housatonic River,

91

and are the descriptions of those processes sufficiently accurate to represent the hydrodynamics, sediment transport, PCB fate and transport, and PCB bioaccumulation in the Housatonic River?

        (ii)    Are the available data sufficient for the development of acceptable models of hydrodynamics, sediment transport, PCB fate and transport, and PCB bioaccumulation in the Housatonic River?

        (iii)    Are the processes in the final models calibrated and validated to the extent necessary for accurately predicting future conditions?

        (iv)    How sensitive are the models to uncertainties in the descriptions of the relevant processes, and are the methodologies employed to evaluate the sensitivity of the model to descriptions of the relevant processes and to evaluate the uncertainties of model predictions sufficient?

In addition, the working group of technical staff and contractors from EPA and Settling Defendant, described in Paragraph 22.g above, may suggest additional questions to be posed to the modeling peer review panel, for consideration by EPA in developing any subsequent changes to the model. Settling Defendant and other interested persons will be provided an opportunity to submit written comments and to make an oral presentation to the modeling peer review panel, in accordance with the Protocols set forth in Appendix J at each stage of the peer review process.

        i.    Nothing herein shall prohibit Settling Defendant from conducting its own modeling or other studies of the Rest of the River and submitting reports thereon as a component of its comments to EPA on EPA's modeling activities.

j.      Following EPA's approval of IMPGs, EPA's determination of the completion of the peer review processes on validation of EPA's model, and receipt by Settling Defendant of EPA's model (including its equations and results) from EPA, Settling Defendant shall develop and submit to EPA a Corrective Measures Study ("CMS") Proposal in accordance with, and on the schedule provided in, the Reissued RCRA Permit. Settling Defendant shall submit copies of that CMS Proposal to the Trustees, the State and Connecticut.

k.      Following EPA's approval of the CMS Proposal, Settling Defendant shall carry out the CMS and shall develop and submit to EPA a CMS Report in accordance with, and on the schedule provided in, the Reissued RCRA Permit, or on an alternative schedule provided in the approved, conditionally approved or modified CMS Proposal. Settling Defendant shall submit a copy of that CMS Report to the State, the Trustees and Connecticut.

l.      EPA expressly reserves the right to undertake any studies it deems necessary for the Rest of the River to shadow or supplement studies undertaken by Settling Defendant.

m.      The RFI Report, IMPG Proposal, CMS Report, EPA's report(s) containing the human health and ecological risk assessments and EPA's modeling activities, the reports of the peer review panels on the human health and ecological risk assessments and on modeling, all comments submitted to EPA and those panels, and other documents considered or relied on by EPA will become part of the administrative record for the Rest of the River Remedial Action.

93

n.      Upon satisfactory completion of the CMS Report in accordance with the Reissued RCRA Permit, EPA will issue a Statement of Basis and a draft modification to the Reissued RCRA Permit, which will set forth the proposed Remedial Action for the Rest of the River and O&M, to be implemented by Settling Defendant pursuant to CERCLA and this Consent Decree.   EPA will propose this draft permit modification pursuant to the Reissued RCRA Permit and EPA's regulations on RCRA permit modifications (40 C.F.R. § 270.41 and Part 124), including the provisions requiring public notice and an opportunity for public comment on the draft permit modification.

o.      Following the close of the public comment period, EPA will notify Settling Defendant of its intended final decision on the modification of the Reissued RCRA Permit.  Settling Defendant shall have the right, within 30 days of such notification, to invoke administrative dispute resolution pursuant to Paragraph 135 of Section XXIV (Dispute Resolution) of this Consent Decree with respect to such notification.

p.      Upon completion of such dispute resolution process (if invoked) or after the 30 day period from EPA's notification referred to in Paragraph 22.o (if Settling Defendant does not invoke dispute resolution), EPA will issue a modification of the Reissued RCRA Permit, obligating Settling Defendant to perform the selected Rest of the River Remedial Action and O&M, which performance shall be pursuant to CERCLA and this Consent Decree.

q.      Settling Defendant shall perform the selected Rest of the River Remedial Action and O&M set forth in EPA's permit modification decision referred to in

94

Paragraph 22.p unless Settling Defendant files a petition for review of such permit

modification decision in the EPA Environmental Appeals Board pursuant to 40 C.F.R.

§ 124.19 and Paragraph 141.b of Section XXIV (Dispute Resolution) of this Consent

Decree, or unless EPA's permit modification decision is otherwise stayed pursuant to 40

C.F.R. Part 124.   The decision of the EPA Environmental Appeals Board on such a

petition for review shall be subject to appeal by Settling Defendant to the United States

Court of Appeals for the First Circuit pursuant to Section 7006(b) of RCRA.   Any

proceedings in the EPA Environmental Appeals Board and the United States Court of

Appeals for the First Circuit shall be governed by applicable law, the rules of such Board

and Court, and the provisions of Paragraph 141.b of Section XXIV of this Consent

Decree, except that, for work subject to such dispute, the United States stipulates to a

stay of the effectiveness of the modified permit for those portions subject to the dispute

through the conclusion of the initial appeal referenced in this subparagraph 22.q by

Settling Defendant to the United States Court of Appeals for the First Circuit pursuant to

Section 7006(b) of RCRA.   The United States and Settling Defendant shall jointly move

the Court of Appeals for an expedited briefing schedule and expedited consideration of

the petition for review.

   r. In the event that Settling Defendant invokes dispute resolution as

provided in Paragraph 22.q, EPA may proceed with design work on the selected Rest of

River Remedial Action during the pendency of such appeals.  Prior to proceeding with

design work under this subparagraph, EPA shall give written notice to Settling

Defendant and give Settling Defendant the opportunity to implement such design work.

If Settling Defendant does not notify EPA of its intent to perform such design work within 30 days of EPA's notification, EPA may proceed with design. At the conclusion of such dispute resolution, if the Rest of River Remedial Action and O&M is upheld and EPA was performing the design work, EPA shall provide Settling Defendant with the results of its design work and return the performance of design work to Settling Defendant, and Settling Defendant shall pay EPA's costs of such work as U.S. Future Response Costs in accordance with Paragraph 95.a (Future Response Costs) of Section XX (Reimbursement of Costs) of this Consent Decree. If only a portion of the Rest of River Remedial Action and O&M is upheld or if the Rest of the River Remedial Action and O&M is not upheld in any part, and EPA was performing design work, EPA will provide Settling Defendant with the results of its design work on the Rest of River Remedial Action and return the performance of design work to Settling Defendant, and Settling Defendant shall pay EPA's costs of such work relating to the portion (if any) of the Rest of River Remedial Action and O&M that was upheld, as U.S. Future Response Costs in accordance with Paragraph 95.a (Future Response Costs) of Section XX (Reimbursement of Costs) of this Consent Decree. If a portion of the Rest of River Remedial Action and O&M is not upheld or if the Rest of River Remedial Action and O&M is not upheld in any part, Settling Defendant shall not be required to pay EPA's costs of any portion of the design work related thereto that will have to be materially changed in substance in light of the decision of the Environmental Appeals Board or the Court of Appeals (as applicable). Further, in the event that Settling Defendant invokes dispute resolution as provided in Paragraph 22.q, Settling Defendant shall perform all

severable work not subject to such dispute in accordance with EPA's final permit modification decision referred to in Paragraph 22.p and a Rest of River SOW developed in accordance with that decision and Paragraph 22.x below.

s.      If the EPA permit modification decision referred to in Paragraph 22.p. is upheld in whole or in part by the Environmental Appeals Board and, if appealed, by the United States Court of Appeals for the First Circuit, Settling Defendant shall perform the selected Rest of the River Remedial Action and O&M, as upheld in whole or in part, as a CERCLA remedial action pursuant to this Consent Decree.

t.      In the event that the Environmental Appeals Board or the United States Court of Appeals for the First Circuit vacates or remands all or part of the EPA permit modification decision referred to in Paragraph 22.p. for further EPA action, EPA may revise its permit modification decision referred to in Paragraph 22.p.

u.      Second Appeal.

(i)   Upon EPA's issuance of a revised permit modification decision referred to in Paragraph 22.t. pursuant to a remand from the Environmental Appeals Board or the United States Court of Appeals for the First Circuit, Settling Defendant shall perform the selected Rest of the River Remedial Action and O&M set forth in EPA's revised permit modification decision unless Settling Defendant timely files a petition for review of such revised permit modification decision.  Settling Defendant shall file its petition for review before the Environmental Appeals Board pursuant to 40 C.F.R. §124.19 unless otherwise approved by the United States Court of Appeals for the First Circuit.

97

(ii)  If Settling Defendant seeks review before the Environmental Appeals Board, the disputed portions of the revised permit modification decision shall be stayed pending the decision of the Environmental Appeals Board.  Settling Defendant may appeal the decision of the Environmental Appeals Board by filing a petition for review in the United States Court of Appeals for the First Circuit pursuant to Section 7006(b) of RCRA.

(iii)  In the event that Settling Defendant files a petition for review with the Environmental Appeals Board or the United States Court of Appeals for the First Circuit, Settling Defendant shall perform all severable work:

(A) which is not subject to dispute; or

(B) for which EPA's original permit modification decision was upheld previously in the Environmental Appeals Board and, if there had been an appeal of the Environmental Appeals Board's previous decision, by the United States Court of Appeals for the First Circuit.

Settling Defendant shall perform such severable work in accordance with EPA's revised permit modification decision and a Rest of River SOW to be developed in accordance with that decision and Paragraph 22.x. below.

(iv)  Any proceedings before the United States Court of Appeals for the First Circuit under subparagraph 22.u(i) or (ii) shall be governed by applicable law, the rules of the Court of Appeals for the First Circuit, and the provisions of Paragraph 141.b(iv)-(vi) of this Consent Decree, except as follows: The United States and Settling Defendant shall jointly move the Court of Appeals for an expedited briefing schedule and

98

expedited consideration of the petition for review. Further, the United States and Settling Defendant shall stipulate to a stay of the effectiveness of the disputed portions of the revised permit modification decision for a 12-month period or until the Court of Appeals issues its decision (whichever occurs first); provided, however, that: (A) at or near the end of the first six months of the stay period, EPA may apply to the Court to lift the stay at the end of the 6-month period and shall have the burden of making the necessary showing to support such application; and (B) at or near the end of the 12-month period of the stay (if the Court has not yet issued its decision or the stay has not previously been lifted), Settling Defendant may apply to the Court to extend the stay for an additional period or until the Court issues its decision and shall have the burden of making the necessary showing to support such application.

(v) During any stay pursuant to this subparagraph 22.u., Settling Defendant shall proceed with design work on the selected revised Rest of the River Remedial Action and O&M. If design work is completed prior to the lifting of any stay, Settling Defendant shall implement work on any non-disputed portions of the selected revised Rest of the River Remedial Action and O&M. If design work is completed prior to the lifting of any stay and EPA decides to move forward with implementation of the Rest of the River Remedial Action, EPA will so notify Settling Defendant in writing and give Settling Defendant the opportunity to implement work on the disputed portions of the selected revised Rest of the River Remedial Action. If Settling Defendant does not notify EPA of its intent to perform the Remedial Action within 30 days of EPA's notification, EPA may commence implementation of the Rest of the River Remedial

99

Action.  If Settling Defendant does not agree to perform the Rest of River Remedial Action, EPA retains the right to list the Site on the CERCLA National Priorities List in accordance with and subject to Paragraph 200.b of this Consent Decree.  Except as otherwise provided in the Consent Decree, if EPA proceeds with listing, Settling Defendant retains all rights to oppose or challenge such listing.

(vi)   Upon the lifting or end of any stay pursuant to this subparagraph 22.u. prior to the conclusion of dispute resolution, Settling Defendant shall perform all Rest of River Remedial Design and Remedial Action and O&M.   If EPA was performing the work, EPA will provide Settling Defendant with the results of its work on the Rest of the River Remedial Action and O&M and return the performance of work to Settling Defendant.

(vii)   At the conclusion of dispute resolution, if the Rest of the River Remedial Action and O&M is upheld and EPA was performing work, EPA shall provide Settling Defendant with any results of its work and return the performance of work to Settling Defendant, and Settling Defendant shall pay EPA's costs of such work as U.S. Future Response Costs in accordance with Paragraph 95.a of Section XX (Reimbursement of Costs) of this Consent Decree.  If only a portion of the Rest of the River Remedial Action and O&M is upheld or if the Rest of River Remedial Action and O&M is not upheld in any part, and EPA was performing work, EPA will provide Settling Defendant with any results of its work on the Rest of the River Remedial Action and O&M and return the performance of work to Settling Defendant.  In addition, if only a portion of the Rest of the River Remedial Action and O&M is upheld or if the Rest of the

100

River Remedial Action and O&M is not upheld in any part, and EPA was performing work, Settling Defendant shall pay EPA's costs of the implementation work that EPA performed, as U.S. Future Response Costs in accordance with Paragraph 95.a., but only to the extent that such work was performed to implement any portion of the Rest of the River Remedial Action and O&M upheld by the Court of Appeals or was incorporated into a subsequent further revised permit modification decision that is not appealed or (if appealed) is upheld on appeal. Nothing in this subparagraph 22.u(vii) shall be deemed to affect the provisions of Paragraph 200.b of this Consent Decree.

      v.  Subsequent Appeals.

          (i)  In the event that the Environmental Appeals Board or the United States Court of Appeals for the First Circuit vacates or remands all or part of EPA's revised permit modification decision pursuant to subparagraph 22.u. or in a subsequent appeal under this subparagraph 22.v., EPA may again revise its permit modification decision. Settling Defendant shall perform such Rest of the River Remedial Action and O&M in accordance with such further revised permit modification unless Settling Defendant timely files a petition for review of such further revised permit modification decision. In the event Settling Defendant files a petition, the provisions of subparagraph 22.u. shall apply, except for subparagraph 22.u.(iv).

          (ii)  Any proceedings before the United States Court of Appeals for the First Circuit under subparagraph 22.v.(i) shall be governed by applicable law, the rules of the Court of Appeals for the First Circuit, and the provisions of Paragraph 141.b of this Consent Decree, except the United States and Settling Defendant shall jointly

move the Court of Appeals for an expedited briefing schedule and expedited

consideration of the petition for review.  Settling Defendant may apply to the Court for a

stay of the further revised permit modification decision pending review by the United

States Court of Appeals for the First Circuit.  The United States may oppose such

application for a stay.

        w.  In the event that Settling Defendant invokes dispute resolution pursuant

to Paragraphs 22.u or 22.v  and 141.b (Dispute Resolution) and EPA's revised permit

modification decision is upheld in whole or in part by the Environmental Appeals Board

and, if appealed, by the United States Court of Appeals for the First Circuit, Settling

Defendant shall perform the selected Rest of the River Remedial Action and O&M, as

upheld in whole or in part, as a CERCLA remedial action pursuant to this Consent

Decree.

        x.  Whenever Settling Defendant is required to design and implement the

Rest of the River Remedial Action or a portion thereof pursuant to this Paragraph 22,

Settling Defendant shall develop and submit to EPA for review and approval a Rest of

River SOW in accordance with the following provisions: Within 7 days after the date

upon which the modification of the Reissued RCRA Permit, or portion thereof, requiring

such action becomes effective pursuant to this Paragraph 22, Settling Defendant shall

propose to EPA for review and approval a schedule for the subsequent submission of a

Rest of River SOW for implementation of such Remedial Action or portion thereof.  That

proposed schedule will be discussed by EPA and Settling Defendant and shall be

subject to final EPA approval, which in no event shall require submission of the Rest of

River SOW sooner than 90 days after the effective date of such Permit modification or portion thereof.  In accordance with the schedule approved by EPA, Settling Defendant shall submit to EPA for review and approval a Rest of River SOW for the Rest of River Remedial Action or effective portion thereof.  Such Rest of River SOW shall include provisions and schedules for the subsequent development of a Remedial Design Work Plan, a Remedial Action Work Plan, and/or other appropriate associated plans to achieve the Performance Standards and other requirements set forth in the effective modification of the Reissued RCRA Permit and the Rest of River SOW and (if applicable) reflecting the outcome of any completed dispute resolution proceeding.

    y. Following EPA approval of the Rest of the River SOW, Settling Defendant shall submit the necessary Remedial Design and Remedial Action Work Plans to EPA for review and approval in accordance with the Rest of River SOW and Section XV (EPA Approval of Plans and Other Submissions) of this Consent Decree and subject to Paragraph 39 (Modification of SOW, Rest of River SOW, or Work Plans) of this Consent Decree.

    z. Settling Defendant shall design and implement the Rest of River Remedial Action, and any required O&M, as a CERCLA remedial action pursuant to this Consent Decree, in accordance with EPA's final RCRA permit modification decision, the final outcome of any dispute resolution proceedings, the Rest of the River SOW, and any approved Work Plans thereunder.  For purposes of the Rest of River Remedial Action and O&M, EPA's modification of the Reissued RCRA Permit to select such Remedial Action and O&M that is effective at the time of initiation of the Rest of River

103

Remedial Design/Remedial Action shall be considered to be the final remedy selection decision pursuant to Section 121 of CERCLA and Section 300.430 of the NCP (40 C.F.R. § 300.430). If such modification is changed by appeals and/or remands, the subsequent modification of the Reissued RCRA Permit shall be considered the final remedy selection decision pursuant to Section 121 of CERCLA and Section 300.430 of the NCP (40 C.F.R. § 300.430).

aa. In the event that both the Reissued RCRA Permit and this Consent Decree require performance of a given action by Settling Defendant, enforcement of such requirement shall be pursuant to this Consent Decree, rather than pursuant to RCRA and the Reissued RCRA Permit. In the event that a given action by Settling Defendant is required only by the Reissued RCRA Permit, enforcement of such requirement shall be pursuant to RCRA and the Reissued RCRA Permit.

bb. Challenges by State to EPA Determination to Waive an ARAR. In the event that the State petitions for review of EPA's permit modification decision referred to in Paragraph 22.p or EPA's revised or further revised permit modification decisions referred to in Paragraphs 22.t and 22.v(i), respectively, in the EPA Environmental Appeals Board pursuant to 40 C.F.R. § 124.19 and/or in the United States Court of Appeals for the First Circuit pursuant to Section 7006(b) of RCRA, and in such proceeding challenges EPA's determination, in such permit modification decision, to waive an ARAR for the Rest of the River Remedial Action or O&M, the following provisions shall apply:

(i)    The United States, the State, and Settling Defendant (if a party) shall stipulate that the standard of review of the State's challenge to EPA's ARAR waiver determination shall be as provided in Section 121(f)(2)(B) of CERCLA.

(ii)    During any such proceeding in the Environmental Appeal Board, the permit modification decision challenged by the State shall be stayed in accordance with the provisions of 40 C.F.R. §§ 124.15(b)(2), 124.16(a) and 124.19(f)(1).

(iii)    If the State appeals to the Court of Appeals from a decision of the Environmental Appeals Board upholding, in whole or in part, EPA's determination to waive an ARAR in EPA's initial permit modification decision referred to in Paragraph 22.p, the following provisions shall apply with respect to such appeal.

(A)    During the pendency of such appeal, Settling Defendant shall not be required to proceed with any design work on the selected Rest of the River Remedial Action or O&M for which resolution of the State's challenge is necessary to be decided prior to undertaking such design work.  EPA may proceed with such design work during the pendency of the State's appeal.  However, prior to proceeding with design work under this subparagraph, EPA shall give written notice to Settling Defendant and give Settling Defendant the opportunity to implement such design work. If Settling Defendant does not notify EPA of its intent to perform such design work within 30 days of EPA's notification, EPA may proceed with such design work.  At the conclusion of the State's appeal, if EPA's ARAR waiver determination is upheld and EPA was performing the design work, EPA shall provide Settling Defendant with the results of its design work relating thereto and return the performance of such design

105

work to Settling Defendant, and Settling Defendant shall pay EPA's costs of such work as U.S. Future Response Costs in accordance with Paragraph 95.a of this Consent Decree. If only a portion of EPA's ARAR waiver determination is upheld or if EPA's ARAR waiver determination is not upheld in any part, and EPA was performing the design work relating to the ARAR waiver determination, EPA will provide Settling Defendant with the results of its design work and return the performance of design work to Settling Defendant. If only a portion of EPA's ARAR waiver determination is upheld, Settling Defendant shall pay EPA's costs of such work relating to the portion that was upheld as U.S. Future Response Costs in accordance with Paragraph 95.a of this Consent Decree. If a portion of EPA's ARAR waiver determination is not upheld, or if EPA's ARAR waiver determination is not upheld in any part, Settling Defendant shall not be required to pay EPA's costs of any portion of the design work related thereto that in light of the Court's decision would have to be materially changed in substance in the remedial design for any revised permit modification decision which is not appealed or is upheld on appeal.

(B)     If Settling Defendant has also appealed to the Court of Appeals pursuant to Paragraph 22.q and if the work subject to Settling Defendant's appeal is not severable from the work subject to the State's challenge, the United States will stipulate to a stay of the effectiveness of the modified permit, insofar as it applies to such work, during the pendency of the State's appeal, and neither Settling Defendant nor EPA shall proceed with the implementation of such work during the pendency of such appeal.

106

(C)    If Settling Defendant does not appeal to the Court of Appeals pursuant to Paragraph 22.q or if the work subject to the State's challenge is severable from the work subject to an appeal by Settling Defendant, either the State or Settling Defendant may move the Court of Appeals for a stay of the effectiveness of the modified permit insofar as it requires Settling Defendant to perform, or for an order precluding performance of, any implementation work on the Rest of the River Remedial Action or O&M for which resolution of the State's challenge is necessary to be decided prior to undertaking such work.  In connection with such motion, the parties shall stipulate that the Court of Appeals may consider the provisions of subparagraph 22.bb(iii)(D) below in considering the applicable stay factors.

(D)    If, due to the absence, denial, or expiration of any stay, either Settling Defendant or EPA proceeds, during the pendency of the State's challenge, with any implementation work that is subject to the State's challenge, and if the Court of Appeals thereafter holds that EPA improperly waived an ARAR, then neither Settling Defendant nor EPA shall be required to undo or re-do any implementation work that has previously been completed, so as to comply with such ARAR.  However, Settling Defendant shall comply with such ARAR, in accordance with the Court of Appeals' decision, in implementing all future work.  In the event of a dispute regarding the scope of Settling Defendant's obligations pursuant to this subparagraph to implement the Court of Appeals' decision regarding the State's challenge, such dispute shall be resolved under the Dispute Resolution provisions of Paragraphs 133 through 139 of this Consent Decree; provided, however, that the State shall also have the right to invoke dispute

107

resolution with respect to such issue in accordance with the same procedures set forth in those paragraphs, and provided further that if the State does so, stipulated penalties or any other penalties or sanctions shall not accrue against Settling Defendant, during the pendency of such dispute resolution proceeding, for any failure by Settling Defendant to perform work which the State believes is required by the Court of Appeals' decision but which EPA has not required Settling Defendant to perform.

(E)     Following the conclusion of the State's appeal to the Court of Appeals, if EPA's ARAR waiver determination is upheld and EPA was performing implementation work relating thereto, EPA will return the performance of such work to Settling Defendant, and Settling Defendant shall pay EPA's costs of such work as U.S. Future Response Costs in accordance with Paragraph 95.a of this Consent Decree. If only a portion of EPA's ARAR waiver determination is upheld or if EPA's ARAR waiver determination is not upheld in any part, and EPA was performing implementation work relating to the ARAR waiver determination, EPA will return the performance of work to Settling Defendant, and Settling Defendant shall pay EPA's costs of the implementation work relating to the ARAR waiver determination, as U.S. Future Response Costs in accordance with Paragraph 95.a, but only to the extent that such work was performed to implement any portion of the permit modification decision upheld by the Court of Appeals or was incorporated into work performed to implement a subsequent revised permit modification decision that is not appealed or (if appealed) is upheld on appeal.

(iv)     If the State appeals to the Court of Appeals from a decision by the Environmental Appeals Board upholding, in whole or in part, EPA's determination to

108

waive an ARAR in EPA's revised or further revised permit modification decision referred to in Paragraphs 22.t or 22.v(i), the following provisions shall apply with respect to such appeal:

        (A)    Notwithstanding the provisions of Paragraph 22.u(v), Settling Defendant or the State may move the Court of Appeals for a stay, pending the Court's decision, of any design work on the selected revised Rest of the River Remedial Action or O&M for which resolution of the State's challenge is necessary to be decided prior to undertaking such design work. If Settling Defendant or the State does not seek such a stay or if any motion for a stay is denied, Settling Defendant shall proceed with such design work during the pendency of the State's appeal. If such a stay is granted, EPA may proceed with such design work during the pendency of the State's appeal. However, prior to proceeding with design work under this subparagraph, EPA shall give written notice to Settling Defendant and give Settling Defendant the opportunity to implement such design work. If Settling Defendant does not notify EPA of its intent to perform such design work within 30 days of EPA's notification, EPA may proceed with such design work. At the conclusion of the State's appeal, if EPA's ARAR waiver determination is upheld and EPA was performing the design work, EPA will provide Settling Defendant with the results of its design work relating thereto and return the performance of such design work to Settling Defendant, and Settling Defendant shall pay EPA's cost of such work as U.S. Future Response Costs in accordance with Paragraph 95.a of this Consent Decree. If only a portion of EPA's ARAR waiver determination is upheld or if EPA's ARAR waiver determination is not upheld in any part,

and EPA was performing the design work relating to the ARAR waiver determination, EPA will provide Settling Defendant with the results of its design work and return the performance of design work to Settling Defendant. If only a portion of EPA's ARAR waiver determination is upheld, Settling Defendant shall pay EPA's costs of such work relating to the portion that was upheld as U.S. Future Response Costs in accordance with Paragraph 95.a of this Consent Decree. If a portion of EPA's ARAR waiver determination is not upheld or if EPA's ARAR waiver determination is not upheld in any part, Settling Defendant shall not be required to pay EPA's costs of any portion of the design work related thereto that in light of the Court's decision would have to be materially changed in substance in the remedial design for any further revised permit modification decision which is not appealed or is upheld on appeal.

(B)     If Settling Defendant has also appealed to the Court of Appeals pursuant to Paragraph 22.u or 22.v (as applicable) and if the work subject to Settling Defendant's appeal is not severable from the work subject to the State's challenge, the provisions of Paragraphs 22.u(iv) or 22.v(ii) (as applicable) relating to a stay of the effectiveness of EPA's revised or further revised permit modification decision shall apply to the implementation of such work; provided, however, that the State may also seek a stay of implementation of such work in accordance with the same procedures set forth in Paragraph 22.bb(iv)(C).

(C)     If Settling Defendant does not appeal to the Court of Appeals pursuant to Paragraph 22.u or 22.v (if applicable) or if the work subject to the State's challenge is severable from the work subject to an appeal by Settling Defendant, either

110

the State or Settling Defendant may move the Court of Appeals for a stay of the effectiveness of the revised or further revised modified permit insofar as it requires Settling Defendant to perform, or for an order precluding the performance of, any implementation work on the Rest of the River Remedial Action or O&M for which resolution of the State's challenge is necessary to be decided prior to undertaking such work. In connection with such motion, the parties shall stipulate that the Court of Appeals may consider the provisions of subparagraph 22.bb(iv)(D) below in considering the applicable stay factors.

(D) If, due to the absence, denial, or expiration of any stay, either Settling Defendant or EPA proceeds, during the pendency of the State's challenge, with any implementation work that is subject to the State's challenge, and if the Court of Appeals thereafter holds that EPA improperly waived an ARAR, then neither Settling Defendant nor EPA shall be required to undo or re-do any implementation work that has previously been completed, so as to comply with such ARAR. However, Settling Defendant shall comply with such ARAR, in accordance with the Court of Appeals' decision, in implementing all future work. In the event of a dispute regarding the scope of Settling Defendant's obligations pursuant to this subparagraph to implement the Court of Appeals' decision regarding the State's challenge, such dispute shall be resolved under the Dispute Resolution provisions of Paragraphs 133 through 139 of this Consent Decree; provided, however, that the State shall also have the right to invoke dispute resolution with respect to such issue in accordance with the same procedures set forth in those paragraphs, and provided further that if the State does so, stipulated penalties

111

or any other penalties or sanctions shall not accrue against Settling Defendant, during the pendency of such dispute resolution proceeding, for any failure by Settling Defendant to perform work which the State believes is required by the Court of Appeals' decision but which EPA has not required Settling Defendant to perform.

(E)    Following the conclusion of the State's appeal to the Court of Appeals, if EPA's ARAR waiver determination is upheld and EPA was performing implementation work relating thereto, EPA will return the performance of such work to Settling Defendant, and Settling Defendant shall pay EPA's costs of such work as U.S. Future Response Costs in accordance with Paragraph 95.a of this Consent Decree. If only a portion of EPA's ARAR waiver determination is upheld or if EPA's ARAR waiver determination is not upheld in any part, and EPA was performing implementation work relating to the ARAR waiver determination, EPA will return the performance of work to Settling Defendant, and Settling Defendant shall pay EPA's costs of the implementation work relating to the ARAR waiver determination, as U.S. Future Response Costs in accordance with Paragraph 95.a, but only to the extent that such work was performed to implement any portion of the revised permit modification decision upheld by the Court of Appeals or was incorporated into work performed to implement a subsequent further revised permit modification decision that is not appealed or (if appealed) is upheld on appeal.

(v)    In any appeal by the State to the Court of Appeals challenging a decision by EPA to waive an ARAR for the Rest of the River Remedial Action or O&M, the United States, the State, and Settling Defendant (if a party) shall jointly move the

112

Court of Appeals for an expedited briefing schedule and expedited consideration of the State's petition for review.

(vi)     For any work conducted by Settling Defendant during the pendency of a State challenge to a determination by EPA to waive an ARAR for the Rest of the River Remedial Action or O&M, Settling Defendant shall not be deemed to be in noncompliance with this Consent Decree for failure to comply with such ARAR unless and until the Court of Appeals determines that EPA improperly waived such ARAR and Settling Defendant fails to comply with such ARAR in accordance with the applicable schedule as determined by the Court or as approved by EPA (after reasonable opportunity for review and comment by the State) following the Court's decision.

(vii)     In the event that Settling Defendant or EPA performs work during the pendency of a State challenge to a determination by EPA to waive an ARAR for the Rest of the River Remedial Action or O&M, and if the Court of Appeals thereafter holds that EPA improperly waived such ARAR, EPA shall not withhold issuance of the Certifications of Completion described in Paragraphs 88 and 89 of this Consent Decree on the ground that the work performed by Settling Defendant or EPA prior to the date when compliance with such ARAR is required under the Court's decision did not meet or comply with such ARAR.

(viii)    The provisions of this Paragraph 22.bb shall not apply to any work that is severable from work subject to the State's challenge to a determination by EPA to waive an ARAR for the Rest of the River Remedial Action or O&M.

113

cc.     Challenges by Connecticut to EPA Determination to Waive an

ARAR. Paragraph 22.bb is incorporated in this subparagraph by reference except that

each reference to "the State" shall be read as a reference to "Connecticut."

## IX. PERFORMANCE STANDARDS AND RELATED REQUIREMENTS

23.     Settling Defendant shall perform the response actions required under this

Consent Decree to achieve and maintain the Performance Standards as described in

this Section IX and in the SOW (Appendix E to this Consent Decree), the Upper ½ Mile

Reach Removal Action Work Plan (Appendix F to this Consent Decree), and the Rest of

the River SOW (to be developed pursuant to this Consent Decree).

24.     The following general Performance Standards shall apply to the response

actions undertaken pursuant to this Consent Decree.

a.      For each Settling Defendant Property that is subject to a Removal

Action Outside the River or the Upper ½ Mile Reach Removal Action pursuant to this

Consent Decree, Settling Defendant shall execute and record a Grant of Environmental

Restrictions and Easements ("ERE") in accordance with the applicable provisions of

Section XIII of this Consent Decree.

b.      For each Non-Settling Defendant Property that is not in residential

use, and that is subject to a Removal Action Outside the River (except for the Allendale

School Property) or the Upper ½ Mile Reach Removal Action pursuant to this Consent

Decree, Settling Defendant shall make best efforts to obtain the execution and

recordation of an ERE (or a Notice ERE for such property that is State-owned and

subject to Article 49 of the State Constitution) in accordance with the applicable

provisions of Section XIII of this Consent Decree (unless the Performance Standards for residential use, as described herein and in the SOW, are achieved at such property).  If an ERE cannot be obtained for any such property in accordance with Section XIII of this Consent Decree, Settling Defendant shall implement a Conditional Solution at such property in accordance with Paragraphs 34-38 of this Consent Decree.

        c.     For the riverbank portions of properties located in the 1 ½ Mile Reach, to the extent that EREs are required pursuant to the 1 ½ Mile Reach Removal Action for such riverbanks that are not relatively inaccessible, Settling Defendant shall execute and record EREs for such riverbanks at Settling Defendant Property in accordance with the applicable provisions of Section XIII of this Consent Decree.   In addition, for such riverbanks at Non-Settling Defendant Property, if EPA is unable to obtain EREs without compensation to the property owners pursuant to Paragraph 21.b, Settling Defendant shall make best efforts to obtain the execution and recordation of EREs for such riverbanks in accordance with the applicable provisions of Section XIII of this Consent Decree.

        d.     For  properties located in the Rest of the River, to the extent that EREs are required at such properties pursuant to the Rest of the River Remedial Action, Settling Defendant shall execute and record an ERE at each such Settling Defendant Property in accordance with the applicable provisions of Section XIII of this Consent Decree, and shall make best efforts to obtain the execution and recordation of an ERE at each such Non-Settling Defendant Property (or a Notice ERE for such property that is

115

State-owned and subject to Article 49 of the State Constitution) in accordance with the

applicable provisions of Section XIII of this Consent Decree.

e.      For the Removal Actions Outside the River, except as specified in

this Section IX or in the SOW, the extent of response actions to address PCBs in soil

shall be determined by spatial averaging methods, as described in Attachment E to the

SOW. Such spatial averaging methods shall be applied to the averaging areas

described, or determined in accordance with the specifications and procedures set forth,

in Sections 2.2, 2.3, 2.5, and 2.6 and Attachment E of the SOW. For certain areas

subject to the Removal Actions Outside the River, the SOW provides for Settling

Defendant to select one of three options for determining averaging areas for the top foot

of soil at a property: (i) consideration of the overall property as an averaging area, or,

for the GE Plant Area, use of the pre-established averaging areas identified in

Attachment E to the SOW, provided that Settling Defendant achieves certain not-to-

exceed ("NTE") PCB concentrations in the top foot of soil in unpaved areas and any

other conditions set forth in Attachment E to the SOW are met; (ii) establishment of

averaging areas which do not exceed 1.0 acre for GE-owned industrial portions of the

GE Plant Area, 0.5 acre for other commercial/industrial properties or recreational

properties, or 0.25 acre for residential properties; or (iii) proposal of other specific

averaging areas to EPA for approval. If Settling Defendant selects the first of these

options for a given property or area, Settling Defendant shall, in addition to achieving the

other applicable Performance Standards, remove and replace all soils in the top foot in

unpaved portions of such property or area in which PCBs have been detected in excess

116

of the following NTE concentrations: 125 ppm at a commercial/industrial property or area; 50 ppm at a recreational property or area; or 10 ppm at a residential property.

f.     For the areas subject to Removal Actions Outside the River, Settling Defendant shall evaluate the non-PCB Appendix IX+3 constituents in soils and sediments in each averaging area in accordance with the procedures set forth in Sections 2.2 through 2.6 and Attachment F of the SOW for evaluating such constituents. Based upon such evaluation, Settling Defendant shall conduct additional response actions, if any, to achieve the applicable Performance Standards for such non-PCB constituents as set forth in Sections 2.2 through 2.6 and Attachment F of the SOW.

g.     For the Removal Actions that relate to groundwater and NAPL – namely, the Plant Site 1 Groundwater Management Area Removal Action, the Former Oxbows J and K Groundwater Management Area Removal Action, the Plant Site 2 Groundwater Management Area Removal Actions, the Plant Site 3 Groundwater Management Area Removal Action, and the Former Oxbows A and C Groundwater Management Area Removal Action -- Settling Defendant shall implement and operate the groundwater/NAPL monitoring, assessment, and response programs described in Attachment H to the SOW for each Groundwater Management Area described in Attachment H to the SOW, and shall achieve the Performance Standards for groundwater quality and for NAPL set forth in Section 2.7, Attachment H, and (where applicable) Annex 2 of the SOW.

25.     The Performance Standards for the Removal Actions at the GE Plant Area shall include all requirements for the GE Plant Area identified as Performance Standards in the SOW attached to this Consent Decree, and the following requirements:

a.     Settling Defendant shall perform soil remediation to address PCBs at the GE Plant Area (excluding the on-plant consolidation areas) as follows:

(i) In an approximate 200-foot wide strip along the north side of the River, located in the area from the former Thermal Oxidizer location downstream to the GE Plant Area boundary, as depicted generally on Figures 2-1 and E-1 of the SOW, Settling Defendant shall remove all paved surfaces, gravel, buildings/structures (except for the 64W oil/water separator), and underlying soil to a total depth of one foot, and shall replace that pavement/soil with a one-foot vegetative Engineered Barrier, as described in Attachment G to the SOW; provided, however, that such barrier need not be installed in any discrete portion of this strip where the average PCB concentrations do not exceed 10 ppm in the top foot, 15 ppm in the 1-3 foot depth, and 100 ppm in the top 15 feet, so long as the effectiveness of the barrier is not impaired by discontinuities in the barrier.

(ii) In a portion of East Street Area 2 - South that has been proposed for use as a City recreational area, as generally depicted on Figures 2-1 and E-1 of the SOW, Settling Defendant shall install a one-foot-thick soil cover, as described in Attachment G to the SOW, and shall remove and replace soils in the next two feet below that cover as necessary to achieve a PCB average of 15 ppm in that depth increment.

118

(iii)  Except at the areas described in Paragraph 25.a(i) and 25.a(ii) above and in Paragraph 25.d below, Settling Defendant shall take the following response-actions for the top one foot of soil in each averaging area at the GE Plant Area:  (A) For unpaved portions of such an averaging area that are located within the 100-year floodplain of the Housatonic River or Unkamet Brook, Settling Defendant shall remove and replace soils to achieve a PCB average of 25 ppm or below in the top one foot.  (B) For unpaved portions of such an averaging area that are located outside that 100-year floodplain, Settling Defendant shall either (at its option) remove and replace soils in the top foot or place a soil cap over soils in the top foot to achieve a PCB average of 25 ppm or below in the top one foot.  Specifications for such soil cap are described in Attachment G to the SOW.  (C) For any averaging area where the average PCB concentration in the top one foot exceeds 25 ppm in the entire area (paved and unpaved portions combined), Settling Defendant shall recalculate the average PCB concentration after incorporating the anticipated performance of the response actions described in clause (A) or (B) above (as applicable).  If that recalculated average PCB concentration still exceeds 25 ppm, Settling Defendant shall either (at its option) remove pavement/soils in the top foot to achieve a PCB average of 25 ppm in the top foot of the averaging area or maintain and enhance existing pavement/concrete surfaces in those paved areas determined to cause the exceedance of the 25 ppm average in the top foot, in accordance with the specifications for pavement enhancement in Attachment G to the SOW.  Where such pavement enhancement is undertaken within the 100-year floodplain

119

of the Housatonic River or Unkamet Brook, Settling Defendant shall provide Flood Storage Compensation.

(iv) Except at the areas described in Paragraph 25.d below, if the PCB average in the soil at the 1-6 foot depth increment exceeds 200 ppm in any averaging area at the GE Plant Area, Settling Defendant shall perform the following activities: (A) In any such area located within the 100-year floodplain of the Housatonic River or Unkamet Brook, Settling Defendant shall remove and replace soils as necessary to achieve a PCB average of 200 ppm in the 1-6 foot depth. (B) In any such area located outside the 100-year floodplain, Settling Defendant shall undertake a combination of soil removal/replacement in unpaved areas and either (at its option) soil removal/replacement or enhancement of existing pavement/concrete surfaces in paved areas as necessary to ensure that the PCB concentrations causing the average to exceed 200 ppm are removed or covered by enhanced pavement.

(v) If any averaging area at the GE Plant Area containing utilities has a PCB average exceeding 200 ppm in the 1-6 foot depth in the utility corridor(s), Settling Defendant shall submit to EPA for review and approval an evaluation of the need for any additional response actions in such area and shall implement any such actions as approved by EPA. In addition, in the event that a new subgrade utility is installed or an existing subgrade utility is repaired or replaced in the future at the GE Plant Area, Settling Defendant shall ensure that the average PCB concentration in the backfill material does not exceed 25 ppm (or, for areas described in Paragraphs 25.a(ii) and 25.d(vi), 10 ppm in the top three feet and 25 ppm for soils at greater depth).

(vi)  At each averaging area (paved and unpaved portions combined) in which the PCB average exceeds 100 ppm in the top 15 feet after taking into account any response actions for soils in the top six feet, Settling Defendant shall install Engineered Barriers in accordance with the specifications for such barriers in Attachment G to the SOW.  Where such Engineered Barriers are installed within the 100-year floodplain of the Housatonic River or Unkamet Brook, Settling Defendant shall provide Flood Storage Compensation.

b.      Settling Defendant shall cap the Hill 78 Consolidation Area and other on-plant consolidation areas after use of these areas for on-plant consolidation of excavated materials and building demolition debris.  The caps for these areas shall comply with the specifications set forth in Attachment G to the SOW for consolidation area/landfill caps.

c.      Settling Defendant shall complete the installation of sheetpiling and other NAPL/groundwater containment/recovery controls in the East Street Area 2-South former seep areas and the Building 68 Area, and shall continue to operate and maintain those systems, in accordance with the Work Plans and EPA conditional approval letters contained in Annex 2 to the SOW, and as necessary to achieve the applicable Performance Standards set forth in those Work Plans and EPA conditional approval letters and in Attachment H to the SOW.  If other similar seep areas are identified, Settling Defendant shall implement similar NAPL/groundwater containment/recovery systems as proposed to and approved by EPA.

121

d.    In addition to the other Performance Standards applicable to the GE Plant Area, Settling Defendant shall perform the following in the Unkamet Brook Area:

(i)  Settling Defendant shall reroute Unkamet Brook to its approximate former channel, as specified in Section 2.2.2 of the SOW.

(ii)  Settling Defendant shall cap the former Unkamet Brook landfill with a consolidation area/landfill cap in the unpaved portion and an asphalt Engineered Barrier in the currently paved portion, in accordance with the specifications in Attachment G to the SOW.

(iii)  Following rerouting of Unkamet Brook, Settling Defendant shall remove and replace brook sediments to achieve a 1 ppm PCB average in the surface sediments (i.e., the top one foot of sediments) in each of three reaches of the brook, as specified in Section 2.2.2 of the SOW.  In addition, Settling Defendant shall (at its option) either remove and replace sediments or install a soil cover over the inundated wetlands that are not subject to the former landfill cap to achieve a 1 ppm PCB average in the top foot of each such inundated wetland, as specified in Section 2.2.2 of the SOW.  Any loss of wetlands shall be mitigated through the payment that Settling Defendant will make in accordance with Paragraph 114.b of Section XXI of this Consent Decree (Natural Resource Damages).

(iv)  In the non-industrial area owned by Settling Defendant to the east of the former Unkamet Brook landfill (as generally depicted on Figures 2-3 and E-1 of the SOW), Settling Defendant shall remove and replace soils to achieve a 10 ppm PCB average in the top foot and a 15 ppm PCB average in the 1-3 foot depth, and shall

install a vegetative Engineered Barrier if the PCB average in the top 15 feet (after taking into account any soil removal/replacement in the top three feet) exceeds 100 ppm.

(v)  Settling Defendant shall evaluate the potential changes to flood storage capacity of the Unkamet Brook floodplain due to the performance of the response actions described in Paragraphs 25.d(i) through 25.d(iv), and shall provide Flood Storage Compensation.  However, to obtain such compensation, Settling Defendant shall not be required to remove soils from the former Unkamet Brook landfill prior to placement of the cap/barrier.

(vi)  For non-industrial recreational areas in the Unkamet Brook floodplain that are not owned by Settling Defendant (as generally depicted on Figures 2-3 and E-1 of the SOW), if an ERE is obtained at a property in accordance with Section XIII of this Consent Decree, Settling Defendant shall remove and replace soils to achieve a 10 ppm PCB average in the top foot and a 15 ppm PCB average in the 1-3 foot depth at each averaging area; and Settling Defendant  shall install an Engineered Barrier in any averaging area with a PCB average exceeding 100 ppm in the top 15 feet (after taking into account any soil removals for the top three feet) and shall provide Flood Storage Compensation.  For any property in such areas for which an ERE is not obtained, Settling Defendant shall implement a Conditional Solution in accordance with Paragraphs 34-38 of this Consent Decree.

(vii)  For commercial/industrial areas that are not owned by Settling Defendant (as generally depicted on Figures 2-3 and E-1 of the SOW), if an ERE is obtained at a property in accordance with Section XIII of this Consent Decree, Settling

123

Defendant shall achieve at such property the same Performance Standards set forth in Paragraphs 26.c(i)-(iv) and 26.e. For any such property for which an ERE is not obtained, Settling Defendant shall implement a Conditional Solution in accordance with Paragraphs 34-38 of this Consent Decree.

e. For the portion of the commercial/industrial property within East Street Area 1-North that is not owned by Settling Defendant (Parcel K10-14-1), if an ERE is obtained in accordance with Section XIII, Settling Defendant shall achieve the same Performance Standards set out in Paragraphs 26.c(i)-(iv) and 26.e. If an ERE is not obtained for such portion, Settling Defendant shall implement a Conditional Solution in accordance with Paragraphs 34-38 of this Consent Decree.

26. The Performance Standards for the Removal Actions at the Former Oxbow Areas shall include all requirements for the Former Oxbow Areas identified as Performance Standards in the SOW attached to this Consent Decree, and the following requirements:

a. At the Lyman Street and Newell Street parking lots owned by Settling Defendant (as generally depicted on Figure 2-4 of the SOW), Settling Defendant shall remove the top one foot of pavement/soil and replace such pavement/soil with a one-foot vegetative Engineered Barrier, as described in Attachment G to the SOW, except as follows: (i) In lieu of removal of the top foot of pavement/soil, Settling Defendant may propose to EPA the installation of a one-foot vegetative Engineered Barrier over the existing pavement/soil, and may implement that approach provided that EPA approves such approach (based on consideration of PCB levels, impacts on

124

drainage, and other relevant factors) and that Flood Storage Compensation is provided. (ii) An Engineered Barrier need not be installed in any discrete portion of either parking lot where the average PCB concentrations do not exceed 10 ppm in the top foot, 15 ppm in the 1-3 foot depth, and 100 ppm in the top 15 feet, so long as the effectiveness of such barrier is not impaired by discontinuities in the barrier.

b.      For the wooded area at Newell Street Area II and the riparian strip at Newell Street Area I which are owned by Settling Defendant (as generally depicted on Figure 2-4 of the SOW), Settling Defendant shall either (at its option): (i) remove and replace soils to achieve PCB averages of 10 ppm in the top foot and 15 ppm in the 1-3 foot depth, and install a vegetative Engineered Barrier if the PCB average in the top 15 feet (after taking into account any soil removal/replacement in the top three feet) exceeds 100 ppm; or (ii) remove the top foot of soil and install a vegetative Engineered Barrier over portions of the area until the average PCB concentrations in the remainder of the area do not exceed 10 ppm in the top foot and 15 ppm in the 1-3 foot depth, and also install a vegetative Engineered Barrier in any other portions of the area where the PCB average exceeds 100 ppm in the top 15 feet.  For any Engineered Barrier installed, Settling Defendant shall provide Flood Storage Compensation.

c.      For commercial/industrial properties, if an ERE is obtained for a property in accordance with Section XIII of this Consent Decree, Settling Defendant shall, at each such property:

(i)      remove and replace soils in the top one foot in the unpaved portion of each averaging area to achieve a 25 ppm PCB average in such portion;

(ii)     in the paved portion of each averaging area, if the PCB

average in the top one foot exceeds 25 ppm, either (at Settling Defendant's

option) remove and replace soils to achieve a 25 ppm PCB average in the top

foot or enhance existing pavement in such portion and provide Flood Storage

Compensation;

(iii)     remove and replace subsurface soils in the 1 to 6 foot depth

interval to achieve a 200 ppm PCB average in such interval at the property

(considering paved and unpaved portions combined); and

(iv)     install an Engineered Barrier if the PCB average in the top 15

feet at the property (considering paved and unpaved portions combined) exceeds

100 ppm (after taking into account any soil removals for the top six feet), and

provide Flood Storage Compensation.

d.     For recreational properties (other than those described in

Paragraphs 26.a and 26.b), if an ERE is obtained for a property in accordance with

Section XIII of this Consent Decree, Settling Defendant shall, for each averaging area,

remove and replace soils to achieve a 10 ppm PCB average in the top one foot and a 15

ppm PCB average at a depth of 1-3 feet. In addition, Settling Defendant shall install an

Engineered Barrier if the PCB average in the top 15 feet at such a property (considering

paved and unpaved portions combined) exceeds 100 ppm (after taking into account any

soil removals for the top three feet), and provide Flood Storage Compensation.

e.     At commercial/industrial or recreational properties where subgrade

utilities are present and the average PCB concentration in soils in the utility corridor(s)

126

exceeds 200 ppm, Settling Defendant shall submit to EPA for review and approval an evaluation of the need for any additional response actions in such area, and shall implement any such actions as approved by EPA. In addition, in the event that a new subgrade utility is installed or an existing subgrade utility is repaired or replaced at such a property in the future, Settling Defendant shall ensure that the average PCB concentration in the backfill material does not exceed 25 ppm at a commercial/industrial property or 10 ppm in the top three feet and 25 ppm for soils at greater depth at a recreational property.

f.      At current residential properties, Settling Defendant shall achieve a 2 ppm PCB average to a depth of one foot at each averaging area, using an approximate 25-foot sampling grid, and shall achieve a 2 ppm PCB average at a depth of one foot to the depth at which PCBs have been detected (up to a maximum of 15 feet), based on averaging procedures described more fully in the SOW.

g.      Settling Defendant shall complete the installation of sheetpiling and other NAPL/groundwater controls in the Lyman Street Area former seep area and the installation of a dense non-aqueous phase liquid ("DNAPL") recovery system at Newell Street Area II, and shall continue to operate and maintain those systems, in accordance with the Work Plans contained in Annex 2 to the SOW, as approved or conditionally approved by EPA, and as necessary to achieve the applicable Performance Standards set forth in those Work Plans and EPA approval/conditional approval letters and in Attachment H to the SOW. If other similar seep areas are identified, Settling Defendant

shall implement similar NAPL/groundwater containment/recovery systems as proposed to and approved by EPA.

      h.     If an ERE is not obtained at a non-residential property not owned by Settling Defendant at the Former Oxbow Areas, Settling Defendant shall implement a Conditional Solution at such property in accordance with Paragraphs 34-38 of this Consent Decree.

      27.    The Performance Standards for the Allendale School Removal Action shall include all requirements for the Allendale School Property identified as Performance Standards in the SOW attached to this Consent Decree and in the Removal Design/Removal Action Work Plan for the Allendale School Property (contained in Annex 3 to the SOW), as approved or conditionally approved by EPA, and the following requirements:

      a.     Settling Defendant shall remove all soils (including soils under the existing cap) in which PCBs have been detected at concentrations exceeding 2 ppm, except within an approximate 25-foot wide strip along the rear portions of the school building, where (due to constructability issues) Settling Defendant shall remove soils to achieve a PCB average of less than 2 ppm.

      b.     Settling Defendant shall replace removed soils with clean soil and restore the area in accordance with the Work Plan and EPA conditional approval letter contained in Annex 3 to the SOW.

      28.    The Performance Standards for the Removal Actions at the Housatonic River Floodplain - Current Residential Properties shall include all requirements for the

Housatonic River Floodplain - Current Residential Properties identified as Performance Standards in the SOW attached to this Consent Decree, and the following requirements:

a.      For current residential properties adjacent to the 1½ Mile Reach, Settling Defendant shall remove and replace soils in Actual/Potential Lawns to achieve, at each averaging area, a 2 ppm PCB average in the top one foot and a 2 ppm PCB average from one foot to the depth at which PCBs have been detected (up to a maximum of 15 feet), based on averaging procedures described more fully in the SOW. Other portions of these properties shall be addressed in the 1 ½ Mile Reach Removal Action as described below in Paragraph 32.

b.      For current residential properties downstream of the Upper 2-Mile Reach, Settling Defendant shall perform the following:

(i)  remove and replace soils in Actual/Potential Lawns on current residential properties to achieve, at each averaging area, a 2 ppm PCB average in the top foot and from one foot to the depth at which PCBs have been detected (up to a maximum of 15 feet), based on averaging procedures described more fully in the SOW;

(ii)  implement appropriate short-term measures, approved by EPA, for portions of such properties that do not constitute Actual/Potential Lawns, where PCB levels exceed MADEP's short term measure ("STM") trigger levels, as specified in the SOW; and

(iii)  address final remediation of the portions of such properties that do not constitute Actual/Potential Lawns in the Remedial Action for the Rest of the River, described in Paragraph 33 below.

129

29.    The Performance Standards for the Removal Action for the Housatonic River Floodplain - Non-Residential Properties (which are located adjacent to the 1½ Mile Reach) shall include all requirements for the Housatonic River Floodplain - Non-Residential Properties identified as Performance Standards in the SOW attached to this Consent Decree, and the following requirements:

a.    At recreational properties (other than riverbank portions), if an ERE is obtained for such a property in accordance with Section XIII of this Consent Decree, Settling Defendant shall remove and replace soils to achieve PCB averages of 10 ppm in the top one foot and 15 ppm in the 1-3 foot depth increment at each averaging area, and shall install an Engineered Barrier on such property if the average PCB concentration exceeds 100 ppm in the top 15 feet (after taking into account any soil removals for the top 3 feet) and provide Flood Storage Compensation.   In addition, Settling Defendant shall comply with the requirements of Paragraph 26.e.  If an ERE is not obtained for such a property, Settling Defendant shall implement a Conditional Solution at such property in accordance with Paragraphs 34-38 of this Consent Decree.

b.    At commercial/industrial properties (other than riverbank portions), if an ERE is obtained for such a property in accordance with Section XIII of this Consent Decree, Settling Defendant shall undertake the same response actions and achieve the same Performance Standards described in Paragraphs 26.c(i)-(iv) and 26.e, for the non-riverbank averaging areas at these floodplain properties.  If an ERE is not obtained for such a property, Settling Defendant shall implement a Conditional Solution at such property in accordance with Paragraphs 34-38 of this Consent Decree.

30.     The Performance Standards for the Silver Lake Area Removal Action shall include all requirements for the Silver Lake Area identified as Performance Standards in the SOW attached to this Consent Decree, and the following requirements:

a.     Settling Defendant shall remove and replace bank soils in accordance with the following:

(i)     At the currently residential properties that are subject to this Removal Action (as described in Section 2.6.2 of the SOW and generally depicted on Figure 2-25 of the SOW), Settling Defendant shall either:  (A) remove and replace bank soils to achieve a PCB average of 2 ppm in the top foot and in the depth from one foot to the depth at which PCBs have been detected (up to a maximum of 15 feet) in the bank soils; or (B) if the rest of a property will be remediated at the same time as the bank soils, remove and replace soils to achieve a PCB average of 2 ppm in the top foot and in the depth from one foot to the depth at which PCBs have been detected (up to a maximum of 15 feet) at the overall property (or designated averaging areas if less than the entire property).

(ii)     For each remaining bank soil averaging area (as described in Section 2.6.2 and Attachment E of the SOW and generally depicted on Figure 2-25 of the SOW), if an ERE is obtained in accordance with Section XIII of this Consent Decree, Settling Defendant shall remove and replace bank soils to achieve PCB averages of 10 ppm in the top foot and 15 ppm in the 1-3 foot depth increment.  If an ERE is not obtained for such an area, Settling Defendant shall implement a Conditional Solution at such bank soil area in accordance with Paragraphs 34-38 of this Consent Decree.

b.      Settling Defendant shall remove approximately 400 in situ cubic yards of sediments from an area of Silver Lake near the outfall from the GE Plant Area, as specified in Section 2.6.2 and Attachment K to the SOW and as generally depicted on Figure 2-25 of the SOW.  Settling Defendant shall replace such removed sediments with clean soil and restore and vegetate the portion of the affected area that is not under water, in coordination with the installation of the sediment cap described in Paragraph 30.c and consistent with the requirements of Paragraph 118.c (Restoration Work) of Section XXI (Natural Resource Damages) of this Consent Decree.

c.      Settling Defendant shall install a cap and armoring system in Silver Lake, which shall include a cap over the entire lake bottom (approximately 26 acres) and armoring over the cap around the perimeter of the lake, and which shall meet the design standards set forth in Section 2.6.2 and Attachment K to the SOW.

d.      Settling Defendant shall conduct periodic inspections and monitoring of the Silver Lake cap and armor system in accordance with the specifications in Attachment K to the SOW.  To the extent that the conditions specified in Attachment K to the SOW for further evaluation or corrective actions for components of this cap and armor system are met, Settling Defendant shall conduct such further evaluations and/or corrective actions subject to and in accordance with EPA approval. In the absence of those conditions, no further response actions shall be required for this system (except as otherwise required pursuant to Section XIX (Emergency Response) or Paragraphs 162, 163, 167 and/or 168 (Pre- and Post-Certification Reservations) of this Consent Decree).

31. The Performance Standards for the Upper ½ Mile Reach Removal Action shall consist of those requirements identified as Performance Standards Numbers 1, 2, 4, 5, 7, 8, 9, 10, and 12 in Section 2.2 of the Removal Action Work Plan for the Upper ½ Mile Reach as approved by EPA, which is set forth in Appendix F to this Consent Decree. (The other numbered Performance Standards in that Work Plan relate to Restoration Work, which is covered by Section XXI of this Consent Decree.)

32. For the 1 ½ Mile Reach Removal Action, Performance Standards will be developed through the Engineering Evaluation/Cost Analysis being performed by EPA and will be set forth in the 1 ½ Mile Reach Removal Action Memo. EPA intends to implement the selected 1 ½ Mile Reach Removal Action for sediments and riverbanks, including attainment of Performance Standards developed, with costs of the 1 ½ Mile Reach Removal Action to be shared pursuant to the provisions of Paragraphs 103-111 of Section XX of this Consent Decree (Reimbursement of Costs). EPA and Settling Defendant agree to coordinate and cooperate, and to have their respective contractors coordinate and cooperate, with each other in the performance of activities at the properties in and adjacent to the 1 ½ Mile Reach.

33. For the Housatonic River - Rest of the River Remedial Action, Performance Standards will be developed through the processes specified in Paragraph 22. and will be set forth in the final modification to the Reissued RCRA Permit and the Rest of River SOW as provided in Paragraph 22 of this Consent Decree. Settling Defendant shall perform the Rest of River Remedial Action and achieve such Performance Standards, as provided in Paragraph 22 of this Consent Decree.

34.    The Performance Standards for a Conditional Solution shall include all requirements identified as Performance Standards for a Conditional Solution in the SOW attached to this Consent Decree, and that may be identified as Performance Standards for a Conditional Solution in the Rest of River SOW, and the following requirements:

a.  (i)  If Settling Defendant has made best efforts but has failed to obtain a property owner's agreement to record and/or register an ERE, or otherwise failed to record and/or register an ERE, pursuant to Section XIII of this Consent Decree, then Settling Defendant shall use best efforts to obtain the property owner's consent for access to the property for sampling and implementation of a Conditional Solution, as described in subparagraph 34.c. of this Paragraph.  If Settling Defendant has used best efforts but consent for access for sampling and/or for implementation of a Conditional Solution cannot be obtained, the United States and the State will assist Settling Defendant in obtaining such access, including, but not limited to, use, as appropriate, of their statutory and regulatory authorities to secure such access.

(ii)  Until such consent for access for sampling and for implementation of a Conditional Solution is obtained, Settling Defendant shall, on an annual basis, after the initial attempt to obtain access, determine whether there has been a change in ownership of such property.  No less frequently than every fifth year after such initial attempt, and at any time there has been a change in ownership of such property, Settling Defendant shall make best efforts to obtain from the property owner either (A) an ERE, including access to perform related response actions, in accordance with Section XIII of this Consent Decree, or (B) consent for access for sampling and for

134

implementation of a Conditional Solution. If Settling Defendant, after using best efforts, cannot obtain either of these, the provisions of Paragraphs 60.f through 60.h relating to governmental assistance in obtaining EREs and consent for access for sampling and implementation of a Conditional Solution will apply. Settling Defendant shall implement a Conditional Solution whenever access is granted.

b. If consent for access for sampling is obtained, Settling Defendant shall conduct tightened grid soil sampling, in accordance with the SOW, to the extent determined by EPA to be necessary to implement the obligations set forth in subparagraph 34.c. of this Consent Decree.

c. If consent for access to implement a Conditional Solution is obtained, Settling Defendant shall implement the following response actions, in accordance with the SOW:

(i) For each averaging area at properties in commercial/industrial use (except riverbanks and the banks of Silver Lake), Settling Defendant shall remove and replace soils as necessary to achieve an average PCB concentration of 25 ppm in the top foot and 0-3 foot depth increments, and 200 ppm in the 1-6 foot depth increment (after taking into account any soil removals for the top 3 feet), and shall install an Engineered Barrier if the average PCB concentration in the top 15 feet exceeds 100 ppm (after taking into account any soil removals for the top 6 feet). In addition, Settling Defendant shall comply with the requirements of Paragraph 26.e.

(ii) For each averaging area at properties in recreational use (except riverbanks and the banks of Silver Lake), Settling Defendant shall remove and replace

135

soils as necessary to achieve an average PCB concentration of 10 ppm in both the top foot and 0-3 foot depth increments, and shall install an Engineered Barrier if the average PCB concentration in the top 15 feet exceeds 100 ppm (after taking into account any soil removals for the top 3 feet). In addition, Settling Defendant shall comply with the requirements of Paragraph 26.e.

(iii)   For each averaging area at riverbanks and the banks of Silver Lake (where Conditional Solutions apply), Settling Defendant shall remove and replace soils as necessary to achieve an average PCB concentration of 10 ppm in both the top foot and the 0-3 foot depth increment.

d.  After a Conditional Solution as described above has been implemented, Settling Defendant shall conduct further response actions as set forth in this Paragraph 34.d.(i)-(iii) to be protective of any legally permissible future use, as approved by EPA after reasonable opportunity for review and comment by the State, if and when the property owner or the owner's successors and assigns: (1) has submitted a plan to the appropriate governmental authority(ies) to authorize any legally permissible future use (if such plan or authorization is necessary) and such plan (if required) has been approved by the governmental authority(ies), and (2) provides to EPA and to Settling Defendant (directly or through EPA) other documented evidence of a commitment to such use (for example, such evidence may include evidence of financing or other financial assurance for the project, other plans for implementing the project (such as architectural plans, contracts for performance of the project, or other similar plans), or an affidavit that the owner intends to go forward with the project or other change in use if the necessary

136

response actions are taken). In such event, Settling Defendant shall conduct additional response actions at the property as necessary to achieve the following Performance Standards:

(i)   For any change from commercial/industrial or recreational uses to residential, daycare, or school (children under 18 years old) uses, Settling Defendant shall achieve:

(A)   for properties located in the floodplain of the Housatonic River, the same Performance Standards set forth in Paragraph 28 this Consent Decree and Section 2.5.2 of the SOW for current residential properties in the Housatonic River floodplain, or

(B)   for properties in any other location at the Site, the same Performance Standards set forth in Paragraph 26.f of this Consent Decree and Section 2.3.2 of the SOW for current residential properties at the Former Oxbow Areas.

(ii)   For any change from commercial/industrial uses to recreational uses. Settling Defendant shall achieve the same Performance Standards set forth in Paragraph 34.c.(ii) above.

(iii)   Settling Defendant shall conduct the following additional response actions necessary to be protective of the legally permissible future use referenced above in this Paragraph 34.d, as approved by EPA after reasonable opportunity for review and comment by the State:

(A)   any additional response actions necessary to achieve applicable Performance Standards in this Consent Decree or in the SOW for the legally

137

permissible future use, including but not limited to adding new GW-2 sentinel wells and/or other response actions if necessary to address any potential indoor air issues for new buildings, and deriving and achieving applicable Performance Standards for Appendix IX+3 constituents in accordance with the SOW based on the new uses;

(B)   if there are no Performance Standards in this Consent Decree or the SOW for a legally permissible future use (i.e., the use of the property is not industrial/commercial, recreational or residential), Settling Defendant shall propose and EPA will approve performance standards and response actions for such use as appropriate, and Settling Defendant shall implement such response actions to achieve any such performance standards; and

(C)   for any activities that would involve any off-property disposition of soils or excavation of soils, response actions to ensure the proper excavation, management and disposition of such soils and the protection of workers and other individuals during such excavation activities, in accordance with applicable laws and regulations.

35.   Within 30 days from the date that EPA notifies Settling Defendant in writing that EPA has determined that the property owner has satisfied the criteria in Paragraph 34.d.(1) and (2) of this Consent Decree, Settling Defendant shall (subject to its rights to seek dispute resolution regarding such determination under Section XXIV of this Consent Decree) submit to EPA for approval a Work Plan for pre-design activities (if any) for the additional response actions described in subparagraph 34.d.(i)-(iii), and a proposed schedule for the subsequent submission of Work Plans for any other pre-

138

design activities and for design and implementation of the additional response actions described in subparagraph 34.d.(i)-(iii). Following receipt of EPA's approval of the pre-design Work Plan and schedule, Settling Defendant shall submit the required Work Plans and implement the additional response actions in accordance with EPA's approval, including the approved schedule.

36. Settling Defendant shall, on an annual basis, after completion of physical on-site construction of any Conditional Solution under subparagraphs 34.c or 34.d, determine whether there has been a change in ownership of such property. Within 30 days of completion of physical on-site construction of any such Conditional Solution, and at any time there has been a change in ownership of such property, Settling Defendant shall provide notice to the owner (for the initial notice, notice shall also be sent to any holders of easements), with copies to EPA and MADEP, of:

a. the requirements set forth in subparagraph 34.d. for implementing any further response actions to be protective of any legally permissible future use (including providing such owner with notice of contact persons at Settling Defendant, EPA and MADEP), and

b. the residual contamination on the property where the Conditional Solution has been implemented.

37. Within seven days of a request from an owner of property where a Conditional Solution has been implemented, Settling Defendant shall provide to such owner a written certification of Settling Defendant's commitment to conduct further response actions on such property in accordance with subparagraph 34.d.

139

38.     Following the implementation of any Conditional Solution under

subparagraph 34.c or 34.d, Settling Defendant shall, on an annual basis, conduct an

inspection of such property not then owned by the United States or the State to

determine whether there has been any change in activities or uses in the property since

the date of implementation of such Conditional Solution where such changes in activities

or uses would involve exposure to soil greater than three feet in depth from the original

grade or would be inconsistent with the land use for which such Conditional Solution

was implemented.  Such inspection shall be conducted in accordance with Appendix Q,

including the criteria set forth therein.  Within 30 days of such inspection, Settling

Defendant shall submit a report to EPA and MADEP based on an evaluation of the

criteria set forth in Appendix Q, together with the appropriate supporting information, and

otherwise in accordance with Appendix Q.

39.     Modification of the SOW, Rest of the River SOW, Upper ½ Mile Reach
Removal Action Work Plan or Work Plans.

a.     For each Removal or Remedial Action required under this Consent

Decree, if EPA determines that modification to the work specified in the SOW, the Upper

½ Mile Reach Removal Action Work Plan, the Rest of the River SOW, and/or in work

plans developed pursuant to the SOW, the Rest of the River SOW, and/or this Consent

Decree is necessary to achieve and maintain the Performance Standards or to carry out

and maintain the effectiveness of a particular Removal or Remedial Action, EPA may

require that such modification be incorporated in the SOW, the Upper ½ Mile Reach

Removal Action Work Plan, the Rest of the River SOW, and/or such other work plans;

provided, however, that a modification may only be required pursuant to this Paragraph to the extent that it is consistent with the scope of the response action for which the modification is required and does not modify the Performance Standards (except as provided in Paragraph 217 (Modification) of this Consent Decree).

b.    If Settling Defendant objects to any modification determined by EPA to be necessary pursuant to this Paragraph, it may seek dispute resolution pursuant to XXIV (Dispute Resolution), Paragraph 136 (record review). The SOW, the Upper ½ Mile Reach Removal Action Work Plan, Rest of the River SOW, and/or other work plans shall be modified in accordance with final resolution of the dispute.

c.    Settling Defendant shall implement any work required by any modifications incorporated in the SOW, the Upper ½ Mile Reach Removal Action Work Plan, the Rest of the River SOW, and/or in work plans developed pursuant to the SOW, the Rest of the River SOW, and/or this Consent Decree in accordance with this Paragraph.

d.    Nothing in this Paragraph shall be construed to affect any other authority or right EPA or the State has under other paragraphs of this Consent Decree to require performance of further response actions.

40.    Nothing in this Consent Decree, the SOW, the Rest of the River SOW, the Upper ½ Mile Reach Removal Action Work Plan, or any of the Work Plans developed pursuant to this Consent Decree, the SOW or the Rest of the River SOW constitutes a warranty or representation of any kind by Plaintiffs that compliance with the work requirements set forth in the SOW, the Rest of the River SOW, the Upper ½ Mile Reach

141

Removal Action Work Plan and/or other Work Plans, which requirements are not part of or included within the Performance Standards, will achieve the Performance Standards.

41.    Settling Defendant shall, prior to any off-Site shipment of Waste Material from the Site to an out-of-state waste management facility, provide written notification to the appropriate state environmental official in the receiving facility's state and to the EPA Project Coordinator of such shipment of Waste Material.  However, this notification requirement shall not apply to any off-Site shipments when the total volume of non-liquid Waste Materials of all such shipments will not exceed 10 cubic yards.

a.    Settling Defendant shall include in the written notification the following information, where available: (i) the name and location of the facility to which the Waste Material are to be shipped; (ii) the type and quantity of the Waste Material to be shipped; (iii) the expected schedule for the shipment of the Waste Material; and (iv) the method of transportation.  Settling Defendant shall notify the state in which the planned receiving facility is located of major changes in the shipment plan, such as a decision to ship the Waste Material to another facility within the same state, or to a facility in another state.

b.    The identity of the receiving facility and state will be determined by Settling Defendant following the award of the contract for  construction of the Removal or Remedial Action in which the shipment of Waste Materials is to be undertaken. Settling Defendant shall provide the information required by Paragraph 41.a as soon as practicable after the award of the contract and before the Waste Material is actually shipped.

142

42. <u>Information from Future Sampling and Studies</u>. For purposes of Paragraphs 162 and 163 (United States Pre- and Post-Certification Reservations), Paragraphs 167 and 168 (State's Pre- and Post-Certification Reservations), and Paragraphs 171 and 172 (Connecticut's Pre- and Post-Certification Reservations), EPA, the State, and Connecticut agree that neither of the following conditions or information will be a sufficient basis to determine that a Removal Action or Remedial Action performed in accordance with this Consent Decree is not protective of human health or the environment:

a. Sampling results or other information demonstrating the presence of PCBs in a given medium and a given area at the Site where such results or information show concentrations that are generally consistent with concentrations that are known to remain or would be expected in such medium and area following completion of such Removal or Remedial Action and achievement of the Performance Standards for such Removal or Remedial Action; provided, however, that this subparagraph 42.a does not apply to discovery of drums, barrels, tanks, transformers, capacitors, impoundments or other containers of PCBs not known to EPA. MADEP, or CTDEP (as applicable) at the time of lodging of this Consent Decree, or to any sampling results or other information demonstrating the presence of PCBs that EPA, MADEP, or CTDEP (as applicable) determines is the result of leaks from containers or spills that occur after the lodging of this Consent Decree.

b. Studies regarding the effects of PCBs that are: (i) not relevant, or (ii) not reliable based on scientifically valid principles. In determining whether such studies

143

are reliable based on scientifically valid principles, EPA, MADEP, or CTDEP (as applicable) will take into consideration, where applicable, whether the theory or technique can be or has been tested, whether the theory or technique and conclusions drawn therefrom have been subjected to publication and peer review (for purposes of this subparagraph, "peer review" shall mean review by other professionals in the relevant field), the known or potential rate of error, and the degree of acceptance of the theory or technique and conclusions drawn therefrom in the relevant scientific community, including, but not limited to, the degree to which the conclusions of such studies have been replicated by other studies (if appropriate).

## X.  REVIEW OF RESPONSE ACTIONS

43.    <u>Periodic Review</u>.  In accordance with the following provisions, Settling Defendant shall conduct studies and investigations as requested by EPA to permit EPA to conduct periodic reviews, consistent with Section 121(c) of CERCLA and any applicable regulations, of whether the Removal and Remedial Actions undertaken pursuant to this Consent Decree are protective of human health and the environment:

a.    For the Removal Actions Outside the River, EPA may conduct such periodic reviews commencing no earlier than five years after the initiation of construction on whichever of those Removal Actions is the last one on which construction is commenced, and Settling Defendant shall conduct studies and investigations as requested by EPA in connection with such reviews.

b.    For the Upper ½ Mile Reach Removal Action, EPA may conduct such periodic reviews commencing no earlier than five years after completion of

144

construction on that Removal Action, and Settling Defendant shall conduct studies and investigations as requested by EPA in connection with such reviews, consistent with Sections 2.2 (Performance Standard 7) and 11.5.4 of the final Removal Action Work Plan for the Upper ½ Mile Reach, as approved by EPA (Appendix F hereto).

> c.     For the Rest of the River Remedial Action, EPA will conduct such periodic reviews in accordance with Section 121(c) of CERCLA and any applicable regulations and guidance.

44.     EPA Selection of Further Response Actions.  If EPA determines, at any time, that any one of the response actions required pursuant to this Consent Decree  is not protective of human health and the environment, EPA may select further response actions for the Site in accordance with the requirements of CERCLA and the NCP.

45.     Opportunity To Comment.  Settling Defendant, the State, Connecticut, and, if required by Sections 113(k)(2) or 117 of CERCLA, the City and the public, will be provided with an opportunity to comment on any further response actions proposed by EPA as a result of a review conducted pursuant to Section 121(c) of CERCLA and to submit written comments for the record during the comment period.  PEDA shall be provided an opportunity to comment on any further response actions proposed by EPA as to property that has been or will be transferred to it by Settling Defendant pursuant to the Definitive Economic Development Agreement.

46.     Settling Defendant's Obligation To Perform Further Response Actions.  If EPA selects further response actions for the Site pursuant to this Section, Settling Defendant shall undertake or fund such further response actions to the extent that the

145

reopener conditions in Paragraph 162 or Paragraph 163 (United States' Pre- and Post-Certification Reservations) are satisfied.  Settling Defendant and/or PEDA (as to property that has been or will be transferred to PEDA pursuant to the Definitive Economic Development Agreement and for which it has assumed liability) may invoke the procedures set forth in Section XXIV (Dispute Resolution) to dispute (i) EPA's determination that the reopener conditions of Paragraph 162 or Paragraph 163 of Section XXVI (Covenants Not To Sue by Plaintiffs) are satisfied, (ii) EPA's determination that the  response action is not protective of human health and the environment, and/or (3) EPA's selection of the further response actions.  Disputes pertaining to whether the response action is protective or to EPA's selection of further response actions shall be resolved pursuant to Paragraph 136 (record review).

47.     Submissions of Plans.  If Settling Defendant is required to perform the further response actions pursuant to Paragraph 46, it shall submit a plan for such work to EPA for approval in accordance with the applicable procedures set forth in Section VI (Performance of the Work by Settling Defendant), Section VII (Removal Actions Outside the River), and Section VIII (River Response Actions) and shall implement the plan approved by EPA in accordance with the provisions of this Decree.

XI.  SAMPLING PROTOCOLS

48.     The Parties agree on the following sampling protocols in addition to those set forth in the SOW, Rest of River SOW and the Upper ½ Mile Reach Work Plan with respect to Settling Defendant's performance of the Work at the Site.

146

a.     The extent of soil remediation to achieve the Performance

Standards relating to PCBs in soils in the Upper ½ Mile Reach and in the areas subject

to the Removal Actions Outside the River will be determined by spatial averaging

methodology, except as expressly specified herein or in the SOW. Spatial averaging is

a method of using computer software to draw perpendicular bisector lines between

adjacent sample locations, and thus create two-dimensional, sample-specific polygon

areas called Thiessen polygons. Using the concentrations of the sampling points and

areas within the polygons, area-weighted averages are calculated. The areas to which

spatial averaging calculations will apply are described in Attachment E to the SOW. The

protocols to be used for spatial averaging are also set forth in Attachment E to the SOW.

Data to be included in spatial averaging will include appropriate existing data, new data

provided by Settling Defendant (including data required to be collected pursuant to this

Consent Decree), and new data provided by the Agencies.

b.     The Agencies reserve the right to conduct additional sampling in the

areas subject to Removal Actions Outside the River. Results from the Agencies'

sampling will be included in spatial averaging. The Agencies shall recover costs of such

sampling from Settling Defendant as U.S. Future Additional Sampling Costs and

Massachusetts Future Response Costs in accordance with Paragraphs 97 and 95.d,

respectively, of Section XX of this Consent Decree (Reimbursement of Costs). PEDA

reserves the right to conduct sampling on property to be transferred to it. Such sampling

shall comply with the requirements of Section XII (Quality Assurance), and if completed

147

and submitted to Settling Defendant in a timely manner will be included in the spatial averaging.

      c.      Settling Defendant shall perform additional sampling in the areas subject to the Removal Actions Outside the River in accordance with the SOW, including Attachments C and D to the SOW, and the Pre-design Investigation Work Plans developed pursuant to this Consent Decree. For purposes of any Conditional Solution to be performed pursuant to Paragraph 34.c of this Consent Decree, EPA may require additional grid soil sampling to the extent necessary to design and implement a Conditional Solution in accordance with the Performance Standards for Conditional Solutions, as described in the SOW. In addition, Settling Defendant shall install and operate groundwater monitoring detection systems as described in Attachment H to the SOW.

      d.      Nothing in this Paragraph 48 or this Consent Decree shall be deemed to require EPA to use spatial averaging in selecting or implementing the 1 ½ Mile Reach Removal Action, or to determine or control whether spatial averaging should be used in selecting or implementing the Rest of the River Remedial Action. Nor shall anything in this Paragraph 48 or this Consent Decree be deemed to preclude Settling Defendant from challenging, in any dispute resolution proceeding relating to the Rest of the River, any decision by EPA not to use or approve spatial averaging in connection with the Rest of the River Remedial Action, or from commenting on any decision by EPA not to use spatial averaging in connection with the 1 ½ Mile Reach Removal Action.

<div align="center">148</div>

## XII. QUALITY ASSURANCE, SAMPLING, and DATA ANALYSIS

49.     Settling Defendant shall use quality assurance, quality control, and chain of custody procedures for all samples in accordance with its Quality Assurance Project Plan ("QAPP") as approved by EPA and any subsequent amendments thereto as approved by EPA. The QAPP shall incorporate "EPA Requirements for Quality Assurance Project Plans for Environmental Data Operation" (EPA QA/R5) and "Preparing Perfect Project Plans" (EPA /600/9-88/087). The QAPP shall be modified to incorporate subsequent amendments to such guidelines upon written notification by EPA to Settling Defendant of such amendment. Amended guidelines shall apply only to procedures conducted after such notification. If relevant to the proceeding, the Parties agree that validated sampling data generated in accordance with the QAPP(s) and reviewed and approved by EPA, as well as validated sampling data generated by EPA in accordance with similar quality assurance procedures, shall be admissible as evidence, without objection, in any proceeding under this Decree. Settling Defendant shall ensure that EPA and State personnel and their authorized representatives are allowed access at reasonable times to all laboratories utilized by Settling Defendant in implementing this Consent Decree. In addition, Settling Defendant shall ensure that such laboratories shall analyze all samples submitted by EPA pursuant to the QAPP for quality assurance monitoring. Settling Defendant shall ensure that the laboratories it utilizes for the analysis of samples taken pursuant to this Decree perform all analyses according to accepted EPA methods. Accepted EPA methods consist of those methods which are documented in the "Contract Lab Program Statement of Work for Inorganic Analysis"

and the "Contract Lab Program Statement of Work for Organic Analysis," dated February 1988, and any amendments made thereto during the course of the implementation of this Decree of which Settling Defendant has notice, or other methods approved in the QAPP.  Settling Defendant shall ensure that all laboratories it uses for analysis of samples taken pursuant to this Consent Decree participate in an EPA or EPA-equivalent QA/QC program.  Settling Defendant shall ensure that all field methodologies utilized in collecting samples for subsequent analysis pursuant to this Decree will be conducted in accordance with the procedures set forth in the QAPP approved by EPA.

50.    Upon request, the Settling Defendant shall allow split or duplicate samples to be taken by EPA and the State or their authorized representatives.  Upon request, and to the extent feasible given the size of the sample and the request for split or duplicate samples by EPA and the State, Settling Defendant shall allow split or duplicate samples to be taken by PEDA on property which has been or will be transferred to PEDA by  Settling Defendant.  Settling Defendant shall notify EPA and the State and PEDA (for any property which has been or will be transferred to PEDA by Settling Defendant) not less than 7 days in advance of any sample collection activity unless shorter notice is agreed to by EPA.  In addition, EPA and the State shall have the right to take any additional samples that EPA or the State deem necessary.  Upon request, EPA and the State shall provide to Settling Defendant, or allow the Settling Defendant to take, split or duplicate samples of any samples they take as part of the Plaintiffs' oversight of Settling Defendant's implementation of the Work or as part of any

150

investigations or other work performed by EPA or the State to select or implement the 1 ½ Mile Reach Removal Action.

51.   Settling Defendant shall submit to EPA 5 copies and to the State  4 copies of the results of all sampling and/or tests or other data obtained or generated by or on behalf of Settling Defendant with respect to the Site and/or the implementation of this Consent Decree unless the Agencies agree otherwise.  Settling Defendant shall submit one copy each of the results of all sampling and/or tests or other data to DOI, NOAA, Connecticut, the City (for the GE Plant Area), and PEDA (for property that has been or will be transferred to PEDA by Settling Defendant) upon request.

52.   Notwithstanding any provision of this Consent Decree, the United States and the State hereby retain all of their information gathering and inspection authorities and rights, including enforcement actions related thereto, under CERCLA, RCRA and any other applicable statutes or regulations; provided, however, that nothing in this Paragraph shall modify the limitations on Settling Defendant's obligations to reimburse the United States or the State under Section XX (Reimbursement of Costs).

## XIII. ACCESS AND  LAND/WATER USE RESTRICTIONS

53.   General Obligations for Settling Defendant Property.

a. Commencing on the date of lodging of this Consent Decree, Settling Defendant shall provide the United States, the State, Connecticut, and their respective representatives, including EPA, MADEP, DOI, NOAA, EOEA, and their agents, contractors, subcontractors and employees, with access at all reasonable times to, over, on, in, and under Settling Defendant Property – except (1) property used by GE Plastics

151

as shown on the map attached hereto as Appendix A-8 and (2) property transferred to PEDA pursuant to Paragraph 12 of this Consent Decree, as to which PEDA shall provide such access in accordance with Paragraphs 12 and 65 – for the purpose of conducting any activity pursuant to this Consent Decree, including, but not limited to, the following activities:

      (i)   Monitoring the Work;

      (ii)  Verifying any data or information submitted to the United States or the State;

      (iii) Conducting investigations relating to contamination at or near the Site;

      (iv) Obtaining samples;

      (v) Assessing the need for, planning, or implementing additional response actions at or near the Site;

      (vi)  Implementing the Work pursuant to the conditions set forth in Paragraph 178 (Work Takeover) of this Consent Decree;

      (vii)  Inspecting and copying records, operating logs, contracts, or other documents maintained or generated by Settling Defendant or its agents, in accordance with Section XXX (Access to Information) of this Consent Decree;

      (viii)  Assessing Settling Defendant's compliance with this Consent Decree; and

152

(ix)   Determining whether the Site or other property is being used in a manner that is prohibited or restricted, or that may need to be prohibited or restricted, by or pursuant to this Consent Decree.

b.  With respect to Settling Defendant Property used by GE Plastics as shown on the map attached hereto as Appendix A-8, commencing on the date of lodging of this Consent Decree, Settling Defendant shall provide the United States, the State, Connecticut, and their respective representatives, including EPA, MADEP, DOI, NOAA, EOEA, and their agents, contractors, subcontractors and employees, with access at all reasonable times, and upon reasonable notice, to, over, on, in and under all locations at such property where Work is being performed, or as necessary to conduct any activity pursuant to this Consent Decree, including, but not limited to, the following activities:

(i)  Monitoring the Work;

(ii)  Verifying any data or information submitted to the United States or the State;

(iii) Conducting investigations relating to contamination at or near the Site;

(iv) Obtaining samples;

(v) Assessing the need for, planning, or implementing additional response actions at or near the Site;

(vi) Implementing the Work pursuant to the conditions set forth in Paragraph 178 (Work Takeover) of this Consent Decree;

153

(vii) Inspecting and copying records, operating logs, contracts, or other documents maintained or generated by Settling Defendant or its agents, in accordance with Section XXX (Access to Information) of this Consent Decree;

(viii) Assessing Settling Defendant's compliance with this Consent Decree; and

(ix) Determining whether the Site or other property is being used in a manner that is prohibited or restricted, or may need to be prohibited or restricted, by or pursuant to this Consent Decree.

c. In addition to the access rights set forth in Paragraph 53.a and provided by any ERE or CER, for purposes of the 1 ½ Mile Reach Removal Action, Settling Defendant shall grant EPA, and its agents, contractors, subcontractors, and employees, certain services and access to the "Site Access and Services Area," as that term is defined in the Access and Services Agreement attached to this Consent Decree as Appendix K ("A&S Agreement"), for activities associated with the 1 ½ Mile Reach Removal Action (e.g., dewatering, storage, permanent consolidation of excavated sediments and bank soils, and use of Settling Defendant's water treatment facilities) in accordance with the provisions of the A&S Agreement.

d. Commencing on the date of lodging of this Consent Decree, Settling Defendant shall not use, nor shall Settling Defendant allow any of its employees, agents, independent contractors, lessees, sublessees, or assigns to use, Settling Defendant Property in any manner that would interfere with or adversely affect the implementation,

154

integrity or protectiveness of the response actions or Restoration Work implemented or to be implemented pursuant to this Consent Decree.

e. EPA and MADEP agree, consistent with their responsibilities under applicable law, to use reasonable efforts to minimize any interference with Settling Defendant's operations through entry onto Settling Defendant Property pursuant to this Consent Decree.

54. EREs for Settling Defendant Property. Where EREs are required under this Consent Decree for any Settling Defendant Property in Massachusetts to implement, monitor, and/or protect the integrity of the response actions required by or pursuant to this Consent Decree and/or the SOW, Settling Defendant shall execute and record and/or register in the appropriate Registry of Deeds or Land Registration Office EREs for such Settling Defendant Property according to the following schedule and process:

a. For Settling Defendant Property, Settling Defendant shall submit to EPA and MADEP fully executed EREs, including, without limitation, subordination agreements as required by subparagraph 54.c, title work as required by subparagraph 54.e, and legal descriptions and surveyed plans of the affected properties and/or restricted areas established therein, in accordance with the following schedule:

(i) For Settling Defendant Property within each area subject to a Removal Action Outside the River, as part of the submission of the Final Completion Report for such Removal Action, or on a schedule proposed by Settling Defendant and approved by EPA, after a reasonable opportunity for review and comment by the State;

155

(ii)  For the riverbank portions of Settling Defendant Property within the area subject to the Upper ½ Mile Reach Removal Action, as part of the submission of the Final Completion Report for the Removal Action Outside the River which covers the non-riverbank portion of the property, or on a schedule proposed by Settling Defendant and approved by EPA, after a reasonable opportunity for review and comment by the State;

(iii)  For the riverbank portions of Settling Defendant Property within the area subject to the 1 ½ Mile Reach Removal Action, excluding any non-accessible riverbank portions of such property, on a schedule to be determined in connection with the  1 ½ Mile Reach Removal Action; and

(iv)  For Settling Defendant Property within the area to be addressed by the Rest of River Remedial Action, on a schedule to be determined in connection with the Rest of River Remedial Action or Rest of River SOW, if EREs are a component of the Rest of River Remedial Action.

Settling Defendant, EPA and the State agree that, in an effort to reduce the number of EREs for the GE Plant Area, it is in their mutual interest to develop a schedule for establishing the EREs for Settling Defendant Property at the GE Plant Area so that each such ERE covers multiple Removal Actions and multiple parcels of Settling Defendant Property, where practicable; provided; however, that Settling Defendant retains the right to submit an ERE for any specific portion of such property at which an individual Removal Action is otherwise completed.

b.   As determined by EPA, after reasonable opportunity for review and

comment by MADEP, and following written notice from EPA to Settling Defendant (with

a copy to MADEP) of EPA's preferred grantee, the ERE shall be granted to (i) MADEP,

(ii) the City, (iii) EPA (for the Rest of River Remedial Action, if applicable), (iv) another

state or federal agency with at least statewide jurisdiction that has statutory authority to

hold property interests and to administer or to enforce property restrictions such as

EREs on behalf of the State or the United States, or (v) any other entity if Settling

Defendant gives its prior consent; provided, however, that nothing in this subparagraph

shall require the State, any of its agencies or the City to accept an ERE which EPA has

approved.  In the event the State or the City will not accept an ERE approved by EPA

pursuant to this Paragraph, and such ERE is not granted to any of the other foregoing

entities, then, pursuant to this subparagraph, Settling Defendant shall be bound by the

terms of such ERE, as modified by EPA, after reasonable opportunity for review and

comment by MADEP  and consultation with the LAT (if appropriate).  If Settling

Defendant conveys any interest in the property subject to such ERE, then Settling

Defendant shall, unless otherwise directed by EPA, after reasonable opportunity for

review and comment by MADEP, reserve to itself and otherwise establish in the

instrument effecting such conveyance the restrictions, covenants, easements,

obligations and conditions set forth in such ERE, as modified by EPA to take into

account such reservation to Settling Defendant, after a reasonable opportunity for review

and comment by MADEP, at the time of the conveyance of the interest in the property

subject to such ERE.  In the event that an entity other than MADEP or EPA will be the

157

grantee of an ERE, the ERE shall be modified as appropriate by EPA, after a reasonable opportunity for review and comment by MADEP, and in consultation with the LAT, if appropriate, to reflect the fact that MADEP and EPA are not the grantees; provided, however that the modified ERE shall not impose additional substantive restrictions on the property.

   c. All EREs granted pursuant to this Paragraph 54 shall be substantially in the form attached hereto as Appendix L, except: (i) as proposed by Settling Defendant and approved by EPA, after a reasonable opportunity for review and comment by MADEP; and (ii) if EREs for Settling Defendant Property are a component of the Rest of the River Remedial Action, EPA, MADEP, and Settling Defendant shall discuss and EPA will approve (after a reasonable opportunity for review and comment by MADEP) any appropriate modifications to the model ERE attached hereto as Appendix L (including protocols) to reflect the Rest of the River Remedial Action. All EREs granted pursuant to this Paragraph 54 shall be enforceable under the laws of the State, including Mass. Gen. Laws Ch. 184 and, as applicable, Mass. Gen. Laws Ch. 21E. Except as requested by Settling Defendant and approved by EPA, after reasonable opportunity for review and comment by MADEP, each ERE shall be granted free and clear of all prior liens and encumbrances and (i) if the ERE is granted to EPA, the ERE shall be acceptable under the Attorney General's Title Regulations promulgated pursuant to 40 U.S.C. § 255; or (ii) if the ERE is granted to an entity other than EPA, the ERE shall be acceptable under the conveyancing laws, standards, and practices of the State. If there are prior liens, encumbrances, or similar interests on the property, Settling Defendant shall use "best

158

efforts" (as defined in Paragraph 60.b or 60.d, as applicable) to obtain, and submit concurrently with the executed ERE, executed subordination agreements, in substantially the form attached hereto as Appendix M, from holders of such prior liens, encumbrances, and interests (except as requested by Settling Defendant and approved by EPA, after a reasonable opportunity for review and comment by MADEP). For such liens, encumbrances, or similar interests as are held by the City, the City shall execute such subordination agreements without charge to Settling Defendant. For easements or similar non-fee property interests held by the State on Settling Defendant Property for which Settling Defendant is obligated to impose an ERE pursuant to this Consent Decree, the State shall not unreasonably withhold consent to subordinate such interests to the ERE without compensation from Settling Defendant so long as such subordination does not interfere with the use and purpose of such interest.

       d. If Settling Defendant, after having used best efforts (as defined by Paragraph 60.b or 60.d, as applicable), is unable to obtain and record or register an agreement, pursuant to Paragraph 54.c, with the holder of an easement or other encumbrance (including, but not limited to, a contract right to acquire property) at Settling Defendant Property at the GE Plant Area to subordinate such interest to an ERE on that property, Settling Defendant shall ensure that, with respect to any such interest other than an interest held by the United States, the State, or the City:

            (i) any work conducted at the area subject to and pursuant to that interest complies with the Health and Safety and Soil Management Protocols that are

159

exhibits to the ERE for that property, in the form attached to this Consent Decree as Exhibits C and D to Appendix L;

(ii) any work by the interest holder in any portion of such interest containing an Engineered Barrier, a Landfill/Consolidation Area Cap, or a building foundation used for disposition of building demolition debris (as described in the SOW) shall only be conducted after the approval of EPA or the State (if the State is the grantee of an ERE on the property containing the interest), except in an emergency;

(iii) for any emergency work by the interest holder in any portion of such interest, the interest holder complies with the provisions of paragraph 8 (Emergency Excavation) of the ERE attached to this Consent Decree as Appendix L; and

(iv) such interest holder, or any successor or assignee of such interest, or Settling Defendant provides advance written notice of the interest holder's intent to perform work at any portion of such interest to EPA and MADEP, and the interest holder and any successor or assignee of such interest allows Settling Defendant to comply with the provisions of this subparagraph 54.d; provided, however, that Settling Defendant shall not be responsible for any failure of any such interest holder to provide the two-hour notice of an emergency excavation required by Paragraph 8 of the ERE attached to this Consent Decree as Appendix L of which emergency Settling Defendant has no knowledge. However, Settling Defendant shall provide such notice in accordance with that provision of the ERE within two hours of the time that Settling Defendant first gains knowledge of such emergency.

160

The enforcement of the obligations set forth in the foregoing subparagraphs (i)-(iv) shall be a requirement of Settling Defendant hereunder. Except as provided in Paragraph 12, Settling Defendant's obligations under this Paragraph 54.d shall remain in effect after any conveyance of a fee interest in the property; provided, however, that should PEDA cease to exist or otherwise will not or cannot perform the requirements in subparagraphs 54.d(i)-(iv) on property transferred to PEDA, Settling Defendant shall ensure that any interest holders with interests that are not subordinate to the ERE comply with such requirements.

e.       (i) For an ERE granted to the United States (in the Rest of the River), Settling Defendant shall obtain a current title insurance commitment or report prepared in accordance with the U.S. Department of Justice Standards for the Preparation of Title Evidence in Land Acquisitions by the United States (1970).

(ii) For an ERE granted to a grantee other than the United States, Settling Defendant shall obtain a current title insurance commitment or certification of title conducted in accordance with the conveyancing laws, standards and practices of the State, running to grantee, insuring or certifying, respectively, that Settling Defendant holds good, clear and marketable title to Settling Defendant Property affected by the ERE, and listing any encumbrances of record, with a copy of any such encumbrances to be provided to grantee, along with the associated subordination agreement(s). If Settling Defendant elects to provide a title insurance commitment, the commitment shall be provided by a recognized title insurance company acceptable to grantee, and coverage shall be in an amount to be agreed upon with grantee. If Settling Defendant

161

elects to provide a certification of title, the certification shall be provided by an insured title examiner.

If such title insurance commitment, certification, or report described in subparagraph (i) or (ii) above reveals a defect in title, Settling Defendant shall correct such defect (except as otherwise proposed by Settling Defendant and approved by EPA, after reasonable opportunity for review and comment by MADEP).

f.    EPA will determine, after a reasonable opportunity for review and comment by the State and consultation with the LAT (if appropriate), whether the ERE as executed, title and any necessary subordination agreements are acceptable. Nothing herein shall require the City, or the State, or any of its agencies, including without limitation MADEP, to accept any interest in an ERE approved by EPA. After approving an ERE, title, and subordination agreements, EPA shall make a request to MADEP to accept a grant of the ERE for any ERE where MADEP is the proposed grantee. If MADEP agrees to accept such a grant of an ERE, Settling Defendant shall, within 10 working days of MADEP's written acceptance and return thereof to Settling Defendant, record and/or register said ERE with the appropriate registry of deeds and/or land registration office, at Settling Defendant's sole cost and expense.

g.  Within 30 days of recording and/or registering the ERE, Settling Defendant shall submit to the grantee of such ERE, with a copy to EPA and MADEP (if MADEP is not the grantee), a final title insurance policy or title certification updated through the time of recording and/or registering the ERE. If EPA determines, after a reasonable opportunity for review and comment by MADEP, that there has been an

162

occurrence since the effective date of the original commitment or certification to impair

the title, Settling Defendant shall (except as otherwise proposed by Settling Defendant

and approved by EPA, after reasonable opportunity for review and comment by MADEP)

ensure that the record title is good, clear and marketable and that all interest holders are

bound by and subject to the ERE in accordance with (i) the Attorney General's Title

Regulations promulgated pursuant to 40 U.S.C. § 255, if EPA is the grantee; or (ii) the

conveyancing laws, standards and practices of the State, if EPA is not the grantee.

Nothing herein shall obligate MADEP to continue to hold an ERE for which EPA has

approved said final title policy or updated title certification, provided that MADEP notifies

EPA within 120 days of receiving written notification from EPA of such final title policy

approval or updated title certification approval that MADEP no longer desires to hold

such ERE, except that MADEP may assign such ERE at any time pursuant to the terms

of the ERE; and provided further that the foregoing limitations on MADEP's rights to

discharge or release such ERE shall be null and void upon Certification of Completion of

the Removal Action affected by such ERE.

h. Within 60 days of recording and/or registering the ERE, or as soon as it

is available thereafter, Settling Defendant shall provide EPA and MADEP a certified

copy of the original recorded and/or registered ERE showing the clerk's recording

stamps.

i. If EPA is not the grantee of the ERE, for the time period prior to

Certification of Completion of the response action for the area in which the property

subject to the ERE is located, the grantee may  approve conditional exceptions from the

163

ERE restrictions or require or approve amendments to or release the ERE only in accordance with the terms of the duly recorded and/or registered ERE and only upon the consent of EPA; provided, however, that the foregoing shall not modify MADEP's rights and obligations pursuant to subparagraph 54.g.

j. For any Settling Defendant Property for which an ERE is required under this Consent Decree or the SOW, Settling Defendant shall not sell, transfer, assign or otherwise convey any interest in such property, or portion thereof, unless prior to such sale, transfer, or assignment:

(i)  Settling Defendant has recorded and/or registered an ERE, according to the process set forth in this Paragraph, on such property, or portion thereof, which is the subject of the sale, transfer, or assignment; and

(ii)  Settling Defendant obtains from such purchaser, transferee, or assignee the Access and Interim Non-Interference Agreements described in Paragraph 59;

Provided, however, that nothing in this subparagraph shall govern the sale, transfer, or assignment of any such property to PEDA.

k.  Settling Defendant shall notify local officials and the public of the original recording and/or registering of, and of any amendments to and/or releases of, in whole or in part, an ERE on Settling Defendant Property, in accordance with the requirements set forth in 310 C.M.R. 40.1403(7), as amended.

55.    CERs for Settling Defendant Property.  Settling Defendant shall execute and record and/or register in the appropriate Registry of Deeds and/or Land Registration

Office, a CER for the 10 acres of wetlands east of the Unkamet Brook landfill ("Unkamet Brook Protected Area"), as described in Paragraph 123.b of this Consent Decree. Settling Defendant shall execute and record and/or register such CER according to the following process:

a. The CER shall be granted to the State acting through the Massachusetts Department of Environmental Management.

b. Settling Defendant shall submit to the LAT with respect to the Unkamet Brook Protected Area, as part of the submission of the Final Completion Report for the Unkamet Brook Area Removal Action, a fully executed CER, including, without limitation, subordination agreements as required by subparagraph 55.c, title work as required by subparagraph 55.d, and a legal description and surveyed plan of the Protected Area, in substantially the form attached hereto as Appendix N (except as proposed by Settling Defendant and approved by the LAT, after a reasonable opportunity for review and comment by EPA and MADEP) and in a form enforceable under the laws of the State, including Mass. Gen. Laws Ch. 184 and, as applicable, Mass. Gen. Laws Ch. 21E.

c. Except as requested by Settling Defendant and approved by the LAT, after reasonable opportunity for review and comment by the State, the CER shall be granted free and clear of all prior liens and encumbrances and shall be acceptable under the conveyancing laws, standards, and practices of the State. If there are prior liens or encumbrances on the property, Settling Defendant shall use "best efforts" (as defined in Paragraph 60.b or 60.d, as applicable) to obtain, and submit concurrently with the executed CER, executed subordination agreements, in substantially the form attached

165

hereto as Appendix M, from holders of such prior liens and encumbrances (except as requested by Settling Defendant and approved by the LAT, after a reasonable opportunity for review and comment by EPA and MADEP). —

d. Settling Defendant shall obtain a current title insurance commitment or certification of title prepared in accordance with conveyancing laws, standards and practices of the State, running to grantee, insuring or certifying, respectively, that Settling Defendant holds good, clear and marketable title to the Unkamet Brook Protected Area, and listing any encumbrances of record, with a copy of such encumbrances to be provided to grantee, along with associated subordination agreement(s). If Settling Defendant elects to provide a title insurance commitment, the commitment shall be provided by a recognized title insurance company acceptable to grantee, and coverage shall be in an amount to be agreed upon with grantee. If Settling Defendant elects to provide a certification of title, the certification shall be provided by an insured title examiner. If such title insurance commitment or title certification reveals a defect in title, Settling Defendant shall correct such defect (except as otherwise proposed by Settling Defendant and approved by the LAT, after reasonable opportunity for review and comment by EPA and MADEP).

e. The LAT will determine, after a reasonable opportunity for review and comment by EPA and MADEP, whether the CER as executed, title and any necessary subordination agreements are acceptable; provided, however, that the LAT will not unreasonably withhold its approval if the CER is substantially in the same form as and contains substantially the same terms as the form attached to this Consent Decree as

166

Appendix N.  Within 21 days of Settling Defendant's receipt of the LAT's written approval

of the CER, title, and subordination agreements, Settling Defendant shall record and/or

register said CER with the appropriate registry of deeds and/or land registration  office,

at Settling Defendant's sole cost and expense.

f.  Within 30 days of recording and/or registering the CER, Settling

Defendant shall submit to the LAT, EPA, and MADEP a final title insurance policy or title

certification updated through the date of recording and/or registering the CER.  If the

LAT determines, after a reasonable opportunity for review and comment by EPA and

MADEP, that there has been an occurrence since the effective date of the original

commitment or report to impair the title, Settling Defendant shall (except as otherwise

proposed by Settling Defendant and approved by the LAT, after reasonable opportunity

for review and comment by EPA and MADEP) ensure that the record title is good, clear

and marketable and that all interest holders are bound by and subject to the CER in

accordance with the conveyancing laws, standards and practices of the State.

g.  Within 60 days of recording and/or registering the CER, or as soon as it

is available thereafter, Settling Defendant shall provide the LAT with a certified copy of

the original recorded and/or registered CER showing the clerk's recording stamps.

h.  Settling Defendant shall not sell, transfer, assign, or otherwise convey

any interest in the property subject to the CER, or portion thereof, unless prior to such

sale, transfer, or assignment:

167

(i) Settling Defendant has recorded and/or registered a CER, according to the process set forth in this Paragraph, on such property, or portion thereof, which is the subject of the sale, transfer, or assignment; and

(ii) Settling Defendant obtains from such purchaser, transferee, or assignee the Access and Interim Non-Interference Agreements described in Paragraph 59.

56.     Non-Settling Defendant Property.

a.  Where access to, and/or land and/or water use restrictions for, any Non-Settling Defendant Property in Massachusetts is required to implement, monitor, and/or protect the integrity of the response actions or Restoration Work required by this Consent Decree and the SOW, Settling Defendant shall use "best efforts", as defined in Paragraph 60, to secure from any persons who own or control such Non-Settling Defendant Property EREs, a CER, Access Agreements and/or Interim Non-Interference Agreements (as applicable) in accordance with Paragraphs 57, 58, and 59, respectively, subject to Paragraphs 61 and 62 of this Consent Decree.

b.  For each Removal Action Outside the River, Settling Defendant shall submit to EPA and MADEP, at the deadline for submittal of the Pre-Design Work Plan for such Removal Action, or within such other time as is proposed by Settling Defendant and approved by EPA, a written notice, in accordance with the requirements of Paragraph 60.e, stating whether each person who owns or controls Non-Settling Defendant Property which is located within the area subject to that Removal Action agrees, after Settling Defendant has used "best efforts," to execute and record an ERE thereon.  If

168

such person agrees to do so, such notice shall also include a statement as to whether any necessary subordination agreements for such property can be obtained, or if that has not yet been determined, a description of the status of Settling Defendant's efforts to obtain such subordination agreements. Settling Defendant shall provide final notice regarding whether such subordination agreements have been obtained no later than the deadline specified in Paragraph 57.a(i) for submittal of executed EREs and related documentation, including subordination agreements. If the person who owns or controls the property does not agree to execute and record an ERE thereon, after Settling Defendant has used "best efforts" to obtain such ERE, then Settling Defendant shall implement a Conditional Solution on such property, unless, within 30 days of Settling Defendant's above-mentioned written notice (or such later time as is approved by EPA, after reasonable opportunity for review and comment by MADEP), the State notifies Settling Defendant in writing that the State is undertaking efforts to obtain an ERE from such person. In the latter event, upon written notification from the State that the State has terminated such efforts without obtaining an ERE, then Settling Defendant shall implement a Conditional Solution on such property.

c.  For the Upper ½ Mile Reach Removal Action, Settling Defendant shall submit to EPA and MADEP a written notice, in accordance with the requirements of Paragraph 60.e, stating whether each person who owns or controls the bank portion of Non-Settling Defendant Property which is located within the Upper ½ Mile Reach agrees to impose an ERE thereon. Such submittal shall be made at the time Settling Defendant is required to submit a written notice stating whether such person agrees, after Settling

169

Defendant has used "best efforts," to execute and record an ERE on the non-bank portions of the property pursuant to subparagraph 56.b. above, or within such other time as is proposed by Settling Defendant and approved by EPA. If such person agrees to do so, such notice shall also include a statement as to whether any necessary subordination agreements for such property can be obtained, or if that has not yet been determined, a description of the status of Settling Defendant's efforts to obtain such subordination agreements. Settling Defendant shall provide final notice regarding whether such subordination agreements have been obtained no later than the deadline specified in Paragraph 57.a(ii) for submittal of executed EREs and related documentation, including subordination agreements. If the person who owns or controls the property does not agree to execute and record an ERE thereon, after Settling Defendant has used "best efforts" to obtain such ERE, then Settling Defendant shall implement a Conditional Solution on such property, unless, within 30 days of Settling Defendant's above-mentioned written notice (or such later time as is approved by EPA, after reasonable opportunity for review and comment by MADEP), the State notifies Settling Defendant in writing that the State is undertaking efforts to obtain an ERE from such person. In the latter event, upon written notification from the State that the State has terminated such efforts without obtaining an ERE, then Settling Defendant shall implement a Conditional Solution on such property.

d. For the 1 ½ Mile Reach Removal Action, to the extent that EPA is unable to obtain EREs pursuant to Paragraph 21.b, Settling Defendant shall submit to EPA and MADEP, on a schedule to be approved by EPA in connection with the 1 ½ Mile Reach

170

Removal Action, a written notice, in accordance with the requirements of Paragraph 60.e., stating whether each person who owns or controls the bank portion of Non-Settling Defendant Property which is located within the 1 ½ Mile Reach Removal Action agrees to execute and record an ERE thereon. If such person agrees to do so, such notice shall also include a statement as to whether any necessary subordination agreements for such property can be obtained, or if that has not yet been determined, a description of the status of Settling Defendant's efforts to obtain such subordination agreements. Settling Defendant shall provide final notice regarding whether such subordination agreements have been obtained no later than the deadline established pursuant to Paragraph 57.a(iii) for submittal of executed EREs and related documentation, including subordination agreements.

e. If EREs are a component of the Rest of River Remedial Action for any Non-Settling Defendant Property, Settling Defendant shall submit to EPA and MADEP, on a schedule to be approved by EPA in connection with that Remedial Action (after a reasonable opportunity for review and comment by MADEP), a written notice, in accordance with the requirements of Paragraph 60.e, stating whether each person who owns such Non-Settling Defendant Property agrees, after Settling Defendant has used "best efforts," to execute and record an ERE thereon. If such person agrees to do so, such notice shall also include a statement as to whether any necessary subordination agreements for such property can be obtained, or if that has not yet been determined, a description of the status of Settling Defendant's efforts to obtain such subordination agreements. Settling Defendant shall provide final notice regarding whether such

171

subordination agreements have been obtained no later than the deadline established pursuant to Paragraph 57.a(iv) for submittal of executed EREs and related documentation, including subordination agreements. If the person who owns or controls the property does not agree to execute and record an ERE thereon, after Settling Defendant has used "best efforts" to obtain such ERE, then Settling Defendant shall implement a Conditional Solution on such property (if a Conditional Solution is a component of the Rest of River Remedial Action), unless, within 30 days of Settling Defendant's above-mentioned written notice (or such later time as is approved by EPA, after reasonable opportunity for review and comment by MADEP), the State and/or the United States notifies Settling Defendant in writing that the State and/or the United States (as applicable) is undertaking efforts to obtain an ERE from such person. In the latter event, upon written notification from the State and/or the United States that the State and/or the United States (as applicable) has terminated such efforts without obtaining an ERE, then Settling Defendant shall implement a Conditional Solution on such property.

f. (i) A Notice ERE may be substituted for an ERE only at State-owned property that is subject to Article 49 of the State Constitution. A Notice ERE shall be in a form that is consistent with the form attached to this Consent Decree as Appendix P, as it may be modified to be consistent with CERCLA response actions pursuant to this Consent Decree. The prohibited and permitted activities and uses and the conditions and obligations in a Notice ERE shall be substantially the same as set forth in the model

172

ERE attached to this Consent Decree as Appendix O, for property in similar use (e.g., industrial/commercial use, recreational use).

(ii) (A)  Within 90 days from the date of entry of this Consent Decree, Settling Defendant shall submit a draft template for a Notice ERE to EPA for approval after reasonable opportunity for review and comment by MADEP.

(B)  By the deadlines indicated in Paragraph 57.a. for submittal of a fully executed ERE, Settling Defendant shall submit a fully executed Notice ERE that satisfies the requirements of subparagraphs (f)(i) and (f)(ii)(A) above for any State-owned property subject to Article 49 of the State Constitution, for approval by EPA after reasonable opportunity for review and comment by MADEP.

(C)  Within 10 working days of EPA's approval of the Notice ERE (or any amendment thereto, pursuant to subparagraph (f)(iii), below), Settling Defendant shall effect the recordation and/or registration of said Notice ERE (or said amendment if applicable), with the appropriate registry of deeds and/or land registration office, and, if the property is unregistered land, shall ensure that such Notice ERE (and said amendment, if applicable) is marginally referenced on the deed to the owner of the subject property.

(D)  Within 60 days after the recordation and/or registration of the Notice ERE (or said amendment) with the appropriate registry of deeds and/or land registration office, Settling Defendant shall submit to EPA and MADEP a certified registry copy of the Notice ERE (or said amendment).  If the land is registered land, the certified registry

173

copy shall include a document number.  If the land is unregistered land, the certified

copy shall include an instrument number and/or book and page number.

(iii)  A Notice ERE may be amended by the property owner by

submitting a proposed amendment to EPA and MADEP for approval by EPA, after

reasonable opportunity for review and comment by MADEP, and then, upon approval,

filing the approved amendment for recording and/or registration, in compliance with

subparagraphs (ii)(C ) and (ii)(D)  above in this Paragraph 56.f; provided, however,

nothing in this subparagraph shall affect the provisions of Paragraph 62.b of this

Consent Decree.

(iv) Settling Defendant shall notify local officials and the public of the

original recordation and/or registration of, and of any amendments to and/or terminations

of, in whole or in part, a Notice ERE on Non-Settling Defendant Property, in accordance

with the requirements set forth in 310 C.M.R. 40.1403(7), as amended.

57.    EREs for Non-Settling Defendant Property.  Subject to Paragraphs 61 and

62 of this Consent Decree, Settling Defendant shall satisfy the following requirements for

Non-Settling Defendant Property in Massachusetts:

a.   For each Non-Settling Defendant Property for which the owner(s) have

agreed to impose EREs, Settling Defendant shall use "best efforts" (as defined in

Paragraph 60) to obtain and submit to EPA and MADEP a fully executed ERE that

meets the requirements of this Paragraph, together with supporting documentation,

including, without limitation, subordination agreements as required by subparagraph

57.d., title work as required by subparagraph 57.e., and legal descriptions and surveyed

plans of the affected properties and/or restricted areas established therein.  Such
documents shall be submitted to EPA and MADEP in accordance with the following
schedule:

(i) For Non-Settling Defendant Property within each area subject to
a Removal Action Outside the River, as part of the submission of the
Conceptual Removal Design/Action Work Plan for such Removal Action
(or, for any of the Housatonic River Floodplain Removal Actions, as part of
the submission of the Removal Design/Action Work Plan);

(ii) For the riverbank portions of Non-Settling Defendant Property
within the area subject to the Upper ½ Mile Reach Removal Action, as part
of the submission of the Conceptual Removal Design/Action Work Plan for
the Removal Action Outside the River which covers the non-riverbank
portion of the property;

(iii) For the riverbank portions of Non-Settling Defendant Property
within the area subject to the Upper 1 ½ Mile Reach Removal Action,
excluding any non-accessible riverbank portions of such property, on a
schedule to be determined in connection with the 1 ½ Mile Reach Removal
Action, but prior to the commencement of on-site construction work; and

(iv) For Non-Settling Defendant Property within the area to be
addressed by the Rest of River Remedial Action, if EREs are a component
of the Rest of River Remedial Action, on a schedule to be determined in

175

connection with the Rest of River Remedial Action or Rest of River SOW, but prior to the commencement of on-site construction work.

b.      As determined by EPA, after reasonable opportunity for review and comment by MADEP, and following written notice from EPA to Settling Defendant (with a copy to MADEP) of EPA's preferred grantee, the ERE shall be granted to (i) MADEP, (ii) the City, (iii) Settling Defendant, (iv) EPA (for the Rest of River Remedial Action, if applicable), (v) another state or federal agency with at least statewide jurisdiction that has statutory authority to hold property interests and to administer or to enforce property restrictions such as EREs on behalf of the State or the United States, or (vi) any other entity if Settling Defendant and the property owner give their prior consent; provided, however, that nothing in this subparagraph shall require the State, or any of its agencies, or the City to accept an ERE which EPA has approved.  In the event the State, or any of its agencies, or the City will not accept an ERE approved by EPA pursuant to this Paragraph, and such ERE is not granted to any of the other foregoing entities, then, pursuant to this subparagraph, Settling Defendant shall be grantee of such ERE, as modified by, and/or unless otherwise directed by, EPA, after reasonable opportunity for review and comment by MADEP, and consultation with the LAT (if appropriate).  In the event that an entity other than MADEP or EPA is the grantee of an ERE, the ERE shall be modified as appropriate by EPA, after a reasonable opportunity for review and comment by MADEP, and in consultation with the LAT, if appropriate, to reflect the fact that MADEP and EPA are not the grantees; provided, however, that such modified ERE shall not impose additional substantive restrictions on the property.

c.    If EPA is not the grantee of the ERE, for the time period prior to Certification of Completion of the response action for the area in which the property subject to the ERE is located, the grantee may approve conditional exceptions from the ERE restrictions or require or  approve amendments to or release the ERE only in accordance with the terms of the duly recorded and/or registered ERE and only upon the consent of EPA; provided, however, that the foregoing shall not modify MADEP's rights and obligations pursuant to subparagraphs 57.g. and 57.m.

d.    All EREs granted pursuant to this Paragraph 57 shall be substantially in the form attached hereto as Appendix O, except: (i) as proposed by Settling Defendant and approved by EPA, after a reasonable opportunity for review and comment by MADEP; and (ii) if EREs for Non-Settling Defendant Property are a component of the Rest of the River Remedial Action, EPA, MADEP, and Settling Defendant shall discuss and EPA will approve (after a reasonable opportunity for review and comment by MADEP) any appropriate modifications to the model ERE attached hereto as Appendix O (including protocols) to reflect the Rest of the River Remedial Action.  Except as noted above, all EREs granted pursuant to this Paragraph 57 shall include provisions assenting to Settling Defendant's subsequent recordation and/or registration of: (1) a Notice of Completion (as such Notice is defined in the model ERE for Non-Settling Defendant Property, attached hereto as Appendix O, which Notice of Completion shall not be deemed a Certification of Completion under this Consent Decree); and (2), if applicable, a revised Plan of Restricted Area in connection therewith; and (3) except as otherwise provided in subparagraph 59.c, and if applicable, a revised

177

Plan of Restricted Area to show the location of any Groundwater Response Action

Component Area (as such term is defined in the aforesaid model ERE) and associated

notice. In addition, Settling Defendant shall use "best efforts" (as defined in Paragraph

60.b or 60.d, as applicable) to ensure that such EREs satisfy the other requirements of

Paragraph 54.c, including (but not limited to) the obtaining of subordination agreements

for prior liens and encumbrances on the property, in substantially the form attached

hereto as Appendix M (including therein an express assent to Settling Defendant's

subsequent recordation and/or registration of said Notice of Completion or said other

notice and, if applicable, said revised Plan(s)). For easements or similar non-fee

property interests held by the State on Non-Settling Defendant Property for which

Settling Defendant is obligated to use "best efforts" to obtain such subordination

agreements, the State shall not unreasonably withhold consent to subordinate such

interests to the ERE without compensation from Settling Defendant so long as such

subordination does not interfere with the use and purpose of such interest. Further,

Settling Defendant shall use "best efforts" (as defined in Paragraph 60.d) to obtain the

property owner's written agreement that if such property owner conveys any interest in

the property prior to the recordation and/or registration of the above-referenced Notice of

Completion, other notice and revised Plan(s), such property owner will include in the

instrument effecting such conveyance a provision by which the transferee of such

interest expressly consents to Settling Defendant's subsequent recordation and/or

registration of said Notice of Completion, said other notice, and said revised Plan(s). A

copy of such written agreement, if obtained, shall be submitted to EPA and MADEP along with the executed ERE and other documentation described in Paragraph 57.a.

e. Settling Defendant shall also use "best efforts" (as defined in Paragraph 60.d) to satisfy the requirements of Paragraph 54.e, modified as appropriate to apply to Non-Settling Defendant Property EREs.

f. EPA will determine, after a reasonable opportunity for review and comment by MADEP and consultation with the LAT (if appropriate), whether the ERE as executed, title and any necessary subordination agreements are acceptable; provided, however, that EPA will not unreasonably withhold its approval if the ERE is substantially in the same form as, and contains substantially the same terms as, the form attached to this Consent Decree as Appendix O (or, for the Rest of the River, any modifications to the ERE form approved by EPA pursuant to Paragraph 57.d(ii), after reasonable opportunity for review and comment by MADEP). Nothing herein shall require the City, or the State, or any of its agencies, including without limitation MADEP, to accept any interest in an ERE approved by EPA. After approving an ERE, title, and subordination agreements, EPA shall make a request to MADEP to accept a grant of the ERE for any ERE where MADEP is the proposed grantee. If MADEP agrees to accept such a grant of an ERE, Settling Defendant shall, within 10 working days of MADEP's written acceptance and return thereof to Settling Defendant, effect the recordation and/or registration of said ERE with the appropriate registry of deeds and/or land registration office, at Settling Defendant's sole cost and expense.

179

g. Within 30 days of the recordation and/or registration of the ERE, Settling Defendant shall submit to EPA and MADEP a final title insurance policy or title certification updated through the time of recording and/or registering the ERE. If EPA determines, after a reasonable opportunity for review and comment by MADEP, that there has been an occurrence since the effective date of the original commitment or report to impair the title, Settling Defendant shall use "best efforts" (as defined in Paragraph 60.d) to ensure that the record title is good, clear and marketable; that the current owner is or will be bound by the ERE; and that the ERE is granted free and clear of all prior liens and encumbrances and in accordance with (i) the Attorney General's Title Regulations promulgated pursuant to 40 U.S.C. § 255, if EPA is the grantee; or (ii) the conveyancing laws, standards and practices of the State, if EPA is not the grantee. Nothing herein shall obligate MADEP to continue to hold an ERE for which EPA has approved said final title policy or updated title certification, provided that MADEP notifies EPA within 120 days of receiving written notification from EPA of such final title policy approval or updated title certification approval that MADEP no longer desires to hold such ERE, except that MADEP may assign such ERE at any time pursuant to the terms of the ERE; and provided further that the foregoing limitation on MADEP's rights to discharge or release such ERE shall be null and void upon Certification of Completion of the Removal Action affected by such ERE. If Settling Defendant is unable to satisfy all of the conditions set forth in subparagraphs 57.a through 57.g of this Paragraph, as determined by EPA (after reasonable opportunity for review and comment by MADEP) prior to EPA's approval for Settling Defendant's commencement of response actions at

the property, then Settling Defendant shall implement a Conditional Solution pursuant to Paragraphs 34-38 of this Consent Decree, unless the State (or EPA, for the Rest of River), within 30 days of EPA's determination, notifies Settling Defendant in writing that the State (or EPA for the Rest of River) is undertaking efforts to obtain any necessary subordination agreements. In the latter event, upon written notification from the State (or EPA, for the Rest of River) that the State (or EPA, for the Rest of River) has terminated such efforts without obtaining such subordination agreements, then Settling Defendant shall implement a Conditional Solution at such property pursuant to Paragraphs 34-38 of this Consent Decree.

h.  Within 60 days of recordation and/or registration of the ERE, or as soon as it is available thereafter, Settling Defendant shall provide EPA, MADEP, and the property owner with a certified copy of the original recorded and/or registered ERE showing the clerk's recording stamps.

i.  Following the completion of response actions at Non-Settling Defendant Property on which an ERE was recorded and/or registered, on a schedule to be proposed by Settling Defendant and approved by EPA, after a reasonable opportunity for review and comment by MADEP (which schedule, for properties subject to a Removal Action Outside the River, shall be no later than submission of the Final Completion Report for such Removal Action), Settling Defendant shall submit to EPA and MADEP a Notice of Completion for such ERE and, if applicable, a revised Plan of Restricted Area. Such Notice shall specify that the restrictions and other provisions of the ERE that were not previously applicable to activities at the property will become

181

applicable to such activities, and, if relevant, shall specify that said revised Plan will replace the previously recorded and/or registered Plan. If EPA (after a reasonable opportunity for review and comment by MADEP, if MADEP is not the grantee) approves said Notice and revised Plan, EPA shall thereafter provide the original Notice to the grantee of the affected ERE and request said grantee's signature thereon. If the grantee agrees to sign said Notice, grantee shall return said executed Notice to Settling Defendant for recordation and/or registration.

j.      Within 10 working days of the grantee's signing said Notice and return thereof to Settling Defendant, Settling Defendant shall record and/or register such Notice and, if applicable, revised Plan with the appropriate registry of deeds and/or land registration office, at Settling Defendant's sole cost and expense. If the affected property is unregistered land, Settling Defendant shall ensure that a marginal reference to both said Notice and said revised Plan is made on the affected ERE.

k.      Within 30 days of such recordation and/or registration, Settling Defendant shall submit to EPA and MADEP an updated final title insurance policy or title certification, updated through the time of recordation and/or registration of said Notice.

l.      Within 60 days of recordation and/or registration of the Notice of Completion and revised Plan (or as soon thereafter as it is available), Settling Defendant shall provide EPA, MADEP, and the property owner with a certified copy of the original recorded and/or registered Notice and, if applicable, revised Plan showing the clerk's recording stamps.

m.     If the updated final title insurance policy or updated title certification reveals, or EPA determines, after reasonable opportunity for review and comment by MADEP, that due to an expansion of or addition to the Restricted Area (as defined in the affected ERE) or any other occurrence since the recordation and/or registration of the affected ERE, there are liens, encumbrances, or other interests in the property that are not subordinate to the ERE as affected by the Notice of Completion and, if applicable, the revised Plan of Restricted Area, then upon written notice from EPA, Settling Defendant shall use "best efforts" (as defined in Paragraph 60.b or 60.d, as applicable) to obtain subordination agreements from all such interest holders (including, without limitation, any such interest holders who may have previously subordinated their respective interests to the affected ERE). Within 60 days of receipt of such notice from EPA, Settling Defendant shall obtain, record and/or register, and submit a copy of each such subordination agreement to EPA and MADEP, and, if applicable, shall notify EPA and MADEP in writing of any such subordination agreements that it has not been able to obtain. Nothing herein shall obligate MADEP to continue to hold an ERE for which EPA has approved said updated final title policy or updated title certification, provided that MADEP notifies EPA within 120 days of receiving written notification from EPA of such updated final title policy approval or updated title certification approval that MADEP no longer desires to hold such ERE, except that MADEP may assign such ERE at any time pursuant to the terms of the ERE; and provided further that the foregoing limitation on MADEP's rights to discharge or release such ERE shall be null and void upon Certification of Completion of the Removal Action affected by such ERE.

183

n.    If Settling Defendant cannot, despite using "best efforts," obtain subordination agreements from the interest holders referred to in Paragraph 57.m (if any), or if EPA otherwise determines, after reasonable opportunity for review and comment by the State (or, in the event that a Certification of Completion has already been issued for the Removal Action that addressed such property, MADEP determines) that the ERE or any provision thereof is unenforceable or otherwise invalid as against the owner of such property or any other holder of an interest in such property, notwithstanding the recordation and/or registration of the Notice of Completion and revised Plan of Restricted Area, assent, subordination agreement, or other documentation, as applicable, then:

(i)    For property in recreational use, the response actions completed at the property shall be deemed a Conditional Solution and Settling Defendant shall comply with the obligations set forth in Paragraphs 34.d. and 35-38; provided, however, that Settling Defendant shall not be required to conduct additional response actions at the property except as set forth in Paragraphs 34.d and 35-38, and in Section XIX (Emergency Response) or Paragraphs 162, 163, 167, and/or 168 (Pre- and Post-Certification Reservations) of this Consent Decree; or

(ii)    For property in commercial/industrial use, Settling Defendant shall evaluate the need for further response actions to be protective of human health and the environment for property in such use, shall submit the results of that evaluation, together with a proposal for any such further response actions, to EPA for approval, with a copy to MADEP, and shall implement such response actions (if any) upon EPA

184

approval, after reasonable opportunity for review and comment by MADEP; provided, however, that Settling Defendant shall not be required to conduct additional response actions beyond those described in Paragraph 34.c(i). Upon completion of any such additional response actions, such response actions shall be deemed a Conditional Solution and Settling Defendant shall comply with the obligations set forth in Paragraphs 34.d and 35-38. Nothing in this subparagraph shall affect Settling Defendant's obligations under Section XIX (Emergency Response) or Paragraphs 162, 163, 167, and 168 (Pre- and Post-Certification Reservations) of this Consent Decree.

o.    Following the recordation and/or registration of an ERE on Non-Settling Defendant Property not then owned by the United States or the State, and any Settling Defendant Property transferred to PEDA, Settling Defendant shall, on an annual basis, conduct an inspection of the property to assess compliance with the ERE during the preceding year, in accordance with Appendix Q, including the criteria set forth therein. Within 30 days of such inspection, Settling Defendant shall submit a report to EPA, MADEP, and the grantee (if it is an entity other than EPA or MADEP), identifying any instances of non-compliance based on evaluation of the criteria set forth in Appendix Q, together with the appropriate supporting information, and otherwise in accordance with Appendix Q.

p.    Settling Defendant shall notify local officials and the public of the original recordation and/or registration of, and of any amendments to and/or terminations of, in whole or in part, an ERE on Non-Settling Defendant Property (including the Notice

185

of Completion and other notice, if any, both as described in subparagraph 57.d), in accordance with the requirements set forth in 310 C.M.R. 40.1403(7), as amended.

58. CER for Non-Settling Defendant Property. In the event that Settling Defendant elects to use Former Oxbows A and C for the implementation of Restoration Work consisting of the creation of forested/wetland habitat, as provided in Paragraph 118.e of this Consent Decree, Settling Defendant shall use "best efforts" (as defined in Paragraph 60.c) to effect the recordation and/or registration of a CER on the portion of Former Oxbows A and C where such Restoration Work will be conducted. In doing so, Settling Defendant shall use "best efforts" (as defined in the applicable subparagraphs of Paragraph 60) to ensure compliance with the same process and requirements set forth in Paragraph 55, modified as appropriate to apply to Former Oxbows A and C. If such a CER is recorded and/or registered, Settling Defendant shall, on an annual basis thereafter, conduct an inspection of Former Oxbows A and C to assess compliance with the CER during the preceding year, in accordance with Appendix Q, including the criteria set forth therein. Within 30 days of such inspection, Settling Defendant shall submit a report to the grantee and the LAT identifying any instances of non-compliance based on evaluation of the criteria set forth in Appendix Q, together with appropriate supporting information, and otherwise in accordance with Appendix Q.

59. Access and Interim Non-Interference Agreements for Non-Settling Defendant Property.

a. Settling Defendant shall use "best efforts" (as defined in Paragraph 60.c) to obtain written access agreements from any persons who own or

186

control Non-Settling Defendant Property for purposes of conducting any activity pursuant to this Consent Decree ("Access Agreements"), except as provided in Paragraph 21.b. of this Consent Decree.  The Access Agreements shall be in substantially the form attached hereto as Appendix R (except as proposed by Settling Defendant and approved by EPA, after a reasonable opportunity for review and comment by MADEP). Settling Defendant shall use such "best efforts" to obtain any such Access Agreement within 45 days of any written request from the United States or the State for any such Access Agreement.  The Access Agreements shall provide such access rights to Settling Defendant, the United States, and/or the State, and their representatives (including contractors), if Settling Defendant, the State, and/or the United States do not already have such access rights pursuant to a duly recorded and/or registered ERE or CER.

b.   Prior to recording or registering an ERE and/or a CER for any Non-Settling Defendant Property at which an ERE and/or CER is required under this Consent Decree, Settling Defendant shall use "best efforts" (as defined in Paragraph 60.c) to obtain or secure an agreement from any persons who own or control such Non-Settling Defendant Property that such persons shall not take any action, or allow any employees, agents, independent contractors, lessees, sublessees, or assigns to take any action, at the property that would interfere with or adversely affect the implementation, integrity or protectiveness of the response actions or Restoration Work to be implemented pursuant to this Consent Decree ("Interim Non-Interference Agreement").  The Interim Non-

187

Interference Agreements shall expire if and when an ERE and/or CER (if applicable) is recorded and/or registered for such property.

c. At any Non-Settling Defendant Property for which Settling Defendant is required (pursuant to Paragraph 24) to make "best efforts" (as defined in Paragraph 60.a) to execute and record an ERE, if the property owner would agree to execute and record an ERE only if provisions pertaining specifically to non-interference with groundwater-related response actions are struck from the ERE, then the ERE may be submitted to EPA for approval absent such provisions.  If such ERE is executed and recorded in accordance with this Consent Decree, and if groundwater-related response actions are later determined by EPA to entail the use of any such property, Settling Defendant shall make "best efforts" (as defined in Paragraph 60.d) to obtain from the property owner an ERE amendment re-instituting said struck provisions, preferably, or in the alternative, an Interim Non-Interference Agreement, to ensure non-interference with groundwater-related response actions.  If such property is thereafter sold to a new owner, and if the ERE was not amended to re-institute said struck provisions, Settling Defendant shall make "best efforts" (as defined in Paragraph 60.d) to obtain from the new property owner an Interim Non-Interference Agreement to be protective of and ensure non-interference with the groundwater-related response actions.  Any such Interim Non-Interference Agreement shall terminate upon Certification of Completion of the groundwater response action.

d. At any Non-Settling Defendant property for which Settling Defendant is not required (pursuant to paragraph 24) to make "best efforts" (as defined in Paragraph

60.a) to execute and record an ERE, if groundwater-related response actions are determined by EPA to be necessary on any such property, Settling Defendant shall make "best efforts" (as defined in Paragraph 60.d) to obtain from the property owner an Interim Non-Interference Agreement to be protective of and ensure non-interference with groundwater-related response actions. If such property is thereafter sold to a new owner, Settling Defendant shall make "best efforts" (as defined in Paragraph 60.d) to obtain from the new property owner an Interim Non-Interference Agreement to be protective of and ensure non-interference with the groundwater-related response actions. Any such Interim Non-Interference Agreement shall terminate upon Certification of Completion of the groundwater response action.

60.    For purposes of Paragraphs 54 through 59 of this Consent Decree, except as otherwise provided in Paragraphs 61 and 62, "best efforts" to obtain EREs, subordination agreements, CERs, Access Agreements, and Interim Non-Interference Agreements for Non-Settling Defendant Property located in areas of the Site other than the Rest of the River, or to obtain subordination agreements for Settling Defendant Property located in areas of the Site other than the Rest of the River, shall be determined in accordance with Paragraphs 60.a, 60.b, 60.c, and 60.d below. For properties located in the Rest of the River, to the extent that EREs, CERs, subordination agreements, Access Agreements, and/or Interim Non-Interference Agreements are required by or pursuant to the Rest of the River Remedial Action, the Parties agree to negotiate in good faith a definition of the meaning of "best efforts" after a final decision is made on the Rest of the River Remedial Action.

189

a. For Non-Settling Defendant Properties located in areas outside the Rest of the River, "best efforts" to obtain EREs shall include offering reasonable monetary compensation in consideration for EREs. For this purpose, "reasonable monetary compensation in consideration for EREs" shall mean that Settling Defendant offers to pay the landowner: (1) all transaction costs associated with obtaining and recording the ERE, including, but not limited to, obtaining any appraisals, but excluding the payment of the landowner's attorney fees prior to executing the ERE or the landowner's attorney fees in connection with any eminent domain proceeding; and (2) either of the following values, at the choice of Settling Defendant:

(i) the value of the difference between: (A) the fair market value of the property, taking into account the property's current use, any applicable zoning and statutory or regulatory restrictions on use, and any other relevant factors relied upon by appraisers, but without regard to the environmental contamination (if any) on the property, and without the imposition of any new restrictions on use resulting from an ERE; and (B) the fair market value of the property, taking into account the property's current use, any applicable zoning and statutory or regulatory restrictions on use, and any other relevant factors relied upon by appraisers, without regard to the environmental contamination (if any) on the property, but with the imposition of the new restrictions set forth in the proposed ERE. These estimates shall be undertaken substantially in accordance with the most current edition of the Uniform Standards of Professional Appraisal Practice by a currently certified general real estate appraiser in the State. If only one appraiser undertakes the estimates, such appraiser shall be

selected by mutual agreement between the landowner and Settling Defendant. Otherwise, three appraisers shall undertake the estimates according to the following process: Settling Defendant and the landowner will each select an appraiser and those two appraisers will select a third appraiser, and the average of the three estimated values as determined by the three appraisers shall be offered to the landowner. Settling Defendant shall pay all costs of appraisals. This calculation is hereinafter referred to as the "FMV Prong";

or

(ii) 18% of the total value of the most recent assessed value by the City of Pittsfield Tax Assessor's Office plus 18% of the value of any prior abatement awarded by such Tax Assessor's Office based upon property-specific contamination. This calculation is hereinafter referred to as the "Assessment Prong," and may be restated as follows:

18% x [(assessed value) + (abatement credit, if any)].

b.  For purposes of this Consent Decree, "best efforts" to obtain a subordination agreement for encumbrances such as liens, mortgages, or similar interests at properties located in areas outside the Rest of River shall mean the following:

(i) Settling Defendant shall negotiate in good faith directly with the interest holder, including permitting the landowner, at the landowner's option, to participate in such negotiations with such interest holder. Upon request, Settling

191

Defendant shall provide any relevant non-privileged information to the interest holder; and

(ii) If such negotiations are unsuccessful, Settling Defendant, in good faith, will contact at least three (but will not be required to contact more than three) lending and other appropriate financial institutions or entities, including at least one such local institution or entity, to inform the same of the opportunity to take over or buy out the prior interest on condition that the new institution or entity subordinate such interest to the ERE. Settling Defendant shall offer to pay the property owner the transaction costs of refinancing or otherwise obtaining the subordination agreement; provided, however, that Settling Defendant shall not be obligated to compensate such property owner for any difference in interest rates or any points charged by the lending or financial institution for either refinancing at a lower interest rate or for executing a subordination agreement. Nothing in this Paragraph 60.b shall be construed to require Settling Defendant to buy out the prior interest.

c. For purposes of Paragraphs 56, 58, and 59, "best efforts" to obtain CERs, Access Agreements and Interim Non-Interference Agreements for Non-Settling Defendant Property located in areas outside the Rest of the River shall include the offer of reasonable compensation, if any, as appropriate, to be determined on a case-by-case basis.

d. For any other activity for which "best efforts" are required under this Consent Decree, insofar as they relate to EREs, CERs, Access Agreements or Interim Non-Interference Agreements for properties located in areas outside the Rest of the

River, and for which "best efforts" is not specifically defined, "best efforts" shall be determined on a case-by-case basis.

e. If Settling Defendant uses "best efforts" but fails to obtain EREs, subordination agreements, Access Agreements, and/or Interim Non-Interference Agreements for Non-Settling Defendant Properties, Settling Defendant shall notify EPA and MADEP as required by Paragraphs 56.b-56.e for EREs and subordination agreements or within 14 days after failing to obtain an Access Agreement or Interim Non-Interference Agreement. Such notice shall be in writing, and shall include a summary of the steps that Settling Defendant has taken to comply with this Paragraph, including, but not limited to, Settling Defendant's last compensation offer (if applicable) in consideration of obtaining the EREs, subordination agreements, Access Agreements, and/or Interim Non-Interference Agreements, any information that is supportive of such last compensation offer (if applicable), and a statement of any other outstanding issues to be resolved. If Settling Defendant uses "best efforts" but fails to obtain subordination agreements for Settling Defendant Property, Settling Defendant shall submit a similar notice to EPA and MADEP at the times specified in Paragraph 54.a(i)-(iv).

f. (i) In the case of Access Agreements or Interim Non-Interference Agreements, the United States and the State will assist Settling Defendant in obtaining such agreements, including, but not limited to, use, as appropriate, of their statutory and regulatory authorities to secure access to the property in question and/or non-interference with the response action in question.

193

(ii) In the case of EREs, the State may, in its sole discretion, assist Settling Defendant in obtaining EREs, including through use of its statutory and regulatory authority. Upon request from Settling Defendant, the State will meet with Settling Defendant to discuss what form such assistance to obtain EREs should take, prior to providing any such assistance. If it is determined that EREs are a component of the Rest of the River Remedial Action, the United States or the State may, in their sole discretion, assist Settling Defendant in obtaining EREs, including through use of their statutory and regulatory authorities. Upon request from Settling Defendant, the United States or the State will meet with Settling Defendant to discuss what form such assistance to obtain EREs should take, prior to providing any such assistance. Before the United States takes or acquires an ERE in the Rest of River, the United States will request that the State take or acquire such ERE. If the State, in its sole discretion, declines to take or acquire such ERE, or if, after a reasonable period of time following such request from the United States, the State is unsuccessful in obtaining such ERE, then the United States may take or acquire such ERE.

g.   Settling Defendant shall reimburse the United States in accordance with the procedures in Section XX (Reimbursement of Costs) for all costs, direct or indirect, incurred by the United States in obtaining such Access Agreements, Interim Non-Interference Agreements, or EREs (in the Rest of River, if EREs are a component of the Rest of River Remedial Action), including, but not limited to, the cost of attorney time to secure or obtain the same and the amount of monetary consideration paid or other just compensation paid to secure or obtain the same. Such costs shall be considered U.S. Future Response Costs and shall be recoverable in accordance with Paragraph 95.a.

194

h. Settling Defendant shall reimburse the State in accordance with the procedures in Section XX and subject to the provision of Paragraph 95.d(iv), for the costs incurred by the State in obtaining Access Agreements or Interim Non-Interference Agreements. With respect to EREs, if Settling Defendant has made "best efforts" but has failed to obtain an ERE, including any necessary subordination of prior interests, pursuant to the process set forth in this Section XIII for a property for which Settling Defendant is required pursuant to this Consent Decree to use "best efforts" to obtain an ERE, and the State has thereafter Incurred costs in obtaining or seeking to obtain such an ERE or any necessary subordination agreements, Settling Defendant shall reimburse the State such costs, not inconsistent with the MCP, as follows:

(i) With respect to those costs Incurred by the State in obtaining or seeking to obtain such ERE, other than those costs Incurred in paying to the owner of such property compensation for such ERE, Settling Defendant shall reimburse the State all such costs, including, but not limited to, attorney and other staff time and resources, the costs of outside appraisals, and litigation expenses.

(ii) With respect to those costs that the State Incurs in paying to the owner of such property compensation for such ERE, Settling Defendant shall reimburse the State such costs as follows:

(A) In the event that the State obtains an ERE through a voluntary purchase (including the settlement of any eminent domain proceeding) for a price to which the Setting Defendant has provided prior consent, Settling Defendant shall reimburse the State such purchase price.

195

(B)  In the event that the State, without having conducted its own appraisal, obtains an ERE through a voluntary purchase for a price to which Settling Defendant has not provided prior consent, Settling Defendant shall reimburse the State such purchase price, but not to exceed 18% of the sum of the most recent assessed value of the property by the City of Pittsfield's Tax Assessor's Office and the value of any prior abatement based on property-specific contamination.

(C)  In the event that the State, having conducted its own appraisal of the fair market value of the ERE in accordance with the standards set forth in Paragraph 60.a(i) (FMV Prong), obtains an ERE through a voluntary purchase (including the settlement of any eminent domain proceeding) for a price to which Settling Defendant has not provided prior consent in writing, Settling Defendant shall reimburse the State such purchase price, but not exceeding the amount of such appraisal; provided, however, that Settling Defendant may seek dispute resolution pursuant to Section XXIV of this Consent Decree without reference to the procedures set forth in 310 C.M.R. 40.1220(3).

(D)  In the event that the State obtains an ERE through an eminent domain taking pursuant to which the property owner has accepted the award offered by the State, Settling Defendant shall reimburse the State the amount of such award if Settling Defendant has given its prior consent to the amount of such award, and otherwise Settling Defendant shall reimburse the State in accordance with subparagraph 60.h(ii)(C) above; provided, however, that the State shall provide 30 days notice to Settling Defendant before exercising its eminent domain authority.

(E)   In the event that the State obtains an ERE through an eminent domain proceeding in which the property owner has rejected the award offered by the State and has initiated a proceeding to contest the value of the ERE taken and that proceeding has gone to final judgment, Settling Defendant shall reimburse the State the amount of such judgment; provided, however, that the State shall provide 30 days notice to Settling Defendant before exercising its eminent domain authority and shall consent to any request that Settling Defendant makes to file a brief as amicus curiae in such proceeding.

(iii)      With respect to those costs Incurred by the State in obtaining or seeking to obtain any necessary agreements to subordinate interests in the property to an ERE (including, without limitation, an ERE for Non-Settling Defendant Property as such ERE may be affected by a Notice of Completion and, if applicable, a revised Plan(s) of Restricted Area or other notice described in subparagraph 57.d), Settling Defendant shall reimburse the State for: (A) costs Incurred by the State in undertaking the same activities required of Settling Defendant by Paragraph 60.b(i) and (ii); (B) costs of staff time resources, attorney time, and related expenses in undertaking other efforts seeking to obtain the necessary subordination agreements; and (C) costs of any other activities to which Settling Defendant has given prior written consent; provided, however, that in no event shall Settling Defendant be required to reimburse the State for costs Incurred in paying to the holder of such interests compensation for the subordination agreements or in buying out such interests, in the absence of Settling Defendant's prior written consent.

197

61.   EREs at Western Massachusetts Electric Company Properties:

Notwithstanding the provisions of Paragraphs 56, 57, and 60 or any other provision of

this Consent Decree, Settling Defendant shall not be required to make "best efforts" to

obtain EREs at properties owned by Western Massachusetts Electric Company or its

parent Northeast Utilities, provided that Settling Defendant demonstrates (e.g., by title

evidence), subject to approval by EPA (after reasonable opportunity for review and

comment by MADEP), that such properties are encumbered by a mortgage that includes

numerous properties owned by Northeast Utilities (including properties outside the Site),

and that hence it would not be practical to obtain subordination agreements for the

encumbrances on the specific properties in question without eliminating or restructuring

much or all of the bonded debt of Northeast Utilities or posting an asset equal to the fair

market value of the properties in question. If EPA, after reasonable opportunity for

review and comment by MADEP, approves such demonstration, Settling Defendant shall

implement a Conditional Solution at such properties in accordance with Paragraphs 34-

38 of this Consent Decree.

62.   Access and EREs at State-Owned Properties

a.   Settling Defendant and the State agree to negotiate a written

umbrella access agreement for sampling and reconnaissance, as well as property-

specific written access agreements, for State-owned property within the Site in

accordance with the following provisions:

(i)   The State will provide access to, over, on, in and under

State-owned property within the Site at reasonable times and places to allow Settling

198

Defendant and its contractors to perform the response actions required by this Consent

Decree on such property. In addition, the State shall not unreasonably withhold access

to, over, on, in and under State-owned property within the Site at reasonable times and

places as necessary to allow Settling Defendant and its contractors to perform the

response actions required by this Consent Decree at other properties within the Site.

(ii)     Before exercising access allowed by a property-specific

access agreement, Settling Defendant shall provide reasonable notice to the appropriate

designated State official with responsibility for the State-owned property that is subject to

such agreement, in the manner specified in, and by the deadlines included in, such

agreement. Before exercising access allowed by the umbrella access agreement for

sampling and reconnaissance, Settling Defendant shall provide reasonable notice as

provided in that agreement.

(iii)    In exercising its access rights pursuant to a property-specific

access agreement, Settling Defendant shall not damage, or interfere with the use of,

State-owned property, except to the extent necessary to perform response actions

required by this Consent Decree. Settling Defendant shall restore such property, to the

extent technically practicable, to a substantially equivalent condition as existed prior to

Settling Defendant's performance of the response actions required by this Consent

Decree. The State shall not interfere with EPA's or Settling Defendant's implementation

of response actions performed in accordance with the Consent Decree.

(iv)    The State agrees that it will provide access to Settling

Defendant, in accordance with the terms and conditions of this subparagraph 62.a, to

perform the response actions required by this Consent Decree on State-owned property within the Site, without compensation other than performance of the obligations to which Settling Defendant has committed in this Consent Decree.  The State further agrees that it will provide access to Settling Defendant, in accordance with the terms and conditions of this subparagraph 62.a, to use State-owned property within the Site to perform the response actions required by this Consent Decree on other property within the Site, without compensation other than the obligations to which Settling Defendant has committed in this Consent Decree, but only to the extent that there is no reasonable alternative to such access.

(v)     Disputes arising between Settling Defendant and the State regarding access to State-owned property shall be subject to the dispute resolution process set forth in Paragraph 140 (Disputes Solely Between Settling Defendant and the State).

b.      For any State-owned property for which Settling Defendant is obligated to use "best efforts" to obtain an ERE pursuant to this Consent Decree, the State shall not unreasonably withhold consent to the placement of an ERE or, for State-owned property subject to Article 49 of the State Constitution, a Notice ERE (as described in Paragraph 56.f of this Consent Decree) on such property without further compensation, so long as such ERE or Notice ERE (i) does not interfere with recreational use of such property and with any other use that is made of such property as of the date of lodging of this Consent Decree, and (ii) comports with the applicable requirements of this Section XIII of the Consent Decree for such EREs or Notice EREs,

including, but not limited to, the requirements regarding consistency between such ERE

or Notice ERE with the model ERE attached to this Consent Decree as Appendix O or,

as applicable, the Notice ERE form attached to this Consent Decree as Appendix P (as

it may be modified as described in Paragraph 56.f) and the Notice ERE template

described in Paragraph 56.f(ii)(A) and (B); provided, however, that the placement of

EREs (but not Notice EREs) on State-owned property shall be subject to any applicable

requirements of state law regarding the disposition of state property.

        c.     Nothing in this Paragraph 62 should be interpreted as the State

consenting to allow Settling Defendant to use State-owned property for the disposal of

Waste Materials that, in Settling Defendant's performance of the Work, have been

moved from where they have come to be located.

        d.     Within 60 days of entry of this Consent Decree, Settling Defendant

shall pay $100,000 to the State, for deposit into the Inland Fisheries and Game Fund

established by M.G.L. c. 131, § 2. Settling Defendant shall forward a check in this

amount, made payable to the Commonwealth of Massachusetts Special Fund 114 to:

            Chief, Environmental Protection Division
            Office of the Attorney General
            200 Portland Street
            Boston, MA 02114

63.    <u>Groundwater EREs</u>.   In the event that a Removal Action to address

groundwater contamination pursuant to this Consent Decree and/or the SOW entails the

placement of structures, including without limitation groundwater wells, slurry walls

and/or sheetpiling, in, on, under or through any Settling Defendant Property or Non-

Settling Defendant Property, then for each such affected property for which an ERE has been recorded and/or registered, and where such ERE provides for a revised Plan of Restricted Area and associated notice to be recorded and/or registered to show areas to be subject to restrictions relating to response actions for groundwater, Settling Defendant shall:

a. prepare a revised Plan of Restricted Area and associated notice for each such ERE such that the area within which each such structure is situated is clearly delineated by metes and bounds; each such area shall be identified on said Plan as a "Groundwater Response Action Component Area";

b. record and/or register with the appropriate registry of deeds and/or land registration office the revised Plan of Restricted Areas and associated notice; and, for EREs on unregistered land, ensure that said Plan and associated notice are marginally referenced on the recorded ERE for each affected property; and

c. submit a copy of said Plan and associated notice, as recorded, and a copy of the ERE bearing the marginal reference, to the Grantor and Grantee of the ERE and to EPA and/or MADEP (if not already the grantee).

64.     Connecticut. For any EREs for properties located in Connecticut, if EREs are a component of the Rest of River Remedial Action, Settling Defendant shall comply with the obligations, if any, set forth in the Rest of River Remedial Action or the Rest of River SOW regarding EREs. After a final decision is made on the Rest of the River Remedial Action, Settling Defendant, EPA, and Connecticut will negotiate in good faith the requirements for and form of EREs for properties in Connecticut (if such EREs are a

202

component of such Remedial Action); provided, however, that such EREs shall be enforceable under the laws of the State of Connecticut, including Connecticut General Statutes § 22a-133n through § 22a-133r and R.C.S.A. § 22a-133q-1.

65.    PEDA.  For any property transferred to PEDA, Paragraph 53 is incorporated in this Paragraph by reference (and Paragraph 54 is also incorporated in this Paragraph by reference if, pursuant to Paragraph 12, Settling Defendant, PEDA, EPA, and MADEP agree that Settling Defendant Property may be transferred to PEDA prior to recording and/or registering an ERE) except that each reference to "Settling Defendant" shall be read as a reference to "PEDA"; provided, however, that subaragraphs 53.b and 53.c are not incorporated in this Paragraph by reference, and provided further that nothing in this Paragraph 65 shall affect Settling Defendant's obligations pursuant to Paragraph 12 or 57.n of this Consent Decree.

66.    The City.  For any property owned by the City, Paragraphs 53 and 54 are incorporated in this Paragraph by reference except that each reference to "Settling Defendant" shall be read as a reference to "the City"; provided, however, that subparagraphs 53.b and 53.c are not incorporated in this Paragraph by reference.

### XIV.  REPORTING REQUIREMENTS

67.    In addition to any other requirement of this Consent Decree, Settling Defendant shall submit to EPA 5 copies, to Connecticut 1 copy, and to the State 4 copies of written monthly progress reports that: (a) describe the actions which have been taken toward achieving compliance with this Consent Decree during the previous month; (b) include a summary, including electronic transmission of data to EPA and

MADEP, of all results of sampling and tests and all other data received or generated by Settling Defendant or its contractors relating to the Site under this Consent Decree in the previous month (except for sampling results and other data provided to Settling Defendant by Plaintiffs); (c) identify all work plans, plans and other deliverables required by this Consent Decree completed and submitted during the previous month; (d) describe relevant actions to be taken by Settling Defendant or its contractors, including, but not limited to, data collection and implementation of work plans, which are scheduled for the next six weeks, provide other information relating to the progress of construction, and provide additional information on the progress of construction to EPA upon request; (e) include information regarding general progress, unresolved delays encountered or anticipated that may affect the future schedule for implementation of the Work, and a description of efforts made to mitigate those delays or anticipated delays; and (f) include any modifications to the work plans or other schedules that Settling Defendant has proposed to EPA or that have been approved by EPA. Settling Defendant shall also submit one copy each of the monthly progress reports to NOAA, DOI, EOEA and the City, as well as to PEDA for property to be transferred to PEDA. Settling Defendant shall submit these progress reports to EPA, NOAA, DOI, EOEA, Connecticut, the State, the City, and (where applicable) PEDA, by the tenth day of every month following the lodging of this Consent Decree until EPA notifies the Settling Defendant pursuant to Paragraph 89.b of Section XVIII (Certification of Completion). If requested by EPA or the State, Settling Defendant shall also provide briefings for EPA and the State to

discuss the progress of the Work in addition to the briefings and meetings of the Management Groups described in Section V of this Consent Decree.

68.     Settling Defendant shall notify EPA, Connecticut, and the State of any material change in the schedule described in the monthly progress report for the performance of any activity, including, but not limited to, data collection and implementation of work plans.  Such notification shall be provided no later than seven days, unless impracticable, prior to the performance of the activity.  Settling Defendant shall notify NOAA, DOI and EOEA of any material change in the schedule described in the monthly progress report for the performance of any activity related to the Restoration Work or other natural resource protection and restoration actitivities no later than seven days, unless impracticable, prior to the performance of the activity.

69.     Upon the occurrence of any event during performance of the Work that Settling Defendant is required to report pursuant to Section 103 of CERCLA or Section 304 of the Emergency Planning and Community Right-to-know Act (EPCRA), Settling Defendant shall within 24 hours of the onset of such event or immediately upon obtaining knowledge of such event, whichever is later, orally notify the EPA Project Coordinator or the Alternate EPA Project Coordinator (in the event of the unavailability of the EPA Project Coordinator), or, in the event that neither the EPA Project Coordinator or Alternate EPA Project Coordinator is available, the Emergency Response Section, Region I, United States Environmental Protection Agency.  In addition, Settling Defendant shall also notify the State Project Coordinator and/or the CTDEP, as appropriate, within the same time frame.  These reporting requirements are in addition to

the reporting required by CERCLA Section 103 or EPCRA Section 304, and applicable state law.

70.     Within 20 days of the onset of such an event, Settling Defendant shall furnish to Plaintiffs a written report, signed by Settling Defendant's Project Coordinator, setting forth the events which occurred and the measures taken, and to be taken, in response thereto. Within 30 days of the conclusion of such an event, Settling Defendant shall submit to the Plaintiffs a report setting forth all actions taken in response thereto.

71.     Settling Defendant shall submit 6 copies of all plans, reports (other than monthly progress reports), and data required by the SOW, the Upper ½ Mile Reach Removal Action Work Plan, the Rest of the River SOW, or any other approved plans to EPA in accordance with the schedules set forth in such plans. Settling Defendant shall simultaneously submit 4 copies of all such plans, reports and data to the State, and one copy of all such plans, reports and data to Connecticut, EOEA, DOI and NOAA. Settling Defendant shall also submit one copy of all such plans, reports and data to PEDA (for property to be transferred to PEDA by Settling Defendant) and to the City.

72.     All reports and other documents submitted by Settling Defendant to any of the Plaintiffs (other than the monthly progress reports referred to above) which purport to document Settling Defendant's compliance with the terms of this Consent Decree shall be signed by an authorized representative of Settling Defendant.

## XV.  EPA  APPROVAL OF PLANS AND OTHER SUBMISSIONS

73.    Except as provided in Paragraph 22 and the Reissued RCRA Permit regarding the Rest of the River, after review of any plan, report or other item which is required to be submitted for approval pursuant to this Consent Decree, EPA, after reasonable opportunity for review and comment by the State and Connecticut, as applicable, shall: (a) approve, in whole or in part, the submission; (b) approve the submission upon specified conditions; (c) modify the submission to cure the deficiencies; ·(d) disapprove, in whole or in part, the submission, directing that Settling Defendant modify the submission; or (e) any combination of the above.  However, EPA shall not modify a submission without first providing Settling Defendant at least one notice of deficiency and an opportunity to cure within 30 days or such longer time as is specified by EPA, except where to do so would cause serious disruption to the Work or where previous submission(s) have been disapproved due to material defects and the deficiencies in the submission under consideration indicate a bad faith lack of effort to submit an acceptable deliverable.

74.    In the event of approval, approval upon conditions, or modification by EPA pursuant to Paragraph 73.a, b, or c, Settling Defendant shall proceed to take any action required by the plan, report, or other item, as approved or modified by EPA subject only to its right to invoke the Dispute Resolution procedures set forth in Section XXIV (Dispute Resolution) with respect to such modifications or conditions.   In the event that EPA modifies the submission to cure the deficiencies pursuant to Paragraph 73.c and

207

the submission has a material defect, EPA retains its right to seek stipulated penalties, as provided in Section XXV (Stipulated Penalties).

75.     a. Upon receipt of a notice of disapproval pursuant to Paragraph 73.d, Settling Defendant shall, within 30 days or such longer time as specified by EPA, correct the deficiencies and resubmit the plan, report, or other item for approval. Any stipulated penalties applicable to the submission, as provided in Section XXV, shall accrue during the 30-day period or otherwise specified period but shall not be payable unless the resubmission is disapproved or modified due to a material defect as provided in Paragraphs 76 and 77.

b. Notwithstanding the receipt of a notice of disapproval pursuant to Paragraph 73.d, Settling Defendant shall proceed, at the direction of EPA, to take any action required by any non-deficient portion of the submission. Implementation of any non-deficient portion of a submission shall not relieve Settling Defendant of any liability for stipulated penalties under Section XXV (Stipulated Penalties).

76.     In the event that a resubmitted plan, report or other item, or portion thereof, is disapproved by EPA, EPA may again require Settling Defendant to correct the deficiencies, in accordance with the preceding Paragraphs. EPA also retains the right to modify or develop the plan, report or other item in accordance with this Consent Decree. Settling Defendant shall implement any such plan, report, or item as modified or developed by EPA, subject only to its right to invoke the procedures set forth in Section XXIV (Dispute Resolution).

77.    If upon resubmission, a plan, report, or item is disapproved or modified by EPA due to a material defect, Settling Defendant shall be deemed to have failed to submit such plan, report, or item timely and adequately unless Settling Defendant invokes the dispute resolution procedures set forth in Section XXIV (Dispute Resolution) and EPA's action is overturned pursuant to that Section.  The provisions of Section XXIV (Dispute Resolution) and Section XXV (Stipulated Penalties) shall govern the implementation of the Work and accrual and payment of any stipulated penalties during Dispute Resolution.  If EPA's disapproval or modification is upheld, stipulated penalties shall accrue for such violation from the date on which the initial submission was originally required, as provided in Section XXV.

78.    All plans, reports, and other items required to be submitted to EPA under this Consent Decree shall, upon approval or modification by EPA, be enforceable under this Consent Decree.  In the event EPA approves or modifies a portion of a plan, report, or other item required to be submitted to EPA under this Consent Decree, the approved or modified portion shall be enforceable under this Consent Decree.

79.    For any plan, report or other item which is required to be submitted for approval by the Trustees pursuant to this Consent Decree, the provisions of Paragraphs 73 to 78 shall apply, except that each reference to EPA shall be read as a reference to the Trustees and the reference to the reasonable opportunity for review and comment by the State shall be deleted.

80.    For any plan, report or other item which is required to be submitted for approval with regard to the Rest of the River prior to the initial modification of the

Reissued RCRA Permit pursuant to Paragraph 22.p of this Consent Decree, approval procedures shall be in accordance with the Reissued RCRA Permit. After the initial modification of the Reissued RCRA Permit, the approval procedures shall be in accordance with this Section.

## XVI. PROJECT COORDINATORS

81.     Within 20 days of lodging this Consent Decree, Settling Defendant, the State and EPA will notify each other, in writing, of the name, address and telephone number of their respective designated Project Coordinators and Alternate Project Coordinators. If a Project Coordinator or Alternate Project Coordinator initially designated is changed, the identity of the successor will be given to the other Parties at least 5 working days before the changes occur, unless impracticable, but in no event later than the actual day the change is made. Settling Defendant's Project Coordinator shall be subject to disapproval by EPA and shall have the technical expertise sufficient to adequately oversee all aspects of the Work. Settling Defendant's Project Coordinator shall not be an attorney for Settling Defendant in this matter. He or she may assign other representatives, including other contractors, to serve as a Site representative for oversight of performance of daily operations during remedial activities.

82.     Plaintiffs may designate other representatives, including, but not limited to, EPA and State employees, and federal and State contractors and consultants, to observe and monitor the progress of any activity undertaken pursuant to this Consent Decree. EPA's Project Coordinator and Alternate Project Coordinator shall have the authority lawfully vested in a Remedial Project Manager ("RPM") and an On-Scene

210

Coordinator ("OSC") by the National Contingency Plan, 40 C.F.R. Part 300. In addition, EPA's Project Coordinator or Alternate Project Coordinator shall have authority, consistent with the National Contingency Plan, to halt any Work required by this Consent Decree and to take any necessary response action when s/he determines that conditions at the Site constitute an emergency situation or may present an immediate threat to public health or welfare or the environment due to release or threatened release of Waste Material consistent with Section XIX (Emergency Response).

83.    EPA's Project Coordinator, the State's Project Coordinator, and the Settling Defendant's Project Coordinator will meet, at a minimum, on a monthly basis, and will participate in the Management Group established pursuant to Paragraph 13 of this Consent Decree. As appropriate, the project coordinators will advise the Trustees of such meetings and invite the Trustees to participate.

## XVII. ASSURANCE OF ABILITY TO COMPLETE WORK

84.    Within 30 days of entry of this Consent Decree, Settling Defendant shall demonstrate its ability to complete the Work by submitting to EPA, the State and Connecticut its most recent Annual Report. Each year thereafter until the completion of the Work, Settling Defendant shall submit its most recent Annual Report to EPA, the State and Connecticut within thirty (30) days of publication of such report. In the event that EPA, after a reasonable opportunity for review and comment by the State, determines at any time that the financial assurances provided by the Annual Report do not demonstrate Settling Defendant's ability to complete the Work, Settling Defendant

shall establish and maintain financial security in the amount of $150,000,000 in one or

more of the following forms:

       a. A surety bond guaranteeing performance of the Work;

       b. One or more irrevocable letters of credit equalling $150,000,000 ;

       c. A trust fund;

       d. A guarantee to perform the Work by one or more parent corporations or

subsidiaries, or by one or more unrelated corporations that have a substantial business

relationship with the Settling Defendant;   or

       e. A demonstration that the Settling Defendant satisfies the requirements

of 40 C.F.R. Part 264.143(f).

If EPA determines pursuant to this Paragraph 84 that Settling Defendant must establish

and maintain financial security in a form other than the Annual Report, then Paragraphs

85 and 86 shall apply.

      85.    If Settling Defendant seeks to demonstrate the ability to complete the Work

through a guarantee by a third party pursuant to Paragraph 84.d of this Consent Decree,

Settling Defendant shall demonstrate that the guarantor satisfies the requirements of 40

C.F.R. § 264.143(f).  If Settling Defendant seeks to demonstrate its ability to complete

the Work by means of the financial test or the corporate guarantee pursuant to

Paragraph 84.d or 84.e, it shall resubmit sworn statements conveying the information

required by 40 C.F.R. § 264.143(f) annually, on the anniversary of the effective date of

this Consent Decree.  In the event that EPA, after a reasonable opportunity for review

and comment by the State, determines at any time that the financial assurances

provided pursuant to this Section are inadequate, Settling Defendant shall, within 30 days of receipt of notice of EPA's determination, obtain and present to EPA for approval one of the other forms of financial assurance listed in Paragraph 84 of this Consent Decree. Settling Defendant's inability to demonstrate financial ability to complete the Work shall not excuse performance of any activities required under this Consent Decree.

86. If EPA has exercised its right under Paragraph 84 to obtain financial assurance in a form other than the Annual Report, and Settling Defendant can show that the estimated cost to complete the remaining Work has diminished below the amount set forth in Paragraph 84 above after entry of this Consent Decree, Settling Defendant may, upon completion of the Removal Actions Outside the River, reduce the amount of the financial security provided under this Section to the estimated cost of the remaining work to be performed. Settling Defendant shall submit a proposal for such reduction to EPA, in accordance with the requirements of this Section, and may reduce the amount of the security upon approval by EPA. In the event of a dispute, Settling Defendant may reduce the amount of the security in accordance with the final administrative or judicial decision resolving the dispute.

87. Settling Defendant may change the form of financial assurance provided under this Section at any time, upon notice to and approval by EPA, provided that the new form of assurance meets the requirements of this Section. In the event of a dispute, Settling Defendant may change the form of the financial assurance only in accordance with the final administrative or judicial decision resolving the dispute.

## XVIII. CERTIFICATION OF COMPLETION

88.     Completion of Each Response Action

a.     Within 90 days after Settling Defendant concludes that a particular Removal Action required by this Consent Decree (excluding Post-Removal Site Control) or the Rest of River Remedial Action (excluding Operation and Maintenance) has been fully performed and that the Performance Standards for such Removal or Remedial Action have been attained, Settling Defendant shall schedule and conduct a pre-certification inspection to be attended by Settling Defendant, EPA, the Trustees (as appropriate), and the State.  The City shall be invited to participate in inspections relating to the GE Plant Area Removal Actions and the Allendale School Removal Action.  PEDA shall be invited to participate in inspections relating to property that will be  transferred to PEDA by Settling Defendant.  If, after the pre-certification inspection, Settling Defendant still believes that such Removal or Remedial Action (excluding Post-Removal Site Control or Operation and Maintenance) has been fully performed and that the Performance Standards for such Removal or Remedial Action have been attained, it shall submit a written report requesting certification to EPA for approval, with a copy to the Trustees, the State, and the City and PEDA (as applicable), pursuant to Section XV (EPA Approval of Plans and Other Submissions) within 30 days of the inspection.  In the report, a registered professional engineer and Settling Defendant's Project Coordinator shall state that the  particular Removal or Remedial Action (excluding Post-Removal Site Control or Operation and Maintenance) has been completed in full satisfaction of the requirements of this Consent Decree.  The written report shall include as-built drawings signed and

214

stamped by a professional engineer. The report shall contain the following statement, signed by a responsible corporate official of Settling Defendant or Settling Defendant's Project Coordinator:

> I certify under penalty of law that this document and all attachments were prepared under my direction or supervision in accordance with a system designed to assure that qualified personnel properly gather and evaluate the information submitted. Based on my inquiry of the person or persons who manage the system, or those persons directly responsible for gathering the information, the information submitted is, to the best of my knowledge and belief, true, accurate, and complete. I am aware that there are significant penalties for submitting false information, including the possibility of fine and imprisonment for knowing violations.

If, after completion of the pre-certification inspection and receipt and review of the written report, EPA, after reasonable opportunity to review and comment by the State, ·determines that the particular Removal Action or Remedial Action (excluding Post-Removal Site Control or Operation and Maintenance) referenced above, or any portion thereof, has not been completed in accordance with this Consent Decree or that the Performance Standards for such Removal or Remedial Action have not been achieved, EPA will notify Settling Defendant in writing of the activities that must be undertaken by Settling Defendant pursuant to this Consent Decree to complete the Removal Action or Remedial Action (excluding Post-Removal Site Control or Operation and Maintenance) and achieve the Performance Standards therefor; provided, however, that EPA may only

215

require Settling Defendant to perform such activities pursuant to this Paragraph to the extent that such activities are consistent with the scope of the response action and do not modify the Performance Standards (except as provided in Paragraph 217 (Modification) of this Consent Decree).  EPA will set forth in the notice a schedule for performance of such activities consistent with the Consent Decree and the SOW or require the Settling Defendant to submit a schedule to EPA for approval pursuant to Section XV (EPA Approval of Plans and Other Submissions).  Settling Defendant shall perform all activities described in the notice in accordance with the specifications and schedules established pursuant to this Paragraph, subject to its right to invoke the dispute resolution procedures set forth in Section XXIV (Dispute Resolution).

        b.     If EPA concludes, based on the initial or any subsequent report requesting Certification of Completion and after a reasonable opportunity for review and comment by the State, that the particular Removal Action (excluding Post-Removal Site Control) or the Rest of River Remedial Action (excluding Operation and Maintenance) has been performed in accordance with this Consent Decree and that the Performance Standards for such Removal or Remedial Action have been achieved, EPA will so certify in writing to Settling Defendant.  Settling Defendant may contest EPA's failure to respond to Settling Defendant's request for certification pursuant to Section XXIV (Dispute Resolution), Paragraph 136 (record review) of this Consent Decree.  This certification shall constitute the Certification of Completion of the  response action for purposes of this Consent Decree, including, but not limited to, Section XXVI (Covenants Not to Sue by

Plaintiffs).  Certification of Completion of the response action shall not affect Settling Defendant's remaining obligations under this Consent Decree.

c.      For each Removal Action Outside the River for which one or more Conditional Solutions are a component, Settling Defendant may seek a Certification of Completion of such Removal Action, including the Conditional Solution(s).  EPA will evaluate such request pursuant to the provisions in this Paragraph, and if it determines that the Removal Action has been performed in accordance with this Consent Decree and that the Performance Standards for such Removal Action have been achieved (excluding Post-Removal Site Control), EPA will issue a Certification of Completion of such Removal Action, including the Conditional Solution(s); provided, however, that insofar as such Certification relates to the Conditional Solution(s), it will be contingent on Settling Defendant's compliance with the obligations relating to Conditional Solutions, as set forth in Paragraphs 34.d and 35-37 of this Consent Decree.  Such Certification relating to a property with a Conditional Solution shall terminate if and when EPA determines and notifies Settling Defendant that Settling Defendant has not complied with the conditions of Paragraphs 34.d and 35-37 with respect to such property.  Settling Defendant shall have the right to seek dispute resolution of such determination by EPA in accordance with Section XXIV of the Consent Decree.

d.      For any Removal or Remedial Action for an area that contains a Non-Settling Defendant Property to or at which the owner of such property has refused to allow access for implementation of the required response actions after Settling Defendant has used "best efforts" to obtain such access and to implement the response actions in

accordance with Section XIII of this Consent Decree, and after any efforts by EPA or the

State to obtain access for the implementation of the response actions, Settling Defendant

may seek a Certification of Completion of such Removal or Remedial Action except for

the portion relating to such property.  EPA will evaluate such a request pursuant to the

provisions in this Paragraph, and if it determines that the Removal or Remedial Action

has otherwise been performed in accordance with this Consent Decree and that the

Performance Standards for such Removal or Remedial Action have otherwise been

achieved (excluding Post-Removal Site Control or Operation and Maintenance), EPA will

issue a Certification of Completion of such Removal or Remedial Action, subject to any

contingencies set forth above in Paragraph 88.c, except for the portion relating to the

property where the owner refused access.  Settling Defendant shall continue to make

best efforts to obtain access to such property to perform the required response actions in

accordance with the same procedures set forth in Paragraph 34.a(ii) of this Consent

Decree, and shall implement the required response action whenever such access is

granted.

    e.  The Trustees shall determine that the Restoration Work that is part of

a particular Removal Action has been fully performed in accordance with Paragraphs 120

and 121 of Section XXI (Natural Resource Damages).

    89.  Completion of the Work for the Site

    a. Within 90 days after Settling Defendant concludes that all phases of the

Work (including Post-Removal Site Control and Operation and Maintenance) have been

fully performed for all Removal and Remedial Actions and Restoration Work required by

this Consent Decree, Settling Defendant shall schedule and conduct a pre-certification inspection to be attended by Settling Defendant, EPA, the Trustees and the State. If, after the pre-certification inspection, Settling Defendant still believes that the Work has been fully performed, Settling Defendant shall submit to EPA, the Trustees and the State a written report by a registered professional engineer stating that the Work has been completed in full satisfaction of the requirements of this Consent Decree. A copy of the Report shall be sent at the same time to the City and PEDA. The report shall contain the following statement, signed by a responsible corporate official of Settling Defendant or Settling Defendant's Project Coordinator:

> I certify under penalty of law that this document and all attachments were prepared under my direction or supervision in accordance with a system designed to assure that qualified personnel properly gather and evaluate the information submitted. Based on my inquiry of the person or persons who manage the system, or those persons directly responsible for gathering the information, the information submitted is, to the best of my knowledge and belief, true, accurate, and complete. I am aware that there are significant penalties for submitting false information, including the possibility of fine and imprisonment for knowing violations.

If, after review of the written report, EPA, after reasonable opportunity for review and comment by the State and the Trustees, determines that any portion of the Work has not been completed in accordance with this Consent Decree, EPA will notify Settling Defendant in writing of the activities that must be undertaken by Settling Defendant

219

pursuant to this Consent Decree to complete the Work; provided, however, that EPA may only require Settling Defendant to perform such activities pursuant to this Paragraph to the extent that such activities are consistent with the scope of the response action and do not modify the Performance Standards (except as provided in Paragraph 217 (Modification) of this Consent Decree).  EPA will set forth in the notice a schedule for performance of such activities consistent with the Consent Decree and the SOW or require the Settling Defendant to submit a schedule to EPA for approval pursuant to Section XV (EPA Approval of Plans and Other Submissions).  Settling Defendant shall perform all activities described in the notice in accordance with the specifications and schedules established therein, subject to its right to invoke the dispute resolution procedures set forth in Section XXIV (Dispute Resolution).

        b.      If EPA concludes, based on the initial or any subsequent request for Certification of Completion by Settling Defendant and after a reasonable opportunity for review and comment by the State and the Trustees, that the Work has been performed in accordance with this Consent Decree, EPA will so notify Settling Defendant in writing. Settling Defendant may contest EPA's failure to respond to Settling Defendant's request for certification pursuant to Section XXIV (Dispute Resolution), Paragraph 136 (record review) of this Consent Decree.

        c.      To the extent that one or more Conditional Solutions are a component of the Work at the Site, Settling Defendant may seek a Certification of Completion of Work, including the Conditional Solution(s).  EPA will evaluate such request pursuant to the provisions in this Paragraph, and if it determines that the Work

has been performed in accordance with this Consent Decree, EPA will issue a

Certification of Completion of the Work at the Site, including the Conditional Solution(s);

provided, however, that insofar as such Certification relates to the Conditional

Solution(s), it will be contingent on Settling Defendant's compliance with the obligations

relating to Conditional Solutions, as set forth in Paragraphs 34.d and 35-37 of this

Consent Decree.  Such Certification relating to a property with a Conditional Solution

shall terminate if and when EPA determines and notifies Settling Defendant that Settling

Defendant has not complied with the conditions of Paragraphs 34.d and 35-37 with

respect to such property.  Settling Defendant shall have the right to seek dispute

resolution of such determination by EPA in accordance with Section XXIV of this Consent

Decree.

        d.       If the owner of a Non-Settling Defendant Property at the Site has

refused to allow access for implementation of the required response actions after Settling

Defendant has used "best efforts" to obtain such access and to implement the response

actions in accordance with Section XIII of this Consent Decree, and after any efforts by

EPA or the State to obtain access for the implementation of the response actions,

Settling Defendant may seek a Certification of Completion of Work at the Site except for

the portion relating to such property.  EPA will evaluate such a request pursuant to the

provisions in this Paragraph, and if it determines that the Work has otherwise been

performed in accordance with this Consent Decree, EPA will issue a Certification of

Completion of the Work, subject to any contingencies set forth above in Paragraph 89.c,

except for the portion relating to the property where the owner has refused access.

Settling Defendant shall continue to make best efforts to obtain access to such property to perform the required response actions in accordance with the same procedures set forth in Paragraph 34.a(ii) of this Consent Decree, and shall implement the required response actions whenever such access is granted.

      e.     The Trustees shall determine that the Restoration Work that is part of a particular Removal Action has been fully performed in accordance with Paragraphs 120 and 121 of Section XXI (Natural Resource Damages).

### XIX.  EMERGENCY RESPONSE

      90.    In the event of any action or occurrence during the performance of the Work which causes or threatens a release of Waste Material from the Site that constitutes an emergency situation or may present an immediate threat to public health or welfare or the environment, Settling Defendant shall immediately notify EPA's Project Coordinator, or, if the Project Coordinator is unavailable, EPA's Alternate Project Coordinator.  If neither of these persons is available, Settling Defendant shall notify the EPA Emergency Response Unit, Region I. Settling Defendant shall also immediately notify the State Project Coordinator, and CTDEP if appropriate.  For purposes of this Section XIX, the phrase "constitutes an emergency situation or may present an immediate threat to public health or welfare or the environment" shall mean an unforeseen combination of circumstances, or the conditions resulting from such circumstances, not normally anticipated to occur as part of the Work, that require immediate action to avoid harm or an immediate threat of harm to human health, welfare or the environment.

222

91.    In the event of any action or occurrence during the performance of the Work which causes or threatens a release of Waste Material from the Site that constitutes an emergency situation or may present an immediate threat to public health or welfare or the environment, and that arises:  (a) at the GE Plant Area (excluding the portions of the Unkamet Brook Area that are not owned or controlled by Settling Defendant, other than the area immediately surrounding Building OP-3); (b) at any other property at the Site owned or controlled by Settling Defendant; or (c) at any property at the Site not owned or controlled by Settling Defendant but due, in whole or in part, to Settling Defendant's performance of the Work; Settling Defendant shall immediately take all appropriate action to prevent, abate, or minimize such release or threat of release.  Settling Defendant shall take such actions in consultation with EPA's Project Coordinator or other available authorized EPA officer and in accordance with all applicable provisions of the Health and Safety Plans, the Contingency Plans, and any other applicable plans or documents developed pursuant to the  Consent Decree, the SOW, the Upper ½ Mile Reach Removal Action Work Plan and/or the Rest of the River SOW.  In the event that Settling Defendant fails to take appropriate response action as required by this Paragraph, and EPA or, as appropriate, the State takes such action instead, Settling Defendant shall reimburse EPA and the State all costs of the response action not inconsistent with the NCP pursuant to Section XX (Reimbursement of Costs).  Such costs shall be reimbursed as U.S. Future Response Costs or Massachusetts Future Response Costs, as applicable, and shall be recoverable in accordance with Paragraphs 95.a or 95.d, as applicable.

223

92.   a.   In the event of any action or occurrence during the performance of the Work which causes or threatens a release of Settling Defendant's Waste Material from the Site that constitutes an emergency situation or may present an immediate threat to public health or welfare or the environment and that arises at any property at the Site not owned or controlled by Settling Defendant, if such release or threatened release is not attributable to Settling Defendant's performance of the Work as set forth in Paragraph 91.c, then Settling Defendant shall immediately notify EPA and MADEP whether it will take all appropriate action to prevent, abate or minimize such release or threat of release.

b.   If Settling Defendant notifies EPA and MADEP pursuant to Paragraph 92.a that it will take all appropriate action referred to in Paragraph 91, Settling Defendant shall take all such action in consultation with EPA's Project Coordinator or other available authorized EPA officer and in accordance with all applicable provisions of the Health and Safety Plans, the Contingency Plans, and in any other applicable plans or documents developed pursuant to the Consent Decree, the SOW, the Upper ½ Mile Reach Removal Action Work Plan and/or the Rest of River SOW.

c.   If Settling Defendant notifies EPA and MADEP pursuant to Paragraph 92.a that it does not intend to take all appropriate action referred to in Paragraph 92.b, then EPA, or as applicable, the State may take such action and send a demand for payment of the costs of such action to Settling Defendant.  EPA, or as applicable the State, shall send such demand within 18 months of completion of the response action.  If Settling Defendant intends to seek reimbursement for payment of such costs from a

potentially responsible third party who has caused EPA's or the State's incurrence of such costs, then Settling Defendant shall so notify EPA, or as applicable the State, within 120 days of receiving a demand for payment of such costs.  Within 120 days of receiving such notice, EPA, or as applicable the State, shall notify Settling Defendant whether it is willing to agree not to enter into a judicial or administrative settlement of claims it may have against such third party in a manner that would terminate Settling Defendant's rights to seek reimbursement from such party.  In the event that EPA, or as applicable the State, is willing to so agree, and/or in the event that Settling Defendant fails to provide notice pursuant to this subparagraph of its intent to seek reimbursement from such third party, Settling Defendant shall reimburse EPA and the State all costs of the response action not inconsistent with the NCP pursuant to Section XX (Reimbursement of Costs). Such costs shall be reimbursed as U.S. Future Response Costs or Massachusetts Future Response Costs, as applicable, and shall be recoverable in accordance with Paragraph 95.a or 95.d, as applicable; provided, however, that Settling Defendant reserves its rights and defenses consistent with other provisions of this Consent Decree to obtain from any other person reimbursement of costs paid under this subparagraph.  In the event that EPA, or as applicable the State, is unwilling to agree not to enter into a judicial or administrative settlement of claims it may have against such third party in a manner that would terminate Settling Defendant's rights to seek reimbursement from such party, or has already entered into such a settlement, then Settling Defendant retains its right to challenge any such settlement and shall have no obligation to make payment pursuant to this subparagraph or Section XX, but EPA, or as applicable the State, may seek

reimbursement of such costs pursuant to CERCLA § 107, M.G.L. c. 21E, § 5, or any other applicable law outside the scope of this Consent Decree. In such an independent action, Settling Defendant may raise any rights and defenses it may have, including any rights to seek reimbursement from third parties.

93.     Subject to Section XXVI of this Consent Decree (Covenants Not To Sue by Plaintiffs), and except as otherwise specifically provided in this Consent Decree, nothing in the preceding Paragraphs or in this Consent Decree shall be deemed to limit any authority of the United States, Connecticut or the State: (a) to take all appropriate action to protect human health and the environment or to prevent, abate, respond to, or minimize an actual or threatened release of Waste Material on, at, or from the Site; or (b) to direct or order such action, or seek an order from the Court, to protect human health and the environment or to prevent, abate, respond to, or minimize an actual or threatened release of Waste Material on, at, or from the Site.

## XX.  REIMBURSEMENT OF COSTS

94.     Past Response Costs.  Within 30 days of the effective date of this Consent Decree (except as provided in Paragraph 94.d(ii) below), Settling Defendant shall:

        a. Pay to a GE-Pittsfield/Housatonic River Special Account ("Special Account") to be established by EPA within the Hazardous Substances Superfund pursuant to this Consent Decree, $13,459,738.00 plus Interest, in reimbursement of U.S. Past Response Costs and costs Incurred and paid by EPA for Designated Fill Properties through March 31, 1999, by FedWire Electronic Funds Transfer ("EFT" or wire transfer) to the U.S. Department of Justice account in accordance with current electronic funds

transfer procedures, referencing the U.S.A.O. file number, the GE-Pittsfield/Housatonic River Special Account, the EPA Region and Site/Spill ID #01-67 and DOJ case number 90-11-3-1479. Interest on the payment shall accrue from the date of lodging of this Consent Decree until the date of payment. Payment shall be made in accordance with the instructions provided to the Settling Defendant. Any payments received by the Department of Justice after 4:00 P.M. (Eastern Time) will be credited on the next business day. Settling Defendant shall send notice that such payment has been made to the United States as specified in Section XXXII (Notices and Submissions) and to Michael Manlogon, Financial Management Officer, EPA Region I, One Congress Street, Suite 1100, Boston, MA 02114-2023.

        b.    Pay to DOI a total of $365,948.00, plus Interest on $240,948.00 of that amount, in reimbursement of DOI Past Assessment Costs and DOI Oversight Costs. Payment shall be by FedWire Electronic Funds Transfer to the U.S. Department of Justice account in accordance with current electronic funds transfer procedures, and referencing Account Number 14X5198 (NRDAR), DOJ number 90-11-3-1479z, the USAO number, and the name of the Site, the GE-Pittsfield/Housatonic River Site. Interest shall accrue from the date of lodging of this Consent Decree until the date of payment. Settling Defendant shall send notice of payment to:

                Bruce Nesslage
                DOI Restoration Fund
                Mail Stop 4449
                1849 C Street, N.W.
                Washington, D.C. 20240

with a copy to:

> Mark Barash
> Office of the Regional Solicitor
> U.S. Department of Interior
> One Gateway Center, Suite 612
> Newton Corner, MA 02158-2868

and shall reference the Account Number 14X5198(NRDAR), and note that the payment is

for DOI Past Assessment Costs and a portion of DOI Oversight Costs for resources

under the trusteeship of DOI in connection with the GE-Pittsfield/Housatonic River Site.

Any payments received after 4:00 p.m. Eastern Time shall be credited on the next

business day. Notice that payments have been made, including copies of electronic

transfer forms and any accompanying transmittal letters, also shall be sent to the United

States as provided in Section XXXII (Notices and Submissions).

c.    Pay to NOAA a total of $643,676.00, plus Interest on $518,676.00 of

that amount, in reimbursement of NOAA Past Assessment Costs and NOAA Oversight

Costs. Payment shall be by FedWire Electronic Funds Transfer to the U.S. Department

of Justice account in accordance with current electronic funds transfer procedures, and

referencing the U.S.A.O. file number, the GE-Pittfield/Housatonic River Site, and DOJ

number 90-11-3-1479z, and shall note that the payment is for NOAA Past Assessment

Costs and a portion of NOAA Oversight Costs for resources under the trusteeship of

NOAA in connection with the GE-Pittsfield/Housatonic River Site. Interest shall accrue

from the date of lodging of this Consent Decree until the date of payment. Settling

Defendant shall send notice of the payment to:

NOAA/NOS/OR&R
Attn: Kathy Salter, DARRF Manager
1305 East West Highway
SSMC 4, Room 9331
Silver Spring, Maryland 20910-3281

with a copy to:

DARP Program Attorney
GE-Pittsfield/Housatonic River Site
NOAA Office of General Counsel
Northeast Region
One Blackburn Drive
Gloucester, Massachusetts 01930-2298

    d.  (i)   Pay to the State the amount of $1,745,000 plus Interest (as defined in Section IV) for reimbursement of Massachusetts Past Response Costs, which Interest shall accrue from the date of lodging of this Consent Decree until the date of payment.

    (ii)   Pay to the State up to but not to exceed $115,000, plus Interest (as defined in Section IV), as billed by MADEP, for State Interim Response Costs Incurred by the State on or after June 21, 1999, with such payment to be made within 30 days of the effective date of this Consent Decree or 60 days of billing, whichever is later. For State Interim Response Costs Incurred and billed prior to lodging of the Consent Decree, Interest shall accrue from the date of lodging of the Consent Decree. For State Interim Response Costs billed after the Consent Decree has been lodged, Interest shall accrue from the date of billing, if not paid by the due date specified above. Billing, costs summaries and supporting documentation for State Interim Response Costs shall be as provided in Paragraph 95.d(v) of this Consent Decree.

(iii)    Unless otherwise instructed by the State, in writing, at any time after lodging of this Consent Decree, the checks shall be payable to the Commonwealth of Massachusetts and shall reference the General Electric case.  Settling Defendant shall forward the checks to:

> Chief, Environmental Protection Division
> Office of Attorney General
> 200 Portland Street
> Boston, Massachusetts 02114.

Copies of the checks shall also be sent to:

> Robert Kalaghan
> Director, Fiscal Management/Cost Recovery and Administration
> DEP/BWSC
> 1 Winter Street
> Boston, Massachusetts 02108

For purposes of this Paragraph only, copies of the checks shall also be sent to:

> Thomas LaRosa
> Assistant General Counsel
> Executive Office of Environmental Affairs
> 100 Cambridge Street, 20th Floor
> Boston, Massachusetts 02108

e.    Pay to the State of Connecticut $115,194.02 plus Interest (as defined in Section IV) in reimbursement of Connecticut Past Response Costs.  Interest on such payment shall accrue from the date of lodging of this Consent Decree until the date of payment.  Such payment shall be made by electronic funds transfer to Fleet Bank NA, Hartford, Connecticut 06115, referencing ABA #011-900-571, for State of Connecticut Treasury - Regular A/C; Account #000-005-4673, F.B.O. Agency #1501/Attorney General.  Settling Defendant shall send notice that such payment has been made to Connecticut as specified in Section XXXII (Notices and Submissions).

230

95.   Future Response Costs.

a.   U.S. Future Response Costs.   Settling Defendant shall reimburse the EPA Hazardous Substance Superfund for all U.S. Future Response Costs and any costs Incurred or paid in connection with the Designated Fill Properties listed in Category 2 in Appendix T after March 31, 1999 not inconsistent with the National Contingency Plan. The Settling Defendant shall make all payments required by this Paragraph in accordance with the procedures set forth in Paragraph 94.a or in the form of a certified or cashier's check or checks made payable to "EPA Hazardous Substance Superfund" and referencing the GE-Pittsfield/Housatonic River Special Account, EPA Region I and Site/Spill ID #01-67, the DOJ case number 90-11-3-1479, and the name and address of the party making payment. If check(s) are used, Settling Defendant shall send the check(s) to EPA Region I, Attn: Superfund Accounting, P.O. Box 360197M, Pittsburgh, PA 15251 and shall send copies of the check(s) to the United States as specified in Section XXXII (Notices and Submissions) and Michael Manlogon, Financial Management Officer, EPA Region I, One Congress Street, Suite 1100, Boston, MA 02114-2023.

b.   DOI Future Costs.   Settling Defendant shall reimburse DOI for all DOI Future Costs not inconsistent with the National Contingency Plan. DOI will send Settling Defendant a bill requiring payment. The bill shall include

(i)   For any DOI employee labor, employee travel, and indirect costs:

(A) a cost summary which lists labor costs by employee and the number of hours charged for each relevant pay period;

231

(B) a listing of the total indirect costs charged, if any, and the indirect cost rate(s) applied, and documents describing the basis for such rate, if it is not a published rate; and

(C) an explanation as to why the costs demanded are claimed to be DOI Future Costs, as defined by this Consent Decree.

(ii)     For any contractor or Interagency or Intergovernmental Agreement costs:

(A) a cost summary listing the contractor(s) and the costs incurred for each contractor;

(B) an explanation as to why the costs demanded are claimed to be DOI Future Costs, as defined by this Consent Decree;

(C) a copy of each relevant progress report or comparable document (if any) that describes the work performed, or if DOI has no such documents, a description of the work performed.

(iii)    A statement that the costs included on the bill are compiled from the DOI accounting system and represent only DOI Future Costs, as defined by this Consent Decree, that have not been previously billed (except for any unpaid balance).

(iv)     DOI will use best efforts to send Settling Defendant a bill for DOI Future Costs on an annual basis.  Settling Defendant shall make all payments within 60 days of Settling Defendant's receipt of each bill requiring payment (or such longer period specified by DOI in the bill) except as otherwise provided in Paragraph 101.  If DOI sends Settling Defendant a bill that demands payment for costs (other than past due

232

amounts from a previous bill) that DOI Incurred over a period of time greater than twelve months, and Settling Defendant, before the time in which payment must be made expires, requests an extension of the time to pay, DOI shall not unreasonably refuse consent to a reasonable extension of time.  Settling Defendant shall make all payments to DOI required by this Paragraph in accordance with instructions to be provided by DOI.

      c.    <u>NOAA Future Costs</u>.  Settling Defendant shall reimburse NOAA for all NOAA Future Costs not inconsistent with the National Contingency Plan.  NOAA will send Settling Defendant a bill requiring payment.  The bill shall include:

      (i)  For NOAA employee labor, employee travel, and indirect costs:

      (A) a cost summary which lists labor costs by employee and the number of hours charged for each relevant pay period;

      (B) a listing of the total indirect costs charged, if any, and the indirect cost rate(s) applied, and documents describing the basis for such rate, if it is not a published rate; and

      (C) an explanation as to why the costs demanded are claimed to be NOAA Future Costs, as defined by this Consent Decree.

      (ii)  For any contractor or Interagency or Intergovernmental Agreement costs:

      (A) a cost summary listing the contractor(s) and the costs incurred for each contractor;

      (B) an explanation as to why the costs demanded are claimed to be NOAA Future Costs, as defined by this Consent Decree;

233

(C) a copy of each relevant progress report or comparable document (if any), that describes the work performed, or if NOAA has no such documents, a description of the work performed.

(iii)   A statement that the costs included on the bill are compiled from the NOAA accounting system and represent only NOAA Future Costs, as defined by this Consent Decree, that have not been previously billed (except for any unpaid balance).

(iv)   NOAA will use best efforts to send Settling Defendant a bill for NOAA Future Costs on an annual basis.  Settling Defendant shall make all payments within 60 days of Settling Defendant's receipt of each bill requiring payment (or such longer period specified by NOAA in the bill) except as otherwise provided in Paragraph 101.  If NOAA sends Settling Defendant a bill that demands payment for costs (other than past due amounts from a previous bill) that NOAA Incurred over a period of time greater than twelve months, and Settling Defendant, before the time in which payment must be made expires, requests an extension of the time to pay, NOAA shall not unreasonably refuse consent to a reasonable extension of time.  Settling Defendant shall make all payments to NOAA required by this Paragraph in accordance with instructions to be provided by NOAA.

d.    Massachusetts Future Response Costs.  Settling Defendant shall reimburse the State for all Massachusetts Future Response Costs not inconsistent with the National Contingency Plan or the Massachusetts Contingency Plan, as applicable, as follows:

234

(i) For such costs of obtaining EREs, in accordance with Paragraph 60.h of this Consent Decree;

(ii) For all such costs Incurred in enforcing the Consent Decree and in participating in dispute resolution under this Consent Decree;

(iii) For all such costs Incurred by the State in fulfilling its mandatory statutory obligations under Section 104(c)(3) of CERCLA in the event of a Work Takeover pursuant to Paragraph 178; and

(iv) Up to, but not exceeding $350,000, for all other Massachusetts Future Response Costs.

(v) The Commonwealth will send Settling Defendant a bill requiring payment that includes a State-prepared cost summary, which includes direct and indirect costs Incurred by the State and its contractors on a periodic basis. The State will use best efforts to send Settling Defendant a bill for Massachusetts Future Response Costs on an annual basis. Each bill shall also include a detailed spreadsheet, or document with comparable information, listing each employee, the appropriate site/location code, the hours worked during each pay period charged for each cost category (including codes differentiating between capped and uncapped costs), and indirect costs/benefits/overhead rate charged for the employees; and contractor reports or other documents which describe the work performed, hours billed, and other expenses charged by those contractors whose costs do not appear on the detailed spreadsheets. In addition, each billing package shall include a certification that the costs included represent only costs Incurred in connection with the Site, and that the costs detailed on

235

the spreadsheet, or comparable document, were Incurred for the appropriate cost category, and do not include costs previously or separately billed to Settling Defendant. Settling Defendant shall make all payments within 60 days of Settling Defendant's receipt of each bill (with supporting documentation) requiring payment (or such longer period specified by the State in the bill), except as otherwise provided in Paragraph 101. If the State sends Settling Defendant a bill that demands payment for costs (other than past due amounts from a previous bill) that the State Incurred over a period of time greater than twelve months, and Settling Defendant, before the time in which payment must be made expires, requests an extension of time to pay, the State shall not unreasonably refuse consent to a reasonable extension of time. Settling Defendant shall make all payments to the Commonwealth required by this Paragraph in the manner described in Paragraph 94.d(iii).

e. Massachusetts Trustee Future Response Costs. Settling Defendant shall reimburse the State for all Massachusetts Trustee Future Response Costs not inconsistent with the National Contingency Plan or the Massachusetts Contingency Plan, as applicable. The State will send Settling Defendant a bill requiring payment. Billing, cost summaries, and supporting documentation for Massachusetts Trustee Future Response Costs, and payment shall be as provided in Paragraph 95.d(v), except that for purposes of this provision:

(i) Copies of the check shall only be sent to:

Thomas LaRosa
Assistant General Counsel
Executive Office of Environmental Affairs
100 Cambridge Street, 20th Floor
Boston, MA 02108

236

(ii)  Each bill shall only be required to include a detailed spreadsheet, or document with comparable information, listing each employee, the hours worked during each pay period charged, and indirect costs/benefits/overhead rate charged for the employees; and contractor reports or other documents which describe the work performed, hours billed, and other expenses charged by those contractors whose costs do not appear on the detailed spreadsheets.  In addition, each billing package shall include a certification that the costs included represent only costs Incurred in connection with the Site, and that the costs detailed on the spreadsheet, or comparable document, were Incurred as Massachusetts Trustee Future Response Costs, and do not include costs previously or separately billed to Settling Defendant.

f.  <u>Connecticut Future Costs.</u>  In full settlement of all Connecticut Future Costs, Settling Defendant shall pay to the State of Connecticut $90,000.  Such payment shall be made within 30 days of the effective date of this Consent Decree by electronic funds transfer to Fleet Bank as specified in Paragraph 94.e of this Consent Decree.

96.  <u>U.S. Future Rest of River Capped Response Costs.</u>  Settling Defendant shall reimburse the EPA Hazardous Substance Superfund for U.S. Future Rest of River Capped Response Costs as follows:

a.  For all such costs not exceeding $11 million, Settling Defendant shall pay 100 percent of such costs.

b.  For all such costs greater than $11 million and not exceeding $18 million, Settling Defendant shall pay 50 percent of such costs.

237

Settling Defendant shall have no obligation to pay any portion of U.S. Future Rest of River Capped Response Costs that exceed $18 million. Payment of U.S. Future Rest of River Capped Response Costs shall be made to the GE-Pittsfield/Housatonic River Special Account in accordance with the procedures in Paragraph 95.a (U.S. Future Response Costs) and Paragraph 100.

97.     U.S. Future Additional Sampling Costs. Settling Defendant shall reimburse the EPA Hazardous Substance Superfund for all U.S. Future Additional Sampling Costs until Settling Defendant's payments equal $400,000. Thereafter, Settling Defendant shall have no further obligation to pay any portion of U.S. Future Additional Sampling Costs. Payment shall be made to the GE-Pittsfield/Housatonic River Special Account in accordance with the procedures in Paragraph 95.a (U.S. Future Response Costs) and Paragraph 100.

98.     Oversight Costs.  In addition to its obligation to pay the costs set forth in Paragraphs 94-97, Settling Defendant shall pay EPA, the Trustees, and the State's Oversight Costs in the amounts set forth herein. Settling Defendant's obligation to reimburse EPA, the Trustees, or the State's Oversight Costs shall be up to, and shall not exceed, the following:

a.     U.S. Oversight Costs. Settling Defendant shall reimburse U.S. Oversight Costs as follows:

(i) For all such costs not exceeding $7 million, Settling Defendant shall pay 100 percent of such costs.

238

(ii) For all such costs greater than $7 million and not exceeding $9 million, Settling Defendant shall pay 75 percent of the costs greater than $7 million.

(iii) For all such costs greater than $9 million and not exceeding $12 million, Settling Defendant shall pay 50 percent of the costs greater than $9 million.

(iv) For all such costs greater than $12 million and not exceeding $15 million, Settling Defendant shall pay 33 1/3 percent of the costs greater than $12 million.

Settling Defendant shall have no obligation to pay any portion of U.S. Oversight Costs that exceed $15 million (which costs shall not be recoverable from Settling Defendant). Payment shall be made to the GE-Pittsfield/Housatonic River Special Account in accordance with the procedures in Paragraphs 95.a (U.S. Future Response Costs) and 100.

b.    U.S. Rest of River Oversight Costs.   Settling Defendant shall reimburse U.S. Rest of River Oversight Costs as follows:

(i) If the estimated cost of the Rest of River Remedial Action (as set forth in the final modification of the Reissued RCRA Permit following all appeals and remands as provided in Paragraph 22) is less than or equal to $100 million, Settling Defendant shall pay 100% of the U.S. Rest of River Oversight Costs as Incurred until its total payments equal 12.5% of the estimated Rest of River Remedial Action costs.

(ii) If the estimated cost of the Rest of River Remedial Action (as set forth in the final modification of the Reissued RCRA Permit following all appeals and remands as provided in Paragraph 22) is greater than $100 million, Settling Defendant shall pay: (A) 100% of the U.S. Rest of River Oversight Costs as Incurred until its total payments equal

239

$12.5 million; plus (B) 7.5% of the estimated costs of the U.S. Rest of River Remedial Action costs over $100 million, as such costs are Incurred. Settling Defendant shall have no further obligation to pay any portion of U.S. Rest of River Oversight Costs after it has made cumulative payments for such costs of up to $25 million.

(iii) Within 30 days after EPA issues the final modification of the Reissued RCRA Permit following all appeals and remands as provided in Paragraph 22, GE may invoke the provisions of Section XXIV (Dispute Resolution) to dispute the estimated cost of the Rest of River Remedial Action for purposes of this Paragraph. The provisions of Paragraph 136 of Section XXIV (Dispute Resolution) shall apply to any such dispute.

(iv) Payment shall be made to the GE-Pittsfield/Housatonic River Special Account in accordance with the procedures in Paragraphs 95.a (U.S. Future Response Costs) and 100.

c.    DOI Oversight Costs.  In addition to the payment made pursuant to Paragraph 94.b (DOI Past Assessment Costs/DOI Oversight Costs), Settling Defendant shall pay DOI for DOI Oversight Costs in two additional payments totaling $275,000.00. No later than one year from the date that this Consent Decree is entered, Settling Defendant shall remit $150,000.00 to DOI in the manner set forth in Paragraph 95.b (DOI Future Costs). No later than two years from the date that this Consent Decree is entered, Settling Defendant shall remit $125,000.00 to DOI in the manner set forth in Paragraph 95.b (DOI Future Costs).

d.    NOAA Oversight Costs.  In addition to the payment made pursuant to Paragraph 94.c (NOAA Past Assessment Costs/NOAA Oversight Costs), Settling

240

Defendant shall pay NOAA for NOAA Oversight Costs in two additional payments totaling $250,000.00. No later than one year from the date that this Consent Decree is entered, Settling Defendant shall remit $125,000.00 to NOAA in the manner set forth in Paragraph 95.c ( NOAA Future Costs). No later than two years from the date that this Consent Decree is entered, Settling Defendant shall remit $125,000.00 to NOAA in the manner set forth in Paragraph 95.c (NOAA Future Costs).

    e.    <u>State Oversight Costs.</u>  Settling Defendant shall reimburse the State 100% of Massachusetts Oversight Costs, Incurred on and after June 21, 1999, until Settling Defendant's payment of such Massachusetts Oversight Costs equals $4,550,000. Settling Defendant shall have no further obligation to pay Massachusetts Oversight Costs after that time. Settling Defendant's annual payments to the State for Massachusetts Oversight Costs shall not exceed $562,500. The foregoing limitations in this subparagraph 98.e shall not apply to costs (if any) Incurred by MADEP in conducting informal reviews specifically requested by Settling Defendant (in Settling Defendant's sole discretion) of draft EREs and/or related documents voluntarily provided by Settling Defendant to MADEP for such informal review, but shall apply to all costs Incurred by the State in reviewing proposed EREs and/or related documents required to be submitted to EPA and/or the State for review pursuant to Section XIII of this Consent Decree. Billing, costs summaries and supporting documentation for Massachusetts Oversight Costs and payment procedures shall be as provided in Paragraph 95.d(v), except that no later than thirty (30) days after the date of entry of this Consent Decree, Settling Defendant shall pay to the Commonwealth $100,000 as an advance payment toward State Oversight

241

Costs otherwise payable under this subparagraph 98.e. The State shall provide an account of the expenditure of such advance payment concurrently with its submission of its first bill pursuant to Paragraph 95(d)(v). Settling Defendant may contest the expenditure of such $100,000 within 120 days of receipt of such bill pursuant to the procedures in Paragraph 101, and the amount of any such expenditures found to be made inconsistent with the terms of this Consent Decree shall be applied as a credit towards subsequent bills for State Oversight Costs.

   f. <u>Massachusetts Trustee Oversight Costs</u>. Settling Defendant shall pay to the State $516,666 for Massachusetts Trustee Oversight Costs which shall be paid in three installments as follows: (i) $166,667.00 within 30 days of entry of this Consent Decree; (ii) $166,666.00 within 1 year from the effective date of this Consent Decree; and (iii) $183,333.00 within 2 years from the effective date of this Consent Decree. Payment shall be by check and shall be forwarded to the State as provided in Paragraph 94.d(iii) except that for purposes of this provision copies of the check shall only be sent to:

    Thomas LaRosa
    Assistant General Counsel
    Executive Office of Environmental Affairs
    100 Cambridge Street, 20th Floor
    Boston, MA 02108

  99. Settling Defendant shall pay U.S. Post-Removal/Groundwater Monitoring Costs Incurred by EPA as follows. Settling Defendant shall pay 100% of such costs Incurred in each twelve month period beginning on the date of the last Certification of Completion issued for the non-groundwater/NAPL-related Removal Actions Outside the

River or the date of the Certification of Completion for the Upper 1/2 Mile Reach Removal Action, whichever is later, but in no event more than $250,000 of such costs for any such twelve month period. Payment shall be made to the GE-Pittsfield/Housatonic River Special Account in accordance with the procedures in Paragraphs 95.a (U.S. Future Response Costs) and 100.

100.    The United States will send Settling Defendant on a periodic basis a bill requiring payment of any amounts due to the United States under Paragraphs 95 through 99 for payment of U.S. Future Response Costs, U.S. Future Rest of River Capped Response Costs, U.S. Future Additional Sampling Costs, U.S. Oversight Costs, U.S. Rest of River Oversight Costs, and U.S. Post-Removal/Groundwater Monitoring Costs. The United States will use best efforts to send Settling Defendant a bill at least annually. Such bill shall list separately the amounts due for each category of costs identified in Paragraphs 95 through 99, and for each such category, shall include the following, provided that confidential business information protected by law shall be released only subject to an appropriate confidentiality agreement or order to the extent allowed by law:

a.  For EPA extramural costs (e.g. contractor, state cooperative agreement, and miscellaneous/purchase order costs), except for interagency agreement costs:

(i)     an itemized cost summary report, listing, for each contractor or other payee, the date and amount of each payment (including any allocated amount); the date and number (if any) of each invoice, voucher or comparable billing document; and

243

the number of the work assignment or comparable task order (if any) for which each payment was made; and

(ii)     a copy of the technical component(s) of each relevant work assignment, technical directive document, technical instruction document, or comparable task order to each contractor or other payee, except that if such document has been provided with a previous bill, reference to such document by number shall be sufficient; and

(iii)     a copy of each relevant progress report or comparable document received by EPA (if any) for the work billed that describes the work performed or, if EPA has no such documents, a description of the work performed.

b.  For EPA extramural costs incurred pursuant to an interagency agreement with ACOE:

(i)     an itemized cost summary report, listing the date and amount of each payment by EPA to ACOE; the date and number (if any) of each invoice, voucher or comparable billing document; and the number of the work assignment or comparable task order issued to ACOE (if any) for which each payment was made; and

(ii)     a copy of the technical component(s) of each relevant work assignment, technical directive document, technical instruction

244

document, or comparable task order issued by EPA to ACOE or by ACOE to a contractor under direct contract to ACOE for work performed pursuant to an interagency agreement between EPA and ACOE, except that if such document has been provided with a previous bill, reference to such document by number shall be sufficient; and

(iii)   a copy of each relevant progress report or comparable document prepared by ACOE (or by a contractor under direct contract to ACOE for work performed pursuant to an interagency agreement between EPA and ACOE) and received by EPA (if any) for the work billed, that describes the work performed, or if EPA and ACOE have no such documents, a description of the work performed.

c.   For EPA extramural costs incurred pursuant to an interagency agreement between EPA and any other United States agency except for ACOE and DOJ:

(i)   an itemized cost summary report, listing the date and amount of each payment by EPA to the relevant agency; the date and number (if any) of each invoice, voucher or comparable billing document; and the number of the work assignment or comparable task order issued to the relevant agency (if any) for which each payment was made; and

245

    (ii)     work assignments, technical instruction documents, technical directive documents, progress reports, or comparable documents describing the work performed by the relevant agency for which the costs were incurred, or if neither EPA nor the relevant agency can locate such documents after reasonable inquiry, a description of the work performed.

    d. For EPA intramural costs (i.e. employee labor, employee travel, and indirect costs), cost summary reports, including:

    (i)     an itemized listing of labor costs by employee, including for each relevant pay period the number of hours charged and the hourly rate; and

    (ii)     a list of action codes included in labor charges for each cost category, or a brief explanation of any other method used to assign labor hours to each cost category; and

    (iii)    a statement of the indirect cost rate(s) applied and an itemized listing of indirect costs; and

    (iv)    an itemized listing of travel costs including for each travel voucher the amount, the name of the travelling employee, and the travel voucher number.

    e. A summary listing direct labor, other direct costs, and indirect costs Incurred by the Department of Justice (if any).

f.  If applicable, a brief explanation of any allocation methodology used to allocate costs Incurred in support of tasks included in more than one cost category.  If the United States incurs such costs (for example, costs of renting a field office that is used for tasks included in more than one cost category), the United States may allocate such costs among cost categories using any reasonable allocation method consistent with general cost accounting standards.

g.  A statement that the costs included on the bill are compiled from the EPA or DOJ accounting system and represent only costs incurred in connection with the Site, for the appropriate cost category, that have not been previously billed (except for any listing of an unpaid balance from a previous bill).

h.  No additional documentation, beyond that specified in subparagraphs a. through g. above, shall be required to establish the amounts Incurred.  Settling Defendant shall make all payments within 60 days (or such longer period specified by EPA in the bill) of Settling Defendant's receipt of each bill requiring payment, except as otherwise provided in Paragraph 101.  If the United States sends Settling Defendant a bill that demands payment for costs (other than past due amounts from a previous bill) that the United States Incurred over a period of time greater than twelve months, and Settling Defendant, before the time in which payment must be made expires, requests an extension of the time to pay, the United States shall not unreasonably refuse consent to a reasonable extension of time.

101.    Settling Defendant may contest payment of any costs under Paragraphs 95-99 (excluding Paragraph 98.c, d, and f) if Settling Defendant determines that the

247

United States, the Trustees, or the State has made an accounting error or if Settling

Defendant alleges that a cost item that is included represents costs that are inconsistent

with the NCP or MCP, as applicable. Settling Defendant may not contest payment of 1 ½

Mile Reach Removal Action Costs on the basis that a cost item that is included

represents costs that are inconsistent with the NCP. Settling Defendant may contest

payment of its share of 1 ½ Mile Reach Removal Action Costs as follows:

      a.   For response costs, Settling Defendant may contest payment of such

costs if it determines that EPA has made an accounting error (including whether a

cost item is not a 1 ½ Mile Reach Removal Action Cost).

      b.   For costs of Restoration Work in the 1 ½ Mile Reach, as described in

Paragraph 118.b, Settling Defendant may contest payment of such costs if it

determines that EPA has made an accounting error (including whether a cost item

is not a 1 ½ Mile Reach Removal Action Cost) or if Settling Defendant alleges that

a cost item is for work that goes beyond the scope (including both the nature and

extent) of the Restoration Work described in Paragraph 118.b of this Consent

Decree and any applicable Work Plans.

Settling Defendant also may contest payment of costs on the basis that the

amount billed exceeds the amount to be paid by Settling Defendant pursuant to the

relevant provision of Paragraphs 95-99. Settling Defendant also may contest payment

on the basis that an amount billed was not allocated to the correct cost category under

Paragraphs 95-99; provided, however, that if the United States, the State, or the court

(as applicable) agrees that such a misallocation occurred, the cost may be re-billed

pursuant to the correct provision of Paragraphs 95-99, if any. Settling Defendant also

may contest payment on the basis that an amount billed was not within the definition of

any cost category for which payment is required under Paragraphs 95-99. Any objection

to costs shall be made in writing no later than the date on which payment of the bill is

required under this Section XX and must be sent to the United States (if the United

States' costs are being disputed), the Trustee(s) (if the Trustee(s)' costs are being

disputed), or the State (if the State's costs are being disputed) pursuant to Section XXXII

(Notices and Submissions). Any such objection shall specifically identify the contested

costs and the basis for objection. In the event of an objection, Settling Defendant shall,

within the time specified in Paragraphs 100.h, 95.b(iv), 95.c(iv), or 95.d(v) (as

applicable), pay all uncontested costs to the United States, the Trustees, or the State in

the manner described in Paragraphs 95-100. Settling Defendant shall send to the United

States, the Trustees, and Massachusetts (as applicable), as provided in Section XXXII

(Notices and Submissions), a copy of the transmittal letter and check paying the

uncontested costs. To contest payment of any costs, the Settling Defendant shall initiate

the Dispute Resolution procedures in Section XXIV (Dispute Resolution). If the United

States, the Trustees, or Massachusetts prevails in the dispute, within 15 days of the

resolution of the dispute, the Settling Defendant shall pay the sums due (with accrued

Interest) to the United States, the Trustees, or Massachusetts, in the manner described in

Paragraphs 95-100. If Settling Defendant prevails concerning any aspect of the

contested costs, Settling Defendant shall pay that portion of the costs (plus associated

accrued Interest) for which it did not prevail to the United States, the Trustees, or

249

Massachusetts. The dispute resolution procedures set forth in this Paragraph in conjunction with the procedures set forth in Section XXIV (Dispute Resolution) shall be the exclusive mechanisms for resolving disputes regarding Settling Defendant's obligation to reimburse the United States, the Trustees, and Massachusetts for the costs set forth in Paragraphs 95-99.

102.   a.  For payments required to be made by Settling Defendant pursuant to this Consent Decree, where Interest is not specified in the particular provision, no interest from the date of lodging or entry of this Consent Decree shall accrue or be owing on the amount specified.

b.  In the event that the payments required by Paragraph 94 (other than 94.d(ii)) are not made within 30 days of the effective date of this Consent Decree, or the payment required by Paragraph 94.d(ii) (State Interim Costs) is not made within 60 days of receipt of a bill or 30 days of the effective date of this Consent Decree (whichever is later), or the payments required by Paragraphs 95-99 are not made within 60 days of Settling Defendant's receipt of the bill (or such longer time as is provided for pursuant to those Paragraphs), Settling Defendant shall pay Interest on the unpaid balance.  Such Interest shall begin to accrue on the date of the bill.  The Interest shall accrue through the date of Settling Defendant's payment.  Payments of Interest made under this Paragraph shall be in addition to such other remedies or sanctions available to Plaintiffs by virtue of Settling Defendant's failure to make timely payments under this Section.  Settling Defendant shall make all payments required by this Paragraph in the manner described in Paragraph 95.

<div align="center">250</div>

103.   Settling Defendant shall pay the following 1 ½ Mile Reach Removal Action Costs:

a.   For all such costs not exceeding $15 million, Settling Defendant shall pay 100 percent of such costs.

b.   For the increment of such costs greater than $15 million and not exceeding $25 million, Settling Defendant shall pay 70 percent of the costs greater than $15 million.

c.   For the increment of such costs greater than $25 million and not exceeding $32.5 million, Settling Defendant shall pay 60 percent of the costs greater than $25 million.

d.   For the increment of such costs greater than $32.5 million and not exceeding $40 million, Settling Defendant shall pay 50 percent of the costs greater than $32.5 million.

e.   For the increment of such costs greater than $40 million and not exceeding $50 million, Settling Defendant shall pay 40 percent of the costs greater than $40 million.

f.   For the increment of such costs exceeding $50 million, Settling Defendant shall pay 30 percent of the costs greater than $50 million.

104.   EPA and Settling Defendant intend that Settling Defendant will pay its share of the 1 ½ Mile Reach Removal Action Costs through Settling Defendant's advance payment, in accordance with Paragraphs 105 through 110 of this Consent Decree, from

251

which EPA will draw down upon Incurrence of costs, rather than relying on reimbursement from Settling Defendant after Incurrence of costs by EPA.

105. The United States shall establish a Special Account for the 1 ½ Mile Reach Removal Action ("the 1 ½ Mile Special Account"). The amounts paid to the 1 ½ Mile Special Account shall accrue Interest and shall be used by the United States in accordance with Section 122(b)(3) of CERCLA, 42 U.S.C. § 9622(b)(3), solely to pay for Settling Defendant's share of the 1 ½ Mile Reach Removal Action Costs, except as otherwise provided by Paragraph 111 of this Consent Decree. Payments by Settling Defendant to the 1 ½ Mile Special Account shall be made in accordance with the procedures in Paragraph 110.

106. Settling Defendant shall pay its share of the 1 ½ Mile Reach Removal Action Costs in accordance with the following procedures:

a. Within 90 days after entry of this Consent Decree, Settling Defendant shall deposit $1 million to the 1 ½ Mile Special Account. ⋅

b. Settling Defendant shall deposit to the 1 ½ Mile Special Account the balance of Settling Defendant's share of the estimated U.S. 1 ½ Mile Reach Removal Action Costs. Settling Defendant shall deposit such monies in four payments, to be made on the first working days following January 1, 2001 (or 30 days after entry of this Consent Decree, whichever is later), January 1, 2002, January 1, 2003, and January 1, 2004. The amount of each of the four payments shall be preliminarily calculated by Settling Defendant and submitted to EPA within 30 days of the issuance of the 1 ½ Mile

252

Reach Removal Action Memo. The amount of each payment shall be calculated as follows:

(i) subtract $1 million from the estimated costs for the design and implementation of the 1 ½ Mile Reach Removal Action, as set forth in the 1 ½ Mile Reach Removal Action Memo;

(ii) multiply the remainder by 25% (.25);

(iii) determine Settling Defendant's share of the product thereof in accordance with Paragraph 103 of this Consent Decree.

The amount of each of the four payments shall be adjusted by subtracting Settling Defendant's share of 1 ½ Mile Reach Removal Action Costs incurred by Settling Defendant, if any, as determined in accordance with Paragraph 107 and the interest that has accrued in the 1 ½ Mile Special Account since the date of Settling Defendant's previous payment under Paragraph 106.a or b, as applicable.

c.    Notwithstanding the foregoing payment provisions, if at any time during implementation of the 1 ½ Mile Reach Removal Action EPA determines that the amounts present in the 1 ½ Mile Special Account are insufficient to fund Settling Defendant's share, as set forth in Paragraph 103 of this Consent Decree, of the costs of ongoing work relating to the segment of the 1 ½ Mile Reach Removal Action, or if EPA determines that additional funds are needed because EPA has decided to implement the 1 ½ Mile Reach Removal Action in fewer than four segments, EPA may notify Settling Defendant of additional monies that EPA determines are necessary to fund Settling Defendant's share of the anticipated shortfall. EPA shall include with such notification a

253

description of the basis for requesting such monies.  Settling Defendant shall, within 30 days of receipt by Settling Defendant of such notification, deposit to the 1 ½ Mile Special Account the amount set forth in such notification.

        d.     If, at any time during implementation of the 1 ½ Mile Reach Removal Action, Settling Defendant determines that the costs to implement that Removal Action will be less than the estimated costs set forth in the 1 ½ Mile Reach Removal Action Memo, Settling Defendant may submit a written request to the United States to reduce Settling Defendant's next payment to the 1 ½ Mile Special Account accordingly.  Settling Defendant shall include with such request appropriate documentation of the basis for requesting such reduction.  The United States' approval of any such request shall not be unreasonably withheld.

        e.     In the event that Settling Defendant invokes dispute resolution pursuant to Section XXIV of this Consent Decree with respect to payments of 1 ½ Mile Reach Removal Action Costs under this Paragraph 106, the invocation of dispute resolution shall not extend, postpone or affect Settling Defendant's obligation to make the payments described in this Paragraph; provided, however, that if Settling Defendant prevails in such dispute resolution proceeding, Settling Defendant shall receive a credit for the amount of the disputed payment as to which Settling Defendant prevailed.  Such credit shall be used and applied against Settling Defendant's next payment or payments under this Paragraph, or, if no such payments remain, against Settling Defendant's payments under Paragraphs 95.a, 98.a or 98.b of this Consent Decree for U.S. Future Response Costs, U.S. Oversight Costs or U.S. Rest of River Oversight Costs.

<div align="center">254</div>

107.   Settling Defendant's share, as set forth in Paragraph 103 of this Consent Decree, of any 1 ½ Mile Reach Removal Action Costs incurred by Settling Defendant shall be used and applied as a credit against Settling Defendant's next payment or payments to the 1 ½ Mile Special Account under Paragraph 106 of this Consent Decree or, if no such payments remain, as a credit against Settling Defendant's obligations under Paragraphs 95.a, 98.a or 98.b of this Consent Decree for U.S. Future Response Costs, U.S. Oversight Costs or U.S. Rest of River Oversight Costs.  Settling Defendant shall provide appropriate documentation to support Settling Defendant's claim that it is entitled to such a credit and the amount of such credit.

108.   Prior to EPA's closeout of the interagency agreement with ACOE for the 1 ½ Mile Reach Removal Action,  EPA may draw down funds deposited in the 1 ½ Mile Special Account to fund Settling Defendant's share of the 1 ½ Mile Reach Removal Action Costs.  Prior to such closeout, funds retained in the 1 ½ Mile Special Account shall not be used to pay for reimbursement of any other costs, including DOI Oversight Costs, NOAA Oversight Costs, Massachusetts Oversight Costs, costs associated with the EE/CA for the 1 ½ Mile Reach, or preparation or issuance of the 1 ½ Mile Reach Removal Action Memo, and attachments to that Action Memorandum.

109.   a.   On a periodic basis, the United States will submit to Settling Defendant information on the U.S. 1 ½ Mile Reach Removal Action Costs.  The United States will use its best efforts to submit such information no less often than every six months.  Such information shall include the documentation set forth in Paragraphs 100.a through 100.e and shall also include a statement showing cumulative U.S. 1 ½ Mile Reach Removal

Action Costs and identifying the increment(s) into which costs reflected on the statement fall and Settling Defendant's corresponding percentage share of such costs. Additional documentation shall not be required to establish the amounts or recoverability of the costs Incurred.

b.    Upon request from Settling Defendant, EPA shall provide to Settling Defendant statements showing deposits to and withdrawals from the 1 ½ Mile Special Account.

c.    Within 90 days following EPA's closeout of the interagency agreement with the ACOE for the 1 ½ Mile Reach Removal Action, EPA shall provide to Settling Defendant a final accounting containing the information specified in Paragraph 109.a, and setting forth the amounts, if any, remaining in the 1 ½ Mile Special Account, inclusive of Interest.

110.   Settling Defendant shall make the payments required by Paragraph 106 of this Consent Decree in the form of a wire transfer or check or checks made payable to "EPA Hazardous Substance Superfund" and referencing the 1 ½ Mile Special Account, EPA Region and Site/Spill ID #01-67, the DOJ case number 90-11-3-1479, and Settling Defendant's name and address. For payment by wire transfer, Settling Defendant shall provide payment in accordance with Paragraph 94.a of this Consent Decree. For payment by check, Settling Defendant shall send the check(s) to EPA Region I, Attn: Superfund Accounting, P.O. Box 360197M, Pittsburgh, PA 15251 and shall send copies of the check(s) to the United States as specified in Section XXXII (Notices and

256

Submissions) and Michael Manlogon, Financial Management Officer, EPA Region I, One Congress Street, Suite 1100, Boston, MA 02114-2023.

111.   To the extent that funds, including interest, remain in the 1 ½ Mile Special Account following EPA's closeout of the interagency agreement with the ACOE for the 1 ½ Mile Reach Removal Action, such funds shall be used and applied as a credit against Settling Defendant's obligations under Paragraphs 95.a, 98.a or 98.b of this Consent Decree for U.S. Future Response Costs, U.S. Oversight Costs or U.S. Rest of River Oversight Costs until the monies in the 1 ½ Mile Special Account have been fully depleted.

## XXI.   NATURAL RESOURCE DAMAGES

112.   Satisfaction of the Plaintiffs' claims for Natural Resource Damages shall consist of:

a.   Performance of the response actions required under this Consent Decree.

b.   The payment of cash to the Trustees by Settling Defendant for Natural Resource Damages as set forth in Paragraph 114 of this Section;

c.   The performance of Restoration Work as set forth in Paragraph 118 of this Section;

d.   Other natural resource protection and restoration actions to be undertaken by Settling Defendant as set forth in Paragraph 123 of this Section;

e.   Performance by PEDA of the obligations set forth in Paragraph 124 of this Section (for which Settling Defendant shall not be liable); and

257

f.    The payment of DOI Past Assessment Costs, DOI Future Costs, DOI Oversight Costs, NOAA Past Assessment Costs, NOAA Future Costs, NOAA Oversight Costs, Massachusetts Trustee Future Response Costs, Massachusetts Trustee Oversight Costs, and, to the extent they include costs Incurred or to be Incurred by the Trustees, Massachusetts Past Response Costs, Connecticut Past Response Costs, and Connecticut Future Costs, all in accordance with Section XX of this Consent Decree.

113.    Notification of Lead Administrative Trustee ("LAT").  Within 30 days of the effective date of this Consent Decree, the Trustees will notify Settling Defendant, EPA, MADEP and CTDEP of the designation of a Lead Administrative Trustee ("LAT").  The LAT will serve as the contact representative for the Trustees for all meetings and other interactions with Settling Defendant, EPA, MADEP and CTDEP on all Trustee-related matters under this Consent Decree, unless otherwise specified in this Consent Decree. The LAT will only serve as the contact representative of the Trustees and will not exercise trusteeship authority on behalf of the Trustees.

114.    Payment of Natural Resource Damages by Settling Defendant. Within 30 days of the effective date of this Consent Decree, Settling Defendant shall make the following payments:

a.    $15,000,000 for Natural Resource Damages, plus Interest from the date of lodging of this Consent Decree;

b.    $600,000 as mitigation for wetlands impacts associated with PCB contamination and with response actions at the Site, plus Interest from the date of lodging of this Consent Decree;

258

      c.      $60,000 as mitigation for additional habitat impacts associated with PCB contamination and Removal Actions at the Site; and

      d.      $75,000 for Restoration Work to be performed by the Trustees in Silver Lake.

115.   Settling Defendant shall pay to the Trustees the amounts set forth in Paragraphs 114.a, b, c and d of this Consent Decree using the U.S. Treasury's Remittance Express program, or, in the event said program is not available to Settling Defendant, then via Federal Wire Transfer. Payment shall be made in accordance with instructions provided by the Department of the Interior. Any payments received after 4:00 p.m. Eastern Time shall be credited on the next business day. Settling Defendant's notice that such payment has been made shall be sent to:

> Bruce Nesslage
> DOI Restoration Fund
> Mail Stop 4449
> 1849 C St. NW
> Washington, D.C. 20240
>
> Executive Office of Environmental Affairs
> Attn: Thomas LaRosa
> 100 Cambridge Street, Room 2000
> Boston, Massachusetts 02202
>
> Edward Parker
> Bureau Chief, Bureau of Natural Resources
> Department of Environmental Protection
> 79 Elm Street
> Hartford, Connecticut 06103
>
> Mark Barash
> Office of the Regional Solicitor
> U.S. Department of the Interior
> One Gateway Center, Suite 612
> Newton Corner, MA 02158-2868

DARP Program Attorney
GE-Pittsfield /Housatonic River  Site
NOAA Office of General Counsel
Northeast Region
One Blackburn Drive
Gloucester, MA 01930-2298

Chief, Environmental Enforcement Section
U.S. Department of Justice
Environment and Natural Resources Division
P.O. Box 7611
Ben Franklin Station
Washington, D.C. 20044
DOJ# 90-11-3-1479Z

Office of Attorney General
Attn: Chief, Environmental Protection Division
200 Portland Street
Boston, Massachusetts 02114

John Looney
Office of Attorney General
55 Elm Street
Hartford, Connecticut 06103

and shall reference Account Number 14X5198 (NRDAR), and state that the payments

are for Natural Resource Damages for natural resources under the trusteeship of EOEA,

CTDEP, DOI and NOAA, with respect to the GE-Pittsfield/Housatonic River Site and are

being made by the General Electric Company.

116.   The amounts set forth in Paragraphs 114.a, b, c and d of this Consent

Decree, together with all interest accrued thereon, shall be administered by the Trustees

and only be spent for restoration, including restoration planning, and other allowable

expenditures associated with the Site, consistent with the Natural Resource Damages

provisions of CERCLA, M.G.L. c. 21E and Conn. Gen. Stat. § 22a-6a.  Any and all costs

Incurred or to be Incurred by the United States, the State, and/or Connecticut in

260

determining how to spend the funds paid pursuant to Paragraph 114 shall not be recoverable from Settling Defendant.

117.   The trusteeships of EOEA, CTDEP, DOI and NOAA, for Natural Resources affected by the GE-Pittsfield/Housatonic River Site overlap.  Accordingly, all monies recovered for Natural Resource Damages from Settling Defendant and PEDA shall be held by DOI in an interest-bearing account on behalf of EOEA, CTDEP, DOI and NOAA. All expenditures, disbursements or other dispositions of such monies together with all interest accrued thereon shall be pursuant to the terms of a Memorandum of Agreement to be entered into among EOEA, CTDEP, DOI and NOAA.

118.   Restoration Work to be Performed or Funded by Settling Defendant. Settling Defendant shall perform and complete or fund the Restoration Work generally described below, in connection with and as part of the individual Removal Actions, in order to restore, replace and/or enhance natural resources and in accordance with the Removal Action Work Plan for the Upper ½ Mile Reach and Section 2.8 and Attachment I of the SOW.  Such Restoration Work shall achieve the Performance Standards for Restoration Work set forth in the Upper ½ Mile Reach Removal Action Work Plan and in Attachment I of the SOW.

a.   As part of the Work to be performed for the Upper ½ Mile Reach Removal Action, provided for in this Consent Decree, Settling Defendant shall perform habitat enhancements, including the installation of certain in-stream structures to increase variability in water flow and depth and enhance in-stream cover, and the

261

restoration and enhancement of vegetation on the banks of the river in the Upper ½ Mile

Reach, in accordance with the Upper ½ Mile Reach Removal Action Work Plan.

      b.      EPA intends, as part of the 1 ½ Mile Reach Removal Action, to

perform Restoration Work in the 1 ½ Mile Reach similar to that described in

subparagraph 118.a above, as well as the installation of other structures to create pools

and riffles (consistent with the Removal Action), and such work shall be funded in

accordance with the cost-sharing provisions for the 1 ½ Mile Reach Removal Action as

set forth in Paragraphs 103-111.

      c.      As part of the Silver Lake Area Removal Action, provided for in this

Consent Decree, Settling Defendant shall perform habitat and recreational

enhancements, including physical enhancement of the submerged shallow shelf in the

lake adjacent to the shoreline, capping and vegetating an "island" located near the

discharge outfall to the lake, planting of trees and other vegetation on the northern and

eastern banks of the lake, planting of herbaceous vegetation on the remaining banks of

the lake (as part of response activities at those banks), and installation of public access

and use areas consisting of walking paths and picnic areas on the northern and eastern

sides of the lake, all in accordance with Attachment I of the SOW.  Settling Defendant

shall also pay $75,000 to the Trustees in accordance with Paragraph 114.d for the

Trustees to perform aquatic habitat and fish restoration in Silver Lake, and shall have no

further obligation relating to those aquatic habitat and fish restoration activities.

d.      As part of the pertinent Removal Actions at the GE Plant Area and Former Oxbow Areas, Settling Defendant shall perform the following Restoration Work at property owned by Settling Defendant:

(i)   As part of the Unkamet Brook Area Removal Action, Settling Defendant shall reroute the brook to its approximate former channel, plant vegetation along the western banks and disturbed eastern banks of the rerouted channel, remove the existing stand of phragmites located in an approximate 2-acre wetland area east of Unkamet Brook, plant herbaceous vegetation on the surface of the landfill/consolidation area cap to be installed over the unpaved portion of the former Unkamet Brook interior landfill and control nuisance species in the Unkamet Brook Removal Action area, all in accordance with Attachment I of the SOW.

(ii)  In the 200-foot-wide riparian strip located in East Street Area 2-South between the former Thermal Oxidizer location and the downstream boundary of the GE Plant Area (as depicted on Figure I-1 of Attachment I of the SOW),  to enhance stormwater retention capacity and habitat quality, Settling Defendant shall create a vegetated buffer through the planting of an herbaceous native grassland community and installation of other habitat enhancements in accordance with Attachment  I of the SOW.

(iii)  At the former Hill 78 Consolidation Area (after completion of use for on-plant consolidation of excavated material), Settling Defendant shall plant an herbaceous native grassland community and install other habitat enhancements in accordance with Attachment I of the SOW.

(iv) At the Newell Street and Lyman Street parking lots, Settling Defendant shall plant an herbaceous native grassland community and install other habitat enhancements in accordance with Attachment I of the SOW.

e.　　To encourage increased wildlife use, Settling Defendant shall install and monitor a total of 12 acres, or the equivalent of 12 acres, of forested/wetland habitat, consisting of approximately 9.75 acres of floodplain forest habitat and approximately 2.25 acres of freshwater palustrine wetlands, at either: (1) an off-site non-contaminated riparian area within the Housatonic River watershed outside the Site ("Off-Site Restoration Area") designated by the Trustees and mutually agreed upon with Settling Defendant; or (2) a combination of the Off-Site Restoration Area and Former Oxbows A and C, in accordance with Attachment I of the SOW and the following provisions:

(i) Settling Defendant shall notify the LAT within 24 months from the entry of this Consent Decree whether it intends to use Former Oxbows A and C for the installation of forested/wetland habitat. If Settling Defendant decides to use Former Oxbows A and C for this purpose, Settling Defendant shall install a minimum of six acres of forested/wetland habitat at Former Oxbows A and C. Settling Defendant shall install the forested/wetland habitat in areas of Former Oxbows A and C that have average PCB concentrations at or below 10 ppm in the top foot and 15 ppm in the top three feet and where an Engineered Barrier will not be installed. Settling Defendant shall obtain an appropriate CER for such area in accordance with Paragraph 58 of this Consent Decree. If Settling Defendant elects to use Former Oxbows A and C for this purpose and can satisfy the above conditions and all of the requirements and Performance Standards set

264

forth in Attachment I of the SOW, then Settling Defendant shall install the remainder of the required 12 acres, or the equivalent of the remainder of the required 12 acres, of forested/wetland habitat at the Off-Site Restoration Area.

(ii)  If, within 24 months of entry of this Consent Decree, Settling Defendant notifies the LAT that it does not intend to use Former Oxbows A and C for the installation of forested/wetland habitat or is unable to demonstrate to the Trustees, prior to the installation of forested/wetland habitat, that the conditions in subparagraph (i) above and the requirements and Performance Standards set forth in Attachment I of the SOW will be satisfied at Former Oxbows A and C, then Settling Defendant shall install the entire 12 acres, or the equivalent of 12 acres, of forested/wetland habitat at the Off-Site Restoration Area.

(iii)  The location of the Off-Site Restoration Area shall be designated by the Trustees, subject to mutual agreement with Settling Defendant on the area selected.  The Off-Site Restoration Area will consist of a non-contaminated riparian area outside of the Site.  Settling Defendant shall not incur any costs or have any responsibility for obtaining access agreements for, or securing any kind of property interest in, the Off-Site Restoration Area, including, but not limited to, ownership, easements or restrictions.  Settling Defendant's sole obligations with respect to the Off-Site Restoration Area shall be to install and monitor (for a period not to exceed 5 years) the forested habitat/wetland in accordance with the requirements and Performance Standards set forth in Attachment I of the SOW after consultation with the Trustees. Based on consultation with, and approval from, the Trustees, the planting densities and

other specific requirements and Performance Standards set forth in Attachment I of the SOW for the Off-Site Restoration Area may be modified to accommodate any unique features presented by that area; provided, however, that Settling Defendant's obligations to install and monitor the forested/ wetland habitat for the Off-Site Restoration Area shall not exceed the equivalent of 12 acres (if Former Oxbows A and C are not used) or the number of acres not installed at Former Oxbows A and C (if Former Oxbows A and C are used).

(iv) If Settling Defendant does not use Former Oxbows A and C for the installation of forested/wetland habitat, Settling Defendant shall pay to the Trustees the sum of $60,000 (in addition to the payments specified in Paragraph 114) for habitat and wetlands impacts associated with PCB contamination and with Removal Actions at the Site. This payment shall be made using the same procedures described in Paragraph 115.

f. Settling Defendant acknowledges that the Restoration Work in this Paragraph may be in addition to work that otherwise might be required to implement the Removal Actions; provided, however, that nothing in this Paragraph 118 shall be construed to require, or to allow the Trustees to require, Settling Defendant to perform additional restoration activities beyond those generally described in this Paragraph 118 and in Paragraph 123 of this Consent Decree and as specified in the Upper ½ Mile Reach Removal Action Work Plan and in the SOW.

119. <u>Work Plans for Restoration Work Components</u>. For the Restoration Work component generally described in Paragraph 118.a, Settling Defendant shall perform

266

such component in accordance with the design details set forth in the Upper ½ Mile
Reach Removal Action Work Plan (Appendix F to this Consent Decree), as approved by
EPA and the Trustees. For each of the Restoration Work components generally
described in Paragraphs 118.c through 118.e and in Attachment I of the SOW, Settling
Defendant shall include specific plans for design and implementation of such component
as part of its Removal Design/Removal Action ("RD/RA") Work Plan for the individual
Removal Action for the area in which such Restoration Work component will be
conducted and, for the Off-Site Restoration Area, in a separate Restoration
Design/Restoration Action Work Plan. In addition, Settling Defendant shall develop and
include in each such RD/RA Work Plan a detailed Restoration Project Monitoring and
Maintenance Plan for the pertinent Restoration Work component, which shall be
designed to achieve the monitoring and maintenance Performance Standards set forth in
Attachment I of the SOW. The portions of the RD/RA Work Plans relating to the
Restoration Work shall, in addition to the review and approval by EPA, after reasonable
opportunity for review and comment by the State, pursuant to Section XV, also be subject
to the review and approval of the Trustees, in accordance with Paragraph 79.

    120. Certification of Completion of Installation of Restoration Work. Upon
completion of installation of each Restoration Work component generally described in
Paragraph 118.a, c, d, and e, including the achievement of applicable Performance
Standards for installation of such component as set forth in the Removal Action Work
Plan for the Upper ½ Mile Reach or in Attachment I of the SOW (as applicable), Settling
Defendant shall submit to the LAT four copies of a Completion of Installation of

267

Restoration Work Report. Such report shall describe the activities undertaken by Settling Defendant and how the applicable Performance Standards for the installation of the Restoration Work component have been achieved. After submittal of the Completion of Installation of Restoration Work Report to the LAT, Settling Defendant shall schedule and conduct an installation inspection and meeting to be attended by Settling Defendant, EPA and the Trustees. Within 30 days of completion of the installation inspection, the Trustees, through the LAT, will notify Settling Defendant in writing as to whether the Restoration Work component has been installed in accordance with this Consent Decree and whether the applicable Performance Standards for the installation of the Restoration Work component have been achieved.  The monitoring and maintenance portions of a Restoration Work component will not be required to be completed before the Trustees may issue such a notification or before EPA issues a Certification of Completion of the particular Removal Action for the area where such Restoration Work component was installed. If the Trustees determine that installation of the Restoration Work component has not been completed in accordance with this Consent Decree or that the applicable Performance Standards for the installation of the Restoration Work component have not been achieved, the LAT will notify Settling Defendant in writing of the activities that must be undertaken to complete the installation of the Restoration Work component; provided, however, that the Trustees may not modify the applicable Performance Standards (except as provided in Paragraph 217 (Modification) of this Consent Decree). Settling Defendant shall perform all activities described in the notice subject to its right to invoke the dispute resolution procedures set forth in Section XXIV.. Settling Defendant shall

268

submit the Certification of Installation of Restoration Work and conduct the installation inspection and meeting with the Trustees no less than 30 days prior to seeking Certification of Completion of the individual Removal Action from EPA.  Once the Trustees have determined that a Restoration Work component has been installed in accordance with this Consent Decree and that the applicable Performance Standards for installation of such component have been achieved, the Trustees will so notify Settling Defendant and EPA.  Settling Defendant may contest the Trustees' failure to respond to a request by Settling Defendant for such notification, pursuant to Section XXIV (Dispute Resolution) of this Consent Decree.

121.  Certification of Completion for Restoration Work. Upon completion of each Restoration Work component generally described in Paragraph 118.a, c, d and e and the achievement of all of the Performance Standards, including those for monitoring and maintenance, as set forth in the Removal Action Work Plan for the Upper ½ Mile Reach or in Attachment I of the SOW (as applicable), Settling Defendant shall submit to the LAT four copies of a Completion of Restoration Work Report.  Such report shall describe the activities undertaken by Settling Defendant and how all of the Performance Standards for the Restoration Work component have been achieved.  After submittal of the Completion of Restoration Work Report to the LAT, Settling Defendant shall schedule and conduct a pre-certification inspection and meeting to be attended by Settling Defendant, EPA and the Trustees.  Within 30 days of completion of the pre-certification inspection, the Trustees, through the LAT, will notify the Settling Defendant in writing as to whether the Restoration Work project has been completed in accordance with this Decree and

269

whether all of the Performance Standards for the Restoration Work component, including those for monitoring and maintenance, have been achieved.  If the Trustees determine that the Restoration Work component has not been completed in accordance with this Consent Decree or that all of the Performance Standards for the Restoration Work component have not been achieved, the LAT will notify the Settling Defendant in writing of the activities that must be undertaken to complete the  Restoration Work component; provided, however, that the Trustees may not modify the applicable Performance Standards (except as provided in Paragraph 217 (Modification) of this Consent Decree). Settling Defendant shall perform all activities described in the notice subject to its right to invoke the dispute resolution procedures set forth in Section XXIV.  Once the Trustees have determined that a Restoration Work component has been completed in accordance with this Consent Decree and that the Performance Standards for such component, including those relating to monitoring and maintenance, have been achieved, the Trustees will so notify Settling Defendant and EPA.  Settling Defendant may contest the Trustees' failure to respond to a request by Settling Defendant for such notification, pursuant to Section XXIV (Dispute Resolution) of this Consent Decree.

122.   Non-Interference With Restoration Work at Settling Defendant Property. This Paragraph applies to the following areas of Settling Defendant Property where Restoration Work is to be performed by Settling Defendant ("Settling Defendant Restoration Areas"): (1) the portions of the riverbanks in the Upper ½ Mile Reach owned by Settling Defendant where Restoration Work shall be performed pursuant to Paragraph 118.a; (2) the banks of the rerouted Unkamet Brook and the surface of the unpaved

270

portion of the former Unkamet Brook landfill, where Restoration Work shall be performed pursuant to Paragraph 118.d(i); and (3) the 200-foot-wide riparian strip in East Street Area 2-South (between the former Thermal Oxidizer location and the downstream boundary of the GE Plant Area), the Newell Street and Lyman Street parking lots, and the surface of the Hill 78 Consolidation Area, where Restoration Work shall be performed pursuant to Paragraphs 118.d(ii)-(iv).  Upon completion of installation of the Restoration Work at each of these areas, Settling Defendant shall prepare and submit to the LAT, with the Completion of Installation of Restoration Work Report under Paragraph 120, for the Trustees' approval, maps showing the final delineation of the Settling Defendant Restoration Areas subject to this Paragraph.  The Trustees' approval of the final delineation of the Settling Defendant Restoration Areas subject to this Paragraph shall be in conjunction with and pursuant to the same procedures for the Trustees' Certification of Completion of Installation of Restoration Work under Paragraph 120.

        a.     Subject to the exceptions set forth in Paragraph 122.b below, commencing upon receipt from the Trustees of (1) Certification of Completion of Installation of Restoration Work under Paragraph 120, and (2) approval of the final delineation of the Settling Defendant Restoration Areas subject to this Paragraph for each area, Settling Defendant shall not take, and shall not allow its employees, agents, representatives, contractors, or lessees to take, any of the following actions within such Settling Defendant Restoration Areas:

271

(i) Construction or placement within such Restoration Areas of any structure, pavement, or other types of materials or items that would materially impact the habitat created by the Restoration Work;

(ii) Removal or destruction of any vegetation installed within such Restoration Areas; or

(iii) Any other activity within, or use of, such Restoration Areas that would materially impair or have material adverse impacts on the habitat created by the Restoration Work in such Restoration Areas.

b. The restrictions and prohibitions set forth in Paragraph 122.a (above) shall not apply to prohibit or restrict the following:

(i) Any response actions undertaken by Settling Defendant, EPA, MADEP or their employees, agents, representatives, or contractors pursuant to this Consent Decree;

(ii) Any monitoring and maintenance activities undertaken by Settling Defendant or its employees, agents, representatives, or contractors as part of the Restoration Work component pursuant to this Consent Decree;

(iii) The destruction, removal, or cutting of vegetation as part of maintenance of such vegetation, or as necessary to implement disease prevention measures, to eliminate a threat to public safety, or to remove invasive nuisance species;

(iv) Activities necessary to respond to an emergency at or near the Settling Defendant Restoration Area, such as fire, flood, or other situation that poses a danger to public health, welfare or the environment;

272

(v)  Actions, activities or work permitted or approved by the Trustees; and/or

(vi)  Any other activities or uses not otherwise prohibited by Paragraph 122.a.

c.      Settling Defendant shall not sell, transfer, mortgage, assign or otherwise dispose of any Settling Defendant Restoration Area unless, prior to such sale, transfer, mortgage, assignment or other property disposition, Settling Defendant: (i) obtains an agreement from such purchaser, mortgagee, transferee, assignee, or other property interest transferee to impose upon such Restoration Area a legally enforceable Conservation Easement and Restriction that embodies the same restrictions set forth in this Paragraph and that will run with the land; and (ii) notifies the LAT of the proposed conveyance and the terms of the Conservation Easement and Restriction at least 60 days prior to the proposed conveyance.

d.      Nothing in this Paragraph 122 shall be deemed to affect the actions of Settling Defendant outside the Settling Defendant Restoration Areas or to authorize the imposition of any restrictions on Settling Defendant's activities at or use of its property outside such Restoration Areas.

123.   Other Natural Resource Protection and Restoration Actions.

a.      Dam Integrity Studies.  Within 60 days after entry of this Consent Decree, Settling Defendant shall conduct an assessment of the integrity of Woods Pond Dam and Rising Pond Dam.  The assessment shall identify and evaluate conditions and circumstances affecting dam integrity including those that could lead to catastrophic

273

failure of the dams and/or substantial release of PCBs. Following such assessment, but

no later than 90 days after entry of this Decree (unless an extension is approved by the

Trustees, after reasonable opportunity for review and comment by EPA and MADEP),

Settling Defendant shall submit a report on the assessment to the LAT, EPA and

MADEP. Settling Defendant shall discuss with the Trustees, EPA and MADEP the need

for and type of appropriate interim measures, if any, necessary to ensure dam integrity so

as to prevent catastrophic failure and/or substantial release of PCBs at or from Woods

Pond Dam and/or Rising Pond Dam. To the extent that the Trustees, EPA and MADEP

believe that measures other than Settling Defendant's existing dam inspection and

maintenance program and other measures (if any) proposed by Settling Defendant in its

report are necessary to ensure dam integrity so as to prevent catastrophic failure and/or

substantial release of PCBs at these dams, they will provide the technical information

underlying their position to Settling Defendant for discussion. If, based on these

discussions, Settling Defendant, the Trustees, EPA and MADEP agree on the need for

and type of such interim measures, Settling Defendant shall undertake the agreed-upon

interim measures in accordance with good engineering principles. If Settling Defendant,

the Trustees, EPA and  MADEP do not agree on the need for or type of interim

measures, the Trustees, after consultation with EPA and MADEP, shall provide to

Settling Defendant a written determination as to the measures that the Trustees, EPA

and MADEP deem necessary to ensure dam integrity so as to prevent catastrophic

failure and/or substantial release of PCBs at these dams. Within 21 days of receipt of

that determination, Settling Defendant may initiate dispute resolution by serving on the

LAT, EPA and MADEP a written Statement of Position consistent with Paragraph 135 (Dispute Resolution). If it does not do so, Settling Defendant shall undertake the interim measures determined to be necessary by the Trustee, EPA and MADEP. If Settling Defendant invokes dispute resolution, such dispute resolution proceeding shall proceed initially pursuant to Paragraphs 137 and 142 of this Consent Decree, with an administrative decision by the Trustee Secretaries. If, after receipt of the Trustee Secretaries' decision, Settling Defendant wishes to pursue judicial resolution of the dispute, it shall file with the Court, within 21 days of receipt of the Trustee Secretaries' decision, a motion for judicial review of that decision in accordance with Paragraph 137 of this Consent Decree. Such proceeding shall be conducted in accordance with Paragraph 137 of this Consent Decree, under which judicial review is not limited to the administrative record. In that proceeding, any party to the dispute may request an evidentiary hearing before the Court. Upon the conclusion of the dispute resolution process, Settling Defendant shall undertake all interim measures determined pursuant to such process to be necessary to ensure dam integrity so as to prevent catastrophic failure and/or substantial release of PCBs at Woods Pond Dam and/or Rising Pond Dam.

The requirements of this Paragraph are in addition to any other investigations and response actions that may be required by EPA pursuant to the final modification of the Reissued RCRA Permit or the Rest of River Remedial Action. Subject to Paragraph 166.h (Massachusetts Covenants) of this Consent Decree, nothing in this provision or Consent Decree shall be deemed to limit any obligations or responsibilities for Woods

Pond Dam that Settling Defendant may have under current law, as amended, as the owner of Woods Pond Dam.

      b.     <u>Conservation Easement</u>. Settling Defendant shall, in accordance with the procedures and schedule set forth in Paragraph 55 of Section XIII (Access and Institutional Controls), execute and record in the Registry of Deeds of Berkshire County a CER, in substantially the form set forth in Appendix N, on 10 acres of wetlands located in the GE Plant Area to the east of the Unkamet Brook landfill, as depicted on a figure attached as Appendix A-5 to this Consent Decree.

      c.     <u>Greenway/Walkway Projects</u>. Settling Defendant agrees to discuss with the Trustees, EPA, and the City at a later time potential greenway/walkway projects in the vicinity of the river at or near the GE Plant Area; provided, however, that Settling Defendant shall not be subject to any stipulated penalties, liquidated damages, or other enforcement actions relating to any activities under this subparagraph 123.c.

    124.  <u>PEDA Obligations</u>. PEDA shall pay to the Trustees a total of $4,000,000.00 consisting of in-kind services and/or a percentage of Net Revenues. PEDA intends to use good faith efforts to satisfy this obligation as soon as feasible.

      a. <u>In-Kind Services</u>. The Trustees may accept in-kind services of any type that may be offered by or through PEDA, by the City of Pittsfield or by other entities, including those who may be involved in the redevelopment at the GE Plant Area. PEDA shall make good faith efforts to actively assist and support the Trustees in securing in-kind services from the City of Pittsfield and other appropriate entities. Such in-kind services may include, but are not limited to, building space for use by the Trustees (for

<div align="center">276</div>

restoration, coordination, administration and public information) and habitat enhancements at the portions of the GE Plant Area to be re-developed under the Definitive Economic Development Agreement. The Trustees may credit the value of such additional in-kind services toward PEDA's $4,000,000 NRD obligation to the Trustees. The amount of the credit for any in-kind services shall be based on documented reasonable costs (or as appropriate, the fair market value of building space or other in-kind services) incurred by PEDA for providing in-kind services accepted by the Trustees or pursuant to another appropriate method acceptable to the Trustees.

b. Annual Net Revenues.

(i)   For purposes of this Paragraph 124, "Net Revenues" means all amounts received by PEDA in the form of rent, sales of property, grants or appropriations, or from any other sources, less the costs of operating and maintaining PEDA, its properties, paying debt service and other such expenditures necessary in PEDA's reasonable discretion for PEDA to successfully accomplish its objectives.

(ii)   PEDA shall pay to the Trustees on an annual basis the first $500,000 plus fifty percent (50%) of any amounts in excess of $500,000 of any Net Revenues received by PEDA. PEDA shall make such payments to the Trustees through DOI in accordance with the procedures set out in Paragraph 115 . PEDA shall indicate that such payment is in partial satisfaction of its obligations to the Trustees under this Paragraph 124. PEDA shall send notice of such payments to the LAT and the Trustees as provided in Paragraph 115. PEDA shall continue to make annual payments until the

277

amount of such payments plus the value of credit given to PEDA by the Trustees for in-kind services provided by PEDA under Paragraph 124.a above equals $4,000,000.

(iii)    After five (5) years from the effective date of the Definitive Economic Development Agreement, PEDA and the Trustees agree to discuss the feasibility of PEDA making annual fixed payments or other types of mutually acceptable payments to the Trustees toward PEDA's $4,000,000 obligation. If PEDA and the Trustees determine that annual fixed or other types of payments are feasible at such time, PEDA shall make the agreed upon payments until the amount of such payments plus the value of credit given to PEDA by the Trustees for in-kind services under Paragraph 124.a above plus the amount of annual payments made by PEDA to the Trustees under Paragraph 124.b(ii) above equals $4,000,000.

(iv)    PEDA shall provide to the LAT on an annual basis a report ("annual report") documenting all amounts received by PEDA in the form of rents, sales of property, grants or appropriations, or from any other sources. The annual report shall also include a reasonably detailed accounting of the costs of operating and maintaining PEDA, its properties, paying debt service and other such expenditures. The annual report shall specify and explain  PEDA's calculation of Net Revenues accrued during the annual reporting period. For any costs or expenditures identified by the Trustees, PEDA shall, within 14 days of such request, provide responsive records (subject to appropriate confidentiality standards and procedures) and a brief  written explanation as to the basis for deciding that each such cost or expenditure was necessary in PEDA's reasonable discretion for PEDA to successfully accomplish its objectives. Within six weeks of

providing the LAT with each annual report PEDA shall meet with the Trustees to discuss and answer questions on the annual report. PEDA shall make available to the Trustees personnel who have detailed knowledge and understanding of the details in the annual report and the documentation supporting its calculations of Net Revenues.

## XXII.  INDEMNIFICATION AND INSURANCE

125.   Indemnification.

a.   The United States, Connecticut and the State do not assume any liability by entering into this agreement or by virtue of any designation of Settling Defendant as EPA's authorized representatives under Section 104(e) of CERCLA. Settling Defendant shall indemnify, save and hold harmless the United States, Connecticut and the State, and their officials, agents, employees, contractors, subcontractors, or representatives, for or from any and all claims or causes of action arising from, or on account of, negligent or other tortious acts or omissions of Settling Defendant, its officers, directors, employees, agents, contractors and subcontractors, and any persons acting on its behalf or under its control, in performing the Work pursuant to this Consent Decree, including, but not limited to, any claims arising from any designation of Settling Defendant as EPA's authorized representative under Section 104(e) of CERCLA.  In addition, Settling Defendant shall indemnify and hold harmless the United States, Connecticut and the State with respect to any and all claims for damages or reimbursement arising from, or on account of, any contract, agreement, or arrangement between Settling Defendant and any person for performance of Work on or relating to the Site, including, but not limited to, claims on account of construction delays.  Further,

279

subject to the dispute resolution provisions of this Paragraph, Settling Defendant agrees
to pay the United States, Connecticut and the State all costs they incur, including, but not
limited to, attorneys fees and other expenses of litigation and settlement, arising from or
on account of: (1) claims made against the United States, Connecticut or the State based
on negligent or other tortious acts or omissions of Settling Defendant, its officers,
directors, employees, agents, contractors and subcontractors, and any persons acting on
its behalf or under its control, in performing the Work pursuant to this Consent Decree; or
(2) claims made against the United States, Connecticut or the State for damages or
reimbursement arising from or on account of any contract, agreement, or arrangement
between Settling Defendant and any person for performance of Work on or relating to the
Site, including, but not limited to, claims on account of construction delays.  Such costs
shall be paid in accordance with the payment procedures in Paragraphs 94.a, 94.d(iii) or
94.e, as applicable, within the time periods specified in Paragraph 100.h of this Consent
Decree.  The United States, Connecticut and the State shall not be held out as a party to
any contract, agreement or arrangement entered into by or on behalf of Settling
Defendant in carrying out activities pursuant to this Consent Decree.  Neither Settling
Defendant nor any such contractor shall be considered an employee or agent of the
United States, Connecticut or the State.

        b.    The United States, Connecticut and the State shall give Settling
Defendant timely notice of receipt of any claim for which the United States, Connecticut
or the State plan to seek indemnification pursuant to this Paragraph.  Settling Defendant
will notify the United States, Connecticut and the State of any insurers who may be

responsible for the defense or indemnification of the United States, Connecticut, the State or Settling Defendant. The United States, Connecticut and the State agree to consult and cooperate with Settling Defendant and any applicable insurers in both the defense and settlement negotiations of any such claim; provided, however, that the United States, Connecticut, and the State each shall control the conduct of its own defense. The United States, Connecticut, and/or the State shall notify and seek the consent of Settling Defendant and any insurers who have sought to associate in the defense of the claim, at least 30 days prior to entering into a settlement of such claim, which consent shall not be unreasonably withheld. In the event Settling Defendant or any such insurer withholds its consent and the United States, Connecticut and/or the State still intends to settle any such claim, such party shall notify Settling Defendant and such insurer of its intent and the reasons therefor at least 15 days prior to entering into any such settlement. Settling Defendant may thereafter initiate dispute resolution pursuant to this Paragraph by filing with the Court a petition within 15 days of such notice. Within 30 days of the petition, Settling Defendant shall file a brief and any supporting documents setting forth the reasons why such settlement should not be entered into. Within 30 days thereafter, the United States, Connecticut and/or the State may file responsive briefs and any supporting documents. After briefs have been filed, the Court may, if appropriate, hold an oral argument or an evidentiary hearing if there are disputed issues of material fact. The Court shall determine if the proposed settlement is reasonable, not collusive, and entered into in good faith. Settling Defendant shall not be required to pay the portion of any of the United States', Connecticut's or the State's

281

expenses, litigation costs or settlement payment which the Court determines is unreasonable, collusive, or entered into in bad faith. For purposes of this dispute resolution process the decision of this Court shall be binding on each of the parties without right of appeal. This Paragraph shall provide the exclusive mechanism for Settling Defendant and its insurers to challenge any such settlement.

        c.    Notwithstanding the above subparagraph, Settling Defendant retains the right to settle any such claim at any time on any basis acceptable to it, so long as such settlement imposes no liability on the United States, Connecticut or the State, does not commit the United States, Connecticut or the State to any legal position, or, except for ministerial actions necessary to effectuate any such settlement, imposes no other obligations on the United States, Connecticut and/or the State.

126.   Settling Defendant waives all claims against the United States, Connecticut, and the State for damages or reimbursement or for set-off of any payments made or to be made to the United States, Connecticut, or the State, arising from or on account of any contract, agreement, or arrangement between Settling Defendant and any person for performance of Work, including, but not limited to, claims on account of construction delays except as otherwise reserved in this Consent Decree.

127.   No later than 15 days before commencing any on-site Work, Settling Defendant shall secure, and shall maintain until the first anniversary of EPA's Certification of Completion of the Work for the Site pursuant to Paragraph 89.b of Section XVIII (Certification of Completion), comprehensive general liability insurance with limits of $10 million dollars, combined single limit, and automobile liability insurance with limits of $5

282

million dollars, combined single limit, naming the United States, Connecticut and the State as additional insureds.  In addition, for the duration of this Consent Decree, Settling Defendant shall satisfy, or shall ensure that their contractors or subcontractors satisfy, all applicable laws and regulations regarding the provision of worker's compensation insurance for all persons performing the Work on behalf of Settling Defendant in furtherance of this Consent Decree.  Prior to commencement of the Work under this Consent Decree, Settling Defendant shall provide to EPA and the State certificates of such insurance and a copy of each insurance policy.  Settling Defendant shall resubmit such certificates and copies of policies each year on the anniversary of the effective date of this Consent Decree.  If Settling Defendant demonstrates by evidence satisfactory to EPA and the State that any contractor or subcontractor maintains insurance equivalent to that described above, or insurance covering the same risks but in a lesser amount, then, with respect to that contractor or subcontractor, Settling Defendant need provide only that portion of the insurance described above which is not maintained by the contractor or subcontractor.

## XXIII.  FORCE MAJEURE

128.   "Force majeure," for purposes of this Consent Decree, is defined as any event arising from causes beyond the control of Settling Defendant, of any entity controlled by Settling Defendant, or of Settling Defendant's contractors, that delays or prevents the performance of any obligation under this Consent Decree despite Settling Defendant's best efforts to fulfill the obligation.  The requirement that Settling Defendant exercise "best efforts to fulfill the obligation" includes using best efforts to anticipate any

283

potential force majeure event and best efforts to address the effects of any potential force

majeure event (1) as it is occurring and (2) following the potential force majeure event,

such that the delay is minimized to the greatest extent possible. "Force Majeure" does

not include financial inability to complete the Work or a failure to attain the Performance

Standards.

129.   If any event occurs or has occurred that may delay the performance of any

obligation under this Consent Decree, whether or not caused by a force majeure event,

Settling Defendant shall orally notify EPA's Project Coordinator or, in his or her absence,

EPA's Alternate Project Coordinator or, in the event both of EPA's designated

representatives are unavailable, the Director of the Office of Site Remediation and

Restoration, EPA Region I, within 2 Working Days of when Settling Defendant first knew

or if applicable, within 5 Working Days of when Settling Defendant's contractors first

knew that the event might cause a delay.  Settling Defendant shall also orally notify the

State Project Coordinator within the same timeframe as EPA.  Within 10 days thereafter,

Settling Defendant shall provide in writing to EPA and the State an explanation and

description of the reasons for the delay; the anticipated duration of the delay; all actions

taken or to be taken to prevent or minimize the delay; a schedule for implementation of

any measures to be taken to prevent or mitigate the delay or the effect of the delay;

Settling Defendant's rationale for attributing such delay to a force majeure event if it

intends to assert such a claim; and a statement as to whether, in the opinion of Settling

Defendant, such event may cause or contribute to an endangerment to public health,

welfare or the environment.  To the extent the delay might affect Settling Defendant's

284

obligations relating to Restoration Work, Settling Defendant shall also provide the written notice to the Trustees. To the extent the delay might affect Settling Defendant's obligations relating to the GE Plant Area Removal Actions or the Allendale School Removal Action, Settling Defendant shall also provide written notice to the City and/or PEDA, as appropriate. Settling Defendant shall include with any notice all available documentation supporting its claim that the delay was attributable to a force majeure. Failure to comply with the above requirements shall preclude Settling Defendant from asserting any claim of force majeure for that event for the period of time of such failure to comply, and for any additional delay caused by such failure. For purposes of this Section, Settling Defendant shall be deemed to know of any circumstance of which Settling Defendant, any entity controlled by Settling Defendant, or Settling Defendant's contractors knew or should have known; provided, however, that such imputation of a contractor's knowledge to Settling Defendant shall not shorten the 5 day oral notification requirement of this Paragraph.

130. If EPA, after a reasonable opportunity for review and comment by the State, and Connecticut and the Federal Trustees as appropriate, agrees that the delay or anticipated delay is attributable to a force majeure event, the time for performance of the obligations under this Consent Decree that are affected by the force majeure event will be extended by EPA, after a reasonable opportunity for review and comment by the State, and Connecticut and the Federal Trustees as appropriate, for such time as is necessary to complete those obligations. An extension of the time for performance of the obligations affected by the force majeure event shall not, of itself, extend the time for

285

performance of any other obligation. If EPA, after a reasonable opportunity for review and comment by the State, and Connecticut and the Federal Trustees as appropriate, does not agree that the delay or anticipated delay has been or will be caused by a force majeure event, EPA will notify Settling Defendant in writing of its decision. If EPA, after a reasonable opportunity for review and comment by the State, and Connecticut and the Federal Trustees as appropriate, agrees that the delay is attributable to a force majeure event, EPA will notify Settling Defendant in writing of the length of the extension, if any, for performance of the obligations affected by the force majeure event.

131.    If Settling Defendant elects to invoke the dispute resolution procedures set forth in Section XXIV (Dispute Resolution), it shall do so no later than 15 days after receipt of EPA's notice. In any such proceeding, Settling Defendant shall have the burden of demonstrating by a preponderance of the evidence that the delay or anticipated delay has been or will be caused by a force majeure event, that the duration of the delay or the extension sought was or will be warranted under the circumstances, that best efforts were exercised to avoid and mitigate the effects of the delay, and that Settling Defendant complied with the requirements of Paragraphs 128 and 129 above. If Settling Defendant carries this burden, the delay at issue shall be deemed not to be a violation by Settling Defendant of the affected obligation of this Consent Decree identified to EPA and the Court.

## XXIV.  DISPUTE RESOLUTION

132.    Unless otherwise expressly provided for in this Consent Decree, the dispute resolution procedures of this Section shall be the exclusive mechanism to resolve

disputes between EPA and Settling Defendant, between the Trustees and Settling Defendant, between Connecticut and Settling Defendant, between the State and Settling Defendant, between the Trustees and PEDA, between EPA and PEDA, between EPA and the City, or between the State and PEDA and/or the City arising under or with respect to this Consent Decree. The procedure for resolution of disputes which involve EPA are governed by Paragraphs 133-139 and 141. The State may participate in such dispute resolution proceedings to the extent specified in those Paragraphs. Disputes exclusively between the State and Settling Defendant are governed by Paragraph 140. Disputes exclusively between the Trustees and Settling Defendant are governed by Paragraph 142. Disputes exclusively between Connecticut and Settling Defendant are governed by Paragraph 143. Disputes between the Trustees and PEDA are governed by Paragraph 144. Disputes between EPA and PEDA are governed by Paragraph 145.a. Disputes between EPA and the City are governed by Paragraph 145.b. Disputes between the State and PEDA and/or the City are governed by Paragraphs 145.c and 145.d. However, the procedures set forth in this Section shall not apply to actions by the United States, the Trustees, Connecticut or the State to enforce obligations of Settling Defendant that have not been disputed in accordance with this Section.

133. Any dispute which arises under or with respect to this Consent Decree shall in the first instance be the subject of informal negotiations between the parties to the dispute. The period for informal negotiations shall not exceed 20 days from the time the dispute arises, unless it is modified by written agreement of the parties to the dispute.

287

The dispute shall be considered to have arisen when one party sends the other parties a written Notice of Dispute.

    134.  Mediation

    a.      Initiation of ADR.  At any time during the informal dispute resolution period, any party to the dispute may propose the use of a mediator to assist in resolving the dispute. Upon the written agreement of the parties to the dispute, the period for informal dispute resolution may be extended for the purpose of mediating the dispute.  Formal dispute resolution, as governed by the procedures set forth in Paragraphs 135 to 137, shall commence immediately upon the termination of the informal dispute resolution period.

    b.      Decision to Continue ADR.  The decision to continue mediation shall be in the sole discretion of each party.

    c.      Costs of ADR.  The parties agree that they will share equitably the costs of mediation, subject to the availability of United States, Connecticut or State funds for this purpose.  The ability of the United States, Connecticut and the State to share the costs of mediation will be determined by each agency in its sole discretion and shall not be subject to dispute resolution or judicial review.  If an agency determines that no mediation funding is available, Settling Defendant shall have the option to cover all of the mediation costs or to request the services of a trained mediator from EPA's in-house ADR program or any other dispute resolution professional whose services may be available to the parties at no cost or to withdraw from or not pursue mediation.

d.   Mediator List.  The Parties agree that they shall, after this Consent Decree is lodged, prepare a list of mediators agreeable to the Parties from which a mediator may be selected. This list shall not preclude any Party from proposing to add a mediator or mediators to the list or from proposing a different mediator for a specific dispute.

e.   Confidentiality.  The Parties agree that participants in mediated discussions pursuant to this Section shall execute a confidentiality agreement in the form attached as Appendix S to this Consent Decree.

135.   a.   In the event that the Parties cannot resolve a dispute by informal negotiations or mediation under the preceding Paragraphs of this Section, then the position advanced by EPA, after reasonable opportunity for review and comment by the State, shall be considered binding unless, within 14 days after the conclusion of the informal negotiation period, Settling Defendant invokes the formal dispute resolution procedures of this Section by serving on the United States and the State a written Statement of Position on the matter in dispute, including, but not limited to, any factual data, analysis or opinion supporting that position and any supporting documentation relied upon by the Settling Defendant.  Settling Defendant may request EPA to grant an extension of this 14-day period to serve its Statement of Position.  If such request is for an additional seven days or less, EPA shall not unreasonably withhold approval of such request. The granting of any request for a longer extension of time to file the Statement of Position shall be within EPA's discretion.  Settling Defendant's Statement of Position shall specify Settling Defendant's position as to whether formal dispute resolution should proceed under Paragraph 136 or Paragraph 137.

289

b.     Following receipt of Settling Defendant's Statement of Position, within 14 days or such longer time period as Settling Defendant received for submittal of its Statement of Position under Paragraph 135.a on the same dispute, EPA, after reasonable opportunity for review and comment by the State, will serve on Settling Defendant its Statement of Position, including, but not limited to, any factual data, analysis, or opinion supporting that position and all supporting documentation relied upon by EPA.  EPA's Statement of Position shall include a statement as to whether formal dispute resolution should proceed under Paragraph 136 or 137.  Within 14 days after receipt of EPA's Statement of Position, Settling Defendant may submit a Reply.

c.     If there is disagreement between EPA and Settling Defendant as to whether dispute resolution should proceed under Paragraph 136 or 137, the parties to the dispute shall follow the procedures set forth in the paragraph determined by EPA to be applicable.  However, if Settling Defendant ultimately appeals to the Court to resolve the dispute, the Court shall determine which paragraph is applicable in accordance with the standards of applicability set forth in Paragraphs 136 and 137.

136.     Except as otherwise provided in Paragraph 123.a, formal dispute resolution for disputes pertaining to the selection or adequacy of any response action and all other disputes that are accorded review on the administrative record under applicable principles of administrative law shall be conducted pursuant to the procedures set forth in this Paragraph.  For purposes of this Paragraph, the adequacy of any response action includes, without limitation: (1) the adequacy or appropriateness of plans, procedures to implement plans, or any other items requiring approval by EPA under this Consent

290

Decree; and (2) the adequacy of the performance of response actions taken pursuant to this Consent Decree.

a. An administrative record of the dispute shall be maintained by EPA and shall contain all statements of position, including supporting documentation, submitted pursuant to this Section. Where appropriate, EPA may allow submission of supplemental statements of position by the parties to the dispute.

b. The Director of the Office of Site Remediation and Restoration, EPA Region I (or other appropriate official in Region I, at the level of Director or Deputy Director of an Office, as designated by the Regional Administrator), will issue, after reasonable opportunity for review and comment by the State, a final administrative decision resolving the dispute based on the administrative record described in Paragraph 136.a. This decision shall be binding upon the Settling Defendant, subject only to the right to seek judicial review pursuant to Paragraph 136.c. and d.

c. Any administrative decision made by EPA pursuant to Paragraph 136.b shall be reviewable by this Court, provided that a motion for judicial review of the decision is filed by Settling Defendant with the Court and served on all Parties within 21 days of receipt of EPA's decision. The motion shall include a description of the matter in dispute, the efforts made by the parties to resolve it, the relief requested, and the schedule, if any, within which the dispute must be resolved to ensure orderly implementation of this Consent Decree. The United States may file a response to Settling Defendant's motion within thirty days after receipt of such motion. Settling Defendant may file a reply to the United States' response within 10 days of receipt of such response. All deadlines set

291

forth in this subparagraph for filings with the Court may be extended by stipulation of Settling Defendant and the United States or by the Court for good cause shown.

    d.    In proceedings on any dispute governed by this Paragraph, Settling Defendant shall have the burden of demonstrating that the decision of the Office of Site Remediation and Restoration Director (or other designated official in Region I, as specified in Paragraph 136.b) is arbitrary and capricious or otherwise not in accordance with law. Judicial review of EPA's decision shall be on the administrative record compiled pursuant to Paragraph 136.a.

    137.    Formal dispute resolution for disputes that neither pertain to the selection or adequacy of any response action nor are otherwise accorded review on the administrative record under applicable principles of administrative law, shall be governed by this Paragraph.

    a.    Following receipt of Settling Defendant's Statement of Position submitted pursuant to Paragraph 135.a, the Director of the Office of Site Remediation and Restoration, EPA Region I (or other appropriate official in Region I, at the level of Director or Deputy Director of an office, as designated by the Regional Administrator), after reasonable opportunity for review and comment by the State, will issue a final decision resolving the dispute. This decision shall be binding on Settling Defendant unless, within 21 days of receipt of the decision, Settling Defendant files with the Court and serves on the parties a motion for judicial review of the decision setting forth the matter in dispute, the efforts made by the parties to resolve it, the relief requested, and the schedule, if any, within which the dispute must be resolved to ensure orderly implementation of the

<div align="center">292</div>

Consent Decree. The United States may file a response to Settling Defendant's motion within thirty days after receipt of such motion.  Settling Defendant may file a reply to the United States' response within 10 days of receipt of such response. All deadlines set forth in this subparagraph for filings with the Court may be extended by stipulation of Settling Defendant and the United States or by the Court for good cause shown.

      b.    Notwithstanding Paragraph R of Section I (Background) of this Consent Decree, judicial review of any dispute governed by this Paragraph shall be governed by applicable principles of law.

      138.    Nothing in this Consent Decree shall be construed to allow Settling Defendant to seek dispute resolution under this Section XXIV regarding:

      a.    EPA's Action Memorandum regarding the Upper 2-Mile Reach or EPA's Action Memorandum for the Removal Actions Outside the River; provided, however, that nothing in this subparagraph shall preclude Settling Defendant from raising any issue with respect to the underlying assumptions or other bases set forth in those memoranda in connection with: (i) a challenge to EPA's selection of the Rest of the River Remedial Action pursuant to Paragraphs 22 and 141.b of this Consent Decree; (ii) dispute resolution regarding a determination by EPA, the State, or Connecticut that the criteria described in Paragraphs 162, 163, 167, 168, 171 and/or 172 (Pre- and Post-Certification Reservations) of this Consent Decree have been satisfied; or (iii) dispute resolution relating to the establishment of spatial averaging areas or the evaluation of non-PCB Appendix IX+3 constituents in accordance with the SOW;

b.    the Action Memorandum to be issued by EPA regarding the 1 ½ Mile Reach upon completion of the EE/CA and EPA's selection of the 1 ½ Mile Reach Removal Action in accordance with Paragraph 21 of this Consent Decree; provided, however, that nothing in this subparagraph shall preclude Settling Defendant from: (i) submitting a position paper to the National Remedy Review Board regarding EPA's EE/CA for the 1 ½ Mile Reach as provided in Paragraph 21.a(iii) of this Consent Decree; or (ii) raising any issue with respect to the underlying assumptions or other bases set forth in the above-described Action Memorandum or other selection documents for the 1 ½ Mile Reach Removal Action in connection with a challenge to EPA's selection of the Rest of the River Remedial Action pursuant to Paragraphs 22 and 141.b of this Consent Decree or in connection with dispute resolution regarding a determination by EPA, the State, or Connecticut that the criteria described in Paragraphs 162, 163, 167, 168, 171 and/or 172 (Pre- and Post-Certification Reservations) of this Consent Decree have been satisfied; and/or

c.    the modification of the Reissued RCRA Permit to select the Rest of the River Remedial Action in accordance with Paragraph 22, except as provided in the Reissued RCRA Permit and Paragraphs 22 and 141.b of this Consent Decree.

139.    The invocation of formal dispute resolution procedures under this Section shall not extend, postpone or affect in any way any obligation of Settling Defendant under this Consent Decree, not directly in dispute, unless EPA, after reasonable opportunity for review and comment by the State, or the Court agrees otherwise.  Stipulated penalties with respect to the disputed matter shall continue to accrue but payment shall be stayed

294

pending resolution of the dispute as provided in Paragraph 157. Notwithstanding the stay of payment, stipulated penalties shall accrue from the first day of noncompliance with any applicable provision of this Consent Decree, and shall continue to accrue in accordance with the provisions of Paragraph 153. In the event that Settling Defendant does not prevail on the disputed issue, stipulated penalties shall be assessed and paid as provided in Section XXV (Stipulated Penalties).

140. <u>Disputes Solely between the State and Settling Defendant.</u> Disputes arising under or with respect to this Consent Decree solely between the State and Settling Defendant that relate to Massachusetts Past Response Costs, Massachusetts Future Response Costs, Massachusetts Interim Response Costs, Massachusetts Oversight Costs, assessment of stipulated penalties by the State, Massachusetts Pre-Certification and Post-Certification Reservations, access to information by the State, the State's right of access to Settling Defendant Property, the State's consent to subordination agreements for EREs as provided in Paragraphs 54.c and 57.d, access to State-owned property (as provided in Paragraph 62), emergency response actions taken by the State pursuant to Section XIX (Emergency Response), and/or notifications to the State pursuant to Paragraph 208 shall be governed in the following manner. The procedures for resolving the disputes mentioned in this Paragraph shall be the same as provided for in Paragraphs 133 to 139 of this Section, except that each reference to EPA shall read as a reference to MADEP, each reference to the Director of the Office of Site Remediation and Restoration, EPA Region I, shall be read as a reference to the MADEP Assistant Commissioner for the Bureau of Waste Site Cleanup, each reference to the

United States shall be read as a reference to the State, and each reference to the State shall be read as a reference to EPA. Dispute resolution under this Paragraph concerning stipulated penalties that relate to Massachusetts Past Response Costs, Massachusetts Future Response Costs, Massachusetts Interim Response Costs, or Massachusetts Oversight Costs shall be limited to whether MADEP has properly assessed and/or calculated such stipulated penalties. The resolution of disputes between the Commonwealth and Settling Defendant that relate to the amount of those Massachusetts Future Response Costs which are subject to Paragraph 95.d(iv), Massachusetts Interim Response Costs or Massachusetts Oversight Costs owed to the Commonwealth shall proceed in accordance with the provisions of 310 C.M.R. 40.1220(3).

141. <u>Dispute Resolution Relating to the Rest of the River</u>: Disputes between Settling Defendant and EPA relating to the Rest of the River shall be subject to the following dispute resolution procedures:

a. For disputes relating to EPA's conditional approval, disapproval, or modification of deliverables submitted by Settling Defendant to EPA under the Reissued RCRA Permit, or regarding other issues arising under the Reissued RCRA Permit, prior to EPA's issuance of the permit modification selecting a Remedial Action for the Rest of the River, as referenced in Paragraph 22.p of this Consent Decree, such disputes shall be resolved in accordance with the Dispute Resolution provisions in Special Condition II.N of the Reissued RCRA Permit. Settling Defendant shall not contend that EPA's conditional approval, disapproval, or modification of any such submissions or other action taken by EPA under the Reissued RCRA Permit (except for a permit modification

296

pursuant to General Condition I.C. of the Reissued RCRA Permit) prior to EPA's issuance of the permit modification selecting a Remedial Action for the Rest of the River constitutes a modification of the Reissued RCRA Permit for purposes of invoking 40 C.F.R. Parts 124 and 270 or Section 7006(b) of RCRA.

b.   For disputes relating to EPA's modification of the Reissued RCRA Permit to select the Rest of the River Remedial Action, as referenced in Paragraphs 22.o, 22.p, 22.t and/or 22.v of this Consent Decree, the dispute resolution procedures shall be as follows:

(i)   Upon receipt of EPA's notification of its intended permit modification decision, as provided in Paragraph 22.o of this Consent Decree, Settling Defendant shall have the right, within 30 days of such notification, to seek administrative dispute resolution within EPA Region I.  Such dispute resolution shall include both informal and formal administrative dispute resolution processes in accordance with the administrative dispute resolution provisions of Paragraphs 133-136 of this Consent Decree; provided, however, that Settling Defendant shall not have the right to seek judicial review of the administrative decision on EPA's notification of its intended permit modification pursuant to this subparagraph.

(ii)   Upon receipt of EPA's permit modification decision, as provided in Paragraph 22.p of this Consent Decree, Settling Defendant shall have the right to seek review of that permit modification decision in the EPA Environmental Appeals Board within 30 days pursuant to 40 C.F.R. § 124.19.

297

(iii)     After issuance of a decision by the Environmental Appeals Board, Settling Defendant shall have the right to seek review of that decision in the United States Court of Appeals for the First Circuit pursuant to Section 7006(b) of RCRA.

(iv)     In the event that the Environmental Appeals Board or the United States Court of Appeals vacates or remands all or part of EPA's permit modification decision and EPA revises and reissues that decision, as provided in Paragraph 22.t of this Consent Decree, Settling Defendant shall have the right to seek review of that revised permit modification decision in the Environmental Appeals Board pursuant to 40 C.F.R. § 124.19 (except as otherwise approved or determined by the United States Court of Appeals) and thereafter in the United States Court of Appeals for the First Circuit, pursuant to Section 7006(b) of RCRA, as provided in Paragraph 22.u. The rights and procedures applicable to subsequent EPA permit modification decisions shall be as provided in Paragraph 22.v.

(v)     Any proceedings in the EPA Environmental Appeals Board and the United States Court of Appeals for the First Circuit shall be governed by applicable law and the rules of such Board and Court; provided, however, that the United States and Settling Defendant shall jointly move the Court of Appeals for expedited briefing and consideration as provided in Paragraphs 22.q, 22.u(iv), and 22.v(ii) (as applicable) of this Consent Decree, and provided further that the effectiveness of the initial or a revised permit modification shall be stayed pending review to the extent provided in Paragraphs 22.q, 22.u(iv), and 22.v(ii), as applicable.

(vi)    In any administrative or judicial challenge to EPA's initial or revised permit modification decision, Settling Defendant shall not contend that EPA's conditional approval, disapproval, or modification of a deliverable submitted by Settling Defendant under the Reissued RCRA Permit or other action taken by EPA under the Reissued RCRA Permit (except for a permit modification pursuant to General Condition I.C. of the Reissued RCRA Permit) prior to EPA's initial permit modification decision setting forth the selected Remedial Action for the Rest of the River constituted a modification of the Permit. However, Settling Defendant shall not be precluded from challenging EPA's decisions on such prior submissions or other such prior EPA action on any substantive grounds. All Parties reserve their rights, during such a challenge, to raise any arguments related to implementation of Work in the Upper 2-Mile Reach of the River.

c.    For any disputes which arise after a final determination has been made on the selection of the Rest of the River Remedial Action and which relate to the Rest of the River, such disputes shall be resolved under the Dispute Resolution provisions of Paragraphs 133 through 139 of this Consent Decree.

142.    Disputes Between the Trustees and Settling Defendant. Disputes arising under this Consent Decree between the Trustees and Settling Defendant that relate to Settling Defendant's obligations under Section XXI (Natural Resource Damages) of this Consent Decree, costs Incurred by or required to be paid to the Trustees, and/or assessment of liquidated damages by the Trustees shall be governed in the following manner. The procedures for resolving the disputes mentioned in this Paragraph shall be

299

the same as provided for in Paragraphs 133-139 of this Section, except that each reference to EPA shall read as a reference to the Trustees, and each reference to the Director of the Office of Site Remediation and Restoration, EPA Region I, shall be read as a reference to the Trustee Secretaries.

143.    Disputes Solely Between Connecticut and Settling Defendant.  Disputes arising under or with respect to this Consent Decree solely between Connecticut and Settling Defendant that relate to Connecticut Past Response Costs, Connecticut Future Costs, Connecticut Pre-Certification and Post-Certification Reservations, assessment of stipulated penalties by Connecticut, access to information by Connecticut, and/or Connecticut's right of access to Settling Defendant Property shall be governed in the following manner.  The procedures for resolving the disputes mentioned in this Paragraph shall be the same as provided for in Paragraphs 133-139 of this Section, except that each reference to EPA shall read as a reference to CTDEP, each reference to the Director of the Office of Site Remediation and Restoration, EPA Region I, shall be read as a reference to the Commissioner of CTDEP, each reference to the United States shall be read as a reference to Connecticut, and each reference to the State shall be read as a reference to EPA.  Dispute resolution under this Paragraph concerning stipulated penalties that relate to Connecticut Past Response Costs or Connecticut Future Costs shall be limited to whether CTDEP has properly assessed and/or calculated such stipulated penalties.

144.    Disputes Between Trustees and PEDA.  Disputes arising under the Consent Decree between the Trustees and PEDA that relate to PEDA's obligations as

set forth in Paragraph 124 of Section XXI (Natural Resource Damages) shall be governed in the following manner.  The procedures for resolving the disputes mentioned in this Paragraph shall be the same as provided for in Paragraphs 133-139 of this Section, except that each reference to EPA shall read as a reference to the Trustees, each reference to the Director of the Office of Site Remediation and Restoration, EPA Region I, shall be read as a reference to the Trustee Secretaries, and each reference to Settling Defendant shall be read as a reference to PEDA.

 145. <u>Disputes Between EPA and PEDA, Between EPA and the City, and Between the State and PEDA and/or the City</u>.

 a. Disputes between EPA and PEDA that relate to property that has been or will be transferred to PEDA pursuant to the Definitive Economic Development Agreement and (i) are authorized pursuant to Paragraph 46 (Settling Defendant's Obligation to Perform Further Response Actions), or (ii) arise under Paragraph 48.b, or (iii) arise under Paragraph 65 of this Consent Decree shall follow the procedures set forth in Paragraphs 133-136 (record review), except that each reference to Settling Defendant shall be read as a reference to PEDA.

 b. Disputes between EPA and the City that arise under Paragraph 66 of this Consent Decree shall follow the procedures set forth in Paragraphs 133-136 (record review), except that each reference to Settling Defendant shall be read as a reference to the City.

 c. Disputes solely between the State and PEDA and/or the City, respectively, under Paragraph 65 or Paragraph 66 of this Consent Decree, that arise

prior to Certification of Completion of the Response Action pursuant to which said dispute arises shall follow the procedures set forth in Paragraphs 133-136 (record review), except that each reference to EPA shall be read as a reference to MADEP, each reference to the Director of Office of Site Remediation, EPA Region I, shall be read as a reference to the MADEP Assistant Commissioner for the Bureau of Waste Site Cleanup, and each reference to Settling Defendant shall be read as a reference to PEDA or the City, as appropriate.

    d. Disputes between the State and PEDA and/or the City, respectively under Paragraph 65 or Paragraph 66 of this Consent Decree, that arise after Certification of Completion of the Response Action pursuant to which said dispute arises, shall follow the procedures set forth in Paragraphs 133-136 (record review), except that each reference to EPA shall be read as a reference to MADEP, each reference to the Director of the Office of Site Remediation, EPA Region I shall be read as a reference to the MADEP Assistant Commissioner for the Bureau of Waste Site Cleanup, and each reference to Settling Defendant shall be read as a reference to PEDA or the City, as appropriate.

## XXV.  STIPULATED PENALTIES

   146. Settling Defendant shall be liable collectively to the United States, the State and/or Connecticut for stipulated penalties or liquidated damages (for failures to comply relating to the Trustees) in the amounts set forth in Paragraphs 147-152 for failure to comply with the requirements of this Consent Decree specified below, unless excused under Section XXIII (Force Majeure); provided, however, that Settling Defendant shall not

be liable for both stipulated penalties and liquidated damages for violations of the same obligation. Settling Defendant shall pay 70% of stipulated penalties to the United States and shall pay 30% of stipulated penalties to the State in accordance with Paragraph 155 of this Section. "Compliance" by Settling Defendant shall include completion of the activities under this Consent Decree or any work plan or other plan approved under this Consent Decree identified below in accordance with all applicable requirements of law, this Consent Decree, the SOW, the Upper ½ Mile Reach Removal Action Work Plan, the Rest of River SOW, and any plans or other documents approved by EPA or the Trustees, or the State (for the obligations specified below in Paragraph 158 of this Section), pursuant to this Consent Decree and within the specified time schedules established by and approved under this Consent Decree.

147. The following stipulated penalties shall accrue per violation per day for any noncompliance related to performance of all Work under this Consent Decree (except for obligations relating to the Trustees, including but not limited to those under Section XXI (Natural Resource Damages)), including but not limited to the SOW, the Rest of River SOW, any Work Plans developed pursuant to the SOW or Rest of River SOW, the Upper ½ Mile Reach Removal Action Work Plan, any components of such Work Plans, and all requirements of Sections VI (Performance of the Work by Settling Defendant), VII (Removal Actions Outside the River), VIII (River Response Actions), IX (Performance Standards), X (Review of Response Actions), XIII (Access and Land/Water Use Restrictions), and XX (Reimbursement of Costs):

303

| Penalty Per Violation Per Day | Period of Noncompliance |
|---|---|
| $3,000 | 1st through 7th day |
| $6,000 | 8th through 14th day |
| $12,000 | 15th day and beyond |

148.    The following liquidated damages shall accrue per violation per day for any noncompliance related to obligations relating to the Trustees, including but not limited to, the Restoration Work described in Section 2.8 and Attachment I of the SOW and in Sections 9, 11.5.3, and 11.6.2 of the Removal Action Work Plan for the Upper ½ Mile Reach, the other natural resource protection and restoration actions described in Paragraph 123 of this Consent Decree, Restoration Work or other natural resource protection and restoration actions conducted under Work Plans or components thereof developed pursuant to the SOW or this Consent Decree, and any related requirements, insofar as they apply to Restoration Work or other natural resource protection or restoration actions of Sections VI (Performance of the Work by Settling Defendant), VII (Removal Actions Outside the River), VIII (River Response Actions), XIII (Access and Land/Water Use Restrictions), XX (Reimbursement of Costs) and XXI (Natural Resource Damages) :

| Penalty Per Violation Per Day | Period of Noncompliance |
|---|---|
| $1,500 | 1st through 7th day |
| $3,000 | 8th through 14th day |
| $6,000 | 15th day and beyond |

149.    Violations of Other Requirements.

a. The following stipulated penalties shall accrue per violation per day for any noncompliance related to performance under this Consent Decree (except for

304

obligations relating to the Trustees, including but not limited to those under Section XXI (Natural Resource Damages)), which is not specifically referenced in Paragraph 147 above or in Paragraph 150.a below:

| Penalty Per Violation per Day | Period of Noncompliance |
|---|---|
| $1,500 | 1st through 7th day |
| $3,000 | 8th through 14th day |
| $8,000 | 15th day and beyond |

b.  The following liquidated damages shall accrue per violation per day for any noncompliance related to performance under this Consent Decree for obligations relating to the Trustees, including but not limited to those under Section XXI (Natural Resource Damages), which is not specifically referenced in Paragraph 148 above or in Paragraph 150.b below:

| Penalty Per Violation per Day | Period of Noncompliance |
|---|---|
| $750 | 1st through 7th day |
| $1,500 | 8th through 14th day |
| $4,000 | 15th day and beyond |

150.   Violation of Report Requirements.

a.  The following stipulated penalties shall accrue per violation per day for failure to submit timely or adequate reports or other written documents pursuant to Section XIV (Reporting Requirements) (except for obligations relating to the Trustees, including but not limited to those under Section XXI (Natural Resource Damages)):

| Penalty Per Violation Per Day | Period of Noncompliance |
|---|---|
| $500 | 1st through 14th day |
| $1,000 | 15th through 30th day |
| $2,500 | 31st day and beyond |

305

b.   The following liquidated damages shall accrue per violation per day for

failure to submit timely or adequate reports or other written documents pursuant to

Section XIV (Reporting Requirements) for obligations relating to the Trustees, including

but not limited to those under Section XXI (Natural Resource Damages):

| Penalty Per Violation Per Day | Period of Noncompliance |
|---|---|
| $500 | 1st through 14th day |
| $1,000 | 15th through 30th day |
| $2,000 | 31st day and beyond |

151.   Liquidated damages paid pursuant to Paragraphs 148, 149.b and 150.b

collectively shall not exceed an aggregate of $750,000.

152.   In the event that EPA assumes performance of a portion or all of the

following Removal or Remedial Actions pursuant to Paragraph 178 of Section XXVI

(Covenants Not to Sue by Plaintiffs), Settling Defendant shall be liable to the United

States for stipulated penalties as set forth below.  For the stipulated penalties set forth in

subparagraphs a, b, f and g of this Paragraph, the simultaneous takeover penalty for

each such subparagraph shall apply only if the United States elects to take over all of the

Removal Actions listed in that subparagraph prior to completion of the first of any one of

such Removal Actions.  In addition, the prior election by the United States to take over

any of the individual Removal Actions listed in that subparagraph shall preclude the

United States from assessing a stipulated penalty for simultaneous takeover for the

Removal Actions under such subparagraph.

a.   GE Plant Area Removal Actions

| | |
|---|---|
| The 30s Complex Removal Action | $100,000 |
| The 40s Complex Removal Action | $100,000 |

| | |
|---|---|
| The 20s Complex Removal Action | $100,000 |
| The East Street Area 2-South Removal Action | $250,000 |
| The East Street Area 2-North Removal Action | $200,000 |
| The East Street Area 1-North Removal Action | $100,000 |
| The Hill 78 Consolidation Area Removal Action | $100,000 |
| The Building 71 Consolidation Area Removal Action | $100,000 |
| The Hill 78 Area-Remainder Removal Action | $100,000 |
| The Unkamet Brook Area Removal Action | $250,000 |
| Simultaneous Takeover of all GE Plant Area Removal Actions | $1,000,000 |

b.   Former Oxbow Area Removal Actions

| | |
|---|---|
| The Former Oxbows A and C Removal Action | $100,000 |
| The Lyman Street Area Removal Action | $100,000 |
| The Newell Street Area II Removal Action | $100,000 |
| The Newell Street Area I Removal Action | $100,000 |
| The Former Oxbows J and K Removal Action | $100,000 |
| Simultaneous Takeover of all Former Oxbow Area Removal Actions | $350,000 |

c.   The Allendale School Removal Action                $300,000

d.   The Silver Lake Area Removal Action               $300,000

e.   The Upper ½ Mile Reach Removal Action

(i)  Takeover of the Upper ½ Mile Reach       $ 600,000
Removal Action on or before the date on which
Settling Defendant has completed construction
of 1/4 Mile

(ii)  Takeover of the Upper ½ Mile Reach       $300,000
Removal Action after the date on which
Settling Defendant has completed
construction of 1/4 Mile

f.   Floodplain Residential Area Removal Actions

The Removal Action for Actual/Potential Lawns       $300,000
within Housatonic River Floodplain-Current
Residential Properties Adjacent to 1 ½ Mile Reach

307

The Removal Action for Actual/Potential Lawns within Housatonic River Floodplain-Current Residential Properties Downstream of Confluence $300,000

Simultaneous Takeover of all Floodplain Residential Area Removal Actions $500,000

g. Groundwater Removal Actions

Plant Site 1 Groundwater Management Area Removal Action $200,000

Former Oxbows J and K Groundwater Management Area Removal Action $100,000

Plant Site 2 Groundwater Management Area Removal Action $125,000

Plant Site 3 Groundwater Management Area Removal Action $125,000

Former Oxbows A and C Groundwater Management Area Removal Action $100,000

Simultaneous Takeover of all Groundwater Removal Actions $ 550,000

h. Rest of River Remedial Action

(i) Takeover of the Rest of River Remedial Action on or before the date on which Settling Defendant has completed 25% of construction 5% of the estimated response costs as set forth in the final RCRA permit modification decision (after all appeals and remands) but not to exceed $4,000,000

(ii) Takeover of the Rest of River Remedial Action after Settling Defendant has completed 25% of construction and on or before the date on which Settling Defendant has completed 50% of construction 3.75% of the estimated response costs as set forth in the final RCRA permit modification decision (after all appeals and remands) but not to exceed $3,000,000

308

| | |
|---|---|
| (iii) Takeover of the Rest of River Remedial Action after Settling Defendant has completed 50% of construction and on or before the date on which Settling Defendant has completed 75% of construction | 2.5% of the estimated response costs as set forth in the final RCRA permit modification decision (after all appeals and remands) but not to exceed $2,000,000 |
| (iv) Takeover of the Rest of River Remedial Action after Settling Defendant has completed 75% of construction and on or before the date on which EPA has certified completion of the Work pursuant to Paragraph 89 (Completion of Work) | 1.25% of the estimated response costs as set forth in the final RCRA permit modification decision (after all appeals and remands) but not to exceed $1,000,000 |

153.   All penalties and liquidated damages shall begin to accrue on the day after

the complete performance is due or the day a violation occurs, and shall continue to

accrue through the final day of the correction of the noncompliance or completion of the

activity.  However, stipulated penalties and liquidated damages shall not accrue:  (1) with

respect to a deficient submission under Paragraphs 67 and 68 of Section XIV (Reporting

Requirements) or under  Section XV (EPA Approval of Plans and Other Submissions),

during the period, if any, beginning on the 31st day after EPA's (or the Trustees', as

applicable) receipt of such submission until the date that EPA (or the Trustees, as

applicable) notifies Settling Defendant of any deficiency; (2) with respect to a decision by

the Director of the Office of Site Remediation and Restoration, EPA Region I (or other

designated official in Region I) under Paragraph 136.b or 137.a of Section XXIV (Dispute

Resolution), during the period, if any, beginning on the 21st day after the date that

Settling Defendant's reply to EPA's Statement of Position is received until the date that

the Director (or other official) issues a final decision regarding such dispute; (3) with

respect to a decision by the Trustee Secretaries under Paragraph 142 of Section XXIV (Dispute Resolution), during the period, if any, beginning on the 21st day after the date that Settling Defendant's reply to the Trustees' Statement of Position is received until the date the Trustee Secretaries issue a final decision regarding such dispute; (4) with respect to judicial review by this Court of any dispute under Section XXIV (Dispute Resolution), during the period, if any, beginning on the 31st day after the Court's receipt of the final submission regarding the dispute until the date that the Court issues a final decision regarding such dispute; or (5) if EPA has not notified Settling Defendant of any deficiency, during the period, if any, beginning on the 181st day after the date the violation occurs until the date that EPA notifies Settling Defendant of such violation.  Nothing herein shall prevent the simultaneous accrual of separate penalties for separate violations of this Consent Decree.

154.   Following EPA's or the Trustees' (as applicable) determination that Settling Defendant has failed to comply with a requirement of this Consent Decree, EPA or the Trustees (as applicable) may give Settling Defendant written notification of the same and describe the noncompliance.  EPA and the State may send Settling Defendant a written demand for the payment of the penalties. The Trustees may send Settling Defendant a written demand for the payment of liquidated damages.  However, penalties and liquidated damages shall accrue as provided in the preceding Paragraph regardless of whether EPA or the Trustees have notified Settling Defendant of a violation.

155.   All penalties and damages accruing under this Section shall be due and payable to the United States and the State within 30 days of Settling Defendant's receipt

from EPA or the Trustees, or the State for the obligations specified below in Paragraph 158 of this Section, of a demand for payment of the penalties or damages, unless Settling Defendant invokes the Dispute Resolution procedures under Section XXIV (Dispute Resolution).

      a.     Except as provided in subparagraph 155.b, all payments to the United States under this Section shall be by wire transfer in accordance with the provisions of Paragraph 94.a or paid by certified or cashier's check(s) made payable to "EPA Hazardous Substances Superfund," which shall be mailed to EPA Region I, Attn: Superfund Accounting, P.O. Box 360197M, Pittsburgh, PA 15251, shall indicate that the payment is for stipulated penalties, and shall reference the EPA Region and Site/Spill ID # 01-67, the DOJ Case Number 90-11-3-1479, and the name and address of the party making payment.  Copies of check(s) (if used)  paid pursuant to this Section, and any accompanying transmittal letter(s), shall be sent to the United States as provided in Section XXXII (Notices and Submissions), and to Michael Manlogon, Financial Management Officer, EPA Region I, One Congress Street, Suite 1100, Boston, MA 02114-2023 .

      b. All payments to the Trustees for liquidated damages under this Section for noncompliance with the applicable provisions of Section XIII (Access and Land/Water Use Restrictions) and Section XXI (Natural Resource Damages) shall indicate that such payment is for liquidated damages, and shall otherwise be made in accordance with the procedures set forth in Paragraph 115.  DOI shall hold the funds recovered pursuant to this Paragraph in an interest-bearing account in its Natural Resource Damage

Assessment and Restoration Fund, and such monies together with all interest accrued thereon shall only be spent for restoration and to reimburse future Trustee assessment costs associated with the Site, which expenditures shall be made in conformity with the provisions and procedures set forth in a Memorandum of Agreement to be entered into among DOI, NOAA, EOEA, and Connecticut.

c. All payments to the State under this Section shall be paid by check made payable to the Commonwealth of Massachusetts and shall be mailed to Chief, Environmental Protection Division, Office of Attorney General, 200 Portland Street, Boston, Massachusetts 02114. The check shall indicate that payment is for stipulated penalties and shall reference the General Electric case or the GE-Pittsfield/Housatonic River Site. Copies of checks paid pursuant to this Section and any accompanying transmittal letter shall be sent to Robert Kalaghan, Director, Fiscal Management/Cost Recovery and Administration, DEP/BWSC, 1 Winter Street, Boston, Massachusetts 02108.

156. The payment of penalties and liquidated damages shall not alter in any way Settling Defendant's obligation to complete the performance of the Work required under this Consent Decree.

157. Penalties and liquidated damages shall continue to accrue as provided in Paragraph 153 during any dispute resolution period, but need not be paid until the following:

a. If the dispute is resolved by agreement or by a decision of EPA or the Trustees that is not appealed to this Court, accrued penalties and liquidated damages

312

determined to be owing shall be paid to EPA, the Trustees and the State within 15 days of the agreement or the receipt of EPA's or the Trustees' decision or order;

        b.   If the dispute is appealed to this Court and the United States prevails in whole or in part, Settling Defendant shall pay all accrued penalties and liquidated damages determined by the Court to be owed to EPA, the Trustees and the State within 60 days of receipt of the Court's decision or order, except as provided in subparagraph c below;

        c.   If the District Court's decision is appealed by any Party, Settling Defendant shall pay all accrued penalties and liquidated damages determined by the District Court to be owing to the United States, the Trustees or the State into an interest-bearing escrow account within 60 days of receipt of the Court's decision or order. Penalties and liquidated damages shall be paid into this account as they continue to accrue, at least every 60 days. Within 15 days of receipt of the final appellate court decision, the escrow agent shall pay the balance of the account to EPA, the Trustees and the State or to Settling Defendant to the extent that such party prevails and in accordance with the allocation provisions of this Section XXV.

158.   <u>State Assessment of Stipulated Penalties</u>. Assessment of stipulated penalties by the State shall be governed in the following manner. Following the State's determination that Settling Defendant has failed to pay Massachusetts Past Response Costs, Massachusetts Interim Costs, Massachusetts Oversight Costs, Massachusetts Future Response Costs, Massachusetts Trustee Future Response Costs or Massachusetts Trustee Oversight Costs owed to the State as required by Section XX

(Reimbursement of Costs), or has failed to timely submit deliverables to the State, or has failed to timely provide such written or oral notices to the State as are required by this Consent Decree, the State may, after reasonable opportunity for review and comment by EPA, give Settling Defendant written notification of the same and describe the noncompliance. The provisions for liability, assessment and payment of the stipulated penalties for the obligations referenced in this Paragraph shall be the same as provided in Paragraphs 146-151 and 153-157 of this Section, except that in Paragraphs 153, 154, 157.a and 157.b, each reference to EPA shall read as a reference to MADEP, each reference to the United States shall read as a reference to the State, each reference to the State shall be read as a reference to the United States, and each reference to the State's reasonable opportunity for review and comment shall read as EPA's reasonable opportunity for review and comment. For penalties assessed under this Paragraph, Settling Defendant shall pay 70% to the State and shall pay 30% to the United States in accordance with the requirements of Paragraph 155 of this Section.

159.   a.   If Settling Defendant fails to pay stipulated penalties and/or liquidated damages when due, the United States or the State may institute proceedings to collect the penalties and/or damages, as well as Interest. Settling Defendant shall pay Interest on the unpaid balance, which shall begin to accrue on the date of demand made pursuant to Paragraph 155.

b.   Except as otherwise expressly provided in Section XXVI (Covenants Not to Sue by Plaintiffs) of this Consent Decree, nothing in this Consent Decree shall be construed as prohibiting, altering, or in any way limiting the ability of the United States or

314

the State to seek any other remedies or sanctions available by virtue of Settling

Defendant's violation of this Decree or of the statutes and regulations upon which it is

based, including, but not limited to, civil penalties pursuant to Sections 122(l) and 109 of

CERCLA; provided, however, that the United States shall not seek civil penalties under

Sections 122(l) and 109 of CERCLA for any violation for which a stipulated penalty has

been specifically demanded in writing hereunder, except in the case of a willful violation

of the Consent Decree.  If the United States seeks civil penalties for willful violations of

this Consent Decree pursuant to Section 122(l) of CERCLA, Settling Defendant may

argue that the amount of any civil penalty should be reduced by the amount of any

stipulated penalty that has been paid for the same violation.  The United States may

oppose such reduction.  Nothing in this Consent Decree shall prohibit the Court from

reducing the civil penalty to be assessed in such action.

160.   Notwithstanding any other provision of this Section, the United States, the

State or Connecticut may, in its unreviewable discretion, waive any portion of stipulated

penalties that have accrued pursuant to this Consent Decree and are due and owing to

that party.

### XXVI. <u>COVENANTS NOT TO SUE BY PLAINTIFFS</u>

161.   <u>United States' Covenant</u>.

a.      In consideration of the actions that will be performed and the

payments that will be made by the Settling Defendant under the terms of the Consent

Decree, and except as specifically provided in Paragraphs 162, 163, 175 and 176 of this

Section, the United States, on behalf of EPA, NOAA, DOI, ACOE, DOD, ATSDR, and any

315

other agency which may have authority to administer the statutes cited in this Paragraph,

covenants not to sue or to take administrative action against Settling Defendant pursuant

to Sections 106 or 107(a) of CERCLA, Section 7003 of RCRA, Section 7 of the Toxic

Substances Control Act ("TSCA"), and/or Section 504 of the Clean Water Act for releases

or threatened releases of Waste Materials at the Site, where such Waste Materials

originated at the GE Plant Area, for performance of the Work, or for Designated Fill

Properties.

        b.      In consideration of the actions that will be performed and the

payments that will be made by Settling Defendant under the terms of this Consent

Decree, and except as specifically provided in Paragraphs 162, 163, 175, and 176 of this

Section, the United States, on behalf of EPA, NOAA, DOI, ACOE, DOD, ATSDR, and any

other agency which may have authority to administer the statutes cited in this Paragraph,

covenants not to sue or to take administrative action against Settling Defendant pursuant

to Sections 1002, 1005, 1006, 1009 and 1015 of the Oil Pollution Act, Section 113(f) of

CERCLA, Sections 3004(u) and (v) and 3008 of RCRA, Section 17 of TSCA, Sections

309, 311 and 404 of the Clean Water Act, and/or Section 10 of the Rivers and Harbors

Act for releases or threatened releases of Waste Material (regardless of the manner in

which such Waste Materials may be listed, defined, or characterized under these

statutes) at the Site, where such Waste Material originated at the GE Plant Area, for

performance of the Work, or for Designated Fill Properties.  The United States' covenant

set forth in this Paragraph 161.b with respect to such statutory provisions does not apply

to any action or claim other than an action or claim to compel Settling Defendant to

implement, comply with, or fund response actions, corrective actions or measures, or

other similar judicial or administrative response-type injunctive relief, or for recovery,

reimbursement, contribution or equitable share of response costs or Natural Resource

Damages, and specifically does not apply to any action or claim for civil penalties under

these statutory provisions, except as provided for in Paragraph 161.c.

    c.    · In consideration of the actions that will be performed and the

payments that will be made by Settling Defendant under the terms of this Consent

Decree, the United States, on behalf of EPA, covenants not to sue for, or to take

administrative action to assess, civil penalties for alleged violations of the Consent Order

issued by EPA on June 30, 1981, pursuant to Sections 3007, 3013, and 7003 of RCRA

(EPA Docket No. 81-164), or of the RCRA Permit that occurred at any time prior to

lodging of this Consent Decree.

    d.    (i)    <u>Timing of Covenants for Removal and Remedial Actions</u>.

Except with respect to the covenants for future liability and for Designated Fill Properties,

these covenants not to sue shall take effect upon the receipt by EPA, NOAA and DOI of

the payments required by Paragraph 94.a, 94.b and 94.c of Section XX (Reimbursement

of Costs). With respect to future liability (other than for Designated Fill Properties), the

covenant not to sue shall be effective for each Removal or Remedial Action to be

performed by Settling Defendant pursuant to this Consent Decree, and for the area and

media addressed by such Removal or Remedial Action, upon EPA's Certification of

Completion for that individual Removal or Remedial Action, except for the 1 ½ Mile

Reach Removal Action, for which the covenant not to sue for future liability shall be

317

effective upon EPA's completion of the 1 ½ Mile Reach Removal Action referred to in Paragraph 21 of this Consent Decree. The covenant not to sue for future liability for the Site shall be effective upon EPA's issuance of the Certification of Completion of the Work for the Site issued pursuant to Paragraph 89 of this Consent Decree. EPA's Certification of Completion of the Work for the Site shall state that it is the final Certification for purposes of this Paragraph.

(ii)     <u>Timing of Covenants for Designated Fill Properties</u>. Except with respect to the covenants for future liability, the covenants not to sue: (A) for Designated Fill Properties listed in Category 1 in Appendix T, shall take effect upon the receipt by EPA of the payments required by Paragraph 94.a of Section XX (Reimbursement of Costs); and (B) for Designated Fill Properties listed in Category 2 in Appendix T, shall take effect upon the receipt by EPA of the payments required by Paragraphs 94.a and 95.a of Section XX related to such Category 2 Designated Fill Properties. With respect to future liability for each of the Designated Fill Properties, the covenant not to sue shall be effective upon written approval by MADEP of a Response Action Outcome Statement (hereafter "RAO") for such property pursuant to the MCP.

e.     These covenants not to sue are conditioned upon the satisfactory performance by Settling Defendant of its obligations under this Consent Decree; provided, however, that a failure by Settling Defendant to satisfactorily perform its obligations with respect to a Removal or Remedial Action shall not affect the United States' covenant not to sue with respect to any other Removal or Remedial Action, unless such failure to satisfactorily perform its obligations with respect to one Removal or

318

Remedial Action results in a Work Takeover pursuant to Paragraph 178 of this Consent Decree, in which case the covenants not to sue do not apply to any Removal or Remedial Action subject to the Work Takeover.

162.   United States' Pre-Certification Reservations (Except Relating to Natural Resource Damages).  The United States reserves its rights pursuant to this Paragraph with respect to performance of each individual Removal or Remedial Action at the Site or with respect to performance of response actions at the Designated Fill Properties. Issuance by the United States of a Certification of Completion for any individual Removal or Remedial Action at the Site or by the State of an RAO for any individual Designated Fill Property shall have no effect on the covenants or reservations of rights by the United States for any other response action at the Site or at the Designated Fill Properties. Subject to Paragraph 177 (Issuance of Administrative Orders) of this Consent Decree, the United States reserves, and this Consent Decree is without prejudice to, the right to institute proceedings in this action or in a new action, or to issue an administrative order seeking to compel Settling Defendant,

a.        to perform further response actions relating to the Site or the Designated Fill Properties, or

b.        to reimburse the United States for additional costs of response, if, prior to Certification of Completion of each individual Removal or Remedial Action or issuance of an RAO for each Designated Fill Property:

(i)       conditions at the Site or the Designated Fill Property as applicable, previously unknown to EPA, are discovered, or

(ii)     information, previously unknown to EPA, is received, in whole

or in part,

and EPA determines that these previously unknown conditions or information together

with any other relevant information indicates that the individual Removal or Remedial

Action or response action previously performed at a Designated Fill Property (as

applicable) is not protective of human health or the environment; provided that such

further response actions are related to EPA's determination that the individual Removal

or Remedial Action, or response actions at a particular Designated Fill Property, as

applicable, are not protective of human health and the environment.

163.    United States' Post-Certification Reservations (Except Relating to Natural

Resource Damages).  The United States reserves its rights pursuant to this Paragraph

with respect to performance of each individual Removal or Remedial Action at the Site or

with respect to performance of response actions at the Designated Fill Properties.

Issuance by the United States of a Certification of Completion for any individual Removal

or Remedial Action at the Site, or by the State of an RAO for any individual Designated

Fill Property, shall have no effect on the covenants or reservations of rights by the United

States for any other response action at the Site or at the Designated Fill Properties.

Subject to Paragraph 177 (Issuance of Administrative Orders) of this Consent Decree,

the United States reserves, and this Consent Decree is without prejudice to, the right to

institute proceedings in this action or in a new action, or to issue an administrative order

seeking to compel Settling Defendant,

    a.    to perform further response actions relating to the Site or the Designated Fill Properties, or

    b.    to reimburse the United States for additional costs of response.

if, subsequent to Certification of Completion of each individual Removal or Remedial Action or issuance of an RAO for each Designated Fill Property,

    (i)    conditions at the Site or the Designated Fill Property, as applicable, previously unknown to EPA, are discovered, or

    (ii)    information, previously unknown to EPA, is received, in whole or in part,

and EPA determines that these previously unknown conditions or this information together with other relevant information indicate that the individual Removal or Remedial Action or response action previously performed at a Designated Fill Property (as applicable) is not protective of human health or the environment; provided that such further response actions are related to EPA's determination that the individual Removal or Remedial Action, or the response actions at a particular Designated Fill Property, as applicable, are not protective of human health and the environment.

164.   <u>United States Covenant as to the City</u>.

    a.  In consideration of the facts and circumstances, and the actions that will be performed in connection with this Consent Decree and the Definitive Economic Development Agreement, and except as specifically provided in Paragraphs 162, 163, and 175 of this Section and below in this Paragraph 164, the United States, on behalf of EPA, covenants not to sue or to take administrative action against the City in its capacity

321

as an owner, within the meaning of Section 107(a)(1) of CERCLA, of the portions of the property identified in Appendix U that are within the Site, pursuant to Sections 106 or 107(a) of CERCLA, for releases or threatened releases of Waste Materials at such portions of property within the Site; provided, however, that with respect to the property at 901 Holmes Road (Parcel No. J2-2-1), the United States' covenant shall extend only to releases or threatened releases of Waste Materials that originated at the GE Plant Area and that are remediated pursuant to this Consent Decree. Except with respect to the covenants for future liability, these covenants not to sue shall take effect upon entry of this Consent Decree. With respect to future liability, the covenants not to sue shall be effective for each property upon EPA's Certification of Completion for the individual Removal or Remedial Action related to such property. The covenant not to sue in this Paragraph with respect to each particular property is contingent upon the satisfactory performance by the City of its obligations under this Consent Decree as to such particular property.

(i) The City certifies that as to each property identified in Appendix U except for 901 Holmes Road (Parcel No. J2-2-1) and the Allendale School Property (Parcel No. K11-7-29): (1) the City, despite due diligence, was unaware of the existence of the contamination at the property at the time it obtained an interest in such property; (2) the City has not caused or contributed to the release of Waste Materials at such property; and (3) the City has not disposed of Waste Materials at such property.

(ii) With respect to 901 Holmes Road, the City certifies that: (1) the City, despite due diligence, was unaware of the existence of the contamination which

322

originated at the GE Plant Area at the property at the time it obtained an interest in the property; (2) the City has not knowingly, or as a result of its negligence in the ownership or operation of its wastewater treatment facility, caused or contributed to the release of, or disposed of, Waste Materials that originated at the GE Plant Area, except in connection with federally permitted releases, as defined in Section 101(10) of CERCLA, 42 U.S.C. § 9601(10).

(iii)   With respect to the Allendale School Property, the City certifies that: (1) the City, despite due diligence, was unaware of the existence of contamination at the property at the time it obtained an interest in the property, and (2) since placement of fill material in connection with construction of the school in 1950-1951 the City has not knowingly or negligently caused or contributed to the release of, or disposed of, Waste Materials at such property.

(iv)   The language of the certifications in this Paragraph shall not be construed to expand the scope of the covenant not to sue in this Paragraph.  These covenants not to sue are conditioned upon the veracity of the City's certifications.  Should the United States determine that such certifications were not true or accurate with respect to a particular property at the time of entry of this Consent Decree, these covenants not to sue shall be null and void as to that particular property.

b.  United States' Pre-Certification Reservations as to the City.

The United States reserves, and this Consent Decree is without prejudice to, the right to institute proceedings in this action or in a new action, or to issue an administrative order seeking to compel the City with respect to properties identified in Appendix U,

323

      (i)      to perform further response actions relating to the Site, or

      (ii)     to reimburse the United States for additional costs of response,

if, prior to Certification of Completion of each individual Removal or Remedial Action

      (A)     conditions at such property previously unknown to EPA, are

discovered, or

      (B)     information, previously unknown to EPA, is received, in whole

or in part,

and EPA determines that these previously unknown conditions or information together

with any other relevant information indicates that the individual Removal or Remedial

Action is not protective of human health or the environment; provided that such further

response actions are related to EPA's determination that the individual Removal or

Remedial Action is not protective of human health and the environment.

      c.    <u>United States' Post-Certification Reservations as to the City</u>

     The United States reserves, and this Consent Decree is without prejudice to, the

right to institute proceedings in this action or in a new action, or to issue an administrative

order seeking to compel the City with respect to properties identified in Appendix U,

      (i)      to perform further response actions relating to the Site,  or

      (ii)     to reimburse the United States for additional costs of response,

if, subsequent to Certification of Completion of each individual Removal or Remedial

Action,

      (A)     conditions at such property previously unknown to EPA, are

discovered, or

(B)     information, previously unknown to EPA, is received, in whole or in part,

and EPA determines that these previously unknown conditions or this information together with other relevant information indicate that the individual Removal or Remedial Action is not protective of human health or the environment; provided that such further response actions are related to EPA's determination that the individual Removal or Remedial Action is not protective of human health and the environment.

165.    United States' Known Conditions and Information

a.     For purposes of Paragraphs 162 and 164.b, except as specified below, the information and the conditions known to EPA shall include the following, to the extent received by EPA 30 days or more prior to the date of lodging of this Consent Decree: (i) the 1981 RCRA Administrative Consent Order; (ii) reports submitted to EPA pursuant to the 1981 RCRA Administrative Consent Order; (iii) the Administrative Record for the RCRA Permit (including the administrative records for the RCRA permit issued on February 11, 1991, and for the modified permit issued effective January 3, 1994, as described in Paragraph I of Section I); (iv) reports submitted to EPA pursuant to the RCRA Permit; (v) reports submitted to EPA after January 3, 1994 pursuant to the 1990 Administrative Consent Orders executed by Settling Defendant and MADEP; (vi) copies submitted to EPA of reports submitted to CTDEP as listed in Appendix W; (vii) the EPA Action Memorandum and the Unilateral Administrative Order (issued Dec. 18, 1996) for the Building 68 Removal Action, the Administrative Record for such Action Memorandum and reports submitted to EPA under such Unilateral Administrative Order; (viii) the EPA

325

Action Memorandum for the Upper Reach, its Administrative Record and reports submitted to EPA pursuant to that Action Memorandum; (ix) the EPA Action Memorandum for the Allendale School Removal Action and its Administrative Record; (x) other reports submitted to EPA in 1998 and 1999 relating to investigations and other response actions conducted by Settling Defendant at the Site in those years (as listed in Appendix V); (xi) the results of any sampling or other investigations conducted by EPA at the Site; (xii) the EPA Action Memorandum for the Removal Actions Outside the River and its Administrative Record; (xiii) with respect to the Designated Fill Properties, all documents submitted by Settling Defendant to EPA regarding the Designated Fill Properties; and (xiv) the narrative answers submitted by Settling Defendant in response to EPA's September 4, 1997 (supplemented on May 22, 1998) CERCLA Section 104(e) information requests ("EPA's Information Request"), and the September 9, 1997 MADEP information request, as well as the narrative answers submitted by Settling Defendant on August 19, 1996, November 27, 1996, March 19, 1997, June 2, 1997, and September 16, 1997, in response to information requests from MADEP dated July 19, 1996, and October 28, 1996.  As of nine months following entry of this Consent Decree, for purposes of Paragraphs 162 and 164.b, the information and the conditions known to EPA shall include the documents specifically referenced in, and submitted with, Settling Defendant's August 19, 1996, November 27, 1996, March 19, 1997, June 2, 1997, and September 16, 1997 responses to MADEP's July 19, 1996, and October 28, 1996 information requests, and the Bates-numbered documents which were referenced by Bates number in, and submitted with, Settling Defendant's narrative responses to EPA's

326

Information Request and MADEP's September 9, 1997 information request.  As of eighteen months following entry of the Consent Decree, for purposes of Paragraphs 162 and 164.b, the information and the conditions known to EPA shall include all other documents submitted by Settling Defendant in response to EPA's Information Request and MADEP's 1996 and 1997 information requests.

   b. For purposes of Paragraphs 163 and 164.c, the information and the conditions known to EPA shall include only the information and conditions identified in the subparagraph immediately above, and that information and those conditions known to EPA as of the date of Certification of Completion of each individual Removal or Remedial Action and set forth in the applicable Action Memorandum or final modification of the Reissued RCRA Permit, the administrative record supporting the particular Removal or Remedial Action, the administrative record developed in design or implementation of the particular Removal or Remedial Action, or in any information received by EPA pursuant to the requirements of this Consent Decree or the Reissued RCRA Permit prior to Certification of Completion of the particular Removal or Remedial Action.

   166. <u>Massachusetts Covenants</u>

   a. (i) In consideration of the actions that will be performed and the payments that will be made by Settling Defendant under the terms of this Consent Decree, and except as provided in Paragraphs 166.k, 167, 168, 175, and 176, the State covenants not to sue or to take administrative action against Settling Defendant, pursuant to the statutes and common law theories listed in Paragraph 166.a(ii), whether on its own behalf or as *parens patriae,* for releases or threatened releases of Waste Material at the

<div align="center">327</div>

Site (where such Waste Material originated at the GE Plant Area) or for performance of the Work; provided, however, that such covenant is limited to claims or actions: (A) to compel Settling Defendant to implement, comply with, or fund response actions, corrective actions or measures, or similar judicial or administrative response-type injunctive relief; (B) for recovery, reimbursement, contribution, or equitable share of response costs or Natural Resource Damages; and (C) for recovery, reimbursement, contribution, or equitable share of property damage.

        (ii)    The statutes and common law theories subject to the covenant in Paragraph 166.a(i), and to the limitations set forth therein, are the following: Sections 107, 113, 121(e)(2), 121(f), and 310 of CERCLA; Sections 1002, 1005, 1006, 1008, and 1009 of the Oil Pollution Act; Section 7002 of RCRA; Section 20 of TSCA; Section 505 of the Clean Water Act; Sections 3A, 4, 4A, 5, 9, and 10 of M.G.L. c.21E and Section 11 of M.G.L. c.21E for violation or enforcement of such Sections 3A, 4, 4A, 5, 9, and 10; Section 4 of M.G.L. c. 21H; Sections 5, 7, and 11D of M.G.L. c.12; Sections 42, 44, 46, and 53 of M.G.L. c.21; Sections 9 and 10 of M.G.L. c.21C; Sections 142A, 142B, 160, 160B, and 162 of M.G.L. c.111; Section 169 of M.G.L. c.111 for violation of Section 167; Sections 40, 40A, 42, and 90 of M.G.L. c.131; Section 7A of M.G.L. c.214; Section 39G of M.G.L. c.40; Sections 59 and 59A of M.G.L. c.91; Sections 4, 9, and 11 of M.G.L. c.93A for violation of Section 2; and Section 6 of M.G.L. c.131A (including the implementing regulations of the statutes listed in this subparagraph a(ii)); and nuisance, trespass, negligence, strict liability, or restitution.

328

(iii)    While not agreeing that CERCLA does not authorize challenges to decisions by EPA to waive ARARs for removal actions, the State agrees not to challenge a decision by EPA to waive a standard or requirement for the Removal Actions Outside the River, the Upper ½ Mile Reach Removal Action, or the 1½ Mile Reach Removal Action, based on the status of such standard or requirement as an ARAR. The State further agrees not to challenge any failure by EPA to enforce such a standard or requirement based on the status of such a standard or requirement as an ARAR. The State reserves any other rights it may have with respect to enforcement or waiver of such standard or requirement.

(iv)    Nothing in this Paragraph 166 or Paragraph 22 shall be interpreted as modifying or otherwise affecting any of the following:

(A)    Settling Defendant's obligations to comply with all ARARs for the Rest of River Remedial Action that have not been waived by EPA pursuant to Section 121 of CERCLA and Special Condition II.J. of the Reissued RCRA Permit;

(B)    the State's rights pursuant to Section 121 of CERCLA and to this Consent Decree to receive notice of, and reasonable opportunity to comment on, EPA's remedy selection plans and decision for the Rest of River;

(C)    the State's rights pursuant to Paragraph 22.bb of this Consent Decree to seek review of any determination by EPA, in its initial or a revised decision to modify the Reissued RCRA Permit, to waive an ARAR for the Rest of the River Remedial Action or O&M; and

329

(D)     any rights the State may have pursuant to Section 121 of CERCLA to bring an action challenging EPA's determination to waive an ARAR for the Rest of the River Remedial Action or O&M during implementation of such Remedial Action or O&M (other than bringing an action challenging EPA's selection of such Remedial Action or O&M pursuant to Paragraph 22.bb) and/or to bring an action challenging EPA's failure to enforce such an ARAR during implementation of the Rest of the River Remedial Action or O&M; provided that, in either case:

(1)     the State brings such action in this Court;

(2)     the State brings such action within two years of obtaining actual knowledge of EPA's determination to waive such ARAR or its failure to enforce such ARAR;

(3)     Settling Defendant or the State may request this Court to grant a stay, pending the Court's decision, of the work (or portion of the work) for which resolution of the State's challenge is necessary to be decided prior to proceeding or proceeding further with such work (or portion thereof); and if Settling Defendant or the State does so, there will be a rebuttable presumption in favor of granting such stay and the Court will consider all relevant equitable factors in deciding whether to grant such stay;

(4)     in the event that the Court holds that EPA has improperly waived such ARAR or has improperly failed to enforce such ARAR, neither Settling Defendant nor EPA shall be required to undo or re-do any implementation work that has previously been completed by Settling Defendant or EPA, so as to comply with such

330

ARAR. However, Settling Defendant shall be required to comply with such ARAR. in accordance with the Court's decision, in implementing all future work;

(5)     Settling Defendant shall not be deemed to be in noncompliance with this Consent Decree for failure to comply with such ARAR unless and until the Court determines that EPA improperly waived or declined to enforce such ARAR and Settling Defendant fails to comply with such ARAR in accordance with the applicable schedule as determined by the Court or as approved by EPA (after reasonable opportunity for review and comment by the State) following the Court's decision; and

(6)     the United States reserves its rights to respond to any such State challenge, including the United States' right to argue that Section 121 of CERCLA does not provide for such a challenge, and Settling Defendant reserves any rights it may have to respond to any such State challenge.

b.     (i)     In consideration of the actions that will be performed and the payments that will be made by Settling Defendant under the terms of this Consent Decree, and except as provided in Paragraphs 166.c and 175, the State covenants not to sue or to take administrative action against Settling Defendant for civil or administrative penalties or civil fines with respect to the release or threatened release of Waste Materials at the Site (regardless of the manner in which such Waste Materials may be listed, defined, or characterized under the statutes and regulations listed in subparagraph 166.b(i)(D) and regardless of whether such release or threatened release is characterized as storage, release, threatened release, presence, disposal, discharge, handling or otherwise pursuant to the statutes and regulations listed in subparagraph

331

166.b(i)(D)) for alleged violations of or noncompliance with the following requirements that occurred prior to the lodging of this Consent Decree and that are based on "known conditions and information" (as set forth in Paragraph 166.b(iv)):

(A)   the Consent Order issued by EPA on June 30, 1981, pursuant to Sections 3007, 3013, and 7003 of RCRA;

(B)   the RCRA Permit;

(C)   the Administrative Consent Orders executed in 1981 and 1990 by MADEP and Settling Defendant, to the extent such Orders applied to any properties within the Site; and

(D)   M.G.L. c.21E; the Massachusetts Contingency Plan; M.G.L. c.21H; Sections 26-53 of M.G.L. c.21; M.G.L. c.21C; Sections 150A and 150B of M.G.L. c.111; Sections 40, 40A, 42, and 90 of M.G.L. c.131; M.G.L. c. 91; M.G.L. c.93A; and M.G.L. c. 131A (including the implementing regulations of the statutes listed above and including, but not limited to, alleged violations or noncompliance with respect to any report, response, or submission by Settling Defendant, or failure to make a report, response, or submission).

(ii)   The State and Settling Defendant concur that the remediation of the existing Waste Material contamination at the Site is to be governed by this Consent Decree, subject to the terms and conditions set forth herein.  Accordingly, in consideration of the actions that will be performed and the payments that will be made by Settling Defendant under the terms of this Consent Decree, except as provided in Paragraphs 166.c and 175, the State covenants not to sue or to take administrative

332

action against Settling Defendant for civil or administrative penalties or civil fines with respect to the performance of the Work, or with respect to the release or threatened release of Waste Materials at the Site (regardless of the manner in which such Waste Materials may be listed, defined, or characterized under the statutes and regulations listed in subparagraph 166.b(iii) and regardless of whether such release or threatened release is characterized as storage, release, threatened release, presence, disposal, discharge, handling or otherwise pursuant to the statutes and regulations listed in subparagraph 166.b(iii)) for alleged violations of or noncompliance with the following requirements occurring after the lodging of this Consent Decree:

(A)    those duties otherwise imposed by state law that have been preempted by operation of CERCLA;

(B)    any obligations under state law where the conduct or inaction that underlies such violation or noncompliance also constitutes a violation of Settling Defendant's obligations under this Consent Decree (other than conduct or inaction that constitutes a violation solely of the first sentence of Paragraph 8 of this Consent Decree and not of any other provision of this Consent Decree); or

(C)    any obligations that Settling Defendant otherwise may have independent of this Consent Decree, pursuant to the statutes and regulations listed in Paragraph 166.b(iii), with respect to the continued presence or passive release of Waste Materials at the Site that this Consent Decree is designed to address (regardless of the manner in which such Waste Materials may be listed, defined, or characterized under such statutes and regulations and regardless of whether such continued presence or

333

passive release is characterized as storage, release, threatened release, disposal, discharge, handling, or otherwise pursuant to such statutes), regarding the following

       (1)    a duty to maintain records regarding, to abate, or to respond to such continued presence or passive release;

       (2)  a duty to secure a permit or other approval for such continued presence or passive release; or

       (3)    damage or injury caused by such continued presence or passive release.

       (iii)    The statutes and regulations referred to in Paragraph 166.b(ii) are: M.G.L. c.21E; the Massachusetts Contingency Plan; M.G.L. c.21H; Sections 26-53 of M.G.L. c.21; M.G.L. c.21C; Section 39G of M.G.L. c.40 and Sections 160, 162, and 170 of M.G.L. c.111; Sections 150A and 150B of M.G.L. c. 111; Sections 40, 40A, 42, and 90 of M.G.L. c.131; M.G.L. c. 91; M.G.L. c.93A; and M.G.L. c.131A (including the implementing regulations of the statutes listed above).

       (iv)    For purposes of Paragraph 166.b(i), "known conditions or information" shall mean:

       (A)    Information and conditions described in the following, to the extent received by the State 30 or more days prior to lodging of this Consent Decree:

       (1)    The reports submitted to MADEP in accordance with, and the documents issued by MADEP pursuant to, the 1981 Administrative Consent Order executed by MADEP and Settling Defendant;

(2)     The reports submitted to MADEP in accordance with, and the documents issued by MADEP pursuant to, the 1990 Administrative Consent Orders (dated May 22 and July 2, 1990) executed by MADEP and Settling Defendant;

(3)     The reports submitted to MADEP pursuant to the RCRA Permit;

(4)     The reports and other documents submitted by Settling Defendant to MADEP pursuant to the Unilateral Administrative Order (issued by EPA to Settling Defendant on December 18, 1996) for the Building 68 Removal Action;

(5)     Reports and other documents submitted to MADEP by Settling Defendant which were also submitted to EPA pursuant to the EPA Action Memorandum for the Upper Reach;

(6)     The reports listed in Appendix V (which consist of other reports submitted to MADEP in 1998 and 1999 relating to investigations and other response actions conducted by Settling Defendant at the Site in those years);

(7)     The results of any sampling or other investigations conducted by MADEP at or regarding the Site;

(8)     Copies of reports submitted by EPA to MADEP of sampling or other investigations conducted by EPA at the Site; and

335

(9)     Settling Defendant's responses (including Bates numbered and other documents submitted in such responses) to MADEP's 1996 and 1997 Requests for Information; and

(B)     Information made known to MADEP concerning the Site, after entry of the Consent Decree, relating to the presence, concentrations, and quantities of Waste Materials or practices and policies for the treatment or disposal of Waste Materials (regardless of the manner in which such Waste Materials may be listed, defined, or characterized under the statutes and regulations listed in subparagraph 166.b(i)(D) that is generally consistent with such information already known to MADEP at least 30 days prior to lodging of this Consent Decree, as provided in subparagraphs iv(A)(1)-(9) above.

c.     The covenant in Paragraph 166.b shall not apply to, and the State specifically reserves, any judicial or administrative claim seeking civil or administrative penalties for the following: (i) failure to notify MADEP of releases or threats of releases of oil or hazardous material; (ii) failure to timely, adequately, and completely respond to, or comply with, requests for information issued by MADEP, including, but not limited to failure to produce complete and timely information and records to MADEP with regard to the transportation, transfer, or disposal of fill, debris, or other material from the GE Plant Area, and making, or causing any person to make, false, inaccurate, incomplete, or misleading statements with regard to the transportation, transfer, or disposal of fill, debris, or other material from the GE Plant Area; (iii) to the extent not covered by clauses (i) and (ii), failure, prior to the lodging of this Consent Decree, to produce complete and timely information and records to MADEP with regard to the transportation, transfer, or disposal

336

of fill, debris, or other material from the GE Plant Area to or at Newell Street Area I or II as defined in the SOW; and (iv) to the extent not covered by clauses (i) and (ii), making, or causing any person to make, false, inaccurate, incomplete, or misleading statements, prior to the lodging of this Consent Decree, with regard to the transportation, transfer, or disposal of fill, debris, or other material from the GE Plant Area to or at Newell Street Area I or II as defined in the SOW; and (v) the matters reserved in Paragraph 175 (General Reservations), including all claims, liability, and actions expressly referenced therein.

d.　　Except as otherwise expressly provided by the terms of Paragraph 166.b, the covenant set forth in Paragraph 166.b does not apply to any judicial or administrative action through which the State is seeking a civil penalty for violations of those statutes set forth in Paragraph 166.b; provided, however, that nothing in this subparagraph shall be interpreted as qualifying the terms of Paragraph 166.c.

e.　　The State's covenants at Paragraphs 166.b and 166.j shall be effective upon entry of this Consent Decree. Except with respect to the covenants for future liability at Paragraphs 166.a and 166.g, the covenants not to sue at Paragraphs 166.a and 166.g shall take effect upon the receipt by the State of the payment required by Paragraph 94.d(i) of Section XX (Reimbursement of Costs). With respect to future liability, the covenants not to sue at Paragraphs 166.a and 166.g shall be effective for each Removal or Remedial Action to be performed by Settling Defendant pursuant to this Consent Decree, and for the area and media addressed by such Removal or Remedial Action, upon EPA's Certification of Completion for that individual Removal or Remedial

337

Action, except for the 1 ½ Mile Reach, for which the covenant not to sue for future liability shall be effective upon EPA's completion of the 1 ½ Mile Reach Removal Action referred to in Paragraph 21 of this Consent Decree. The covenant not to sue for future liability for the Site under Paragraphs 166.a and 166.g shall be effective upon EPA's issuance of the final Certification of Completion of Work for the Site issued pursuant to Paragraph 89 of this Consent Decree. EPA's Certification of Completion of Work for the Site shall state that it is the final Certification for purposes of this Paragraph 161.e.

f.     These covenants not to sue are conditioned upon the satisfactory performance by Settling Defendant of its obligations under this Consent Decree; provided, however, that a failure by Settling Defendant to satisfactorily perform its obligations with respect to a Removal or Remedial Action shall not affect the State's covenant not to sue with respect to any other Removal or Remedial Action, unless such failure to satisfactorily perform its obligations with respect to one Removal or Remedial Action results in a Work Takeover pursuant to Paragraph 178 of this Consent Decree, in which case the covenants not to sue do not apply to any Removal or Remedial Action subject to the Work Takeover.

g.     Without addressing whether the United States could lawfully do so, the Parties acknowledge that the United States has not to date delegated to the State the authority to take administrative or judicial action pursuant to Section 106 of CERCLA. The Parties further acknowledge that they intend that, in the event the United States were to delegate such authority to the State, the State shall not exercise such authority to

338

the extent that the United States has covenanted not to exercise such authority in Paragraph 161 of this Consent Decree.

h.     Nothing in this Consent Decree affects Settling Defendant's obligations pursuant to M.G.L. c.253, §§ 44-50A, and to the regulations promulgated thereunder, and the State reserves the right to take any administrative or judicial action to enforce any such obligations, including, but not limited to, issuing administrative orders or pursuing judicial enforcement or cost recovery; provided, however, that the Parties acknowledge that such authority shall be used exclusively with regard to the dam safety purposes underlying such obligations, and not to seek additional response actions or costs to address the contamination concerns addressed by this Consent Decree.

i.     The covenants included in this Paragraph 166 do not constitute a Brownfields Covenant Not to Sue Agreement entered into pursuant to M.G.L. c.21E, § 3A(j)(3) and 940 C.M.R. 23.00.

j.     Notwithstanding any other provision of this Consent Decree, the State covenants not to seek civil penalties pursuant to Section 310 of CERCLA for any violation of this Consent Decree by Settling Defendant.

k.     The covenants in this Paragraph 166 shall not apply to, and the State specifically reserves, any rights or claims that the Massachusetts Highway Department may have against Settling Defendant under any contracts, existing as of the date of lodging of this Consent Decree, between the Massachusetts Highway Department and Settling Defendant relating to the Massachusetts Highway Department's project to reconstruct Merrill Road and East Street in Pittsfield, Massachusetts, including but not

limited to such contracts regarding the properties and easements taken by eminent

domain from Settling Defendant by the Massachusetts Highway Department in 1997 for

the purpose of such reconstruction.

167.    State's Pre-Certification Reservations (Except Relating to Natural Resource

Damages): The State reserves its rights pursuant to this Paragraph with respect to

performance of each individual Removal or Remedial Action at the Site.  Issuance of a

Certification of Completion for any individual Removal or Remedial Action at the Site shall

have no effect on the covenants or reservations of rights by the State for any other

response action at the Site.  Subject to Paragraph 177 (Issuance of Administrative

Orders) of this Consent Decree, the State on behalf of MADEP reserves, and this

Consent Decree is without prejudice to, any right jointly with, or separately from, the

United States to institute proceedings in this action or in a new action under Section 107

of CERCLA, 42 U.S.C. § 9607, or under any applicable State law, including but not

limited to M.G.L. c. 21E, seeking to compel Settling Defendant (1) to perform other

response actions at the Site, or (2) to reimburse the State for additional response costs

for response actions at the Site, to the extent that EPA has determined that such

response actions required under (1) and (2) above in this Paragraph will not significantly

delay or be inconsistent with the response actions selected or contemplated by EPA, if,

prior to EPA's Certification of Completion of each individual Removal or Remedial Action:

(i)  conditions at the Site, previously unknown to the State, are discovered or

become known to the State, or

340

(ii) information previously unknown to the State is received by the State, in whole or in part,

and the MADEP Commissioner or his or her delegate determines, pursuant to M.G.L. c. 21E, that these previously unknown conditions or this information together with any other relevant information indicate that the individual Removal or Remedial Action taken is not protective of health, safety, public welfare or the environment; provided that such further response actions are related to MADEP's determination that the individual Removal or Remedial Action is not protective of human health and the environment.  The United States reserves all rights it may have under applicable law to oppose any determinations made or any actions taken, ordered or proposed by the State pursuant to this Paragraph.

168.    State's Post-Certification Reservations (Except Relating to Natural Resources Damages).  The State reserves its rights pursuant to this Paragraph with respect to performance of each individual Removal or Remedial Action at the Site. Issuance of a Certification of Completion for any individual Removal or Remedial Action at the Site shall have no effect on the covenants or reservations of rights by the State for any other response action at the Site. Subject to Paragraph 177 of this Consent Decree, the State, on behalf of MADEP, reserves, and this Consent Decree is without prejudice to, the right jointly with, or separately from, the United States to institute proceedings in this action or in a new action under Section 107 of CERCLA, 42 U.S.C. § 9607, or under any applicable State law, including but not limited to M.G.L. c. 21E, seeking to compel Settling Defendant (1) to perform other response actions at the Site, or (2) to reimburse the State for additional response costs for response actions at the Site, to the extent that

EPA has determined that such response actions required under (1) and (2) above in this Paragraph will not significantly delay or be inconsistent with the response actions selected or contemplated by EPA, if, subsequent to EPA's Certification of Completion of each individual Removal or Remedial Action:

(i) conditions at the Site, previously unknown to the State, are discovered or become known to the State after the Certification of Completion, or

(ii) information previously unknown to the State is received by the State, in whole or in part, after the Certification of Completion,

and the MADEP Commissioner or his or her delegate determines, pursuant to M.G.L. c. 21E, that these previously unknown conditions or this information together with any other relevant information indicate that the individual Removal or Remedial Action taken is not protective of health, safety, public welfare or the environment; provided that such further response actions are related to MADEP's determination that the individual Removal or Remedial Action is not protective of human health and the environment.  The United States reserves all rights it may have under applicable law to oppose any determinations made or any actions taken, ordered or proposed by the State pursuant to this Paragraph.

169.   State's Known Information and Conditions.

a.      For purposes of Paragraphs 167 and 174.b, except as specified below, the information and the conditions known to the State shall include only the information and conditions described in the following, to the extent received by the State 30 days or more prior to lodging:

342

(i)     The reports submitted to MADEP in accordance with, and the documents issued by MADEP pursuant to, the 1981 Administrative Consent Order executed by MADEP and Settling Defendant;

(ii)    The reports submitted to MADEP in accordance with, and the documents issued by MADEP pursuant to, the 1990 Administrative Consent Orders (dated May 22 and June 29, 1990) executed by MADEP and Settling Defendant;

(iii)   The reports submitted to MADEP pursuant to the RCRA Permit;

(iv)   Reports and other documents submitted by Settling Defendant to MADEP pursuant to the EPA Unilateral Administrative Order (issued to Settling Defendant on Dec. 18, 1996) for the Building 68 Removal Action;

(v)    Reports and other documents submitted by Settling Defendant to MADEP pursuant to the EPA Action Memorandum for the Upper Reach;

(vi)   The EPA Action Memorandum for the Allendale School Removal Action and its Administrative Record;

(vii)   The reports listed in Appendix V, which consist of other reports submitted to MADEP in 1998 and 1999 relating to investigations and other response actions conducted by Settling Defendant at the Site in those years;

(viii)  The results of any sampling or other investigations conducted by MADEP at the Site;

(ix)   Copies of reports submitted by EPA to MADEP of sampling or other investigations conducted by EPA at the Site; and

343

(x)     Settling Defendant's written narrative answers (excluding documents referenced therein) submitted by Settling Defendant in response to MADEP's July 19, 1996, October 28, 1996, and September 9, 1997 Requests for Information.

As of nine months following entry of this Consent Decree, for purposes of Paragraphs 167 and 174.b, the information and the conditions known to the State shall include the documents referenced in and submitted with Settling Defendant's responses to MADEP's 1996 Requests for Information and the Bates-numbered documents which Settling Defendant submitted with and specifically cross-referenced in its narrative answers submitted in response to MADEP's September 9, 1997 Request for Information. As of eighteen months following entry of this Consent Decree, for purposes of Paragraphs 167 and 174.b, the information and the conditions known to the State shall include the remaining Bates-numbered documents submitted by Settling Defendant in response to MADEP's September 9, 1997 Request for Information.

b.     For purposes of Paragraphs 168 and 174.c, the information and the conditions known to the State shall include only the information and the conditions identified in subparagraph 169.a, and that information and those conditions known to MADEP as of the date of the Certification of Completion of each individual Removal or Remedial Action, EPA's administrative record supporting the particular Removal or Remedial Action, the administrative record developed in design or implementation of the particular Removal or Remedial Action, or any information received by MADEP pursuant to the requirements of this Consent Decree or the Reissued RCRA Permit prior to the Certification of Completion of the particular Removal or Remedial Action.

344

170.   Connecticut Covenants

a.  In consideration of the actions that will be performed and the payments that will be made by the Settling Defendant under the terms of this Consent Decree, and except as specifically provided in Paragraphs 171, 172, 175 and 176 of this Section, Connecticut covenants not to sue or take administrative action against Settling Defendant pursuant to Sections 107, 121(e)(2), or 113 of CERCLA, Sections 310 and 106 of CERCLA, Sections 7002 and 7003 of RCRA, Sections 20 and 7 of TSCA, Sections 1002, 1005, 1006, 1008 and 1009 of the Oil Pollution Act or Sections 505 and 504 of the Clean Water Act for releases or threatened releases of substances subject to these statutes at the Site, where such substances originated at the GE Plant Area, or for performance of the Work; and not to sue or take administrative action against Settling Defendant pursuant to the Connecticut statutory provisions set forth herein with respect to releases, spills or discharges of or pollution from, or threatened releases, spills or discharges of or pollution from, the chemical liquids, hazardous wastes, oil or petroleum, waste oil or solid, liquid or gaseous products subject to such statutes at the Site, where such substances originated at the GE Plant Area, or for performance of the Work.  The Connecticut statutory provisions subject to Connecticut's covenant are Sections 5, 6, 6a, 7, 427, 432, 435, 451 and 452 of Title 22a of the Connecticut General Statutes, and, to the extent Connecticut participates in the New England Interstate Water Pollution Control Commission, these covenants include Section 309, Article XII of the Connecticut General Statutes.  For purposes of this subparagraph a, the phrase "substances subject to these statutes" includes wastes, hazardous constituents, refuse, materials, chemical

345

substances or mixtures, PCBs, pollutants, oil, hazardous substances, and pollution sources.

   b.  In consideration of the actions that will be performed and the payments that will be made by the Settling Defendant under the terms of this Consent Decree, and except as specifically provided in Paragraphs 171, 172, 175 and 176 of this Section and subject to the limitations set forth herein, Connecticut covenants not to sue Settling Defendant pursuant to Sections 7002 and 3004(u) or (v) of RCRA, Sections 7002 and 3008 of RCRA, Sections 20 and 17 of TSCA, Sections 505 and 309 of the Clean Water Act, or Sections 505 and 311 of the Clean Water Act; and further covenants not to sue Settling Defendant for nuisance, negligence, negligence per se, strict liability for ultrahazardous activity, restitution, reckless misconduct, trespass, or under the public trust doctrine theory, with respect to pollution, chemical liquids, hazardous wastes, oil or petroleum, waste oil or solid, liquid or gaseous products at the Site where such pollution, chemical liquids, hazardous wastes, oil or petroleum, waste oil or solid, liquid or gaseous products originated at the GE Plant Area, or for performance of the Work; and further covenants not to sue or take administrative action against Settling Defendant, pursuant to the statutory provisions set forth herein, with respect to the pollution, chemical liquids, hazardous wastes, oil or petroleum, waste oil or solid, liquid or gaseous products subject to the statutes set forth herein at the Site, where such pollution, chemical liquids, hazardous wastes, oil or petroleum, waste oil or solid, liquid or gaseous products originated at the GE Plant Area, or for performance of the Work.  The Connecticut statutory provisions subject to Connecticut's covenant are Sections 6b, 6e, 14 et seq.

(Environmental Protection Act), 123, 131, 133c-g, 225, 226, 226a, 226b, 416, 430, 438, 449(c) and 463-469 of Title 22a of the Connecticut General Statutes. Connecticut's covenant set forth in this subparagraph 170.b, with respect to the aforementioned common law and statutory provisions, does not apply to any action other than: (i) an action to compel Settling Defendant to implement response actions, corrective actions or measures, or for other similar judicial or administrative injunctive relief; or (ii) an action for recovery of response costs, damages, civil penalties or Natural Resource Damages

       c.    For purposes of subparagraphs a and b of this Paragraph 170, the phrase "pollution, chemical liquids, hazardous wastes, oil or petroleum, waste oil or solid, liquid or gaseous products" shall be as defined in Chapters 445 or 446k of the Connecticut General Statutes.

       d.    Except with respect to future liability, these covenants not to sue shall take effect upon the receipt by Connecticut of the payment required by Paragraph 94.e of Section XX (Reimbursement of Costs). With respect to future liability, the covenant not to sue shall be effective for each Removal or Remedial Action upon EPA's Certification of Completion for that individual Removal or Remedial Action to be performed by the Settling Defendant, except for the 1½ Mile Reach, for which the covenant not to sue for future liability shall be effective upon EPA's completion of the 1½ Mile Reach Removal Action referred to in Paragraph 21 of this Consent Decree. The covenant not to sue for future liability for the Site shall be effective upon EPA's issuance of the final Certification of Completion of the Work for the Site pursuant to Paragraph 89 of this Consent Decree.

e.    These covenants not to sue are conditioned upon the satisfactory performance by Settling Defendant of its obligations under this Consent Decree; provided, however, that a failure by Settling Defendant to satisfactorily perform its obligations with respect to a Removal or Remedial Action shall not affect Connecticut's covenant not to sue with respect to any other Removal or Remedial Action, unless such failure to satisfactorily perform its obligations with respect to one Removal or Remedial Action results in a Work Takeover pursuant to Paragraph 178 of this Consent Decree, in which case the covenants not to sue do not apply to any Removal or Remedial Action subject to the Work Takeover.

f.    In addition, Paragraphs 166.a(iii) and 166.a(iv) are incorporated into this Paragraph 170.f by reference except that each reference to "the State" shall be read as a reference to "Connecticut," each reference to "Paragraph 166" shall be read as a reference to "Paragraph 170," and each reference to "Paragraph 22.bb" shall be read as a reference to "Paragraph 22.cc."

171.   Connecticut's Pre-Certification Reservations (Except Relating to Natural Resource Damages).  Connecticut reserves its rights pursuant to this Paragraph with respect to performance of each individual Removal or Remedial Action at the Site. Issuance of a Certification of Completion for any individual  Removal or Remedial Action at the Site shall have no effect on the covenants or reservations of rights by Connecticut for any other response action at the Site.  Subject to Paragraph 177 of this Consent Decree, the State of Connecticut on behalf of CTDEP reserves, and this Consent Decree is without prejudice to, any right jointly with, or separately from, the United States to

348

institute proceedings in this action or in a new action under Section 107 of CERCLA. 42 U.S.C. § 9607, or under any applicable Connecticut law, including but not limited to Conn. Gen. Stat. §§ 22a-432 and 22a-451, seeking to compel Settling Defendant (1) to perform other response actions at the Site, or (2) to reimburse Connecticut for additional response costs for response actions at the Site, to the extent that EPA has determined that such response actions required under (1) and (2) above in this Paragraph will not significantly delay or be inconsistent with the response actions selected or contemplated by EPA, if, prior to EPA's Certification of Completion of each individual Removal or Remedial Action:

(i)  conditions at the Site, previously unknown to Connecticut, are discovered or become known to Connecticut, or

(ii)  information previously unknown to Connecticut is received by Connecticut, in whole or in part,

and the CTDEP Commissioner or his or her delegate determines, pursuant to Conn. Gen. Stat. §§ 22a-432 and 22a-451, that these previously unknown conditions or this information together with any other relevant information indicate that the individual Removal or Remedial Action taken is not protective of health, safety, public welfare or the environment; provided that such further response actions are related to CTDEP's determination that the individual Removal or Remedial Action is not protective of human health and the environment. The United States reserves all rights it may have under applicable law to oppose any determinations made or any actions taken, ordered or proposed by Connecticut pursuant to this Paragraph.

349

172. Connecticut's Post-Certification Reservations (Except Relating to Natural Resource Damages). Connecticut reserves its rights pursuant to this Paragraph with respect to performance of each individual Removal or Remedial Action at the Site. Issuance of a Certification of Completion for any individual Removal or Remedial Action at the Site shall have no effect on the covenants or reservations of rights by Connecticut for any other response action at the Site. Subject to Paragraph 177 of this Consent Decree, the State of Connecticut, on behalf of CTDEP, reserves, and this Consent Decree is without prejudice to, the right jointly with, or separately from, the United States to institute proceedings in this action or in a new action under Section 107 of CERCLA, 42 U.S.C. § 9607, or under any applicable Connecticut law, including but not limited to Conn. Gen. Stat. §§ 22a-432 and 22a-451, seeking to compel Settling Defendant (1) to perform other response actions at the Site, or (2) to reimburse Connecticut for additional response costs for response actions at the Site, to the extent that EPA has determined that such response actions required under (1) and (2) above in this Paragraph will not significantly delay or be inconsistent with the response actions selected or contemplated by EPA, if, subsequent to EPA's Certification of Completion of each individual Removal or Remedial Action:

(i) conditions at the Site, previously unknown to Connecticut, are discovered or become known to Connecticut after the Certification of Completion, or

(ii) information previously unknown to Connecticut is received by Connecticut, in whole or in part, after the Certification of Completion,

350

and the CTDEP Commissioner or his or her delegate determines, pursuant to Conn. Gen. Stat. §§ 22a-432 and 22a-451, that these previously unknown conditions or this information together with any other relevant information indicate that the individual Removal or Remedial Action taken is not protective of health, safety, public welfare or the environment; provided that such further response actions are related to CTDEP's determination that the individual Removal or Remedial Action is not protective of human health and the environment. The United States reserves all rights it may have under applicable law to oppose any determinations made or any actions taken, ordered or proposed by Connecticut pursuant to this Paragraph.

173. Connecticut Known Conditions and Information.

a. For purposes of Paragraph 171, except as specified below, the information and the conditions known to Connecticut shall include the following, to the extent received by Connecticut 30 days or more prior to the date of lodging of this Consent Decree: (i) the 1981 RCRA Administrative Consent Order issued by EPA; (ii) reports submitted to EPA pursuant to the 1981 RCRA Administrative Consent Order; (iii) the Administrative Record for the RCRA Permit (including the administrative records for the RCRA permit issued on February 11, 1991, and for the modified permit issued effective January 3, 1994, as described in Paragraph I of Section I); (iv) reports submitted to EPA pursuant to the RCRA Permit; (v) reports submitted to EPA after January 3, 1994 pursuant to the 1990 Administrative Consent Orders executed by Settling Defendant and MADEP; (vi) reports submitted to CTDEP under the 1984 and 1990 Cooperative Agreements between Settling Defendant and CTDEP and reports submitted to CTDEP

351

regarding investigations of the Connecticut portion of the Housatonic River subsequent to 1995 (all as listed in Appendix W); (vii) the EPA Action Memorandum and EPA Unilateral Administrative Order (issued to Settling Defendant on Dec. 18, 1996) for the Building 68 Removal Action, the Administrative Record for such Action Memorandum and reports submitted to EPA under such Unilateral Administrative Order; (viii) the EPA Action Memorandum for the Upper Reach, its Administrative Record, and reports submitted to EPA pursuant to that Action Memorandum; (ix) other reports submitted to EPA in 1998 and 1999 relating to investigations and other response actions conducted by Settling Defendant at the Site in those years (as listed in Appendix V); (x) the EPA Action Memorandum for the Allendale School Removal Action and its Administrative Record; (xi) the EPA Action Memorandum for the Removal Actions Outside the River and its Administrative Record; (xii) the results of any sampling or other investigations conducted by Connecticut at the Site; and (xiii) copies of reports submitted to CTDEP concerning sampling or other investigations conducted by EPA or MADEP at the Site.

b. For purposes of Paragraph 172, the information and the conditions known to Connecticut shall include only the information and conditions identified in the subparagraph immediately above, and that information and those conditions known to Connecticut as of the date of Certification of Completion of each individual Removal or Remedial Action, the administrative record supporting the particular Removal or Remedial Action, the administrative record developed in design or implementation of the particular Removal or Remedial Action, or any information received by Connecticut

352

pursuant to the requirements of this Consent Decree prior to Certification of Completion of the particular Removal or Remedial Action.

174. Massachusetts Covenants as to the City

a. (i) In consideration of the facts and circumstances, and the actions that will be performed in connection with this Consent Decree and the Definitive Economic Development Agreement, and except as specifically provided in Paragraphs 167, 168, and 175 of this Section and below in this Paragraph 174, the State covenants not to sue or to take administrative action against the City in its capacity as an owner, within the meaning of Sections 5(a)(1) of M.G.L. c.21E and 107(a)(1) of CERCLA, of the portions of the property identified in Appendix U that are within the Site, pursuant to Section 5(a) of M.G.L. c. 21E or Section 107(a) of CERCLA, for releases or threatened releases of Waste Materials at such portions of property within the Site; provided, however, that with respect to the property at 901 Holmes Road (Parcel No. J2-2-1), the State's covenant shall extend only to releases or threatened releases of Waste Materials that originated at the GE Plant Area and that are remediated pursuant to this Consent Decree. Except with respect to the covenants for future liability, these covenants not to sue shall take effect upon entry of this Consent Decree. With respect to future liability, the covenants not to sue shall be effective for each property upon EPA's Certification of Completion for the individual Removal or Remedial Action related to such property. The covenant not to sue in this Paragraph with respect to each particular property is contingent upon the satisfactory performance by the City of its obligations under this Consent Decree as to such particular property.

353

(A)     The City certifies that as to each property identified in Appendix U except for 901 Holmes Road (Parcel No. J2-2-1) and the Allendale School Property (Parcel No. K11-7-29): (1) the City, despite due diligence, was unaware of the existence of the contamination at the property at the time it obtained an interest in such property; (2) the City has not caused or contributed to the release of Waste Materials at such property, (3) the City has not disposed of Waste Materials at such property; and (4) for each property, the City meets the requirements of Section 5(c)(3) of M.G.L. c.21E.

(B)     With respect to 901 Holmes Road, the City certifies that: (1) the City, despite due diligence, was unaware of the existence of the contamination that originated at the GE Plant Area at the property at the time it obtained an interest in the property; and (2) the City has not knowingly, or as a result of its negligence in the ownership or operation of its wastewater treatment facility, caused or contributed to the release of, or disposed of, Waste Materials that originated at the GE Plant Area, except in connection with federally permitted releases as defined in Section 101(10) of CERCLA, 42 U.S.C. § 9601(10).

(C)     With respect to the Allendale School Property, the City certifies that: (1) the City, despite due diligence, was unaware of the existence of contamination at the property at the time it obtained an interest in the property; and (2) since placement of fill material in connection with construction of the school in 1950-1951, the City has not knowingly or negligently caused or contributed to the release of, or disposed of, Waste Materials at such property.

354

(ii)    These covenants not to sue are conditioned upon the veracity of the City's certifications.  The language of the certifications in this Paragraph shall not be construed to expand the scope of the covenant not to sue in this Paragraph 174. Should the State determine that such certifications, in whole or in part, were not true or accurate with respect to a particular property at the time of entry of this Consent Decree, these covenants not to sue shall be null and void as to that particular property.

(iii)    The State's covenant under this Paragraph 174 also is subject to the following conditions:

(A)    with respect to the portions of property identified in Appendix U that are within the Site, the City's compliance with the release notification provisions established by M.G.L. c.21E and the MCP;

(B)    the City's providing reasonable access upon reasonable notice, as provided in M.G.L. c.21E and the MCP, to the portions of property identified in Appendix U that are within the Site to employees, agents, and contractors of MADEP for all purposes authorized by M.G.L. c.21E and the MCP, and to other persons intending to conduct response actions pursuant to that Chapter and the MCP and/or pursuant to this Consent Decree;

(C)    the City's responding in a reasonably timely manner to any request made by the State to produce information with respect to portions of property identified in Appendix U that are within the Site as required pursuant to M.G.L. c.21E and the MCP; and

355

(D) the City's taking reasonable steps as appropriate (1) to prevent the exposure of people to Waste Materials on portions of property identified in Appendix U that are within the Site and under the City's control; and (2) to contain any further release or threat of release of Waste Material from a structure or container under the City's control located on portions of property identified in Appendix U that are within the Site upon obtaining knowledge of a release or threat of release of Waste Material, provided, however, that such steps shall not interfere with Settling Defendant's or EPA's performance of response actions pursuant to this Consent Decree.

b. State's Pre-Certification Reservations as to the City

The State on behalf of MADEP reserves, and this Consent Decree is without prejudice to, any right jointly with, or separately from, the United States to institute proceedings in this action or in a new action under Section 107 of CERCLA, 42 U.S.C. § 9607, or under any applicable State law, including but not limited to M.G.L. c.21E, seeking to compel the City, with respect to the properties identified in Appendix U, (1) to perform other response actions at the Site, or (2) to reimburse the State for additional response costs for response actions at the Site, to the extent that EPA has determined that such response actions required under (1) and (2) above in this Paragraph will not significantly delay or be inconsistent with the response actions selected or contemplated by EPA, if, prior to EPA's Certification of Completion of each individual Removal or Remedial Action:

(i) conditions at such property, previously unknown to the State, are discovered or become known to the State, or

356

(ii)   information previously unknown to the State is received by the State

in whole or in part,

and the MADEP Commissioner or his or her delegate determines, pursuant to M.G.L.

c.21E, that these previously unknown conditions or this information together with any

other relevant information indicate that the individual Removal or Remedial Action taken

is not protective of health, safety, public welfare or the environment; provided that such

further response actions are related to MADEP's determination that the individual

Removal or Remedial Action is not protective of human health and the environment.  The

United States reserves all rights it may have under applicable law to oppose any

determinations made or any actions taken, ordered or proposed by the State pursuant to

this Paragraph.

     c.   State's Post-Certification Reservations as to the City

        The State, on behalf of MADEP, reserves, and this Consent Decree is

without prejudice to, the right jointly with, or separately from, the United States to institute

proceedings in this action or in a new action under Section 107 of CERCLA, 42 U.S.C. §

9607, or under any applicable State law, including but not limited to M.G.L. c.21E,

seeking to compel the City, with respect to the properties identified in Appendix U, (1) to

perform other response actions at the Site, or (2) to reimburse the State for additional

response costs for response actions at the Site, to the extent that EPA has determined

that such response actions required under (1) and (2) above in this Paragraph will not

significantly delay or be inconsistent with the response actions selected or contemplated

357

by EPA, if, subsequent to EPA's Certification of Completion of each individual Removal or Remedial Action:

        (i)    conditions at such property, previously unknown to the State, are discovered or become known to the State after the Certification of Completion, or

        (ii)    information previously unknown to the State is received by the State, in whole or in part, after the Certification of Completion,

and the MADEP Commissioner or his or her delegate determines, pursuant to M.G.L. c.21E, that these previously unknown conditions or this information together with any other relevant information indicate that the individual Removal or Remedial Action taken is not protective of health, safety, public welfare or the environment; provided that such further response actions are related to MADEP's determination that the individual Removal or Remedial Action is not protective of human health and the environment. The United States reserves all rights it may have under applicable law to oppose any determinations made or any actions taken, ordered or proposed by the State pursuant to this Paragraph.

    175.   <u>General Reservations of Rights</u>.  The covenants not to sue set forth above do not pertain to any matters other than those expressly specified in Paragraph 161, 164.a, 166, 170, and 174.a. The United States, Connecticut and the State reserve, and this Consent Decree is without prejudice to, all rights against Settling Defendant and the City with respect to all other matters, including but not limited to, the following:

        a.    claims based on a failure by Settling Defendant or the City (as applicable) to meet a requirement of this Consent Decree; .

<div align="center">358</div>

b.      liability arising from the past, present, or future disposal, release. or threat of release of Waste Material outside of the Site, except, as to claims of the United States against Settling Defendant, with respect to Designated Fill Properties;

c.      liability for future disposal of Waste Material at the Site, other than as provided in the Consent Decree, the SOW, the Upper ½ Mile Reach Removal Action Work Plan, the Rest of the River SOW, Work Plans approved pursuant to the Consent Decree, the SOW, or the Rest of the River SOW, the Work to be performed under this Consent Decree, or otherwise ordered by EPA;

d.      criminal liability;

e.      liability for violations of federal or state law which occur during or after implementation of any Removal or Remedial Action under this Consent Decree;

f.      liability, prior to Certification of Completion of the Groundwater Removal Actions under this Consent Decree, for additional response actions that EPA determines are necessary to achieve Performance Standards for NAPL, as set forth in the Consent Decree and SOW for such Removal Actions, but that cannot be required pursuant to Paragraph 39 (Modification of the SOW or Related Work Plans);

g.      liability arising from the past, present or future operations by Settling Defendant at the GE Plant Area unrelated to the releases or threatened releases of Waste Material that are the subject of this Consent Decree, to performance of the Work or, as to the United States, to Designated Fill Properties;

h.      any judicial or administrative action seeking injunctive relief to require Settling Defendant or the City: (i) to comply with any legal obligations to report releases

359

or threats of releases of Waste Material, to respond to requests for information, or otherwise to provide timely, complete, and accurate information to the United States, the State, or Connecticut; or (ii) to comply with any other ongoing obligations of state or federal law, except as provided in Paragraphs 161, 164, 166, 170, 174 and 177, as applicable;

     i.    any claims or defenses relating to the administration or enforcement of a recorded ERE and/or CER at the Site that EPA or the State may otherwise have under state or federal law against Settling Defendant or the City in its capacity as grantor of a recorded ERE and/or CER or as the owner of property subject to a recorded ERE and/or CER; provided, however, that any disputes regarding the obligations of Settling Defendant, in its capacity as Settling Defendant (and not in its capacity as grantor of a recorded ERE and/or CER or as an owner of property subject to a recorded ERE and/or CER), pursuant to Section XIII of this Consent Decree shall be subject to dispute resolution as authorized pursuant to Section XXIV of this Decree;

     j.    in the event Settling Defendant asserts a claim against the United States, Connecticut, or the State pursuant to Paragraph 184 of this Consent Decree, all claims, counterclaims, defenses, or causes of action against the Settling Defendant arising out of the same matters, transactions, or occurrences that are the subject of Settling Defendant's claim; and

     k.    liability of the City arising from the past, present or future disposal, release or threat of release of Waste Material other than at those portions of the properties identified in Appendix U that are within the Site.

176.   Reservations Relating to Natural Resource Damages.  Notwithstanding any other provision of this Consent Decree, the United States, the State and Connecticut, on behalf of their respective Trustees, NOAA, DOI, EOEA and CTDEP, reserve the right to institute proceedings against Settling Defendant in this action or in a new action seeking recovery of Natural Resource Damages, if, after lodging of this Consent Decree:

a.    there is:

(i) a catastrophic failure of Woods Pond Dam or Rising Pond Dam that results in a substantial release of PCBs from the impoundments behind one or both of the dams to the Housatonic River and/or its associated environs, and such release results in injury to, destruction of, or loss of natural resources.  Such action shall be limited to Natural Resource Damages that result from such release.

(ii) with respect to Woods Pond Dam only, material breach of the dam due to Settling Defendant's negligent operation or maintenance of Woods Pond Dam that results in a release of PCBs from the impoundment behind Woods Pond Dam to the Housatonic River and/or its associated environs, that is materially greater than PCB transport from that impoundment under the normal range of flow conditions, and such release results in injury to, destruction of, or loss of natural resources.  Such action shall be limited to Natural Resource Damages that result from such release.

b.   Any proceedings initiated pursuant to this Paragraph 176 shall be commenced within three years of such release.  Except as provided in Paragraph 199.a of this Decree, in any proceedings initiated by the United States, the State or Connecticut

pursuant to this Paragraph, Settling Defendant may assert any defenses available under applicable law.

    c.  If the Rest of the River Remedial Action addresses the threat of catastrophic dam failure and the management of sediments in the impoundments behind Woods Pond Dam and Rising Pond Dam, the reservation of rights set forth in Paragraph 176.a(i) shall expire as to releases from Rising Pond Dam and Woods Pond Dam upon Certification of Completion of the Rest of the River Remedial Action pursuant to Paragraph 88 (Completion of Each Response Action).

    d.  Notwithstanding any other provision of this Consent Decree, the United States, the State and Connecticut, on behalf of their respective Trustees, reserve the right to institute proceedings against the City with respect to Natural Resource Damages related to the Site.

177.  Issuance of Administrative Orders.

    a.  The United States, the State and Connecticut agree not to issue any administrative orders to Settling Defendant for the performance of Work that the Settling Defendant is performing or (prior to the time for such performance under the approved schedule) is required to perform under this Consent Decree except as provided in Paragraphs 162, 163, 167, 168, 171 and/or 172 (Pre- and Post-Certification Reservations) of this Consent Decree.

    b.  The United States, the State and Connecticut agree that, subject to Settling Defendant's satisfactory completion of the Work required by this Consent Decree, the information and conditions currently known to EPA, the State and

Connecticut, as defined in Paragraphs 165, 169 and 173, demonstrate no need for issuance of an order to conduct removal actions at the Site.

  c.  The United States, the State and Connecticut agree not to issue any administrative orders to Settling Defendant to perform work in the 1 ½ Mile Reach based on Paragraphs 162, 163, 167, 168, 171 and/or 172 (Pre- and Post-Certification Reservations) of this Consent Decree prior to the time that the 1 ½ Mile Reach Removal Action to be conducted by EPA in the 1 ½ Mile Reach is completed.

  d.  The United States, the State and Connecticut agree not to issue any administrative orders to Settling Defendant to perform work in the Rest of the River based on Paragraphs 162, 163, 167, 168, 171 and/or 172 (Pre- and Post-Certification Reservations) of this Consent Decree prior to the time that a final decision on the Rest of River Remedial Action has become effective pursuant to Paragraph 22 of this Consent Decree.

  e.  If the United States, the State or Connecticut issues an administrative order pursuant to Paragraphs 162, 163, 167, 168, 171 and 172 (Pre- and Post-Certification Reservations) of this Consent Decree, Settling Defendant shall have the right to invoke and pursue dispute resolution in accordance with Section XXIV (Dispute Resolution) of this Consent Decree with respect to such order.

  178. <u>Work Takeover</u>

  a.  In the event EPA determines that Settling Defendant has ceased implementation of any Removal or Remedial Action, is seriously or repeatedly deficient or late in its performance of any Removal or Remedial Action, or is implementing any

Removal or Remedial Action in a manner which may cause an endangerment to human health or the environment, EPA may assume the performance of such Removal or Remedial Action.

b.      In the event of an EPA determination as provided in Paragraph 178.a, EPA may also assume performance of any or all other Removal or Remedial Actions if EPA determines that such other Removal or Remedial Actions are sufficiently technically related to the Removal or Remedial Action subject to the determination so that it is likely that Settling Defendant will cease implementation of such other Removal or Remedial Actions or that Settling Defendant's performance of such other Removal or Remedial Actions will be seriously or repeatedly deficient or late or will cause an endangerment to human health or the environment.

c.      Settling Defendant may invoke the procedures set forth in Section XXIV (Dispute Resolution), Paragraph 136 (Record Review), to dispute EPA's determination that takeover of the Work is warranted under this Paragraph.  Costs Incurred by the United States in performing the Work pursuant to this Paragraph shall be considered U.S. Future Response Costs that Settling Defendant shall pay pursuant to Section XX (Reimbursement of Costs).

179.   Subject to the other provisions of this Consent Decree, the United States, Connecticut and the State retain all authority and reserve all rights to take any and all response actions authorized by law.

180.   <u>Covenant Not to Sue the State by the United States</u>.  In consideration of the State's directly accepting any interest in land as grantee of any ERE and/or CER under

the terms of this Consent Decree, the United States covenants not to sue or to take administrative action against the State, pursuant to Sections 106 and 107(a) of CERCLA, and Sections 3008 and 7003 of RCRA, for releases or threats of releases of Waste Materials at or from the property subject to the ERE and/or CER for which liability arises as a result of the State's said interest[s] in land.  These covenants not to sue shall take effect upon the recordation of any ERE and/or CER, pursuant to this Consent Decree, granting any interest in land to the State.

181.   The United States and PEDA agree to initiate negotiations after lodging of the Consent Decree regarding a prospective purchaser agreement ("PPA") based on PEDA's prospective ownership of certain properties located at the GE Plant Area pursuant to the Definitive Economic Development Agreement.  In order to promote economic redevelopment, the United States and PEDA agree to negotiate in good faith and will use best efforts to reach an agreement by January 30, 2000.  The parties intend to negotiate the terms of the PPA, including the covenant not to sue, to provide protections consistent with the EPA Model Agreement on Settlements with Prospective Purchasers of Contaminated Property, with appropriate Site-specific modifications.  Any PPA that is negotiated is subject to review and approval by appropriate officials of the United States and PEDA.

182.   Massachusetts and PEDA agree to initiate negotiations after lodging of the Consent Decree regarding a Brownfields Covenant Not to Sue Agreement pursuant to Section (3)(A)(j)(3) of M.G.L. c. 21E (Brownfields Covenant) based on PEDA's prospective ownership of certain properties located at the GE Plant Area pursuant to the

Definitive Economic Development Agreement. In order to promote economic redevelopment at such property, Massachusetts and PEDA agree to negotiate in good faith and will use best efforts to reach an agreement as soon as reasonably feasible, provided that PEDA can demonstrate compliance with the applicable requirements under the Brownfields statute. Any Brownfields covenant that is negotiated is subject to review and approval by appropriate officials of Massachusetts and PEDA.

### XXVII. COVENANTS BY SETTLING DEFENDANT

183.   Covenant Not to Sue.   Subject to the reservations in Paragraph 184 and except as provided in Paragraphs 5(d) and 13 of the Consent Decree entered on June 30, 1999, in United States v. General Electric Company, Civil Action No. 99-30131-MAP (D. Mass.), Settling Defendant hereby covenants not to sue and agrees not to assert any claims or causes of action against the United States, on behalf of EPA, DOI, NOAA, DOD, ACOE, ATSDR, or any other agency of the United States which may have authority to administer the statutes cited in Paragraph 161, or against Connecticut or the State (including any department, agency or instrumentality of Connecticut or the State), with respect to the Site, this Consent Decree, or, as to the United States, Designated Fill Properties. The claims or causes of action covered by this paragraph include, but are not limited to:

a. any direct or indirect claim for reimbursement from the Hazardous Substance Superfund (established pursuant to the Internal Revenue Code, 26 U.S.C. § 9507) through Sections 106(b)(2), 107, 111, 112, or 113 of CERCLA, or any other provision of law;

b.  any direct or indirect claim for reimbursement, recovery, contribution or equitable share of response costs, for Natural Resource Damages, or for property damage pursuant to M.G.L. c.21E;

c.  any claims under Section 107 or 113 of CERCLA, Section 7002 of RCRA, Section 504 of the Clean Water Act, or Sections 1002, 1005, 1008, 1009, or 1015 of the Oil Pollution Act related to the Site or, as to the United States, Designated Fill Properties;

d.  any claims arising out of response activities at the Site or, as to the United States, Designated Fill Properties, including claims based on the United States', Connecticut's and the State's selection or performance of response actions, oversight of response actions, or approval of plans for such actions;

e.  any claim under the Fifth Amendment to the United States Constitution or under the Massachusetts Constitution for "takings";

f.  any claim under the Tucker Act, 28 U.S.C. § 1491, or at common law, arising out of or relating to access to, land use restrictions on, or response activities undertaken at the Site; and

g.  any claim, demand or cause of action arising from a contract between the Settling Defendant and the United States, including but not limited to claims, demands, or causes of action under the Contract Disputes Act of 1978, 41 U.S.C. § 601 et seq., Public Law 85-804, or Federal Acquisition Regulation, Part 50, except for applications to the Court by Settling Defendant to obtain relief under Paragraph 211 of this Consent Decree regarding the Access and Services Agreement.

Nothing in this Paragraph shall be construed to preclude Settling Defendant from pursuing dispute resolution under Section XXIV of this Decree, defending against a claim by the United States or the State in accordance with Paragraph 16.m of this Decree, challenging a settlement under Paragraph 125 of this Decree, applying to the Court for relief under Paragraph 211 of this Decree, submitting comments to any government agency, or challenging rules, regulations or permits issued by any such agency; provided, however, that any challenge to issuance of the Reissued RCRA Permit shall be in accordance with Paragraph 10 of this Consent Decree, and any challenges to the modification to the Reissued RCRA Permit to select the Rest of the River Remedial Action shall be in accordance with Paragraphs 22 and 141.b of this Consent Decree.

184.    Settling Defendant reserves, and this Consent Decree is without prejudice to, the following:

a.    claims by Settling Defendant against the United States, subject to the provisions of Chapter 171 of Title 28 of the United States Code, for money damages for injury or loss of property or personal injury or death caused by the negligent or wrongful act or omission of any employee of the United States while acting within the scope of his office or employment under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.  However, any such claim against the United States shall not include a claim for any damages caused, in whole or in part, by the act or omission of any person, including any contractor, who is not a federal employee as that term is defined in 28 U.S.C. § 2671; nor shall any such claim include a claim based on

EPA's selection of response actions, or the United States' oversight or approval of Settling Defendant's plans or activities; provided, however, that nothing in this subparagraph shall affect Settling Defendant's right to assert claims against any person (other than the United States or a federal employee), including any contractor, for impacts to GE property arising out of negligent work by such person performing work in connection with the 1 ½ Mile Reach Removal Action. (The reservation in this Paragraph 184.a applies only to claims which are brought pursuant to any statute other than CERCLA and for which the waiver of sovereign immunity is found in a statute other than CERCLA);

   b. claims by Settling Defendant against the United States based on contamination in the Rest of the River that Settling Defendant shows by clear and convincing evidence is or was caused by the gross negligence of the United States or its contractor in performance of work in the 1 ½ Mile Reach. (Nothing in the reservation in this Paragraph 184.b shall permit any claims by Settling Defendant for reimbursement or offset of Settling Defendant's share of response costs for the 1 ½ Mile Reach Removal Action, as provided in Paragraphs 103-111 of this Consent Decree);

   c. liability of the United States, on behalf of DOD, arising from past or present disposal, release, or threat of release of Waste Materials by DOD or its contractors outside of the Site or the Designated Fill Properties, and liability arising from future disposal, release, or threat of release of Waste Material by the DOD or its contractors (other than Settling Defendant) outside of the Site or the Designated Fill

Properties, except for liability arising from future transshipment of Waste Material by Settling Defendant or its contractor;

       d.     liability of the United States, on behalf of DOD, for future disposal of Waste Material by DOD or its contractors (other than Settling Defendant) at the Site, other than future disposal of Waste Material by DOD or its contractors (other than Settling Defendant) as provided in the Consent Decree, the SOW, the Upper ½ Mile Reach Removal Action Work Plan, the Rest of the River SOW, Work Plans approved pursuant to the Consent Decree, the SOW, or the Rest of the River SOW, or the Work to be performed under this Consent Decree.

       e.     any right by Settling Defendant to submit and pursue claims regarding requests for information on any subject under M.G.L. chapter 66 (Public Records Act) and/or Connecticut General Statutes, Title 1, Chapter 14, Sections 1-200 et seq. (Connecticut Freedom of Information Act) or any other similar provisions of state law;

       f.     any and all rights by Settling Defendant to defend against a request for information or administrative subpoena submitted by, and/or an action related to such request for information or subpoena brought by, the United States, the State or Connecticut under federal, State or Connecticut law, including but not limited to Sections 104(e) and 122(e) of CERCLA and Section 8 of M.G.L. c. 21E, except as otherwise provided in this Consent Decree;

       g.     claims arising from past, present or future operations by Settling Defendant at the GE Plant Area unrelated to releases or threatened releases of Waste

Material that are the subject of this Consent Decree, performance of the Work or, as to the United States, Designated Fill Properties;

> h.      in the event the United States, the State or Connecticut brings further action against Settling Defendant pursuant to Paragraphs 162, 163, 167, 168, 171 and/or 172 of this Consent Decree, all claims, counterclaims, defenses or causes of action against the United States, the State or Connecticut for cost recovery, reimbursement, contribution or equitable share of response costs incurred by Settling Defendant as a result of such further action; provided, however, that nothing in this subparagraph shall limit the right of the United States, the State or Connecticut to assert any defense to such claim or cause of action;

> i.      in the event the United States, the State, or Connecticut, on behalf of their respective Trustees, NOAA, DOI, EOEA and CTDEP, brings further action against Settling Defendant for recovery of Natural Resource Damages pursuant to Paragraph 176 of this Consent Decree, all claims, counterclaims, defenses or causes of action against the United States, the State, or Connecticut for Natural Resource Damages paid by Settling Defendant as a result of such further action; provided, however, that nothing in this subparagraph shall limit the right of the United States, the State, or Connecticut to assert any defense to such claim or cause of action;

> j.      any claims or defenses relating to the administration or enforcement of a recorded ERE and/or CER at the Site that Settling Defendant may otherwise have under state or federal law, in its capacity as grantor or as the owner of property subject to a recorded ERE and/or CER, against EPA or the State; provided, however, that any

371

disputes regarding the obligations of Settling Defendant, in its capacity as Settling Defendant (and not in its capacity as grantor of a recorded ERE and/or CER or the owner of property subject to a recorded ERE and/or CER), pursuant Section XIII of this Consent Decree shall be subject to dispute resolution as authorized pursuant to Section XXIV of this Decree; and

  k. any rights or claims that Settling Defendant may have against the Massachusetts Highway Department under any contracts, existing as of the date of lodging of this Consent Decree, between the Massachusetts Highway Department and Settling Defendant relating to the Massachusetts Highway Department's project to reconstruct Merrill Road and East Street in Pittsfield, Massachusetts, including but not limited to such contracts regarding the properties and easements taken by eminent domain from Settling Defendant by the Massachusetts Highway Department in 1997 for the purpose of such reconstruction.

Nothing in this Paragraph shall be construed to create any rights or claims that do not otherwise exist independent of this Consent Decree.

185. Nothing in this Consent Decree shall be deemed to constitute preauthorization of a claim within the meaning of § 111 of CERCLA, 42 U.S.C. § 9611, or 40 C.F.R. § 300.700(d).

186. Settling Defendant agrees not to assert any claims and to waive all claims or causes of action that it may have for all matters relating to the Site, including for contribution, against the following persons where such person's liability to Settling Defendant with respect to the Site is based solely on having arranged for disposal or

372

treatment, or for transport for disposal or treatment, of Waste Materials at the Site, or having accepted for transport for disposal or treatment of Waste Materials at the Site.

       a.    Any person other than Berkshire Gas Company who:

          (i)    contributed materials constituting Municipal Solid Waste ("MSW") or Municipal Sewage Sludge ("MSS") to the GE Plant Area and such materials did not exceed 0.2% of the total volume of waste at the GE Plant Area; and

          (ii) . contributed materials containing hazardous substances, but not constituting MSW or MSS, to the GE Plant Area and such materials did not exceed the greater of:

             (A)    0.002% of the total volume of waste at the GE Plant Area, or

             (B)    110 gallons of liquid materials or 200 pounds of solid materials.

       b.    Any person who:

          (i)    contributed materials constituting MSW or MSS to a residential or non-residential property within the Site (other than the GE Plant Area) and such materials did not exceed 0.2% of the total volume of waste at such property; or

          (ii)    contributed materials containing hazardous substances, but not constituting MSW or MSS, to a residential or non-residential property within the Site (other than the GE Plant Area) and such materials did not exceed the greater of

             (A)    0.002% of the total volume of waste at such property, or

373

(B)    25 gallons of liquid materials or 50 pounds of solid

materials.

This waiver shall not apply to any claim or cause of action against any person meeting

the above criteria if EPA has determined that the materials contributed to the particular

property by such person contributed or could contribute significantly to the costs of

response at that property.

## XXVIII.  COVENANTS BY THE CITY

187.    Covenant Not to Sue.  Subject to the reservations in Paragraph 188, the

City hereby covenants not to sue and agrees not to assert any claims or causes of action

against the United States or the State (including any department, agency or

instrumentality of the State), with respect to releases or threatened releases of Waste

Material at the property identified in Appendix U.  The claims or causes of action covered

by this Paragraph include, but are not limited to:

a.    any direct or indirect claim for reimbursement from the Hazardous

Substance Superfund (established pursuant to the Internal Revenue Code, 26 U.S.C.

§ 9507) through Sections 106(b)(2), 107, 111, 112, or 113 of CERCLA, or any other

provision of law;

b.    any direct or indirect claim for reimbursement, recovery, contribution or

equitable share of response costs, for Natural Resource Damages, or for property

damage pursuant to M.G.L. c.21E;

c.    any claims arising out of response activities at any of the properties

identified in Appendix U, including claims based on the United States', Connecticut's and

374

the State's selection or performance of response actions, oversight of response actions or approval of plans for such actions;

d.    any claim under the Fifth Amendment to the United States Constitution or under the Massachusetts Constitution for "takings"; and

e.    Any claim under the Tucker Act, 28 U.S.C. § 1491 or at common law, arising out of or relating to access to, land use restrictions on, or response activities undertaken at any of the properties identified in Appendix U.

188.    The City reserves, and this Consent Decree is without prejudice to, the following:

a.    claims by the City against the United States, subject to the provisions of Chapter 171 of Title 28 of the United States Code, for money damages for injury or loss of property or personal injury or death caused by the negligent or wrongful act or omission of any employee of the United States while acting within the scope of his office or employment under circumstances where the United States, if a private person, would liable to the claimant in accordance with the law of the place where the act or omission occurred.  However, any such claim against the United States shall not include a claim for any damages caused, in whole or in part, by the act or omission of any person, including any contractor, who is not a federal employee as that term is defined in 28 U.S.C. § 2671; nor shall any such claim include a claim based on EPA's selection of response actions, or the United States' oversight or approval of the City's or the Settling Defendant's plans or activities.  (The reservation in this Paragraph 188.a applies only to

claims which are brought pursuant to any statute other than CERCLA and for which the waiver of sovereign immunity is found in a statute other than CERCLA);

      b.    in the event the United States or the State brings an action against the City pursuant to Paragraphs 164 and/or 174 of this Consent Decree, all claims, counterclaims, defenses or causes of action against the United States or the State for cost recovery, reimbursement, contribution or equitable share of response costs incurred by the City as a result of such further action; provided, however, that nothing in this subparagraph shall limit the right of the United States or the State to assert any defense to such claim or cause of action; and

      c.    in the event the United States or the State, on behalf of their respective Trustees, NOAA, DOI, and EOEA, brings an action against the City for recovery of Natural Resource Damages, all claims, counterclaims, defenses or causes of action against the United States or the State for Natural Resource Damages paid by the City as a result of such further action; provided, however, that nothing in this subparagraph shall limit the right of the United States or the State to assert any defense to such claim or cause of action.

Nothing in this Paragraph shall be construed to create any rights or claims that do not otherwise exist independent of this Consent Decree.

### XXIX.  EFFECT OF SETTLEMENT; CONTRIBUTION PROTECTION

189.   Nothing in this Consent Decree shall be construed to create any rights in, or grant any cause of action to, any person not a Party to this Consent Decree.  The preceding sentence shall not be construed to waive or nullify any rights that any person

not a signatory to this Decree may have under applicable law. Except as provided in Paragraph 186 of this Consent Decree, each of the Parties expressly reserves any and all rights (including, but not limited to, any right to contribution), defenses, claims, demands, and causes of action which each Party may have with respect to any matter, transaction, or occurrence relating in any way to the Site against any person not a Party hereto.

190.    The Parties agree, and by entering this Consent Decree this Court finds, that the payments to be made and the Work to be performed by Settling Defendant pursuant to this Consent Decree represent a good faith settlement and compromise of disputed claims, and that this settlement represents a fair and reasonable resolution of Settling Defendant's liability for the matters addressed in this Consent Decree.

191.    The Parties agree, and by entering this Consent Decree this Court finds, that the Settling Defendant is entitled, as of the effective date of this Consent Decree, to protection from contribution actions or claims to the extent provided by CERCLA Section 113(f)(2), 42 U.S.C. § 9613(f)(2), or other applicable law, for matters addressed in this Consent Decree. "Matters addressed in this Consent Decree" shall mean all Work performed and to be performed by Settling Defendant pursuant to this Consent Decree, all response actions performed and to be performed by the United States in connection with the 1 ½ Mile Reach Removal Action, all U.S. Future Response Costs, U.S. Oversight Costs, U.S. Past Response Costs, U.S. Interim Response Costs, U.S. Future Rest of River Capped Response Costs, U.S. Rest of River Oversight Costs, U.S. Future Additional Sampling Costs, U.S. Post-Removal/Groundwater Monitoring Costs, DOI

377

Future Costs, DOI Oversight Costs, DOI Past Assessment Costs, NOAA Future Costs, NOAA Oversight Costs, NOAA Past Assessment Costs, Connecticut Future Costs. Connecticut Past Response Costs, Massachusetts Future Response Costs, Massachusetts Oversight Costs, Massachusetts Past Response Costs, Massachusetts Interim Response Costs, Massachusetts Trustee Future Response Costs, Massachusetts Trustee Oversight Costs, any Natural Resource Damages and all Restoration Work and other natural resource protection and restoration actions to be completed and payments to be made by Settling Defendant to the Trustees.

192.    The State and Settling Defendant agree, and by entering this Consent Decree this Court finds, that pursuant to M.G.L. c.21E, § 3A(j)(2), Settling Defendant is entitled, as of the effective date of this Consent Decree, to protection from claims brought pursuant to M.G.L. c. 21E, regarding matters addressed in this Consent Decree, for cost recovery, contribution, and equitable share as to those persons receiving notice and an opportunity to comment on this Consent Decree in accordance with M.G.L. c.21E, § 3A(j)(2).  For purposes of this paragraph, "matters addressed" shall be as defined in Paragraph 191.  The 90-day comment period shall commence 30 days after the date of lodging of this Consent Decree.  Settling Defendant's failure to provide timely and adequate notice to one person shall not affect its rights as against any other person who received such notice.

193.    Connecticut and Settling Defendant agree, and by entering this Consent Decree the Court finds, that the Settling Defendant is entitled, as of the effective date of this Consent Decree, to protection from contribution actions or claims to the extent

378

provided by other applicable law, for matters addressed in this Consent Decree, as defined in Paragraph 191.

194.   The Parties agree, and by entering this Consent Decree this Court finds, that the State is entitled, as of the date of transfer of any interest in land pursuant to an ERE and/or CER, to protection from contribution actions or claims to the extent provided by CERCLA Section 113(f)(2), 42 U.S.C. § 9613(f)(2), for matters addressed in this Consent Decree, provided that such contribution actions arise as a result of the State's acquisition of an interest in land as grantee of an ERE and/or CER pursuant to this Consent Decree.  For purposes of this paragraph, "matters addressed in this Consent Decree" shall mean Removal and Remedial Actions performed pursuant to this Consent Decree, reimbursement of all costs Incurred and to be Incurred relating to the release of Waste Materials at the Site, Natural Resource Damages, and Restoration Work and other natural resource protection and restoration actions to be completed and payments made to the Trustees pursuant to this Consent Decree.

195.   The United States, the State and the City agree, and by entering this Consent Decree the Court finds, that the City is entitled, as of the effective date of this Consent Decree, to protection from contribution actions or claims to the extent provided by CERCLA Section 113(f)(2), 42 U.S.C. § 9613(f)(2), for matters addressed in this Consent Decree.  For purposes of this Paragraph, the "matters addressed in this Consent Decree" shall mean costs Incurred or to be Incurred by any person in connection with the Work, as to the portions of the properties identified on Appendix U

379

that are within the Site, for Waste Materials that originated at the GE Plant Area and are remediated pursuant to this Consent Decree.

196.    The Parties do not intend for the provisions of Paragraphs 191-195 to affect in any way the rights of persons with actual or potential claims against the parties referenced in Paragraphs 191-195 with respect to any portion of the Site for causes of action other than those described in such Paragraphs.

197.    Settling Defendant agrees that with respect to any suit or claim for contribution brought by it for matters related to this Consent Decree, it will notify the United States, Connecticut and the State in writing no later than 60 days prior to the initiation of such suit or claim unless Settling Defendant asserts such suit or claim as a counterclaim or third-party claim in an action instituted by a person not a Party to this Consent Decree, in which case Settling Defendant will notify the United States, Connecticut and the State within 20 days of asserting such counterclaim or third-party claim.

198.    Settling Defendant also agrees that with respect to any suit or claim for contribution brought against it for matters related to this Consent Decree, it will notify in writing the United States, Connecticut and the State within 30 days of service of the complaint on it. In addition. Settling Defendant shall notify the United States, Connecticut and the State within 10 days of service or receipt of any Motion for Summary Judgment and within 30 days of receipt of any order from a court setting a case for trial.

199.    a.  In any subsequent administrative or judicial proceeding initiated by the United States, Connecticut or the State for injunctive relief, recovery of response costs, or

other appropriate relief relating to the Site or to other properties where Waste Materials from the GE Plant Area have come to be located, Settling Defendant shall not assert, and may not maintain, any defense or claim based upon the principles of waiver, res judicata, collateral estoppel, issue preclusion, claim-splitting, or other defenses based upon any contention that the claims raised by the United States, Connecticut or the State in the subsequent proceeding were or should have been brought in the instant case; provided, however, that nothing in this Paragraph affects the enforceability of the covenants not to sue set forth in Section XXVI (Covenants Not to Sue by Plaintiffs).

b. In any subsequent administrative or judicial proceeding initiated by Settling Defendant against the United States, Connecticut or the State for injunctive relief, recovery of response costs or other appropriate relief relating to the Site or to other properties where Waste Materials from the GE Plant Area have come to be located, the United States, Connecticut and/or the State (as applicable) shall not assert, and may not maintain, any defense or claim based upon the principles of waiver, res judicata, collateral estoppel, issue preclusion, claim-splitting, or other defenses based upon any contention that the claims raised by Settling Defendant in the subsequent proceeding were or should have been brought in the instant case; provided, however, that nothing in this Paragraph affects the enforceability of Settling Defendant's covenants set forth in Section XXVII.

200.   EPA will defer a final decision on its proposal to place the "GE-Housatonic River Site" on the CERCLA National Priorities List ("NPL"), as set forth in 62 Fed. Reg. 50450 (September 25, 1997).  EPA will not finalize such listing or otherwise seek to place

381

the Site or any portion thereof on the NPL, except only as provided in subparagraphs 200.a and 200.b below.

      a.    EPA may finalize listing the Site on the NPL any time that it concludes that a "Work Takeover" situation exists pursuant to Paragraph 178 of this Consent Decree. Settling Defendant reserves the right to seek dispute resolution pursuant to Section XXIV of this Consent Decree in connection with EPA's determination that a Work Takeover situation exists; provided, however, that if Settling Defendant invokes dispute resolution in connection with that determination, the NPL listing process shall not be stayed pending the outcome of the dispute resolution process. Settling Defendant also reserves its right to challenge such a final NPL listing in court, but shall not in such a challenge raise or otherwise use against the United States the fact of the settlement, and in particular the Upper ½ Mile Reach Removal Action, the 1 ½ Mile Reach Removal Action, the Removal Actions Outside the River, and/or any studies of the Rest of the River pursuant to the Reissued RCRA Permit.

      b.    For response actions in the Rest of River which Settling Defendant is not obligated to perform after the outcome of the dispute resolution process described in Paragraphs 22 and 141.b of this Consent Decree, but which the United States concludes are still necessary, or as provided in Paragraph 22.u(v), EPA may proceed with listing the Site on the NPL and may incur costs from the Hazardous Substances Superfund on such response actions; provided, however, that notwithstanding the provisions of Section 113(j) of CERCLA, the United States will not seek cost recovery from Settling Defendant for any costs incurred to implement any portion of the Rest of the

River Remedial Action that is determined to be arbitrary and capricious or otherwise unlawful by the EPA Environmental Appeals Board or by the United States Court of Appeals.

201.   The Parties agree that the characteristics of the Site and the context of these negotiations are unique and that no aspect of this settlement should be considered precedent.

### XXX.  ACCESS TO INFORMATION

202.   Settling Defendant shall provide to EPA, Connecticut and the State, upon request, copies of all documents and information within its possession or control or that of their contractors or agents relating to the implementation of this Consent Decree, including, but not limited to, sampling, analysis, chain of custody records, manifests, trucking logs, receipts, reports, sample traffic routing, correspondence, or other documents or information related to the Work. Settling Defendant shall also make available to the United States, Connecticut and the State, at a reasonable time and place, for purposes of assisting the United States, Connecticut or the State in overseeing the Work or implementing the Consent Decree, a representative of Settling Defendant with knowledge of, and to discuss, the performance of the Work. Nothing in this Paragraph constitutes a waiver of otherwise applicable privilege or business confidentiality claims.

203.   In response to requests for information from EPA, Settling Defendant may assert business confidentiality claims covering part or all of the documents or information submitted to EPA under this Consent Decree to the extent permitted by and in

383

accordance with Section 104(e)(7) of CERCLA, 42 U.S.C. § 9604(e)(7), and 40 C.F.R. § 2.203(b). Documents or information determined to be confidential by EPA will be afforded the protection specified in 40 C.F.R. Part 2, Subpart B. In response to requests for information from Connecticut or the State, Settling Defendant may assert business confidentiality claims covering part or all of the documents or information submitted to Connecticut or the State under this Consent Decree to the extent permitted by and in accordance with state law. If no claim of confidentiality accompanies documents or information when they are submitted to EPA, Connecticut and the State, or if EPA, Connecticut or the State has notified Settling Defendant that the documents or information are not confidential under the standards of Section 104(e)(7) of CERCLA or state law, the public may be given access to such documents or information without further notice to Settling Defendant.

204. For submissions to EPA, Settling Defendant may assert that certain documents, records and other information are privileged under the attorney-client privilege or any other privilege recognized by federal law. For submissions to the State or Connecticut, Settling Defendant may assert that certain documents, records and other information are privileged under the attorney-client privilege or any other privilege recognized by state law. If Settling Defendant asserts such a privilege in lieu of providing documents, it shall provide the Plaintiffs with the following: (1) the title of the document, record, or information; (2) the date of the document, record, or information; (3) the name and title of the author of the document, record, or information; (4) the name and title of each addressee and recipient; (5) a description of the contents of the document,

record, or information: and (6) the privilege asserted by Settling Defendant. However. no final documents. reports or other information required to be created or generated to implement the requirements of this Consent Decree shall be withheld on the grounds that they are privileged.

205.   No claim of privilege shall be made with respect to any data, including, but not limited to, all sampling, analytical, monitoring, hydrogeologic, chemical, or engineering data, or any other factual information evidencing conditions at or around the Site or otherwise obtained in implementing this Consent Decree.

## XXXI.   RETENTION OF RECORDS

206.   a. Settling Defendant shall preserve and retain, for the periods specified in Paragraph 206.b, a copy of the following final records and documents (where no "final" record or document was created, then a copy of the last draft of such record or document shall be preserved and retained for the specified period) now in its possession or control or which come into its possession or control, regardless of any corporate retention policy to the contrary:

(i)   Correspondence with the United States, the State, Connecticut, City, PEDA or with owners of properties within the Site, specifically discussing the performance of the Work or implementation of this Consent Decree;

(ii)   Records and documents reflecting the chain-of-custody of collection and analysis, and the analytical reports of analyses, of physical evidence (including chemical sampling) relating specifically to the performance of the Work or the implementation of this Consent Decree;

385

(iii)    Technical reports and field notes supporting Settling Defendant's plans for or conduct of activities specifically related to performance of the Work or implementation of this Consent Decree (including any "shadow studies");

(iv)    Records and documents documenting the generation, storage, transportation and disposal or treatment of Waste Materials pursuant to this Consent Decree.

(v)    Records and documents documenting the protocols to be followed by Settling Defendant in the performance of Work pursuant to this Consent Decree.

b.    Records or documents required to be retained under Paragraph 206.a above (except those which pertain to the Rest of the River Remedial Action and/or the Upper ½ Mile Reach and 1½ Mile Reach Removal Actions) shall be retained until 5 years after EPA's issuance under Paragraph 88 of this Decree of the last Certification of Completion for the Removal Actions Outside the River taken by Settling Defendant. Records or documents required to be retained under Paragraph 206.a above which pertain to the Rest of River Remedial Action and/or to the 1½ Mile Reach and Upper ½ Mile Reach Removal Actions shall be retained until 5 years after EPA's issuance under Paragraph 88 of this Decree of the Certification of Completion for the Rest of the River Remedial Action.

c.    For purposes of this Paragraph 206, records and documents in the possession of contractors retained by Settling Defendant shall be deemed to be within Settling Defendant's "control."

d.      For purposes of Section XXV (Stipulated Penalties), a violation of this Paragraph 206 by Settling Defendant shall be limited to a stipulated penalty of $500 for any individual record or document not retained in compliance with subparagraph a. The cumulative maximum stipulated penalties which can be assessed against Settling Defendant for violations of this Paragraph 206 shall be limited to $250,000.

207.    At the conclusion of the relevant document retention period specified in Paragraph 206, Settling Defendant shall notify the United States and the State at least 90 days prior to the destruction of any such records or documents, and, upon request by the United States or the State, Settling Defendant shall deliver any such records or documents to EPA or the State. Settling Defendant may assert that certain documents, records and other information are privileged under the attorney-client privilege or any other privilege recognized by federal or state law, as applicable. If Settling Defendant asserts such a privilege, it shall provide the Plaintiffs with the following: (a) the title of the document, record, or information; (b) the date of the document, record, or information; (c) the name and title of the author of the document, record, or information; (d) the name and title of each addressee and recipient; (e) a description of the subject of the document, record, or information; and (f) the privilege asserted by Settling Defendant. However, no documents, reports or other information required to be created or generated to implement the requirements of this Consent Decree shall be withheld on the grounds that they are privileged. Settling Defendant shall retain all documents for which it has asserted a claim of privilege until such time as the Parties have resolved any disputes concerning such documents.

387

208.   For any notification that Settling Defendant transmits to EPA pursuant to Paragraph 5(b)(1) of the Consent Decree entered on June 30, 1999, in *United States v. General Electric Company,* Civil Action No. 99-30131-MAP (D. Mass) (hereinafter "the 104(e) Consent Decree"), Settling Defendant shall at the same time transmit such notification to MADEP (if the relevant place or location is in Massachusetts) or to CTDEP (if the relevant location is in Connecticut).   Nothing in this Paragraph 208 shall be interpreted as modifying any reporting obligations that Settling Defendant may have pursuant to M.G.L. c.21E or the MCP or pursuant to relevant Connecticut state law; provided, however, that while the State may seek stipulated penalties pursuant to Paragraph 158 of this Consent Decree (for the amounts set forth in Paragraph 149.a) for GE's failure to transmit to MADEP a copy of any notification provided to EPA pursuant to Paragraph 5(b)(1) of the 104(e) Consent Decree, this provision does not create any right by the State or Connecticut  to enforce the provisions of the 104(e) Consent Decree.

## XXXII.  NOTICES AND SUBMISSIONS

209.   Whenever, under the terms of this Consent Decree, written notice is required to be given or a report or other document is required to be sent by one Party to another, it shall be directed to the individuals at the addresses specified below, unless those individuals or their successors give notice of a change to the other Parties in writing.  All notices and submissions shall be considered effective upon receipt, unless otherwise provided.  Written notice as specified herein shall constitute complete satisfaction of any written notice requirement of the Consent Decree with respect to the

388

United States, EPA, NOAA, DOI, the State, Connecticut, and Settling Defendant, respectively.

As to the United States:

Chief, Environmental Enforcement Section
Environment and Natural Resources Division
U.S. Department of Justice
P.O. Box 7611
Washington, D.C.  20044-7611
Re: DJ    # 90-11-3-1479
          # 90-11-3-1479Z

and

Director,
Office of Site Remediation and Restoration
United States Environmental Protection
Agency
Region I
One Congress Street
Suite 1100
Boston, Massachusetts 02114-2023
Ref: GE-Pittsfield/Housatonic River Site

As to EPA:

Bryan Olson
EPA Project Coordinator
United States Environmental Protection
Agency
Region I
One Congress Street
Suite 1100
Boston, Massachusetts 02114-2023

As to DOI:

Field Supervisor
U.S. Fish and Wildlife Service
22 Bridge Street
Concord, New Hampshire 03301

Mark Barash
Office of Regional Solicitor
U.S. Department of the Interior
One Gateway Center, Suite 612
Newton Corner, Massachusetts 02158-2868

389

As to NOAA                          Kenneth Finkelstein, PhD.
                                    NOAA Project Coordinator
                                    NOAA/CPRD
                                    c/o EPA Office of Site Remediation and
                                        Restoration (HIO)
                                    1 Congress Street
                                    Boston, Massachusetts 02114

                                    Anton P. Giedt
                                    NOAA Office of General Counsel
                                    One Blackbum Drive
                                    Gloucester, Massachusetts 01930-2298

As to the State:                    J. Lyn Cutler
                                    State Project Coordinator
                                    Section Chief, Special Projects
                                    Bureau of Waste Site Cleanup
                                    Department of Environmental
                                        Protection
                                    436 Dwight Street
                                    Springfield, MA 01103

                                    Thomas La Rosa
                                    Executive Office of Environmental Affairs
                                    100 Cambridge Street
                                    Room 200
                                    Boston, Massachusetts 02202

                                    Chief, Environmental Protection Division
                                    Office of the Attorney General
                                    200 Portland Street
                                    Boston, Massachusetts 02114

As to Connecticut:                  Charles Fredette
                                    Water Management Bureau
                                    Planning and Standards
                                    Department of Environmental Protection
                                    79 Elm Street
                                    Hartford, Connecticut 06103

As to the City:                     Mayor
                                    City of Pittsfield
                                    City Hall
                                    Pittsfield, MA 01201

390

As to the Settling Defendant:

Andrew T. Silfer, P.E.
Project Coordinator
Corporate Environmental Programs
General Electric Company
100 Woodlawn Avenue
Pittsfield, Massachusetts 01201

and

Andrew J. Thomas, Jr.
Counsel, Environmental Matters
Corporate Environmental Programs
General Electric Company
3135 Easton Turnpike
Fairfield, Connecticut 06431

As to PEDA:

Director, Pittsfield Economic
Development Authority
100 Woodlawn Ave
Building 42-100
Pittsfield, MA 01201

## XXXIII. EFFECTIVE DATE

210. The effective date of this Consent Decree shall be the date upon which this

Consent Decree is entered by the Court, except as otherwise provided herein.

## XXXIV. RETENTION OF JURISDICTION

211. This Court retains jurisdiction over both the subject matter of this Consent

Decree and Settling Defendant for the duration of the performance of the terms and

provisions of this Consent Decree for the purpose of enabling any of the Parties to apply

to the Court at any time for such further order, direction, and relief as may be necessary

or appropriate for the construction or modification of this Consent Decree, or to effectuate

or enforce compliance with its terms, or to resolve disputes in accordance with Section

XXIV (Dispute Resolution) hereof.

391

## XXXV. APPENDICES

212.   The following appendices are attached to and incorporated into this

Consent Decree:

"Appendix A" is the following set of maps related to the Site:

      A-1.   GE-Pittsfield/Housatonic River Site

      A-2.   GE Plant Area

      A-3.   Building 71 Consolidation Area

      A-4.   Hill 78 Consolidation Area

      A-5.   Unkamet Brook Area

      A-6.   Former Oxbow Areas

      A-7.   Silver Lake Area

      A-8.   GE Plastics Area

"Appendix B" is EPA's "Combined Action and EE/CA Approval Memorandum" for

the Upper Reach, dated and approved May 26, 1998.

"Appendix C" is EPA's Action Memorandum for the Allendale School Removal

Action, dated and approved July 12, 1999.

"Appendix D" is EPA's Action Memorandum for Removal Actions Outside the

River, dated August 4, 1999, and approved August 5, 1999.

"Appendix E" is the SOW for the Removal Actions Outside the River.

"Appendix F" is the Removal Action Work Plan for Upper ½ Mile Reach of

Housatonic River, dated August 1999, and EPA's approval letter dated August 5, 1999.

"Appendix G " is the Draft Reissued RCRA Permit.

392

"Appendix H" is the Administrative Consent Order to be executed by MADEP and Settling Defendant.

"Appendix I" is the list of Property to Be Transferred to PEDA Pursuant to Definitive Economic Development Agreement.

"Appendix J" is the Protocol for EPA Peer Review Process – Housatonic River.

"Appendix K" is the Access and Services Agreement.

"Appendix L" is the Model Grant of Environmental Restriction and Easement for Settling Defendant Property.

"Appendix M" is the Model for Subordination Agreement.

"Appendix N" is the Model Grant of Conservation Easement and Restriction for Unkamet Brook Wetlands Area.

"Appendix O" is the Model Grant of Environmental Restriction and Easement for Non-Settling Defendant  Property.

"Appendix P" is the Form of Notice ERE for State-Owned Properties.

"Appendix Q" is the EREs, CERs and Conditional Solution Inspection Criteria and Requirements.

"Appendix R" is the Model for Consent to Access to Property.

"Appendix S" is the Model Confidentiality Agreement for Mediation, referenced in Section XXIV (Dispute Resolution).

"Appendix T" is the List of Designated Fill Properties.

"Appendix U" is the list of Properties Owned by the City Subject to this Consent Decree.

393

"Appendix V" is the List of GE Documents Submitted to USEPA and MADEP from 1/1/98 through 7/31/99 Relating to Investigations and Response Actions Conducted by GE at the Site in that Time Period, Excluding Documents Submitted Under RCRA Permit, State ACOs, and Building 68 UAO.

"Appendix W" is the List of GE Documents Submitted to Connecticut Department of Environmental Protection Which Conveyed Site-Related Information: 1984 to Present.

Settling Defendant does not, by entering into this Consent Decree, admit the validity of any statements or conclusions set forth in Appendices B, C or D.

### XXXVI. COMMUNITY RELATIONS

213.    Settling Defendant shall propose to EPA and the State the extent of its participation in the community relations plan to be developed by EPA. Settling Defendant shall cooperate with EPA and the State in implementing that plan. Settling Defendant shall also cooperate with EPA and the State in providing information regarding the Work to the public, including the Citizens' Coordinating Council. As requested by EPA or the State, Settling Defendant shall participate in the preparation of such information for dissemination to the public, including the Citizens' Coordinating Council, and in public meetings which may be held or sponsored by EPA or the State to explain activities at or relating to the Site.

214.    During the performance of the Work under this Consent Decree, the Parties shall coordinate and cooperate with the Citizens Coordinating Council established with regard to the Site.

## XXXVII. MODIFICATION

215.    Schedules specified in this Consent Decree for completion of the Work may
be modified by agreement of Settling Defendant and EPA, after reasonable opportunity
for review and comment by the State. All such modifications shall be made in writing and
shall be effective upon filing with the Court.

216.    Except as provided in Paragraph 39 ("Modification of the SOW or related
Work Plans"), no material modifications shall be made to the SOW, the Upper ½ Mile
Reach Removal Action Work Plan, or the Rest of River SOW without written notification
to and written approval of the United States, Settling Defendant, and the Court. Prior to
providing its approval to any modification, the United States will provide the State with a
reasonable opportunity to review and comment on the proposed modification. In the
event that the State disagrees with EPA's proposal to make a material modification to the
SOW, the United States shall attach the State's objections to its motion to modify the
SOW and shall include a reference to the State's objections in the body of such motion.
Modifications to the SOW, the Upper ½ Mile Reach Removal Action Work Plan, or the
Rest of River SOW that do not materially alter such document may be made by written
agreement between EPA, after providing the State with a reasonable opportunity to
review and comment on the proposed modification, and Settling Defendant. Material
modifications to the SOW, the Upper ½ Mile Reach Removal Action Work Plan, or the
Rest of River SOW shall be effective upon filing by the United States and approval by the
Court. Non-material modifications to the SOW, the Upper ½ Mile Reach Removal Action
Work Plan, or the Rest of River SOW shall be effective upon filing with the Court by the

United States. Written notification of material modifications to the SOW, the Upper ½ Mile Reach Removal Action Work Plan, or the Rest of River SOW shall be given to the City and PEDA.

217.    Non-material modifications to the Consent Decree (which do not include modifications to the SOW, the Upper ½ Mile Reach Removal Action Work Plan, or the Rest of River SOW) may be made only by written notification to and written approval of the United States, the State and the Settling Defendant. Such modifications will become effective upon filing with the Court by the United States. Material modifications to the Consent Decree and any modifications to the Performance Standards may be made only by written notification to and written approval of the United States, Connecticut, the State, Settling Defendant and the Court. Written notification of material and non-material modifications to this Consent Decree shall be given to the City and PEDA.

218.    Nothing in this Decree shall be deemed to alter the Court's power to enforce, supervise or approve modifications to this Consent Decree.

219.    For purposes of this Section XXXVII of the Consent Decree, the Consent Decree shall not include the SOW, the Upper ½ Mile Reach Removal Action Work Plan, or the Rest of River SOW.

### XXXVIII.   LODGING AND OPPORTUNITY FOR PUBLIC COMMENT

220.    This Consent Decree shall be lodged with the Court and subject to public notice and comment in accordance with 42 U.S.C. § 9622(d)(2), 42 U.S.C. § 6973, 28 C.F.R. § 50.7, 40 C.F.R. Part 124, and M.G.L. 21E, § 3A(j)(2). The United States reserves the right to withdraw or withhold its consent if the comments regarding the

Consent Decree disclose facts or considerations which indicate that the Consent Decree is inappropriate, improper, or inadequate. Given the unique circumstances of this case, where the state and federal agencies have worked together closely and cooperatively throughout the development and settlement of the case, the State or Connecticut may withdraw or withhold its consent to the entry of this Consent Decree if comments received disclose facts or considerations which show that the Consent Decree violates state law; and the State also may withdraw or withhold its consent to the entry of this Consent Decree if comments received disclose facts or considerations which show that the Consent Decree's termination of the rights of third parties by operation of M.G.L. c. 21E, § 3A(j)(2) would render the Consent Decree unfair. The United States reserves the right to challenge in court the State's or Connecticut's withdrawal from the Consent Decree. The State and Connecticut reserve the right to oppose the United States' position in opposition to the proposed withdrawal. In addition, in the event of the United States' withdrawal from this Consent Decree, the State and Connecticut reserve their right to withdraw from this Consent Decree. Settling Defendant consents to the entry of this Consent Decree without further notice, except as provided in Paragraph 10.c of this Consent Decree.

221.    Except as otherwise provided in Paragraph 16 (Performance of Removal Actions Prior to Effective Date of Consent Decree), if for any reason the Court should decline to approve this Consent Decree in the form presented, this agreement is voidable at the sole discretion of any Party and the terms of the agreement may not be used as evidence in any litigation between the Parties.

## XXXIX. SIGNATORIES/SERVICE

222.    Each undersigned representative of Settling Defendant, the City, and PEDA, and the Assistant Attorney General for the Environment and Natural Resources Division of the Department of Justice, the Attorney General for the Commonwealth of Massachusetts, and the Attorney General for the State of Connecticut certifies that he or she is fully authorized to enter into the terms and conditions of this Consent Decree and to execute and legally bind such Party to this document.

223.    Settling Defendant hereby agrees not to oppose entry of this Consent Decree by this Court or to challenge any provision of this Consent Decree unless the United States has notified the Settling Defendant in writing that it no longer supports entry of the Consent Decree, and/or except as provided in Paragraph 10.c of this Consent Decree.  The City and PEDA agree not to oppose entry of this Consent Decree by this Court, unless the United States has notified the City and PEDA in writing that it no longer supports entry of the Consent Decree.

224.    Settling Defendant, the City and PEDA shall identify, on the attached signature pages, the name, address and telephone number of an agent who is authorized to accept service of process by mail on behalf of that Party with respect to all matters arising under or relating to this Consent Decree.  Settling Defendant, the City and PEDA hereby agree to accept service in that manner and to waive the formal service requirements set forth in Rule 4 of the Federal Rules of Civil Procedure and any applicable local rules of this Court, including, but not limited to, service of a summons.

## XL. FINAL JUDGMENT

225. Upon approval and entry of this Consent Decree by the Court, this Consent Decree shall constitute a final judgment between and among the United States, the Commonwealth of Massachusetts, the State of Connecticut, the City, PEDA and Settling Defendant. The Court finds that there is no just reason for delay and therefore enters this judgment as a final judgment under Fed. R. Civ. P. 54 and 58.

SO ORDERED THIS 27 DAY OF *Oct.* , *2000* .

*Michael A. Ponsor*

United States District Judge

THE UNDERSIGNED PARTY enters into this Consent Decree in the matter of United States, the Commonwealth of Massachusetts, and the State of Connecticut v. General Electric Company, relating to the General Electric-Pittsfield/Housatonic River Site.

**FOR THE UNITED STATES OF AMERICA**

Oct. 5, 1999
Date

Lois J. Schiffer
Assistant Attorney General
Environment and Natural Resources Division
U.S. Department of Justice
Washington, D.C.  20530

10/4/99
Date

Cynthia S. Huber
Senior Attorney
Environmental Enforcement Section
Environment and Natural Resources Division
U.S. Department of Justice
P.O. Box 7611
Washington, D.C.  20530-7611
(202) 514-5273

10/4/99
Date

Catherine Adams Fiske
Environmental Enforcement Section
Environment and Natural Resources Division
U.S. Department of Justice
One Gateway Center
Suite 616
Newton Corner, MA 02458
(617) 450-0444

400

THE UNDERSIGNED PARTY enters into this Consent Decree in the matter of United States, the Commonwealth of Massachusetts, and the State of Connecticut v. General Electric Company, relating to the General Electric-Pittsfield/Housatonic River Site.

Donald Stern
United States Attorney
District of Massachusetts

Karen Goodwin
Assistant United States Attorney
District of Massachusetts
1550 Main Street
Springfield, Massachusetts

401

THE UNDERSIGNED PARTY enters into this Consent Decree in the matter of United States, the Commonwealth of Massachusetts, and the State of Connecticut v. General Electric Company, relating to the General Electric-Pittsfield/Housatonic River Site.

*10/5/99*
Date

John P. DeVillars
Regional Administrator, Region I
U.S. Environmental Protection Agency
Boston, Massachusetts 02114-2023

*10/5/99*
Date

Timothy M. Conway
John W. Kilborn
Senior Enforcement Counsels
U.S. Environmental Protection Agency
Region 1
One Congress Street
Suite 1100
Boston, Massachusetts 02114-2023

402

THE UNDERSIGNED PARTY enters into this Consent Decree in the matter of United States, the Commonwealth of Massachusetts, and the State of Connecticut v. General Electric Company, relating to the General Electric-Pittsfield/Housatonic River Site.

1•/4/99
Date

Steven A. Herman
Assistant Administrator
Office of Enforcement and Compliance
 Assurance
U.S. Environmental Protection Agency
Washington, D.C. 20460

403

THE UNDERSIGNED PARTY enters into this Consent Decree in the matter of United States, the Commonwealth of Massachusetts, and the State of Connecticut v. General Electric Company, relating to the General Electric-Pittsfield/Housatonic River Site.

FOR THE COMMONWEALTH OF
MASSACHUSETTS

Tom Reilly
Attorney General
Commonwealth of Massachusetts

10/2/99
Date

10/5/99
Date

Dean Richlin        -
First Assistant Attorney General
Office of the Attorney General
One Ashburton Place
Boston, Massachusetts 02108

James R. Milkey
Assistant Attorney General
Chief, Environmental Protection Division
200 Portland Street
Boston, Massachusetts 02114

10/5/99
Date

10/5/99
Date

Matthew Brock
Assistant Attorney General
Office of Attorney General
200 Portland Street
Boston, Massachusetts 02114

Nancy E. Harper
Assistant Attorney General
Office of Attorney General
200 Portland Street
Boston, Massachusetts 02114

THE UNDERSIGNED PARTY enters into this Consent Decree in the matter of United States, the Commonwealth of Massachusetts, and the State of Connecticut v. General Electric Company, relating to the General Electric-Pittsfield/Housatonic River Site.

10 · 5 · 99

Date

Lauren A. Liss
Commissioner
Department of Environmental
   Protection
Commonwealth of Massachusetts

Oct. 5, 1999

Date

Robert Durand
Secretary
Executive Office of Environmental
   Affairs
Commonwealth of Massachusetts

THE UNDERSIGNED PARTY enters into this Consent Decree in the matter of United States, the Commonwealth of Massachusetts, and the State of Connecticut v. General Electric Company, relating to the General Electric-Pittsfield/Housatonic River Site.

FOR THE STATE OF CONNECTICUT

10/5/99
Date

Richard Blumenthal
Attorney General
55 Elm Street
P.O. Box 120
Hartford, Connecticut 06141-0120

10/5/99
Date

John M. Looney
Richard F. Webb
Assistant Attorneys General
55 Elm Street
P.O. Box 120
Hartford, Connecticut 06141-0120

10/5/99
Date

Arthur J. Rocque, Jr.
Commissioner of Environmental Protection
79 Elm Street
Hartford, Connecticut 06106

406

THE UNDERSIGNED PARTY enters into this Consent Decree in the matter of United States, the Commonwealth of Massachusetts, and the State of Connecticut v. General Electric Company, relating to the General Electric-Pittsfield/Housatonic River Site.

FOR GENERAL ELECTRIC COMPANY

10-7-99

Date

Stephen D. Ramsey
Vice President
Corporate Environmental Programs
General Electric Company
3135 Easton Turnpike
Fairfield, CT 06431

Agent Authorized to Accept Service on Behalf of Above-signed Party:

Name:        Michael Carroll
Title:          Manager of Pittsfield Remediation
                   Programs
                   Corporate Environmental
                   Programs
                   General Electric Company
Address:    100 Woodlawn Ave.
                   Pittsfield, MA 01201
Ph. Number:   413-494-3500

THE UNDERSIGNED PARTY enters into this Consent Decree in the matter of United States, the Commonwealth of Massachusetts, and the State of Connecticut v. General Electric Company, relating to the General Electric-Pittsfield/Housatonic River Site.

FOR THE PITTSFIELD ECONOMIC
DEVELOPMENT AUTHORITY

*10/5/99*
Date

Thomas E. Hickey, Jr.
Interim Director
100 Woodlawn Avenue, Bldg. 42-100
Pittsfield, MA 01201

Agent Authorized to Accept Service on Behalf of the Pittsfield Economic Development Authority:

Jeffrey M. Bernstein, Esq.
Bernstein, Cushner & Kimmell, P.C.
One Court Street, Suite 700
Boston. MA 02108

408

THE UNDERSIGNED PARTY enters into this Consent Decree in the matter of United States, the Commonwealth of Massachusetts, and the State of Connecticut v. General Electric Company, relating to the General Electric-Pittsfield/Housatonic River Site.

FOR THE CITY OF PITTSFIELD

10-5-99
Date

Gerald S. Doyle, Jr.
Mayor of the City of Pittsfield
City Hall
Pittsfield, MA 01201

Agent Authorized to Accept Service on Behalf of the City of Pittsfield:

Jeffrey M. Bernstein, Esq.
Bernstein, Cushner & Kimmell, P.C.
One Court Street, Suite 700
Boston, MA 02108

409