# EXHIBIT "B"

FILED MB
GLYNN CO. CLERK'S OFFICE
Filed 10/20/2022 2:58 PM
Accepted 10/21/2022 8:56 AM
CASE # CE22-01086

*Ronald M. Adams*

CLERK SUPERIOR COURT

## IN THE SUPERIOR COURT OF GLYNN COUNTY
## STATE OF GEORGIA

CITY OF BRUNSWICK, by )
and through its MAYOR AND BOARD )
OF COMMISSIONERS, )
                           )
        Plaintiff, )
                           )
v.                         ) CIVIL ACTION FILE
                           ) NO. CE22-01086
HONEYWELL INTERNATIONAL, )
INC., formerly known as ) JUDICIAL OFFICER: JUDGE KELLEY
ALLIED CHEMICAL CORPORATION, )
and as ALLIEDSIGNAL, INC., and THE )
GEORGIA POWER COMPANY, )
                           )
        Defendants. )

## COMPLAINT

COMES NOW the City of Brunswick through counsel and shows the Court the following:

### PARTIES, JURISDICTION AND VENUE

1.

The Plaintiff, the City of Brunswick, by and through its Mayor and Commissioners, is a municipal corporation in Glynn County, Georgia. Plaintiff, by and through its mayor, commissioners and attorney, brings this action to protect and enforce the rights, interests and duties of the City and as trustee of the citizens, taxpayers and properties of the City of Brunswick. The city limits of the City of Brunswick are deleneated on the attached map. Ex. A.

2.

Claims sought by the City of Brunswick are brought on behalf of the Plaintiff by Plaintiff's counsel in their role as attorneys for the City of Brunswick.

3.

The Defendant Honeywell International, Inc. is a corporation incorporated under the laws of

the State of Delaware. Its principal place of business is 855 S. Mint Street, Charlotte, North Carolina 29201. This Defendant may be served by service upon its registered agent for service, Corporation Service Company, 2 Sun Court, Suite 400, Peachtree Corners, Georgia 30092. It is subject to the jurisdiction of this Court. This corporation was formerly named AlliedSignal, Inc. and, before being named AlliedSignal, Inc., was named Allied Chemical Corporation and Allied Chemical and Dye Corporation. This company is referred to herein as "Honeywell."

4.

The Defendant Georgia Power Company (hereinafter "Georgia Power") is a Georgia corporation with its principal place of business at 241 Ralph McGill Blvd., N.E., Bin #10180, Atlanta, Georgia 30308-3374. This Defendant may be served by service upon its registered agent for service, Kristi Dow, 241 Ralph McGill Blvd., N.E., Bin # 10180, Atlanta, Georgia 30308. It is subject to the jurisdiction of this Court.

5.

This action arises out of acts and injuries which occurred in Glynn County, Georgia. Jurisdiction and venue lie in the Superior Court of Glynn County, Georgia.

## GENERAL ALLEGATIONS

6.

The City of Brunswick owns properties that lie west of Newcastle Street and east of the Turtle River that include high ground, marshes and creek and river bottoms; property that lies east of Glynn Avenue, south of the F.J. Torras Causeway, and west of the Mackay River that includes high ground, marshes and creek bottoms; property lying both north and south of the F.J. Torras Causeway, east of the Back River and west of the Little River that includes high ground, marshes and creek bottoms; property that encompasses the southern portion of the Altimaha Canal that

includes high ground and the now non-navigable canal; and property that lies on the east side of Andrews Island that includes high ground, marshes and river bottom.

7.

In 1955, Defendant Honeywell, then operating as Allied Chemical and Dye Corporation, purchased land abutting Purvis Creek for use as a site for construction and operation of a chlor-alkalai chemical plant. The tract of land purchased by Honeywell included 480 acres of marshland. This property is referred to herein as the Honeywell Plant Site and as the Plant Site. Numerous documents refer to this tract of land as the "LCP Site" even though the site is owned by Defendant Honeywell.

8.

Prior to beginning construction of the chlor-alkalai plant, Honeywell assured the State of Georgia "that there will be no significant discharge of industrial waste from our plant" into the waters at Brunswick. Ex. B.

9.

Defendant Honeywell built and operated the chlor-alkalai plant on the Plant Site from 1956 through December 1979, at which time it sold the Plant to Linden Chemicals and Plastics Corp., herein referred to as "LCP." LCP subsequently changed its corporate name to Hanlin GP, Inc., but continued to do business under the trade name LCP until the Plant was closed in 1994.

10.

At the Plant, Defendant Honeywell manufactured chlorine gas, caustic soda, bleach and hydrogen gas in a process using metallic mercury in large processing areas called cell rooms.

11.

By design, waste and waste water contaminated with mercury were discharged through a

ditch that emptied into Purvis Creek. The mercury dumped into Purvis Creek spread in the tidal water throughout the Turtle River estuary and into waters within the City of Brunswick.

12.

Between 1956 and 1979, Defendant Honeywell discharged tons of vaporized mercury into the air of Glynn County. Approximately one million pounds of mercury was wrongfully released into the environment by Defendant Honeywell.

13.

Mercury discharged into the air and water by Defendant Honeywell precipitated and flowed within the City of Brunswick and onto property of the City of Brunswick.

14.

Between 1962 and 1972, Defendant Honeywell used graphite anodes impregnated with Aroclor 1268 poly-chlorinated byphenals (PCBs) in its chlorine manufacturing process.

15.

Each PCB-impregnated anode contained from 8.5 to 10 pounds of Aroclor-1268 (PCBs). Between 1962 and 1972, Defendant Honeywell utilized at its Brunswick Plant approximately twenty-five percent of the amount of Aroclor-1268 (PCBs) produced annually in the United States.

16.

Between 1962 and 1972, Defendant Honeywell consumed thirty to sixty tons of Aroclor-1268 (PCBs) per year at the Plant.

17.

Defendant Honeywell was the only company in Georgia to purchase Aroclor-1268 (PCBs) for use in its manufacturing process.

18.

During the manufacturing process, mercury was also absorbed by the graphite anodes.

19.

During the manufacturing process, the anodes eroded into dust. The eroded graphite dust that was contaminated with mercury and Aroclor-1268 (PCBs) was discharged into Purvis Creek or captured in filters and backwashed through the plant sewer into Purvis Creek or dumped on site.

20.

An anode was considered "spent" or no longer usable after eighty to ninety percent of the anode had eroded into the cell. Defendant Honeywell stacked contaminated spent anodes around the Plant Site, dumped spent anodes in the marsh, built berms in the marsh out of spent anodes, and filled in potholes in roads at the Plant Site with spent anodes.

21.

The anodes that were dumped in the marsh and used to build berms contained Aroclor-1268 (PCBs) and mercury.

22.

Defendant Honeywell dumped hundreds of tons of Aroclor-1268 (PCBs) in filter backwash sent to Purvis Creek, in the trash dump in and near the marsh behind the cell rooms, and in berms and in other construction and fill at the Plant Site.

23.

PCBs were banned for use in the United States by the U.S. Environmental Protection Agency in the 1970's.

24.

Between 1956 and 1978, Defendant Honeywell dumped used cell room parts in the marsh

and on land to the west of the Plant. These used parts were contaminated with mercury. Mercury was visible on the ground in the areas where the old parts were dumped in the marsh.

25.

Defendant Honeywell used a bulldozer to fill portions of the marsh where it had dumped used parts and spent anodes containing mercury and Aroclor-1268 (PCBs).

26.

In 1973, Defendant Honeywell discovered that its cell rooms were sinking because caustic soda that it had dumped was chemically dissolving the earth under the Plant. The sinking foundation caused the cell room floors to crack and sink, thus facilitating further discharge of mercury into the environment.

27.

No later than 1969, management of Defendant Honeywell knew that metallic mercury dumped into a salt water estuary would methylize into the food chain, bioaccumulate and biomagnify, with the result that fish in the estuary would acquire levels of methylmercury toxic to people who ate the fish.

28.

No later than 1969, management of Defendant Honeywell knew that people living near Minamata Bay in Japan had been poisoned by methylmercury in fish they had eaten, and that the source of this toxic mercury was a chemical plant that had dumped metallic mercury into Minamata Bay.

29.

Copies of studies documenting the methylization and bioaccumulation of mercury and the Minamata Bay tragedy were furnished to the management of Defendant Honeywell's Brunswick

Plant and kept in the Plant files. At least since 1969, management of Defendant Honeywell knew that metallic mercury dumped into the Turtle River Estuary would methylize, bioaccumulate in the fish and poison people who ate the fish.

30.

Despite the notice and knowledge of the toxic consequences of dumping metallic mercury into the Turtle River salt water estuary, Defendant Honeywell intentionally continued to dump more metallic mercury into the Turtle River Estuary and made no effort to recover the mercury that it had already wrongfully dumped and released.

31.

No later than 1970, management of Defendant Honeywell knew that PCBs released into the environment are strongly absorbed on particles, concentrate in animal fat, and are transferred through the food chain.

32.

No later than 1970, management of Defendant Honeywell knew that PCBs in very low concentrations cause death in fish, crab and oyster populations, with toxic effects found at levels as low as one part per billion in an aquatic environment, the equivalent of one pint of PCBs dumped into 300 acres of water one foot deep.

33.

No later than 1970, management of Defendant Honeywell knew that PCBs should never be disposed of in a manner in which the PCBs could enter an aquatic environment.

34.

Despite actual notice and knowledge of the severe toxic consequences of releasing PCBs into an aquatic environment, Defendant Honeywell intentionally continued to dump PCB waste at a rate

-7-

of tens of thousands of pounds of PCBs each year onto its Brunswick Plant Site, into ponds on the Site, into marshlands and into its outfall canal that led to Purvis Creek and the Turtle River Estuary.

35.

Despite actual notice and knowledge of the severe toxic consequences of releasing PCBs into an aquatic environment, Defendant Honeywell took no action to remove any of the tens of thousands of pounds of PCBs that it had already dumped on its Site, into the marshlands and in the outfall canal that leads to Purvis Creek, the Turtle River Estuary and beyond.

36.

No later than 1971, management of Defendant Honeywell had learned that its mercury had, in fact, methylized, entered the food chain and was in fish, crabs and other marine life in the Turtle River Estuary and beyond at levels that posed a risk of injury to people eating the seafood.

37.

Despite the knowledge and notice to Defendant Honeywell of the dire potential consequences of its wrongdoing, Defendant Honeywell elected to hide its wrongdoing and to take no action to notify and warn its neighbors, the City of Brunswick, or the citizens of the City of Brunswick or those who fished and crabbed in the waters of Glynn County or those who ate seafood from the waters of Glynn County.

38.

In 1978, management of Defendant Honeywell directed managers of each Honeywell unit to evaluate the cost of complying with environmental laws for each unit. Management of Honeywell had decided to discontinue ownership and operation of plants where the cost of environmental stewardship was found to be "uneconomical."

39.

In December, 1979, Defendant Honeywell sold its Brunswick chlor-alkalai plant to Linden Chemicals and Plastics Corporation (LCP) for the purpose of shedding Defendant Honeywell's responsibilities for environmental stewardship.

40.

Defendant Honeywell sold its Brunswick Plant and Plant Site to LCP without disclosing to LCP that Defendant Honeywell had dumped many tons of mercury and PCBs on and off the Site, and that the Plant buildings were slowly sinking because of caustic soda and mercury that Defendant Honeywell had dumped under the buildings.

41.

Defendant Honeywell sold the Brunswick Plant and Plant Site for the purpose of continuing the nuisance and trespasses that it had created by releasing mercury and PCBs that were spreading into the Turtle River Estuary and beyond, including waters within the City of Brunswick and onto property of the City of Brunswick.

42.

Defendant Honeywell's sale of the Brunswick Plant and Plant Site had the effect of continuing the nuisance and trespasses that it had created by releasing mercury and PCBs that were spreading into the Turtle River Estuary and nearby waters and marshes within the City of Brunswick and onto property of the City of Brunswick.

43.

Defendant Honeywell financed, in part, the sale of its Brunswick Plant and Plant Site to LCP and was, at all times relevant, a creditor of LCP.

-9-

44.

Defendant Honeywell used the power that it held as a creditor of LCP as a tool to keep the

Plant in operation for the express purpose of avoiding and delaying removal of the tons of mercury

and tons of PCBs that it had dumped on the Plant Site, in adjacent marshes and waters within the

City of Brunswick and onto property of the City of Brunswick. It thereby maintained and aggravated

the nuisance and trespasses that it had created.

45.

In 1981, Defendant Honeywell filed a required report with the U.S. Environmental Protection

Agency that stated that 4500 tons of material containing trace amounts of mercury had been disposed

at the Plant Site. Defendant Honeywell did not inform the U.S. Environmental Agency that it had

disposed of hundreds of tons of PCBs, that it had created an uncontained dump site containing PCBs

and mercury in the marsh, or that it had discharged many tons of mercury into Purvis Creek.

Defendant Honeywell represented in documents submitted to the U.S. Environmental Agency before

1981, in 1981, and after 1981, that the wastes that it had dumped at its Brunswick Plant Site did not

contain PCBs.

46.

The false representations contained in reports that Defendant Honeywell filed with the U.S.

E.P.A. and the Georgia E.P.D. were done with the purpose and with the effect of continuing the

nuisance and trespasses that Defendant Honeywell had create. False statements made to the Georgia

E.P.D. and other agencies of the State of Georgia were in violation of O.C.G.A. § 16-10-20.

47.

By 1985, LCP was in financial difficulty. From 1985 to 1994, Defendant Honeywell used

its power as a creditor of LCP to keep the Plant in operation for the purpose and with the effect of

-10-

continuing the nuisance and trespasses that Defendant Honeywell had created.

48.

In 1988, LCP contacted Defendant Honeywell to complain about sinking of the mercury cell rooms and other environmental misdeeds that Defendant Honeywell had not disclosed to LCP prior to the sale of the Plant to LCP.

49.

In 1988, Defendant Honeywell formed a conspiracy with LCP to hide environmental misdeeds, and to facilitate the continued operation of the Plant for the purpose and with the effect of continuing and aggravating the nuisance that Defendant Honeywell had created.

50.

When management of Defendant Honeywell learned that the State of Georgia had discovered some of the tons of PCBs that Defendant Honeywell had illegally dumped at the Plant Site, Defendant Honeywell conspired with LCP to assist Defendant Honeywell's effort to illegally hide its responsibility for the PCBs dumped at the Site by requesting that insolvent LCP claim responsibility for the PCBs, with Defendant Honeywell secretly reimbursing LCP for costs, even though LCP had never used PCB's at the Brunswick Plant. Defendant Honeywell thus sought to pay LCP to deceive government agents for the purpose of hiding illegal, criminal conduct on the part of Defendant Honeywell and to avoid full financial responsibility for its misdeeds, all in violation of O.C.G.A. § 16-10-20.

51.

In 1991, the Georgia Department of Natural Resources ("the DNR") discovered that fish and other marine life in the Turtle River estuary and beyond were contaminated with mercury and Aroclor-1268 (PCBs).

52.

Following the discovery of contaminated fish, the D.N.R. closed Purvis Creek and a portion of the Turtle River and Gibson Creek to commercial fishing and shellfish/seafood harvesting because of the presence of mercury and Aroclor-1268 (PCBs) in marine life in those waters.

53.

The D.N.R. issued a seafood consumption advisory for these waters. The D.N.R. advisory recommended that seafood caught in these waters not be consumed because of the presence of mercury and Aroclor-1268 (PCBs) in the marine life.

54.

In 1992, the Environmental Protection Division of the Georgia Department of Natural Resources ("E.P.D.") learned that anodes containing Aroclor-1268 (PCBs) had been used to build berms for the Plant outfall. E.P.D. ordered LCP to begin removal of the anodes.

55.

Defendant Honeywell's efforts to hide this portion of its wrongful conduct failed. The Georgia E.P.D. learned that Defendant Honeywell, and not LCP, had used the PCBs and had dumped the anodes and decomposed particles from anodes contaminated with Aroclor-1268 (PCBs) in the marsh and water. E.P.D. ordered Defendant Honeywell to remove the contaminated anodes.

56.

As a result of a negotiated consent order with E.P.D., Defendant Honeywell agreed to do further testing to delineate the extent of Aroclor-1268 (PCBs) contamination at the Plant Site. As a result, E.P.D. did not discover at that time the extent of Aroclor-1268 (PCBs) contamination that existed in the old Honeywell trash, elsewhere at the Plant Site, and in the waters and marshes throughout Glynn County. Defendant Honeywell was thus able to continue to wrongfully hide large

-12-

amounts of the PCBs that it had dumped and left in Brunswick.

57.

By 1993, Defendant Honeywell determined that it could save over $20,000,000 if it could keep the Brunswick Plant in operation so that it could "defer" environmental remediation costs and thus leave its mercury and PCBs on and off the Site, thereby continuing and expanding the ongoing nuisance and trespasses. Defendant Honeywell believed that if the Brunswick Plant closed, the environmental regulators would move quickly to make Defendant Honeywell remediate the contamination at the Plant Site.

58.

Defendant Honeywell attempted to keep the Brunswick Plant in operation despite LCP's financial difficulty. Defendant Honeywell and HoltraChem, Inc. began negotiating a prospective purchase of the Brunswick Plant and the other chlor-alkalai plants from LCP. Defendant Honeywell wanted to purchase the Brunswick Plant in order to further delay environmental remediation costs and save millions of dollars.

59.

In June 1993, the Georgia E.P.D. notified LCP of its intent to revoke the environmental permits at the Brunswick Plant.

60.

In 1993, Defendant Honeywell provided millions of dollars to LCP to keep the Plant in operation so that Defendant Honeywell could continue to postpone environmental remediation of the Plant Site, with the effect of continuing and expanding the nuisance that Defendant Honeywell had created.

-13-

61.

During 1993, Defendant Honeywell's expenditures to keep the Brunswick Plant in operation included guarantee of the Plant power bill, without which the Plant power would have been cut off and the plant would have shut down.

62.

In October 1993, Defendant Honeywell took control of operations at the Brunswick Plant and sent its employee, Mark White, to serve as plant manager of the Brunswick Plant.

63.

Between September 1993, and February 1994, Defendant Honeywell opposed Georgia E.P.D.'s attempt to revoke LCP's environmental permits. Defendant Honeywell claimed that it possessed sufficient interest in the Brunswick Plant during this time to give it standing to oppose the permit revocation proceedings.

64.

In October 1993, Defendant Honeywell sent James Kavney, a Honeywell employee, to take charge of maintenance at the Plant.

65.

Between October 1993, and February 1994, numerous Honeywell employees worked in operations and maintenance at the Plant.

66.

The prolonged operation of the Plant made possible by the efforts of Defendant Honeywell caused additional releases of mercury and PCBs from the Plant Site to the marsh and surrounding waters.

-14-

67.

Defendant Honeywell kept the Plant in operation in order to avoid having to spend money to remediate its releases of mercury and PCBs, and thus continued and aggravated the ongoing and expanding nuisance and trespasses.

68.

In February 1994, the Brunswick Plant shut down.

69.

A Unilateral Administrative Order was issued to Defendant Honeywell, LCP, and Mark White ordering them to remove the chemicals remaining at the Plant, to determine the extent of contamination at the Plant, and to begin the environmental remediation of the Plant and the Plant Site.

70.

Following the shutdown, the U.S. E.P.A. discovered tons of mercury underneath the cell rooms, in the soil around the Plant Site, in the marsh in front of the old Honeywell trash dump, in the old Honeywell trash dump and in the waters surrounding the Plant Site. Testing of marine life in waters adjacent to the Plant again confirmed that the seafood in this area was contaminated with mercury and was not safe to eat. The sediment in creeks and rivers adjacent to the Plant was found to be contaminated with mercury.

71.

The U.S. E.P.A. discovered tons of Aroclor-1268 (PCBs) in the soil around the Plant, in the marsh in front of the old Honeywell trash dump, in the old Honeywell trash dump and in the waters surrounding the Plant Site and beyond. Testing of marine life in waters adjacent to the Plant confirmed that the fish and crabs in this area were contaminated with Aroclor-1268 (PCBs) and

therefore were not safe to eat. The sediment in creeks and rivers adjacent to the Plant and beyond was found to be contaminated with Aroclor-1268 (PCBs).

72.

The U.S. E.P.A. concluded that large amounts of mercury and Aroclor-1268 (PCBs) continued to be discharged from the Plant Site into the adjacent waters. In 1998, U.S. E.P.A. required Defendant Honeywell to remove one foot of soil from thirteen acres of the marsh and sediment in creeks in front of the old Honeywell trash dump. Large amounts of mercury and PCBs had continued to be discharged from the thirteen acres of marsh and creek.

73.

Mercury and PCBs released from the Plant and the Plant Site have entered the food chain in the Turtle River estuary and the waters and marshes within the City of Brunswick and onto property of the City of Brunswick.

74.

Mercury and PCB contamination of the food chain in the Turtle River Estuary and adjacent waters and marshes will continue to spread.

75.

Defendant Honeywell's activities at the Plant Site caused and continue to cause toxic mercury and PCBs to be spilled, discharged and deposited into the Turtle River, its tributaries, surrounding marshlands and onto property of the City of Brunswick in amounts, concentrations and combinations that are harmful to health, safety and welfare of the citizens of the City of Brunswick, and to animals, birds and aquatic life.

76.

Defendant Honeywell has stored, disposed, discharged and released its hazardous wastes onto

property of the City of Brunswick and in the waters and marshlands abutting property of the City of Brunswick in order to avoid the costs of safe storage and safe disposal of its hazardous wastes.

77.

Mercury and PCB contamination of the water, sediment, and marine life in the Turtle River Estuary and adjacent waters and marshes within the City of Brunswick has interfered with and will continue to damage the value and usefulness of property in the City of Brunswick, and interfere with use and enjoyment, and rental value of these properties until contaminants are removed from the land, marsh and sediment of the waters, creek and river bottoms.

78.

As a waterfront property owner, the City of Brunswick has the right to construct docks into the creeks and rivers.

79.

As a result of Defendant Honeywell's widespread disposal of mercury and PCBs, the usefulness, enjoyment and rental value of docks of the City of Bunswick have been diminished.

80.

The City of Brunswick owns properties that abut and are inundated by tidal waters in which commercial and recreational fishing, crabbing and shrimping have been prohibited or severely restricted.

81.

Animals, birds, aquatic life and vegetation living within the Turtle River Estuary and surrounding waters and marshlands have been poisoned as a result of Defendant Honeywell's pollution.

-17-

82.

Mercury and PCBs wrongfully released by Defendant Honeywell have been ingested by fish, crabs and other wildlife.

83.

As a result of the wrongful acts of Defendant Honeywell, the crabs, oysters, fish and other wildlife that inhabit the Turtle River area and adjacent waters and marshes within the City of Brunswick have dangerously high levels of mercury and PCBs.

84.

The fish, oysters and crabs in the area of the Turtle River and adjacent waters are unfit for human consumption as a result of Defendant Honeywell's contamination.

85.

Defendant Honeywell knew at all times that mercury and PCBs were harmful to the environment.

86.

Defendant Honeywell knew at all times that it should not allow its mercury and PCB waste to enter into any body of water, including the Turtle River Estuary and adjacent waters and marshes.

87.

For many years, the Defendant Georgia Power Company owned and operated an electrical generator station that abutted the Turtle River and known as Plant McManus. The Georgia Power Plant was coal fired, and emitted mercury into the air, the waters and the marshes of Glynn County.

88.

The mercury released by Georgia Power has, in part, migrated onto marshes and shoreline owned by the City of Brunswick thereby contributing to the pollution of property of the City of

-18-

Brunswick.

89.

The Defendant Georgia Power has acknowledged joint responsibility for the mercury pollution of the Marshes of Glynn, as evidenced by the Consent Decree agreed to by Georgia Power. *United States of America v. Honeywell International Inc. and Georgia Power Company*, Civil Action No. 2:16-CV-00112, U.S. District Court, S.D. GA, DKT. 3-1, 07-29-16.

90.

Defendants had a duty to the City of Brunswick to manage, store and contain their hazardous wastes in a reasonable manner.

91.

Defendants had a duty to the City of Brunswick to operate their plants in a manner that did not pollute the waters and marshlands on and abutting property of the City of Brunswick.

92.

Defendants had a duty to the City of Brunswick to design and maintain all hazardous waste storage and disposal areas so that hazardous wastes would not seep into the marshlands and waters on and abutting property of the City of Brunswick.

93.

The above-described actions of Defendants were in violation of the Georgia Water Quality Control Act. O.C.G.A. § 12-5-29(a),(b). Such wrongful acts constitute repeated violations of the criminal prohibitions of the Act. O.C.G.A. § 12-5-53.

94.

Defendants' dumping of mercury and PCBs into public waters was, at all times, illegal and criminal.

-19-

95.

Having wrongfully and knowingly discharged toxic chemicals into the Turtle River and the creeks, canals and marshes on and adjacent to property of the City of Brunswick, Defendants are and have been under a duty to notify the City of Brunswick and to warn the City of Brunswick of the dangers that they have created.

96.

Defendants and U.S. E.P.A. have defined the boundaries of the site subject to remediation under the Comprehensive Environmental Response and Liability Act, 42 U.S.C. § 9601, et seq. The property within this site is referred to as the Allied/LCP CERCLA Site as shown of Exhibit C to this Complaint.

97.

Property, waters and marshland outside the area of the Allied/LCP CERCLA Site are not part of a CERCLA superfund site.

98.

Defendants has polluted land, water and marshland outside the boundaries of the Allied/LCP CERCLA Site.

99.

As a result of the actions of Defendants, property of the City of Brunswick has been damaged and reduced in value.

100.

As a direct result of Defendants' wrongful actions, the City of Brunswick owns properties containing hazardous and toxic wastes that render the City of Brunswick potentially liable for the remediation of the waste on its property. Defendants are liable for all such remediation costs and

damages.

101.

The actions of Defendants have interfered with the value, use and enjoyment of property of the City of Brunswick. The properties of the City of Brunswick have been poisoned and contaminated.

102.

Defendants have ratified the conduct of their employees, agents, and contractors that benefitted each Defendant and that caused and or contributed to the City of Brunswick's damage and injury.

103.

At all times relevant hereto, it was foreseeable to Defendants that their conduct would harm the City of Brunswick.

104.

Defendants acted in concert to accomplish the tortious conduct about which Plaintiff complains.

105.

Defendants' fault in this case is indivisible. Plaintiff's injury and damage in this case are indivisible.

106.

Defendants are jointly and severally liable to Plaintiff for the full amount of Plaintiff's damages.

107.

At all times relevant hereto, it was foreseeable to Defendants that their failure to prevent their

pollutant discharges could harm the City of Brunswick and its property.

108.

At all times relevant hereto, it was foreseeable to Defendants that their failure to permanently remove their pollutants from property of the City of Brunswick could harm the City of Brunswick and its property.

## COUNT ONE

## CONTINUING TRESPASS

109.

Plaintiff restates and incorporates by reference, as if fully set forth herein, paragraphs 1 through 108.

110.

The continuing unpermitted presence and spread of Defendants' pollution at and about property of the City of Brunswick, unreasonably and substantially interferes with the City's right to exclude others and the pollutants of others from its property.

111.

Defendants' continuing failure and refusal to permanently remove their pollution from property of the City of Brunswick, unreasonably and substantially interferes with the City's right to exclude others and the pollutants of others from its property.

112.

By their conduct above-described, each Defendant maintained and maintains a continuing trespass on property of the City of Brunswick.

113.

By their conduct above-described, each Defendant procured, assisted, or induced the commission of the trespasses alleged in this Complaint.

114.

The continuing trespass that Defendants have maintained and are maintaining here is an actual and proximate cause of aggravation, inconvenience and other damage and injury to the City of Brunswick.

115.

The City of Brunswick was and is specially damaged by Defendants' continuing trespasses.

116.

Because of Defendants' continuing trespasses, Defendants are liable to the City of Brunswick in dollar amounts to be determined by the enlightened conscience of the jury.

117.

Defendants' conduct set out above was reckless, showed willful misconduct, malice, wantonness, oppression, an entire want of care, and that conscious indifference to the consequences of their conduct to the City of Brunswick.

118.

Because Defendants' conduct set out above showed willful misconduct, malice, wantonness, oppression or that entire want of care which would raise the presumption of conscious indifference to consequences, O.C.G.A § 51-12-5.1 entitles the City of Brunswick to an award of punitive damages against each Defendant sufficient to punish, penalize and deter each Defendant from further like conduct.

119.

Within the meaning of O.C.G.A. § 13-6-11, Defendants have acted in bad faith, thereby entitling the City of Brunswick to recover its expenses of this litigation including reasonable attorney's fees, expert fees, and other litigation costs from Defendants.

## COUNT TWO

## CONTINUING NUISANCE

120.

Plaintiff restates and incorporates by reference, as if fully set forth herein, paragraphs 1 through 108.

121.

The continuing unpermitted presence and spread of Defendants' pollution at and about property of the City of Brunswick unreasonably and substantially interferes with the City's use and enjoyment of its property.

122.

Defendants' continuing failure and refusal to permanently remove their pollution from property of the City of Brunswick unreasonably and substantially interferes with the City's use and enjoyment of its property.

123.

The City of Brunswick is entitled to the full use and enjoyment of its property free from the Defendants' continuing nuisances.

124.

Defendants' continuing nuisances cause the City of Brunswick hurt, inconvenience and damage within the meaning of O.C.G.A. § 41-1-1.

-24-

125.

Defendants' failure and refusal to permanently abate their continuing nuisances and damage is continuance or maintenance of the nuisance.

126.

Defendants' nuisances are continuing and abatable.

127.

Defendants cause or are a contributing cause of the continuing abatable nuisances, about which the City of Brunswick here complains.

128.

The continuing nuisances are an actual and proximate cause of the City of Brunswick's damage and injury.

129.

The rental or use value of property of the City of Brunswick is reduced by Defendants' continuing abatable nuisances.

130.

The City of Brunswick is specially damaged by the loss of rental or use value of its property, by its annoyance, aggravation and inconvenience, by its loss of use and enjoyment, and by its lawsuit expenditures including attorney's fees and expenses, resulting from Defendants' maintenance of the nuisances.

131.

Defendants are liable to the City of Brunswick in dollar amounts to be determined by the enlightened conscience of the jury.

132.

Defendants' conduct set out above was reckless, showed willful misconduct, malice, wantonness, oppression, an entire want of care, and that conscious indifference to the consequences of their conduct to the City of Brunswick.

133.

Because Defendants' conduct set out above showed willful misconduct, malice, wantonness, oppression or that entire want of care which would raise the presumption of conscious indifference to consequences, O.C.G.A § 51-12-5.1 entitles the City of Brunswick to an award of punitive damages against each Defendant sufficient to punish, penalize and deter each Defendant from further like conduct.

134.

Within the meaning of O.C.G.A. § 13-6-11, Defendants have acted in bad faith, thereby entitling the City of Brunswick to recover its expenses of this litigation including reasonable attorney's fees, expert fees, and other litigation costs from Defendants.

WHEREFORE, Plaintiff respectfully prays that this Court:

[a]     Issue Service of Process and grant Plaintiff a trial by Jury;

[b]     Enter Judgment in favor of Plaintiff, against Defendants on all of Plaintiff's Claims;

[c]     Award punitive damages to Plaintiff against each Defendant, in an amount determined by the jury;

-26-

[d]    Enter Judgment against Defendants and in favor of Plaintiff, awarding Plaintiff its

reasonable O.C.G.A. § 13-6-11 attorney's fees, costs, and other expenses of litigation in amounts

determined by the jury;

[e]    Grant Plaintiff such other relief as this Court deems just and proper.

Respectfully submitted,


 s/ John C. Bell, Jr.
John C. Bell, Jr. – Ga. Bar # 048600
Pamela S. James – Ga. Bar # 389015
THE BELL FIRM
PO Box 1547
Augusta, GA 30903-1547
(706) 722-2014
john@bellfirm.net
pam@bellfirm.net


  s/ Brian Donald Corry
Brian Donald Corry – Ga. Bar #165557
McQUIGG SMITH & CORRY
504 Beachview Drive Suite 3D
Saint Simons Island, GA 31522
(912) 638-1174
brian@msclawga.com


  s/ Robert P. Killian
Robert P. Killian – Ga. Bar # 417575
KILLIAN LAW FIRM LLC
47 Professional Drive
Brunswick, GA   31520
(912) 263-9520
bob@killianlawfirm.com


-27-

*s/ Robert B. Jackson, IV*
Robert B. Jackson, IV - Ga. Bar # 387750
ROBERT B. JACKSON, IV, LLC
260 Peachtree Street - Suite 2200
Atlanta, Georgia  30303
(404) 313-2039
rbj4law@gmail.com

COUNSEL FOR PLAINTIFF